200566

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

A.F. MOORE & ASSOCIATES, INC., et al.,

        Plaintiffs,

    v.

MARIA PAPPAS, Cook County Treasurer and
Ex Officio County Collector, FRITZ KAEGI,
Cook County Assessor, and the COUNTY OF
COOK,

        Defendants.

No. 1:18-cv-04888

Judge John J. Tharp

Magistrate Judge M. Sheila Finnegan

**MOTION TO COMPEL REAL ESTATE ANALYSIS CORPORATION
SUBPOENA RESPONSES**

Defendants, MARIA PAPPAS, Cook County Treasurer and Ex-Officio County Collector ("Treasurer"), and the COUNTY OF COOK ("County"), by Special Assistant State's Attorneys Daniel J. Cozzi, Jonathan W. Powell, Micah J. Fishman and Mary J. Goers of SWANSON, MARTIN & BELL, LLP, respectfully move this Honorable Court to compel Michael Kelly, Bradley Braemer, Carlos Mendoza, Daniel Kelly, John Van Santen and Real Estate Analysis Corporation's outstanding document subpoena responses. In support thereof, the Treasurer and County state as follows:

**BACKGROUND**

These defendants have every right to investigate the validity of data provided to and used by plaintiffs' experts to create the sales ratio study underlying this lawsuit. The five plaintiffs have filed a single complaint consolidating 18 cases from state court, claiming over $38 million in damages for supposed errors in the Cook County Assessor's commercial and industrial tax assessment practices. (ECF 192-1.) They seek to collect that money from school districts, which shoulder the primary burden for paying settlements and verdicts in tax appeal cases. Plaintiffs' second amended complaint, like their prior pleadings, asserts a theory of recovery that relies on a

sales ratio study performed solely for this litigation by Dr. Daniel McMillen (ECF 192-1, pp. 9-11, 14, 19), a statistics professor with no other experience performing a study like this. Dr. McMillen completed his initial study in 2008, and he has since made several lengthy updates to his study, which changed his methodology and added more sales data and tax years. Dr. McMillen's study makes a number of far-reaching criticisms of the Cook County assessment scheme spanning more than 10 years and multiple assessors. The sales ratio study and updates total approximately 1,300 pages, consisting mainly of data and analysis concerning the values of certain properties in Cook County that were selected for the study. Dr. McMillen purports to use those values to form his opinions regarding the *de facto* levels of assessment for the commercial and industrial classes as a whole. The defendants contend that the plaintiffs and Dr. McMillen used self-serving, nonrepresentative and misleading fair market value data that was intentionally selected to drive down the final levels of assessment in his study, to in turn increase plaintiffs' alleged damages.

Plaintiffs' counsel also hired their longtime appraisal expert from other tax appeal cases, Michael Kelly of Real Estate Analysis Corporation ("REAC"), to "screen" the voluminous fair market value data that Dr. McMillen would use in his study. (*See, e.g.*, May 5, 2008 correspondence from M. Kelly, attached as *Exhibit A*; plaintiffs' second amended Rule 26(a)(1) disclosures, attached as *Exhibit B*, p. 30.) Strict sales screening is a key part of performing a valid sales ratio study. According to Dr. McMillen, Kelly's REAC data was "critical" to the entire sales ratio study. (*See* June 27, 2017 deposition of Dr. McMillen, attached as *Exhibit C*, pp. 116-17.) Kelly had never screened sales for a sales ratio study before his work on plaintiffs' ratio study. However, Kelly and other appraisers at REAC had previously given their professional opinions about the fair market value of several properties included in plaintiffs' sales ratio study when they

performed appraisals for plaintiffs' counsel and other plaintiffs' attorneys in unrelated tax appeal cases. The REAC fair market value for a given property was almost always higher in the sales ratio study than in the prior tax appeal case. For example, Kelly's appraisal of the Willis Tower in tax appeal litigation assigned a fair market value of $677,300,000, but then Kelly assigned a fair market value of $840,000,000 to the Willis Tower for plaintiffs' ratio study. (*See* September 16, 2015 deposition of M. Kelly, attached as *Exhibit D*, pp. 63-65.) The defendants believe that the plaintiffs and Kelly knowingly violated basic principles of sales screening to generate biased and inaccurate data in this case in an effort to drive down the alleged *de facto* assessment levels and thereby increase plaintiffs' alleged damages. The defendants intend to depose Kelly about the quality of his sales screening process in this case and they need REAC's relevant appraisals to do so.

On March 5, 2021, counsel for the Treasurer and County issued document subpoenas to REAC, Kelly and other appraisers at REAC ("REAC subpoenas"), seeking primarily information about the data Kelly chose to provide to Dr. McMillen to include in his study. (*See* service of REAC subpoenas, attached as *Exhibit E*.) The subpoenas were similar to a subpoena that Kelly and REAC were compelled to answer in the A.F. Moore state court litigation on March 19, 2015. It is no secret that these defendants intend to use the REAC subpoena response to highlight that Kelly's opinion of each property's fair market value was very different when he determined the value for the sales ratio study (where plaintiffs' counsel wanted him to use higher values), as compared to when REAC determined the fair market value of those same properties in tax appeal cases (where plaintiffs' counsel wanted him to use lower values).

To date, REAC and the individual appraisers have not produced any materials in response to these defendants' subpoenas. Rather, in a letter from plaintiffs' counsel on March 31, 2021,

3

Kelly, Bradley Braemer, Carlos Mendoza, Daniel Kelly and former REAC employee John Van Santen (collectively, "REAC subpoena recipients") simply indicated that Kelly assisted Dr. McMillen "in vetting some sales for use in his ratio study" and that the materials in Kelly's possession "was the subject of documentary discovery and a deposition of Mr. Kelly during the previous state court litigation." (*See* plaintiffs' March 31, 2021 correspondence regarding REAC subpoenas, attached as *Exhibit F*.) This disingenuous response ignored the fact that many of the materials sought in the subpoenas were created *after* REAC's subpoena response in early 2015, and Kelly's deposition on September 30, 2015, so they could not have been produced or testified about in the state court litigation.

The scope of the REAC subpoenas is proportional to the complexity (18 consolidated cases from state court) and alleged damages (over $38 million) of this litigation. Neither the plaintiffs nor the subpoena recipients have filed a motion to quash the subpoenas in more than two years. The REAC subpoena recipients also did not object to the subpoenas in a timely fashion pursuant to the Federal Rules of Civil Procedure. REAC is not being unfairly burdened with these subpoenas. While the plaintiffs continue to object to disclosing the full amount that REAC has been paid for its work in this case, it is likely greater than $180,000. (*See* REAC's invoices, attached as *Exhibit G*.)

On January 21, 2022, counsel for the Treasurer and County conferred with plaintiffs' counsel (who claims to represent all of the REAC subpoena recipients) about their failure to respond to the subpoenas before filing this motion pursuant to Rule 37.2, but those efforts were not successful. Plaintiffs' counsel later alluded in court to REAC having "some issues regarding the pandemic" with locating or producing materials requested in this case. (*See* November 28, 2022 hearing transcript, attached as *Exhibit H*, pp. 19-20.) The REAC materials subpoenaed by

these defendants were not contained in the recently recovered box of REAC materials that the plaintiffs produced on December 30, 2022.

There is no sensible basis for the plaintiffs or the REAC subpoena recipients to suppress discovery of critical information about the accuracy of the data selected for the sales ratio study that the plaintiffs have chosen to put at the center of this litigation. The REAC subpoenas deal primarily with level of assessment issues, which plaintiffs' counsel openly admits are an appropriate subject of discovery at this stage of the case. (*See*, *e.g.*, ECF 196, pp. 25–26.) The plaintiffs have even suggested that level of assessment discovery should be the *only* discovery allowed at this time, yet they are shutting down these defendants when the defendants engage in their own level of assessment discovery.

Plaintiffs' attempt to block the REAC subpoenas must be viewed in the context of their unmistakable litigation strategy for the past two years. First, the plaintiffs refused to serve proper Rule 26(a) disclosures. (ECF 132; ECF 140.) The Court subsequently determined that plaintiffs' Rule 26(a) disclosures were insufficient. (ECF 188.) The plaintiffs then objected to every single interrogatory and request for production issued by these defendants and the Assessor, even after admitting in a meet and confer with all counsel present that plaintiffs' counsel had not even *read* the discovery requests before objecting to them. (ECF 160.) The Court subsequently determined that plaintiffs' attempt to avoid answering written discovery in that manner was inappropriate. (ECF 188.) Next, the plaintiffs twice refused to identify a single Rule 30(b)(6) witness in response to these defendants' detailed deposition notices. (ECF 146; ECF 152; ECF 154; *see* plaintiffs' letters objecting to amended Rule 30(b)(6) notices, attached as *Exhibit I*.) The Court denied plaintiffs' motion for a protective order regarding the Rule 30(b)(6) deposition notices. (ECF 188.) The plaintiffs even objected to the model confidentiality order language proposed by the Northern

5

District of Illinois in an effort to further stall the production of third-party materials that the defendants had subpoenaed. (ECF 170; ECF 173.) Judge Kocoras rejected plaintiffs' arguments there as well and he entered the requested confidentiality order. (ECF 176.)

The plaintiffs later filed a motion for a protective order to bar discovery on the market values of the subject properties. (ECF 214.) That was denied. (ECF 259.) After the plaintiffs continued to object to all forms of written discovery, the defendants filed a motion to compel written discovery compliance, a motion to determine the sufficiency of responses to requests for admission and a motion to compel the plaintiffs to answer certain supplemental interrogatories. (ECF 214; ECF 230; ECF 240; ECF 245.) Your Honor overruled numerous objections by the plaintiffs and granted these defendants' motion to compel written discovery in part (ECF 259), ordered that the plaintiffs must answer virtually identical requests for admission (*Id*.) and granted the vast majority of defendants' motion to compel answers to supplemental interrogatories. (*Id*.) Despite all of these rulings, the plaintiffs have answered virtually none of defendants' written discovery requests to date. Instead, the plaintiffs continuously point to cherry-picked data on plaintiffs' counsel's website that is not responsive to defendants' discovery requests. Simply put, the plaintiffs continue to stonewall any attempt by the defendants to conduct discovery in this case.

In the same vein, the plaintiffs are obstructing the REAC subpoenas even though the subpoenas impose little or no burden on the plaintiffs themselves. Kelly, as the former president of REAC, was already ordered by Cook County Circuit Court Judge Alfred Paul (now retired) to respond to a similar subpoena from the Treasurer in the state court litigation on March 19, 2015. The plaintiffs vigorously objected to responding to that subpoena as well, but Judge Paul rejected all of their arguments seeking to block disclosure of the REAC data. The subpoenas in the present case mainly request updated information from what REAC and Kelly were previously ordered to

produce in the state court case because Dr. McMillen updated his study several times after REAC's 2015 subpoena response and he used additional REAC data.

At every step in this litigation, the plaintiffs have refused to disclose basic information requested by the defendants or even allow third parties to disclose any information about their sales ratio study or alleged $38 million in damages. The REAC subpoenas are an appropriate means to uncover essential information about the alleged *de facto* levels of assessment in plaintiffs' lawsuit, and the subpoenas should be enforced now to avoid further delay in this case.

## LAW

### I. Rule 45 Subpoena Power

Rule 45 provides a means for a party in litigation to obtain documents and electronically stored information from third parties by subpoena. A party issuing a subpoena to a third party under Rule 45 does not need to demonstrate good cause to obtain the requested documents. *Continental Coatings Corp. v. Metco, Inc.*, 50 F.R.D. 382, 384 (N.D. Ill. 1970). Rule 45 contains no numerical limit on the number of subpoenas a party may issue.

### II. Objections To Subpoenas

#### A. Deadline For Objections

Pursuant to Rule 45(d)(2)(B), any objection to a subpoena must "be served before the earlier of the time specified for compliance or 14 days after the subpoena is served." *Young v. City of Chicago*, 2017 WL 25170, at *6 (N.D. Ill. Jan. 2, 2017). The 14-day objection period applies to requests for production of documents and other tangible things. *National Paint & Coatings Ass'n v. City of Chicago*, 147 F.R.D. 184, 185 (N.D. Ill. 1993). "The serving party may then move to compel compliance with the subpoena." *Id.* (citing R. 45(d)(2)(B)(i)).

#### B. Assertion Of Privilege

When documents are being withheld pursuant to a claim of privilege, a responding party is required to notify the requesting party of the subpoena. *Hobley v. Burge*, 433 F.3d 946, 950 (7th Cir. 2006). An attorney asserting a privilege must "timely support that claim with a 'privilege log' which describes the nature of each document being withheld." *Id*. at 947-48. "An objection to a request for production of documents [for R. 34] must be stated 'with specificity', and like Rule 45, Rule 26 obliges a party responding to discovery to claim a privilege expressly and prepare a privilege log." *Id*. (citing *Mosely v. City of Chicago*, 252 F.R.D. 445, 452 (N.D. Ill. 2008)). "Together, Rules 45 and 26(b)(5) give a party or subpoenaed non-party responding to discovery a choice: prepare an adequate privilege log or risk an order compelling disclosure of allegedly privileged material." *Id*. (citing *Mosely*, 252 F.R.D. at 449, n. 5).

### C. Prohibition On Boilerplate Objections

"[J]ust as Rule 34(b)(1)'s reasonable particularity requirement should apply with no less force to a subpoena's document requests to a non-party, a non-party's Rule 45(d)(2)(B) objections to those requests should be subject to the same requirements facing a party objecting to discovery under Rule 34. That is, a non-party's Rule 45(d)(2)(B) objections to discovery requests in a subpoena are subject to the same prohibition on general or boiler-plate objections and requirements that the objections must be made with specificity and that the responding party must explain and support its objections." *American Federation of Musicians of the United States and Canada v. Skodam Films, LLC*, 313 F.R.D. 39 (N.D. Tex. 2015); *see also Heller v. City of Dallas*, 303 F.R.D. 466, 483 (N.D. Tex. 2014).

### ARGUMENT

**I. The Court Has Already Rejected Plaintiffs' Request To Limit These Defendants' Subpoena Power.**

Rule 45 sets forth no numerical limit on how many subpoenas a party may issue in an effort to obtain relevant information. In plaintiffs' omnibus motion for a protective order, the plaintiffs requested—without any legal authority or further explanation—that the defendants be collectively limited to two subpoenas per case. (ECF 146, p. 3.) In its ruling on September 30, 2021, the Court denied plaintiffs' motion and declined to limit defendants' subpoena power in any way. (ECF 188.) Therefore, the REAC subpoenas carry the full force of the law and must be enforced. These defendants' efforts to investigate the accuracy of the conclusions in plaintiffs' sales ratio study and their alleged damages should not be stalled by a never-ending series of objections.

## II. The REAC Subpoenas Seek Relevant Information That Is Needed By These Defendants And Their Consultants To Analyze The Merit Of Plaintiffs' Level of Assessment Claims.

The primary purpose of the REAC subpoenas is to evaluate the validity of the data the plaintiffs cite to support their far-reaching level of assessment and damages claims in this litigation. The plaintiffs have hired two experts with no experience performing a ratio study to put together a complex ratio study to show that the levels of assessment in multiple classes of property were much lower than the *de jure* levels. Plaintiffs' second amended complaint repeatedly references Dr. McMillen's study results, and bases plaintiffs' damages on the study results. (ECF 192-1, pp. 11-14.) The plaintiffs have only produced the information about Dr. McMillen's data that they chose to release, not the data that these defendants actually requested. The defendants and their consultants wish to examine the data "screened" by Kelly and used by Dr. McMillen because it appears to be biased and inaccurate.

The plaintiffs have asserted wide-ranging equal protection claims based on the data used in these studies. Much of the information sought in the REAC subpoenas is unrelated to the value of plaintiffs' individual properties. Rather, it is sought for the purpose of discovering REAC's

valuation of properties that Kelly supposedly "vetted" and chose to include in the sales ratio study to assess the propriety of using that data. In order to defend this case and investigate plaintiffs' bold claims about the *de facto* levels of assessment, the REAC subpoenas should be enforced.

## III. The REAC Subpoenas Seek Information To Evaluate The Credibility Of Plaintiffs' Sales Screening Expert.

When determining the fair market value of the properties in Dr. McMillen's sales ratio studies, Kelly used values that were significantly higher than what he and other REAC appraisers concluded were the actual fair market value of those same properties for tax appeal purposes. (*See, e.g.*, Ex. D, pp. 63-65.) When Kelly was deposed in the state court litigation on September 30, 2015, much of his testimony focused on other appraisals REAC had performed on properties included in Dr. McMillen's 2008 sales ratio study, the same type of information being requested in the present subpoenas. Since Dr. McMillen included new properties in his updates to the 2008 sales ratio study, these defendants should be allowed to subpoena and evaluate the appraisals that REAC had performed on the newly-included properties.

The production of REAC's data, in other words, is essential to evaluating not only Kelly's credibility, but also the credibility of Dr. McMillen's entire study. Dr. McMillen testified that the REAC data was "critical" to Dr. McMillen's study. (Ex. C, p. 117.) If Kelly's sales screening was inconsistent with his own company's analysis of the exact same properties for tax appeal purposes, that calls into question all of the results of Dr. McMillen's study.

## IV. The Subpoenas At Issue Are Very Similar To The Subpoena That REAC And Kelly Were Ordered To Answer In The State Court Litigation In 2015.

As the Treasurer did in the state court litigation, these defendants have issued subpoenas requesting appraisal data from Kelly and other REAC appraisers connected to this litigation. The subpoenas in this case request updated information from what REAC and Kelly were previously

10

ordered to produce in the state court litigation. Like in the state court litigation, the materials requested in the REAC subpoenas at issue relate to properties that plaintiffs' experts chose to put at issue in their sales ratio study.

Plaintiffs' efforts to block the REAC subpoenas is particularly frustrating because this exact issue was extensively litigated in the state court litigation. Judge Paul determined—after several briefs and hearings—that REAC and Kelly must answer a similar subpoena in a ruling on March 19, 2015. (*See* December 11, 2014 document subpoena to M. Kelly and REAC, attached as *Exhibit J*; plaintiffs' January 6, 2015 correspondence regarding REAC subpoena, attached as *Exhibit K*; plaintiffs' January 27, 2015 motion to quash (in part) subpoena to M. Kelly for various appraisals, attached as *Exhibit L*; Treasurer's January 28, 2015 motion to compel, attached as *Exhibit M*; plaintiffs' February 24, 2015 reply in support of motion to quash, attached as *Exhibit N*; Treasurer's March 12, 2015 motion to reconsider Court's rulings granting plaintiffs' motion to quash, attached as *Exhibit O*; March 19, 2015 order on motion to reconsider, attached as *Exhibit P*.)

Just like in this case, the plaintiffs argued in their motion to quash more than eight years ago that the subpoena to REAC was premature (Ex. L, p. 1), but that argument was rejected by Judge Paul. The plaintiffs also argued that the appraisals sought from Kelly and REAC were outside the scope of Kelly's involvement in this case (Ex. L, p. 3), but Judge Paul rejected that argument too. Since the time that Judge Paul ordered Kelly and REAC to respond to the Treasurer's document subpoena, Kelly has "vetted" sales of additional properties used in plaintiffs' multiple updates to the original 2008 sales ratio study. Plaintiffs' current claim that issuing similar subpoenas in this case is somehow premature or harassing makes little sense in light of Judge

Paul's ruling eight years ago, when he determined that a similar subpoena to REAC and Kelly was timely, relevant and appropriate.

**V.     The Objections Asserted By The REAC Subpoena Recipients Should Be Stricken.**

The objections asserted by the REAC subpoena recipients must also be disregarded because they are boilerplate objections similar to the boilerplate objections this Court has overruled in other motions in this case.  (*See*, *e.g.*, September 30, 2022 hearing transcript, attached as *Exhibit Q*.)  In their untimely letter of March 31, 2021, where plaintiffs' counsel objected to the subpoenas in their entirety, they asserted boilerplate and nonsensical objections:

> (1) The Subpoenas are part of a pattern of overly broad and abusive discovery, primarily serving purposes of harassment, increasing the costs and burdens of the litigation, and delay.  (2) Moreover, the subpoenas seek information that is duplicative of discovery done in the prior state litigation, is not relevant to any party's claims or defenses, violates attorney work-product privilege, and is completely disproportional to the needs of the case, all in violation of Federal Rule of Civil Procedure 26(b).  (3) In addition, expert opinions of value should be dealt with in accordance with the Court's schedule regarding expert discovery, not by way of third-party subpoena at this state of the case.  Consequently, any further response to the Subpoenas will await the court's ruling on the Motion.

(Ex. F.)

In his December 16, 2021 email, plaintiffs' counsel added the following:

> Mr. Kelly was disclosed as a person having knowledge related only to his assistance and/or technical support that he provided for purposes of [the] sales ratio study conducted by Daniel P. McMillen, Ph.D. . . . Any appraisal work that Mr. Kelly or his firm did with respect to any of the subject properties is subject to the pending motion for protective order and the court's order of 12/8/21 holding discovery as to market value issues in abeyance.

(*See* plaintiffs' December 16, 2021 email, attached as *Exhibit R*.)

Plaintiffs' boilerplate objections to producing the same type of information that was already ordered to be produced in the state court litigation is disingenuous and wrong. The plaintiffs do not actually believe that these defendants are requesting "duplicative" information

12

because much of the materials requested in the REAC subpoenas was either not requested in the state court litigation or was not even created before REAC's subpoena response in the state court litigation. While the plaintiffs claim that the REAC subpoenas are harassment, the judge managing the state court litigation determined that many of the same type of materials requested were relevant to level of assessment issues. Much of Kelly's deposition in the state court litigation related to the REAC subpoena response that the plaintiffs had fought so hard to block.

Plaintiffs' claim of increased costs from responding to this subpoena must be viewed in light of the over $38 million the plaintiffs are claiming in damages from the defendants, the extreme burden the plaintiffs have placed on the defendants over the past 18 years of this litigation and the $180,000 or more that the plaintiffs have paid to REAC for their work in this case alone. The "burden" on REAC must also be weighed against the high stakes of this litigation for the affected school districts. It is not premature expert discovery because REAC has been disclosed as plaintiffs' experts since at least 2009, and it is appropriate to subpoena REAC well in advance of Kelly's deposition testimony in this case to ensure that all of the requested materials have been fully produced and analyzed. Plaintiffs' motion for a protective order, which they referenced in their written objection, was subsequently denied (ECF 188), so it can no longer serve as a basis for the plaintiffs to disregard the REAC subpoenas.

Plaintiffs' claim that REAC's appraisals of the properties used to determine the levels of assessment in Dr. McMillen's study is somehow improper market value discovery was specifically rejected by Judge Paul when he held that this type of discovery constituted level of assessment discovery. Investigation of plaintiffs' level of assessment claims is plainly not affected by plaintiffs' fair market value motion in this case, which only applies to the "subject properties," as the plaintiffs specify in the title of their motion. (ECF 214.)

13

**VI.**     **The REAC Subpoena Recipients Have Waived Their Right To Object To The Subpoenas.**

Rule 45(d)(2)(B) requires that any objection to a subpoena must "be served before the earlier of the time specified for compliance or 14 days after the subpoena is served." Kelly and the other REAC subpoena respondents did not object within 14 days of being served with their respective subpoenas. Therefore, they waived their right to object to the subpoenas and their objections should be stricken.

**VII.**    **Plaintiffs' Continued Efforts To Block REAC From Responding To Subpoenas Show That The REAC Materials Requested Undermine Plaintiffs' Claims.**

The plaintiffs have insinuated that these defendants' subpoenas seek irrelevant information. (*See* ECF 146, p. 2.) But that begs the question—why have the plaintiffs spent so much time and effort trying to prevent the disclosure of irrelevant information? The answer is obvious: the information requested in the REAC subpoenas hurts plaintiffs' case. The plaintiffs know that a truthful subpoena response will show that Kelly and REAC opined that the fair market value for many properties included in plaintiffs' sales ratio study was significantly lower for tax appeal purposes than what they listed as the fair market value of those same properties in the sales ratio study. That inconsistent position is likely related to the deep financial ties between REAC and plaintiffs' counsel, both in this case and many other matters. That finding alone would put plaintiffs' entire study, as well as the credibility of plaintiffs' experts, in serious doubt. In a case where the plaintiffs have obtained unprecedented written and oral discovery from the Assessor with virtually no written discovery responses and no depositions provided by the plaintiffs, it is only fair that the defendants be permitted to evaluate the data used in plaintiffs' sales ratio study and the credibility of their main expert.

**CONCLUSION**

14

WHEREFORE, defendants MARIA PAPPAS, Treasurer and Ex-Officio Collector of Cook County, and the COUNTY OF COOK, request that this Honorable Court enter an order compelling Michael Kelly, Bradley Braemer, Carlos Mendoza, Daniel Kelly, John Van Santen and Real Estate Analysis Corporation to provide a complete response to their subpoenas in 14 days and for any additional relief this Courts deems fair and just.

Respectfully submitted,
SWANSON, MARTIN & BELL, LLP

By: _____
Daniel J. Cozzi

Daniel J. Cozzi (ARDC# 6303107)
Jonathan W. Powell (ARDC# 6330304)
Micah J. Fishman (ARDC# 6338965)
Mary J. Goers (ARDC# 6339026)
SWANSON, MARTIN & BELL, LLP
330 North Wabash, Suite 3300
Chicago, IL 60611
(312) 321-9100

15

**<u>NOTICE OF FILING AND CERTIFICATE OF SERVICE</u>**

I hereby certify that February 27, 2023, I electronically filed the foregoing with the Clerk of the United States District Court for the Northern District of Illinois by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ Daniel J. Cozzi

Daniel J. Cozzi
SWANSON MARTIN & BELL, LLP
330 N. Wabash, Suite 3300
Chicago, IL 60611
dcozzi@smbtrials.com
ARDC #0633107