**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **A.F. MOORE & ASSOCIATES, INC., et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 18 C 4888** |
| | ) | |
| **MARIA PAPPAS, Cook County Treasurer, FRITZ KAEGI, Cook County Assessor, and the COUNTY OF COOK** | ) | **Judge John J. Tharp, Jr.** |
| | ) | **Magistrate Judge Sheila Finnegan** |
| | ) | |
| **Defendants.** | ) | |

## ORDER

Plaintiffs are taxpayers who have sued Cook County and its Treasurer and Assessor ("Defendants") over the assessment and collection of taxes upon their commercial and industrial properties ("subject properties"). Defendants sought discovery regarding the fair market value of the subject properties. In opposition, Plaintiffs filed a motion for a protective order to bar all such discovery (Doc. 214). After reviewing the parties' memoranda (Docs. 214, 225, 235), the Court heard oral argument (Doc. 252, at 6-51). Later, this Court denied the motion for reasons summarized on the record (Doc. 265, at 4-6), but said a written order with more detailed analysis would follow, and now issues that order.

## BACKGROUND

### A.    Overview

Plaintiffs assert that the fair market value (FMV) of the subject properties is no longer relevant given their filing of a Second Amended Complaint (SAC) that dropped prior Count VI. That count had alleged that the estimates of FMV of the subject properties

used in calculating taxes (what Plaintiffs call the "official market values") were too high. As a result of the overvaluation, the assessed values were inflated and the properties were effectively taxed at a rate ("assessment level") exceeding the lawful rate. In the SAC, however, Plaintiffs "do not contest" these valuations and the correctness of the resulting assessed values, assessment levels, and taxes. They still seek tax refunds but only on their alternative theory: while the taxes on the subject properties were correct, the majority of similarly-situated properties were undervalued and so taxed at a lower and unlawful assessment level in contrast to the higher and legally-required level applied to their properties. Hence, Plaintiffs seek refunds based on an alleged denial of equal protection and uniformity.

In their motion, Plaintiffs argue that market value "discovery should be barred because, under the Second Amended Complaint and Defendants' answers and affirmative defenses, no contest or issue is raised concerning the official market values established by the Assessor and other County officials for the subject properties. Therefore, discovery related to some alternative to the official market values is irrelevant to any party's claim or defense and is wholly disproportionate to the needs of the case." (Doc. 214, at 1).

Defendants disagree, asserting that the FMV of the subject properties remains relevant to Plaintiffs' alleged damages and the merits of the equal protection claims since "each property's certified assessed value [is] at issue" and this "is comprised of two elements: the property's fair market value and the assessment level applied to the property's class." (Doc. 225, at 1). Defendants reason that these elements are "intertwined" and cannot be "untangle[d]" in the claims that remain. (*Id.* at 5). They also

2

observe that the sales ratio studies of Plaintiffs' experts "rely on fair market value data from hundreds of other properties to purportedly show … other taxpayers enjoyed a lower level of assessment." (*Id.*). Defendants conclude "[i]t is likely that the market value evidence … will establish that plaintiffs in fact enjoyed the same level of assessment applied to all other taxpayers in their class and were not treated less favorably, thus defeating plaintiffs' equal protection claim." (*Id.*).

During the September 30, 2022 hearing, the Court denied Plaintiffs' motion for a protective order barring all FMV discovery of the subject properties, stating:

> We are in the discovery stage of this case. The key issues are in my view novel, the stakes are quite high for both sides, and reasonable minds could differ -- and they do here -- on whether the market value of the plaintiffs' subject properties is relevant or not. My written opinion will explain why. Under these circumstances, I decline to impose a protective order barring all market value discovery. I cannot predict at this stage of the litigation that there is no need for the discovery because Judge Tharp will undoubtedly rule -- I can't say that he will undoubtedly rule in plaintiffs' favor and find that the evidence that defendants seek to offer and argue from -- evidence that they believe to be critical to their ability to defend the case and attack the claimed damages -- is irrelevant and inadmissible. So unless Judge Tharp decides to make an early determination on the admissibility or inadmissibility of market value evidence, you know, unless he declares such evidence to be inadmissible, that market value discovery will need to proceed.
>
> I know from past hearings that given the volume of the market value evidence and how much time it will consume for all parties that the plaintiffs intend to ask Judge Tharp to take up this relevancy issue now rather than later. So at the end of this hearing, we'll talk about a timetable for the filing of any objections to my order after you receive it, that is, the written order with more detailed findings. I am going to allow plaintiffs to defer at least for the time being responding to the market value discovery.
>
> And I also want to say before turning to other discovery motions before me that my ruling on Motion 214 on the plaintiffs' protective order is only denying plaintiffs the ability to foreclose across the board all market value discovery based on the claim that it's irrelevant. It's not a ruling on any specific market value discovery request that may have been asserted to which plaintiffs may have made objections[.]

3

(Doc. 265, at 4-5). In the docket entry, a schedule was set for the filing and briefing of objections to the denial of the motion following the issuance of the more detailed written order. (Doc. 259). FMV discovery has been deferred since that time.

### B. Procedural History

After certain tax assessments on the subject properties were unsuccessfully appealed to the Assessor, Plaintiffs filed appeals with the Board of Review (the "BOR") for all assessments, arguing that the market values used by the Assessor were too high.[1] Since the challenges covered multiple years for most of the properties, a total of 23 assessments were at issue. In more than half of these, the BOR decided to change the assessment downward but only slightly. (Doc. 252, at 14-15). Plaintiffs then paid the required taxes but exercised their rights to further challenge them and seek refunds by filing tax objection complaints in the Circuit Court of Cook County in 2009.

In 2018, Plaintiffs filed this action, arguing that Illinois' procedural rules for challenging property taxes prevented them from proving their federal constitutional claims in state court. On April 30, 2019, Judge Kocoras granted Defendants' motion to dismiss for lack of subject matter jurisdiction on the grounds that Plaintiffs' claims were barred by the Tax Injunction Act, 28 U.S.C. § 1341, and for other reasons. (Doc. 59). Plaintiffs successfully appealed to the Seventh Circuit which ruled that the Tax Injunction Act and comity doctrine did not bar federal jurisdiction over Plaintiffs' equal protection and due process challenges to Illinois' system for seeking real estate tax refunds. Defendants' petitions for rehearing and petition for a writ of certiorari to the Supreme Court were

---

[1]     *See e.g.*, Doc. 225-7 which includes the BOR's decision on Prime Group Realty's 2006 appeal along with the appraisal and other evidence and briefs submitted by Prime Group in support of the appeal.

denied. *A.F. Moore & Assocs., Inc. v. Pappas*, 948 F.3d 889 (7th Cir.), *cert. denied sub nom. Kaegi v. A.F. Moore & Assoc., Inc.,* 141 S. Ct. 865 (2020), and *cert. denied Pappas v. A.F. Moore & Assocs., Inc.*, 141 S. Ct. 866 (2020).

On October 1, 2020, the litigation resumed before Judge Kocoras. (Doc. 105). On February 12, 2021, the case was referred to this Court to supervise discovery and rule on discovery motions (one then pending and others that followed) (Doc. 137). On September 27, 2021, the case was reassigned from Judge Kocoras to Judge Tharp. (Doc. 187).

## C.    Subject Properties and Current Claims

The chart below summarizes the plaintiffs, their properties, the tax assessment years at issue, and the claimed amount of tax refunds owed as reflected in the SAC. (Doc. 192-1 ¶¶ 42-47).[2]

| Plaintiff | Property | Tax Years | Refund Sought |
|---|---|---|---|
| A.F. Moore & Assoc. Inc. | 8908 S. Harlem Ave. Bridgeview, IL (Industrial) | 2008 | $803,639 |
| J. Emil Anderson & Son, Inc. | 7510-40 N. Caldwell Ave., Niles, IL (Industrial) | 2007 - 2008 | $712,175 |
| Prime Group Realty Trust (**no longer a plaintiff**) | 1701 Golf Road, Rolling Meadows, IL (Multi-tenant office bldg.) | 2004 - 2009 | $11,210,498 |
| American Academy of Orthopaedic Surgeons (**no longer a plaintiff**) | 6300 N. River Road, Rosemont, IL | 2007-2008 | $419,467 |

---

[2]    The SAC was never separately filed but is in the record as an exhibit to the motion seeking leave to file it. Future references to the SAC are denoted as "SAC ¶ __." As noted in the chart, two of the Plaintiffs are no longer in the case as their motions for voluntary dismissal were granted on February 22, 2023 (Doc. 297). Defendants did not object based on the representation that these plaintiffs would also dismiss with prejudice their related state court cases, currently stayed pending the outcome of this litigation. (Doc. 296). As for the remaining plaintiffs, the Fox Valley and Simon Property Group plaintiffs are affiliated, and are represented by counsel from Dentons US LLP. All other plaintiffs are represented by counsel from O'Keefe Lyons & Hynes LLC.

| | (surgical training facility & office bldg) | | |
|---|---|---|---|
| | | | |
| Erling Eide | 1001 Skokie Blvd., Northbrook, IL (Retail store) | 2004-2008 | $1,032,588. |
| | | | |
| Fox Valley/River Oaks Partnership and Simon Property Group (Delaware), Inc | River Oaks Mall - 159th St. & Torrence Ave., Calumet City, IL (Regional shopping center) | 2005-2014 | $21,286,000 |

Plaintiffs sue for declaratory and injunctive relief regarding the assessment and collection of taxes upon their properties. Specifically, Count I alleges that the tax assessments of each of the subject properties in each of the specified years violates the right to equal protection of the laws under the Fourteenth Amendment "in that the majority of other similarly-situated property was assessed systematically and intentionally at a level of assessment significantly lower and more favorable than the level of assessment required by law and applied to the plaintiff's subject property." (SAC ¶ 73). As the Seventh Circuit described the allegations, "the Assessor violated the Equal Protection Clause by valuing their properties correctly under the Cook County ordinance but cutting everyone else a break with a lower de facto rate." *A.F. Moore & Assocs.*, 948 F.3d at 895. Plaintiffs seek a declaratory judgment that the assessments resulted in the collection of unconstitutionally excessive taxes in the specified amounts entitling them to refunds, an injunction requiring the Collector to refund these taxes with interest, and attorney's fees and costs. (SAC ¶ 76).

For similar reasons, Plaintiffs also allege that the assessments violated their rights to equal protection and uniformity under the Illinois Constitution (Count IV). (*Id.* ¶ 93). They further allege Due Process violations under the Constitutions of the United States

(Count II) and Illinois (Count III) based in part on the "Methodology Prohibition" which "may be construed to bar all discovery and evidence of methodologies, practices and procedures used by the Assessor in assessing the plaintiffs' properties and similarly-situated properties." (*Id.* ¶¶ 80, 87). Finally, Plaintiffs allege in Count V a violation of the Illinois Constitution prohibiting assessment of property in any class at a level of more than two and one-half times the lowest level of assessment of property in any other class. (*Id.* ¶ 97).

### D. Assessment Process & Terminology

In considering the parties' arguments, an understanding of the assessment process and terminology is helpful, particularly the relationship between a property's (1) market value, (2) assessed value, and (3) assessment level.

### 1. Summary

In a nutshell, the assessed value of a property is determined by multiplying the property's estimated FMV by the assessment level which is set by law based on the category of property (e.g., residential, industrial, commercial). (*See* Doc. 214, at 10) ("[S]tate and local law requires the Assessor and Board of Review to first determine a property's market value, which they then must convert to an assessed value based strictly on the percentages or assessment levels stated in the Classification Ordinance."). For example, if a house has an estimated FMV of $1,000,000 and the assessment level under the law is 16%, then the assessed value of the house for calculating taxes would be $160,000.[3]

---

[3] The assessed value is then multiplied by the "State Equalization Factor" and by the "Local Tax Rate" to reach the amount of taxes owed. (Doc. 186, at 3). In this case, the State Equalization Factor and Local Tax Rate are not in dispute. (*Id.* at 3 n.2).

The assessed value is disclosed to the property owner and appears in a property tax bill. If there is an appeal to the BOR, the assessed value may be lowered as occurred here in approximately 12 of the 23 assessments at issue for the subject properties. As for the legally-required assessment level, it appears in the applicable ordinance described later. The third component, estimated FMV, is determined by the Assessor (or BOR upon appeal) based on information about the property known at the time. This FMV estimate is not typically disclosed or included in a property tax bill.[4] But if the assessed value and the assessment level are known, then one can derive the estimated FMV by dividing the assessed value by the assessment level. Indeed, given the interrelationship of the three components (estimated FMV, assessed value, assessment level), an unknown value for any one of these components may be derived through an equation using the known values for any two of the other components, as shown below:

| Unknown Value | Equation Using Known Values |
| --- | --- |
| ASSESSED VALUE | Estimated FMV x Assessment Level |
| ASSESSMENT LEVEL | Assessed Value ÷ Estimated FMV |
| ESTIMATED FMV | Assessed Value ÷ Assessment Level |

### 2. De Jure and De Facto Assessment Levels

The Illinois Constitution provides that real property may be sorted into categorical classifications for taxation purposes. These classifications must be reasonable, and

---

[4] According to the SAC, the market value estimates were not disclosed prior to at least 2009 (¶ 27), though for Class 2 residential property, the tax bills expressly stated the estimated market value (labeled "property value") and the statutory level of assessment on which the assessed value was purportedly based at all relevant times. (SAC ¶ 18). A bill for a residential property was provided by Plaintiffs as a sample. (Doc. 182-2, at 4564-65).

assessments must be uniform within each class.  Ill. Const. 1970, Art. IX, § 4(b).  Cook County enacted a Real Property Assessment Classification Ordinance ("the Ordinance").  Code of Ordinances of Cook County § 74-60 *et seq.*  Prior to its amendment effective January 1, 2009, at all times relevant to this lawsuit, the Ordinance provided that "The Assessor shall assess . . . real estate in the various classes at the following percentages of market values":

> Class 2 [single family residential]: 16 percent
> Class 4 [not-for-profit]: 30 percent
> Class 5a [commercial]: 38 percent.
> Class 5b [industrial]: 36 percent

Code of Ord. § 74-64; (SAC ¶ 12).  "Market value" is defined in the Ordinance as "that value, estimated at the price [the property] would bring at a fair voluntary sale."  Code of Ord. § 74-62(b).

Because these assessment levels are mandated by law, they are referred to as "de jure" or statutory assessment levels.  To the extent a property was assessed at a level higher (or lower) than the de jure level required by the Ordinance, the level is referred to as a "de facto" assessment level.  De facto assessment levels can result when the estimated FMV used to determine the assessed value is lower (or higher) than the actual FMV.  Consider, for example, a Cook County residential property determined in 2007 to have an assessed value of $160,000.  If one assumes the property was taxed at the de jure assessment level of 16%, then the Assessor/BOR presumably estimated the property's FMV to be $1,000,000.  This is determined by dividing the assessed value by the assessment level ($160,000 ÷.16).

But if the property was undervalued at the time of assessment (e.g., appraisal and other evidence establishes that the actual FMV was $2,000,000 yet an estimate of

$1,000,000 was used), then the property arguably was taxed at a de facto assessment level of only 8% rather than the required de jure level of 16%. This 8% assessment level is derived by dividing the assessed value by the FMV ($160,000 ÷ $2,000,000). Conversely, if the property was overvalued at the time of assessment (e.g., the actual FMV was only $500,000), then the de facto assessment level would be 32% ($160,000 ÷ $500,000), so higher than the statutory or de jure level of 16%.

In this case, Plaintiffs no longer will offer appraisal evidence to support a claim that the subject properties were overvalued at the time of assessment, resulting in a de facto assessment level that was *higher* than the de jure level. Instead, the SAC does not contest that the legally-required de jure level was applied to accurate estimates of FMV, and so the assessed values and resulting taxes were correct. Plaintiffs nonetheless seek refunds due to the alleged more favorable treatment given to other taxpayers whose comparable properties were taxed at a de facto level lower than the de jure level applied to the subject properties. Defendants seek to discover and offer evidence that the subject properties were undervalued at the time of assessment, so they can argue that Defendants were not treated more favorably and are not entitled to the claimed refunds.

### 3. Certification of Assessed Value

Each year, the assessed value of all properties must be certified pursuant to 35 ILCS 200/16-150 (entitled "Certification of Assessment Books"). Under this certification provision, the BOR "shall [by specified time] complete its work, and order the county assessor to make those entries in the assessment books and lists as may be required to make the assessments conform with the changes directed to be made therein by the [BOR]." *Id.* The provision also requires the county assessor and a majority of the BOR

members to attach and sign an affidavit to the assessment book, stating "in substantially the following form":

> We, and each of us, as county assessor and as members of the (board of appeals or board of review) … do **solemnly swear** that the books ... contain a full and complete list of all the property in this county subject to taxation for the year (insert year) so far as we have been able to ascertain them, and **that the assessed value** set down in the proper column opposite the several kinds and descriptions of property, **is, in our opinion, a just and equal assessment of the property for the purposes of taxation according to law** ….

*Id.* (bolding added).

After assessed values as determined by the Assessor (or by the BOR after an appeal) are certified, taxpayers must pay the taxes determined to be owed.  If a taxpayer then appeals further by filing a Tax Objection complaint in a court, it is possible that the assessed value will be reduced by the Court but the "certified" value appearing in the assessment books is not changed to reflect this.  (Doc. 252, at 15, 23-24).

### 4.  "Official" Market Value

Plaintiffs frequently refer in the SAC (and in briefs and hearings since that filing) to the "official fair market value" or "official market value" of the subject properties.  This term is not in prior versions of their complaint nor is it a term appearing in the Ordinance or caselaw, so appears to have been coined by Plaintiffs.  In the SAC, Plaintiffs equate the term with the estimated FMV from which the certified assessed value was determined using the de jure assessment level.  (*See* SAC ¶ 39) ("Each certified assessed value was derived from *a fair market value estimate (the "official fair market value" or "official market value"*) to which the de jure assessment level was applied pursuant to 35 ILCS 200/9-150 and §§ 74-62 through 74-64 of the Classification Ordinance by the Assessor and a majority of the BOR of Review.") (emphasis added).

11

Plaintiffs note that the official market value may be derived by dividing the certified assessed value by the de jure assessment level. (*See* Doc. 214, at 11) ("The assessed values of Plaintiffs' properties are laid out in numerous public records, and these can be readily converted back to the official market values from which they were derived by simple arithmetic, i.e. dividing the assessed values by the applicable de jure classification percentages."). When questioned as to why they adopted the term "official" market value, Plaintiffs responded that the term is appropriate since the Assessor and BOR members had certified under oath that the assessed values were correctly derived "according to law" as noted above. (Doc. 252, at 62). (*See also* Doc. 214, at 11) ("These sworn certifications by the Assessor and Board of Review that Plaintiffs' assessments were made 'according to law' necessarily asserted that official market values had been converted to assessed values at the applicable de jure assessment levels, according to the state statutes and the County's Classification Ordinance.").

In their prior version of the complaint, despite the fact that the assessed values of the subject properties had been certified, Plaintiffs referred not to the "official" fair market value of those properties but to the Assessor's fair market value "estimate." (Doc. 124 ¶ 40). In that prior complaint, Plaintiffs alleged in the now omitted Count VI that "a correct estimate of the property's fair market value would have produced a significantly lower assessed value" and so argued that they had been taxed at a de facto level that was *higher* than the de jure rate.[5]

---

[5]     Count VI alleged (in part) that "The assessed value of each of the subject properties exceeded the legally-required percentage of each property's fair market value, even if that percentage is considered to be the level of assessment required by the Classification Ordinance, since a correct estimate of the property's fair market value would have produced a significantly lower assessed value. The assessment and resulting taxes are therefore incorrect and illegal under 35 ILCS 200/23-15."

(Doc. 124 ¶ 96) (italics added).

### E.    Request to Defer FMV Discovery

During discovery prior to the filing of the SAC, Plaintiffs acknowledged that FMV discovery was relevant but argued that it should be deferred until after the parties completed what they described as the more important "assessment level" discovery concerning the Assessor's practices and methodologies.  (Doc. 196, at 31-39; Doc. 146, at 11-13).  Defendants reportedly had issued 56 subpoenas to third parties (e.g., banks, real estate companies, law firms) seeking documents relating to the FMV of the subject properties at the time of assessment, and intended for their experts to opine on that issue. (Doc. 196, at 22, 33, 38).   In opposing any delay of the FMV discovery, Defendants claimed Plaintiffs had been trying to delay this discovery for the preceding 10 years, always saying it was potentially relevant but should be done later.  (Doc. 196, at 38).  For reasons stated on the record at that September 30, 2021 hearing, the Court declined to defer all FMV discovery as Plaintiffs had requested.  (*Id.* at 39).

### F.    Second Amended Complaint

A few weeks later, Plaintiffs filed a motion on October 18, 2021 for leave to file the SAC, stating in part:

> The original and amended complaints also had a Count VI which disputed the official fair market values of Plaintiffs' subject properties certified by the Assessor and other officials.1 While such market value discrepancies could also affect the calculation of the claimed tax refunds (analogous to damages), they played no part in the basic constitutional violation as alleged or as the Seventh Circuit understood and explained it. *** Therefore, Plaintiffs seek leave to file their [SAC], confining the federal constitutional issues to the violation discussed by the Seventh Circuit.

(Doc. 192, at 3) (citations in footnote 1 omitted).  Shortly after leave was granted and the SAC became the operative complaint (Doc. 201), Plaintiffs filed the motion now at issue

for a protective order barring discovery of the market values of the subject properties as irrelevant to any claim or defense in the case. (Doc. 214). Plaintiffs cautioned at a later hearing, however, that if FMV discovery were still allowed, they might replead Count VI. (Doc. 252, at 64).[6]

In the SAC, Plaintiffs allege they "do not contest the official market values upon which the certified assessed values were based for each property for the tax years in question, [but] do contest the certified assessed values as discriminatory under the U.S. Constitution and Illinois Constitution." (SAC ¶ 40). They allege, based on sales ratio studies summarized in the SAC, that at least in tax years 2000 through 2008, "most property (but not all)" in Classes 2, 5a and 5b "was undervalued, so that the average de facto levels of assessment were significantly lower than the legally required [de jure] levels." (*Id.* ¶ 19). And in "certain tax years after 2008, including tax years 2012-2014, most property (but not all) in all the major classes was also undervalued at average de facto levels significantly lower than the de jure levels, despite a reduction in the de jure levels effective in 2009 [when the Ordinance was enacted]." (*Id.*).

Plaintiffs will seek to prove that their properties were among the minority taxed at the de jure level during the years at issue rather than among the majority taxed at a lower de facto level. In other words, their claim is not that they paid too much in taxes due to an incorrect assessment but that similarly-situated taxpayers paid too little because their properties were undervalued. Comparison of the old and new allegations for one of the

---

[6] Plaintiffs observed that "deletion of the former Count VI and related allegations effectively reduced the refunds for five of the six subject properties by several million dollars." (Doc. 214, at 3 n.2). Actually, the collective refunds sought for those five properties declined by about $1,125,587. But the refund sought for the sixth property (River Oaks Mall) *increased* by more than this amount ($1,198,050) after Count VI was dropped. Hence, the total refunds sought in the SAC actually increased. (*Compare* Doc. 124 ¶¶ 39-44 with Doc. 192-1 ¶¶ 42-47).

properties is illustrative of key changes stemming from the dropping of Count VI, and shows the interplay between estimated FMV, assessed value, and the assessment level:

| PRIOR COMPLAINT (Doc. 124 ¶ 40) | SECOND AMENDED COMPLAINT (Doc. 192-1 ¶ 43) |
|---|---|
| a. The assessed value for 7510 North Caldwell was [$]3,261,983 for each of tax years 2007 and 2008. The Taxpayer paid total taxes on these assessments of $1,001,496.38. | a. Identical |
| b. *At the de jure assessment level*, the **assessed value** for 2007-2008 **was purportedly based on an Assessor's fair market value estimate** of $9,061,064 while, *at uniform de facto levels*, **the same assessment implied effective Assessor's market values** ranging from approximately $14,497,702 to $30,344,028. | b. *At the de jure assessment level*, the **certified assessed value** for 2007-2008 corresponded to an **official fair market value estimate** of $9,061,064. |
| c. An appraisal of 7510 North Caldwell estimated the property's fair market value to be $7,450,000. | No appraisal is referenced. |
| d. Based on the **appraised market value** and *the de facto assessment level*, the taxes paid on 7510 North Caldwell were discriminatory, excessive, and overpaid by approximately $763,617.[7] | c. Based on the **official market value** and the *de facto assessment level*, the taxes paid on 7510 North Caldwell were discriminatory, excessive, and overpaid by approximately $712,175. |

---

[7] Equations can be run to derive and understand the numbers alleged in the prior complaint column for this property. While the de jure assessment level is not identified, it presumably is 36% (assessed value of $3,261,983 ÷ estimated FMV of $9,061,064). Plaintiffs allege that if the property had been taxed not at the de jure level of 36% but at "uniform de facto levels" (presumably lower and more favorable levels that their expert will opine were applied to comparable properties), the estimated FMV of this property would have had to be much higher to lead to the same assessed value -- ranging from $14,497,702 to $30,344,028. Using the stated higher FMV figures, one can derive the uniform de facto levels using an equation: assessed value of $3,261,983 ÷ FMV of $14,497,702 leads to a de facto assessment level of 22.5%; and assessed value of $3,261,983 ÷ FMV of $30,344,028 results in a de facto assessment level of 10.75%. As the chart indicates, Plaintiffs alleged in the prior complaint that the property's actual FMV was only $7,450,000 based on an appraisal, so used this figure in determining the excessive taxes. In the SAC, they drop the allegation that the property was overvalued during the assessment, so use the official market value of $9,061,064 in calculating the excessive taxes.

## DISCUSSION

In opposing FMV discovery, Plaintiffs emphasize that they have "admitted in their Second Amended Complaint that, for all purposes in this case, the officially determined market values of the subject properties were 'correct,' and that the assessed values were certified from the official market values at the de jure levels in compliance with state and local law. Therefore, they say the "official market values and assessments at the de jure levels are *fixed reference points* for comparison to the de facto levels" that they intend to prove were applied to comparator properties. (Doc. 235, at 7; italics added). In their view, because the official market values are "not contested by any party," the "discovery related to some alternative to the official market values is irrelevant to any party's claim or defense and is wholly disproportionate to the needs of the case." (Doc. 214, at 1).

This Court first explores the significance of potential evidence that the subject properties were undervalued at the time of assessment, and then addresses arguments that Defendants are not permitted to contest the valuations and have not done so.

### A.    Relevance of FMV Evidence

Defendants say they seek discovery of the "true" FMV of the subject properties because "[i]t is likely that the market value evidence … will establish that plaintiffs in fact enjoyed the same level of assessment applied to all other taxpayers in their class and were not treated less favorably, thus defeating plaintiffs' equal protection claim." (Doc. 225, at 3). They further argue that "[s]ince plaintiffs allege there are two different levels of assessment at issue, it is disingenuous for plaintiffs to suggest the de jure level of assessment was applied to them, and then deprive defendants from seeking evidence to refute that claim." (*Id.* at 10).

16

### 1.    Undervaluation of Subject Properties

Evidence that the subject properties were undervalued at the time of assessment would appear to support an argument that they were not taxed at the de jure assessment level but rather a lower de facto assessment level.  This in turn could conceivably provide a defense to the equal protection and uniformity claims and the damages sought.  As noted, Plaintiffs assume in the SAC that the de jure assessment level was applied to their properties in determining the assessed values that were certified.  Plaintiffs then use these two known components to derive the estimated (official) FMV used in the assessment process: assessed value (reflected in the property tax bill) divided by the de jure assessment level (identified in the Ordinance) = estimated (official) FMV.

But as shown in hypotheticals discussed earlier (*supra*, at 9-10), if a property's estimated (official) FMV was incorrect, this would conceivably allow an argument that the property was effectively taxed at a de facto assessment level instead of the de jure level.  More specifically, if property was undervalued, the effective assessment level would be a de facto level that is *lower* than the de jure level.  Conversely, if the property was overvalued, the effective assessment level would be a de facto level that is *higher* than the de jure level (as Plaintiffs planned to argue before dropping Count VI).  This presumably is why Plaintiffs observed in an earlier filing in this litigation that "[a]t times, 'de facto assessment levels' can be 'woven into (or concealed in) valuation methodology…."  (Doc. 31, at 13 n.13).

To illustrate the impact of a property's market value on the assessment level, consider the allegations pertaining to the A.F. Moore industrial property in Berwyn, Illinois that had a certified Assessed Value of $5,039,975 in 2008. (SAC ¶ 42).  Plaintiffs allege

that "[a]t the de jure assessment level, the certified assessed value for 2008 corresponded to an official fair market value estimate of $14,058,635." (*Id.*). This latter number does not appear in the tax bills but it can be derived by dividing the certified assessed value ($5,039,975) by the de jure assessment level (36% so .36). This equates to a figure very close to the $14,058,635 alleged by Plaintiffs as the "official fair market estimate." (*Id.*).

If Defendants were to offer appraisals and other FMV evidence unknown at the time of assessment, and this showed the property's FMV was actually closer to $20 million dollars than $14 million dollars, then Plaintiffs' effective assessment level would be considerably lower than the de jure 36%. If the certified assessed value of $5,039,975 is divided by a FMV of $20,000,000, this leads to a de facto assessment level of approximately 25%. Again, such evidence would seemingly support Defendants' argument that Plaintiffs were not among the minority of properties taxed at the de jure level but rather among the majority of properties that they allege were taxed at a lower de facto level.

Evidence that the subject properties were undervalued would also appear relevant to the amount of any tax refunds claimed. Plaintiffs acknowledged this in a prior discovery motion, stating: "Individual property valuations may relate to the amount of damages, i.e., tax refund amounts given Equal Protection, Due Process, or state constitutional violations…." (Doc. 146, at 11). And in their motion seeking leave to file the SAC (after observing that they no longer were disputing the official market values of the subject properties), Plaintiffs remarked: "While such market value discrepancies could also affect

the calculation of the claimed tax refunds (analogous to damages), they played no part in the basic constitutional violation as alleged…." (Doc. 192, at 3).[8]

For these reasons, Defendants argue the FMV discovery is "essential to defending against Plaintiffs' equal protection claims" and demonstrating that they suffered no damages. (Doc. 225, at 7). They point, for example, to the "Continental Towers" subject property (1701 Golf Road in Rolling Meadows). In the complaint filed with the BOR to challenge the assessments, owner Prime Group Realty allegedly included a report from its retained appraiser indicating a FMV of $48.6 million as of January 1, 2004. Prime Group alleged to the BOR that "the appraisal remains the best evidence of the property's fair market value for the 2006 tax year." (Doc. 225-7, at 10-11). But through discovery from "unbiased third parties" obtained prior to the stay of FMV discovery, Defendants say they have evidence that the FMV was significantly higher.[9]

---

[8]    Plaintiffs also acknowledged the potential impact of FMV evidence on the amount of tax refunds during a hearing where the Court posed the following question:

> But if they were granted discovery, and they were able -- and it's admissible -- and that's to be determined by Judge Tharp -- and it were to show that the property value that the BOR and assessor certified after that appeal was too low and the fact finder were to conclude that it was, you know, higher, that would impact the amount of the refund that you would be claiming, would it not?

Plaintiffs' counsel responded: "It only would if they introduced a defense to that effect, and they have not done so." (Doc. 252, at 47).

[9]    These appraisals included: (1) a 2006 appraisal finding fair market value at $142 million (Doc. 225-1); (2) a 2005 appraisal finding fair market value at $121 million (Doc. 225-2); (3) a 2005 appraisal finding fair market value at $107.7 million; and (4) a 2006 prospectus indicating an appraised value of $147 million (Doc. 225-3). Plaintiffs note that there is also a third-party appraisal for the property that is "25% to 40% *lower* than the various official market values for the same property." (Doc. 235, at 3 n.3) (emphasis in original). Recently, Prime Group's motion for voluntarily dismissal was granted (Doc. 297), so any debate over the FMV of Continental Towers presumably is moot.

## 2. Sales Ratio Studies

For the comparator properties, Plaintiffs do not assume that the estimated (official) FMVs -- derived by dividing assessed values by de jure assessment levels -- are accurate, as they do with the subject properties. Instead, Plaintiffs rely on sales ratio studies done by their expert over many years (together with other evidence) to establish that the majority of similarly-situated properties were undervalued during the assessment, so the properties were effectively taxed at de facto assessment levels significantly lower than the de jure levels. In support of their equal protection and uniformity claims, they contrast those lower de facto levels with the higher de jure level that they "do not contest" was applied to the subject properties.[10]

In the SAC, Plaintiffs describe the results of the sales ratio studies of their expert, as well as sales ratio studies done by the Illinois Department of Revenue (IDOR). (SAC ¶¶ 19-26). According to IDOR, "[a] sales ratio study compares a property's assessed

---

[10]     Plaintiffs' counsel explained this during the March 22, 2022 hearing as follows:

        MR. DAVIS: Well, no, we know what the de jure -- what the market value was, which was then converted into the assessed value at the de jure level, and that is what we have conceded is correct for purposes of the case for the subject properties. And -- because then you know that the subject properties' assessed values were derived at the de jure level, then you can compare the majority of other properties through the ratio study, either IDOR's or McMillen's or both.
        THE COURT: And how do we know the [subject] properties were assessed at the de jure level?
        MR. DAVIS: Well, because they swore they did it because it --
        THE COURT: Well, they do that for -- you know, don't they always do that? Do they sometimes swear to a different --
        MR. DAVIS: No.
        THE COURT: -- de facto level?
        MR. DAVIS: No, they swear only to the de jure level.
        MS. KETCHAM: No.
        MR. DAVIS: And we're -- we have conceded that they are correct in some instances, including those regarding the subject properties. And, in fact, we believe the evidence will show they were correct in hundreds of cases where they actually did assess at a reasonably correct market value and converted that to an assessed value at the de jure level….

(Doc. 252, at 27-34).

value as of January 1 in one year to its selling price in the following year[,]" and the "sales ratio" is the prior year's assessed value divided by the current year's sales price.[11] Plaintiffs' counsel explained that sales ratio studies examine thousands of sales to determine a reliable average of the relationship between the Assessor's estimates of value and the market-indicated values based on those thousands of sales. (Doc. 252, at 12, 22). Their expert's study allegedly "established the average ratios of assessments-to-sales prices across thousands of properties without drawing any conclusion about any specific, individual property." (Doc. 235, at 12).

In the lengthy SAC, Plaintiffs discuss the ratio sales and other evidence supporting their assessment-level claims in detail. The Seventh Circuit summarized the allegations this way:

> Before 2008, a County ordinance required the County Assessor to assess single-family residential property at 16% of the market value, commercial property at 38% of the market value, and industrial property at 36% of the market value. But between 2000 and 2008, the Assessor in fact assessed most of the property in those three categories at rates significantly lower than the rates prescribed by law. Cook County officials were candid about the discrepancy between the de jure rates and the de facto rates. In April 2008, the Assessor proposed an ordinance that would "recalibrate" the classification system to "more closely reflect the current relationship between assessment and market value." And one of the ordinance's primary sponsors on the Cook County Board of Commissioners advocated for the recalibration in clear terms: "We have known for years, forever, and pretended that it is not true [and] that somehow the assessments were at the statutory levels; they are not. This reflects the actual reality as best we know it."

---

[11] (*See* IDOR Publication 136 "Property Assessment and Equalization" April 2016, at 7, available at https://tax.illinois.gov/content/dam/soi/en/web/tax/research/publications/pubs/documents/pub-136.pdf (last visited 3/28/2023)). IDOR's stated purpose in conducting these sales ratio studies is to show whether assessments in a given area "actually average 33 1/3rd percent of the market value." (*Id.*). If not, then "a blanket percentage change (increase or decrease), called an 'equalization factor' or 'multiplier,' is applied to all non-farm property to bring the level of assessments to 33 1/3 precent." (*Id.*). These assessments are also said to be a "useful tool for local assessing officials in their efforts to achieve assessment uniformity." (*Id.*). The Court informed the parties that it had consulted this IDOR publication. (Doc. 252, at 5).

Although most property was assessed at the lower de facto rates, a minority was assessed at the de jure rates or even higher. A.F. Moore & Associates and the other plaintiffs in this case count their properties in that minority.

*A.F. Moore & Assocs.*, 948 F.3d at 891.

Defendants assert that "[i]n over 15 years of litigation, plaintiffs have failed to explain how or why that would be true" – that their properties were assessed at the de jure rates while most property was assessed at lower de facto rates. They reason that "[t]he best way to test plaintiffs' unsubstantiated theory on this contested issue is to discover the true (as opposed to 'official') market value of plaintiffs' properties and then see what level of assessment was used to arrive at each certified assessed value." (Doc. 225, at 3).

Defendants further observe that Plaintiffs' equal protection theory is "based on their experts' sale ratio studies, which rely on sales data (i.e., fair market value data) from hundreds of other properties in Cook County to show that the purported de facto level of assessment was applied to entire classes of property, while their properties were assessed at higher de jure levels." (*Id.* at 9). They thus question why "fair market value data of other properties is relevant for purposes of plaintiffs' experts, [but] the fair market value of plaintiffs' own properties is not even discoverable." (*Id.*) (citing *Peacock v. Ill. Prop. Tax App. Bd.*, 339 Ill. App. 3d 1060, 1069, 792 N.E.2d 367, 374-75 (4th Dist. 2003) (for ratio study to be relevant for purposes of equal protection and uniformity, "the properties selected for comparison must be similar in kind and character and must be similarly-situated to the subject property.").

As for Plaintiffs' alleged violations of the uniformity clause of the Illinois constitution, Defendants note that here too the fair market value of property is key; the

uniformity clause "requires equality in the burden of taxation" that "in turn, requires equality of taxation in proportion to the value of the property taxed." *Walsh v. Prop. Tax App. Bd.*, 181 Ill.2d 228, 234, 692 N.E.2d 260, 262 (1998). Hence, "whether the uniformity clause was violated depends on whether 'the same kinds of properties within the same taxing boundary' were valued 'at different proportions of their true value.'" (Doc. 225, at 7-8). For these reasons, Defendants say their experts intend to rely on fair market value data for all the properties – the comparator properties and the subject properties. (Doc. 270, at 29).

Given the interrelationship of a property's FMV, assessed value, and assessment level, the Court is persuaded that evidence showing the subject properties were undervalued at the time of assessment would be relevant in determining the effective assessment level. This in turn would appear relevant to the defense that Plaintiffs were not treated less favorably than the majority of other taxpayers by being subjected to a higher, de jure assessment level. Also, Plaintiffs have themselves stated that FMV evidence is relevant to the amount of the tax refunds (damages) to which they are entitled if they prevail. *See supra*, at 18-19.

In sum, while Plaintiffs no longer wish to offer evidence showing their properties were overvalued during the assessment (leading to an effective de facto assessment level *higher* than the de jure level) and so "do not contest" those valuations in the SAC, this does not negate the relevancy of evidence of the properties' undervaluation that Defendants wish to offer.

**B.     Are Defendants Permitted to Contest Estimated (Official) Market Value & De Jure Assessment Level**

This leads to the crux of Plaintiffs' argument in support of the motion.  Even if evidence obtained through discovery proved the subject properties were significantly undervalued at the time of assessment, in Plaintiffs' view the evidence would be inadmissible.  They assert Defendants have not contested the estimated (official) FMV of the subject properties, and are foreclosed from doing so under the law.  Therefore, all discovery seeking evidence that actual FMV was higher than the estimated (official) FMV used during the assessment is irrelevant to any party's claim or defense and disproportionate.  Plaintiffs' specific arguments in this regard are now examined in turn.

**1.     Answers and Affirmative Defenses**

Plaintiffs assert that Defendants may not offer FMV evidence showing the properties were undervalued during the assessment process because their "answers and affirmative defenses … do not attack the correctness of the subject properties' official market values, and they admit that these are undisputed."  (Doc. 235, at 3).  Based on review of the answers, the Court disagrees as it does not appear that Plaintiffs alleged (and Defendants admitted) that the "official market values" of the subject properties were "correct" or "undisputed."[12]

---

[12]     In the answer to paragraph 39 of the SAC, for example, the Assessor admitted that certified assessed value is derived from a FMV estimate to which the de jure assessment level is applied – not that the FMV estimates for the subject properties were correct or are undisputed.  (Doc. 209 ¶ 39).  In response to paragraph 41 ("Because each plaintiff's property was assessed significantly above the de facto assessment levels systematically applied to the majority of more favored properties, and above the maximum level permitted by the Illinois Constitution and laws, the taxes paid on each plaintiff's property were discriminatory and excessive as summarized below"), the Assessor answered that he "lacks sufficient knowledge whether Plaintiffs' properties were assessed significantly above the de facto assessment levels systematically applied to the majority of more favored properties, and above the maximum level permitted by the Illinois Constitution and laws, leaving Plaintiffs to their burden of proof. The Assessor denies that taxes paid on Plaintiffs' properties were discriminatory and excessive."  (*Id.* ¶ 41).

Nor is the Court persuaded that Defendants are prevented from offering evidence that the subject properties were undervalued at the time of assessment because this was not pled as an affirmative defense. (Doc. 235, at 3) ("If Defendants wanted to argue that the Assessor and BOR applied de facto levels to some alternate, higher market value estimates to calculate the certified assessed values for the subject properties, then Federal Rule of Civil Procedure 8(c)(1) required them to plead the same in an affirmative defense."). Rule 8(c)(1) has a long list of specific affirmative defenses that must be pled, and Plaintiffs do not identify which one they believe applies here (none appears analogous), or cite any case authority for their position.[13] Finally, Defendants observed during oral argument that they are permitted to contest damages (the claimed tax refunds) without pleading this as an affirmative defense (Doc. 252, at 50), and they have denied that Plaintiffs are entitled to tax refunds. (Doc. 208, ¶ 4).

## 2. Certification of Assessed Value & Legal Presumption

Plaintiffs next assert that Defendants are not permitted to contest the correctness of the estimated (official) FMV of the subject properties since the assessed values were certified, and tax assessments are presumed to be correct. They reason that "[t]hese sworn certifications by the Assessor and Board of Review that Plaintiffs' assessments were made 'according to law' necessarily asserted that official market values had been converted to assessed values at the applicable de jure assessment levels, according to the state statutes and the County's Classification Ordinance." (Doc. 214, at 11). Based on this, Plaintiffs conclude: "There is no legal basis for any of the Defendants to repudiate

---

[13]    Parties may seek to amend pleadings based on information learned in discovery, and Rule 15(a)(2) states that courts should "freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago and N.W. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015).

the Assessor's and [BOR's] certification of the assessments of Plaintiffs' subject properties, as this is the basis of a process in which they are all integral participants[.]" (*Id.* at 12).

To be clear, what the Assessor and BOR swear to each year (in a document listing all assessed properties in the county) is that the "assessed value" of each is "in our opinion, a just and equal assessment of the property for the purposes of taxation according to law." On its face, this is an opinion expressed on a specific date based on information known at that time rather than on unknown FMV information acquired later through litigation. Plaintiffs have not identified any case holding that the certification of assessed value bars taxing authorities relying on previously-unknown FMV information to defend a taxpayer-filed lawsuit for tax refunds. Absent a case directly on point, this Court declines to read the certification language as broadly as Plaintiffs suggest.

In a similar vein, Plaintiffs argue in footnote 8 of their motion that the estimated (official) FMV may not be challenged by Defendants because "[t]he correctness of the derivation of Plaintiffs' assessments from official market values in compliance with state and local law is supported by a legal presumption set forth in the tax objection statute in addition to the sworn certification by the Cook County officials." (Doc. 214, at 13 n.8) (citing 35 ILCS 200/23-15(b)(2)) ("[t]he taxes, assessments and levies that are the subject of the objection shall be presumed correct and legal."). Legal presumptions, however, are subject to rebuttal based on evidence. In fact, the statute that Plaintiffs rely on says exactly that in the final five but omitted words of the sentence quoted above. The complete sentence states: "The taxes, assessments, and levies that are the subject of

the objection shall be presumed correct and legal, *but the presumption is rebuttable*." 35 ILCS 200/23-15(b)(2) (emphasis added).

Plaintiffs' position on this point also appears to be internally inconsistent. On the one hand, they argue based on the presumption and certification language that taxing authorities are stuck with the estimated (official) market value once a property's assessed value has been certified. But at the same time, they argue that the reason Defendants should not get FMV discovery here is that this is not a "routine" or "typical" tax appeal where FMV is in dispute. (*See* Doc. 235, at 4) ("Unlike a typical state court tax appeal, fair market value is no longer in dispute here and, in any event, what may be discoverable (and relevant) in a routine Illinois tax appeal case has no bearing on what is discoverable in this equal protection case."). Yet even in routine state court tax cases, the assessed values of properties have been certified and the legal presumption applies.[14]

### 3. Plaintiffs' Acceptance of Estimated (Official) FMV

Plaintiffs differentiate this case from routine tax appeals where FMV is in dispute and discoverable because they -- as the "masters of their complaint" – chose in the SAC to "explicitly accept[] the official market values of the subject properties as uncontested and correct according to state and local law. (Doc. 235, at 4-5) (citing SAC ¶¶ 38-40). But this begs the question of whether (and why) this necessarily means Defendants are unable to contest these values by offering evidence unknown at the time of assessment

---

[14]    The parties disagree about whether discovery of alternative market values always occurs in tax appeals in the Circuit Court of Cook County regardless of the type of tax objection claim asserted. (*Compare* Doc. 225, at 15 with Doc. 235, at 13-14, n.15). The parties seem to agree, however, that in the Cook County lawsuit filed by Plaintiffs (now stayed), the judge bifurcated discovery so FMV discovery was to occur but only after assessment-level discovery. (Doc. 146, at 11-12; Doc. 146-7) ("On June 27, 2012, the state court issued an 'Order of Consolidation for Certain Discovery Purposes' and an 'Order Controlling Discovery.' The court bifurcated the issues into those related to level of assessment and those related to the market value of individual properties and provided that consolidated discovery on the assessment level issues would proceed first…."). *See also* Doc. 252, at 35, 39.

27

revealing that the properties were undervalued and so had the benefit of a lower de facto assessment level than alleged in the lawsuit.

Here again, Plaintiffs rely on the legal presumption that assessments and taxes are correct and legal. They argue in footnote 8 of their motion that "[t]he same presumption has been applied in constitutional uniformity and equal protection claims in earlier Illinois tax objections to determine the disparity between a correctly assessed taxpayer and others treated more favorably." (Doc. 214, at 13 n.8). None of the cases briefly described in the footnote, however, involved an equal protection and uniformity case like this one where the taxing authorities *did* seek to contest the estimated (official) FMV of the taxpayer's property to defend against the claims and damages. Since those courts were not called upon to decide the issue of whether the taxing authorities are barred from doing so because of the legal presumption, they are not controlling cases.[15]

Finally, Plaintiffs observe (again in footnote 8 of the motion) that "[c]ases such as *Allegheny Pittsburgh Coal* are also fundamentally similar, in that the Equal Protection question was determined based upon the plaintiffs' acceptance of the market value basis

---

[15] Plaintiffs waited until their reply brief to characterize the cases in footnote 8 of their motion as "controlling Illinois Supreme Court decisions" and to discuss them in more than short parentheticals. (*Compare* Doc. 214, at 13, n.8 with Doc. 235, at 3, 13). Plaintiffs' citations and parentheticals from footnote 8 for these "controlling" cases follows:

> *Mobile & Ohio Railroad Co. v. State Tax Commission*, 374 Ill. 75, 78 (1940) ("no question is raised" concerning objector's market valuation by the state commission; *People ex rel. Ross v. Chicago, Milwaukee & St. Paul & Pacific Railroad Co.*, 381 Ill. 58, 59 (1942) ("No question is raised as to the . . . full value of the [objector's] property"); *People ex rel. Kohorst v. Gulf, Mobile & Ohio Railroad Co.*, 22 Ill.2d 104, 109 (1961) ("There is a presumption of statutory compliance, and . . . the railroad assessor . . . verifies the full valuation. There is no evidence in the record to overcome the presumption and proof, and we must conclude that objector's property was assessed at 100%.").

(Doc. 214, at 13 n.8). In their reply, Plaintiffs discuss two additional cases that, like the others, do not address the question before this Court. (Doc. 235, at 13) (citing *People ex rel. McDonough v. Illinois Central Railroad Co.*, 355 Ill. 605, 190 N.E.2d 82 (1934) and *Application of Rosewell*, 106 Ill.2d 311, 325, 478 N.E.2d 343, 349 (1985)).

of their assessments, contesting them only based on the disparate treatment of other properties." (Doc. 214, at 13 n.8) (citing *Allegheny Pittsburgh Coal Co. v. County Comm'r of Webster Co., W. Va.,* 488 U.S. 336, 338 n.1, 340 n.3, 345 (1989)). Not surprisingly, Defendants distinguish *Allegheny Pittsburgh Coal* because "there was no issue as to whether the properties were in fact 'comparable' because the parties had already so stipulated." (Doc. 225, at 8-9) (citing 488 U.S. at 340 n.3.). As before, the Court is not persuaded that just because an issue was uncontested in the cases referenced by Plaintiffs, this means a taxing authority may never contest a property's valuation and assessment level when sued by a taxpayer seeking a tax refund in a case like this one.

### 4. Finality Principles

Plaintiffs' last argument is that Defendants are not permitted to offer evidence that the subject properties were undervalued at the time of assessment because this would violate finality principles:

> Apart from the general absence of any legal basis for Defendants to attack their own sworn valuation process, this violates "a fundamental principle that the actions of the taxing authorities must have some finality." *Chicago Gravel Co. v. Rosewell*, 103 Ill.2d 433, 439 (1984) ("Absent fraud [by the taxpayer], the taxes cannot in a subsequent year be increased because the parcel was underassessed."); *People ex rel. Greer v. Hunt*, 311 Ill. 291, 293-94 (1924) ("There must be some stability in the administration of the taxing laws by the tax authorities and some security to the property owner in reliance on the official acts of the authorities.").

(Doc. 214, at 14). The two cited cases are distinguishable as neither required the court to reach the issue presented here.

In *Chicago Gravel*, for example, the taxing authorities discovered their own clerical error made years earlier about the acreage of a property. This caused the undervaluation of the property over multiple years, so they initiated administrative proceedings to collect

back taxes, interest and penalties for a 12 year period. 103 Ill.2d at 435. The Illinois Supreme Court held this was impermissible since "property which has been assessed, and upon which taxes have been levied and paid in their entirety, even though the assessment through mistake was too low, may not be reassessed in a subsequent year as omitted." *Id.* at 437. Taxes could only be recaptured, the court held, where "the taxpayer was guilty of fraud, or some form of wrongdoing." *Id.* at 438.

The case at hand is different. Here, the taxing authorities did not initiate proceedings to retroactively increase past tax assessments and obtain a court order requiring a taxpayer to pay additional taxes beyond what was previously paid. Rather, the taxpayer initiated a lawsuit seeking a refund of taxes previously assessed and paid. And in response, the taxing authorities are seeking to discover and use in their defense previously unknown FMV evidence to avoid refunding taxes. Defendants argue this is permissible as Plaintiffs filed a lawsuit and chose to put the assessment levels of their properties at issue, so cannot now "handcuff" them by preventing the discovery of information that may undermine the legal claims and requested damages. (Doc. 252, at 39-40). In the absence of a controlling case supporting Plaintiffs' position, the Court agrees.

## CONCLUSION

On the record before it, this Court is not persuaded that there is justification to bar all FMV discovery as wholly irrelevant and so disproportional. Defendants *do* intend to contest the estimated (official) FMV if armed with evidence showing the FMV of the subject properties at the time of assessment was materially higher than previously known. Such evidence would conceivably allow a factfinder to conclude that the effective

assessment level applied to the properties was lower than the de jure level alleged by Plaintiffs, and to defeat (or reduce) the tax refunds. The real question is whether Defendants are barred under the law from offering such valuation evidence under the circumstances presented here. Absent a case directly addressing this question, FMV discovery must proceed unless the district judge issues an early ruling barring such evidence. For all of these reasons, the Court has denied Plaintiffs' Motion for Protective Order Barring Discovery on the Market Values of the Subject Properties as Irrelevant to any Claim or Defense in the Case (Doc. 214).

ENTER:

Dated: March 28, 2023

SHEILA FINNEGAN
United States Magistrate Judge