UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

A.F. MOORE & ASSOCIATES, INC., )
et al., )
                                )
          Plaintiff(s),         )
                                ) NO. 1:18-cv-04888
     -vs-                       )
                                )
MARIA PAPPAS, Cook County       )
Treasurer and Ex Officio County )
Collector, et al.,              )
                                )
          Defendant(s).         )

          The videotaped videoconference deposition upon oral examination of MICHAEL LARSON, a witness produced and sworn before me, Brandy L. Bradley, RPR, a Notary Public in and for the County of Hamilton, State of Indiana, taken on behalf of the Defendants Pappas & Cook County at the remote location of the witness, Indianapolis, Marion County, Indiana, on the 21st day of August, 2025, pursuant to the Indiana Rules of Trial Procedure.

Page 2

APPEARANCES

FOR PLAINTIFFS:      Paul H. Tzur
(SPD/Fox Valley/      Sam Ventresca
River Oaks)          BLANK ROME, LLP
                     444 West Lake Street, Suite 1650
                     Chicago, IL  60606
                     paul.tzur@blankrome.com

FOR DEFENDANTS:      Daniel J. Cozzi
(Pappas &            Romteen Bahramirad
Cook County)         Brittany C. Dushman
                     E. Tripp Burton
                     SWANSON, MARTIN & BELL, LLP
                     330 N. Wabash Avenue, Suite 3300
                     Chicago, IL  60611
                     dcozzi@smbtrials.com

FOR DEFENDANT:       Katherine G. Schnake
(Cook County         Matthew L. Pagano
Assessor)            HINSHAW & CULBERTSON, LLP
                     151 N. Franklin Street
                     Suite 2500
                     Chicago, IL  60606
                     kschnake@hinshawlaw.com

THE VIDEOGRAPHERS:  Kelly Haering
                    Robin Brown


I N D E X   O F   E X A M I N A T I O N

                                          PAGES

DIRECT EXAMINATION                             6
    QUESTIONS BY DANIEL J. COZZI
CROSS-EXAMINATION                            330
    QUESTIONS BY PAUL H. TZUR

Page 4

MARKED              DESCRIPTION              PAGES
Exhibit 32    Paz e-mail*
Exhibit 33    ROC Realty Income from Operations*
Exhibit 34    Property Tax BUM Report*
Plaintiff(s)
Exhibit 1     Supplemental Responses to 'Rogs    334
     (*EXHIBITS MARKED BUT NOT REFERENCED)

Page 3

I N D E X   O F   E X H I B I T S

MARKED               DESCRIPTION              PAGES
Defendant(s)
Exhibit 1      LinkedIn page                     40
Exhibit 2      Annual Report - 2006              98
Exhibit 3      Securities Trading Policy        108
Exhibit 4      Code of Conduct111
Exhibit 5      2nd Amended Initial Disclosures  152
Exhibit 5.1    Leer e-mail                      188
Exhibit 6      Market Income Analysis           195
Exhibit 7      Moffitt e-mail                   209
Exhibit 8      Pending Appeals Probability...   211
Exhibit 9      Paz e-mail                       231
Exhibit 10     Cates e-mail                     234
Exhibit 11     Tax Value chart                  243
Exhibit 12     Larson e-mail                    249
Exhibit 13     Paz e-mail                       251
Exhibit 14     Paz e-mail                       261
Exhibit 15     Masbaum e-mail                   266
Exhibit 16     Pending Appeals - Prop Tax Dept. 273
Exhibit 16.1   Masbaum e-mail                   277
Exhibit 17     Larson e-mail                    295
Exhibit 17.1   Larson e-mail                    299
Exhibit 18     Larson e-mail                    300
Exhibit 19     Paz e-mail                       307
Exhibit 20     5 Year Value Comparison Report   309
Exhibit 20.2   County County BoR 2010           315
Exhibit 21     Real Estate Tax Transmittal      313
Exhibit 22     5 Year Value Comparison Report   314
Exhibit 23     5 Year Value Comparison Report   317
Exhibit 24     Property Tax Management, LLC      320
Exhibit 25     2008 Property Listing*
Exhibit 26     Profit Center/Cost Recovery...*
Exhibit 27     Profit Center/Cost Recovery...*
Exhibit 28     Total Sales Volume YTD Summary*
Exhibit 29     Paz e-mail*
Exhibit 30     WPG, Inc.*
Exhibit 31     Larson e-mail*

Page 5

THE VIDEOGRAPHER:  We are on the record at 11 a.m. on August 21st, 2025.  Audio and video recording will continue to take place unless all parties agree to go off the record.  Please note that the microphones are sensitive and may pick up whispering and private conversations.

This is the video-recorded proceeding of Michael Larson taken by counsel for the Defendant in the matter of A.F. Moore & Associates, Incorporated, et al. versus Maria Pappas, et al. filed in the United States District Court for the Northern District of Illinois, Eastern Division.  This proceeding is being held via Zoom videoconferencing.

My name is Kelly Haering.  I'm the videographer on behalf of U.S. Legal Support located at 16825 North Chase Drive in Houston, Texas.  I'm not related to any party in this action, nor am I financially interested in the outcome.

The court reporter is Brandy Bradley on behalf of U.S. Legal Support.

Counsel will state their appearances for the record, and the court reporter will swear in the witness.

Page 6

MR. TZUR: Good morning. Paul Tzur and Sam Ventresca from Blank Rome, LLP on behalf of the Plaintiff Fox Valley and Simon Property Group.

MR. COZZI: Good morning. Dan Cozzi. I'm here with Romteen Bahramirad, Brittany Dushman, Tripp Burton, and Brynn Sermersheim on behalf of the treasurer and Cook County.

MS. SCHNAKE: Good morning. Kate Schnake and Matt Pagano on behalf of the Cook County Assessor.

Pursuant to the Indiana Supreme Court Case 20S-MS-236 signed March 31, 2020, MICHAEL LARSON, having been first duly sworn to tell the truth, the whole truth and nothing but the truth relating to said matter, was examined and testified as follows:

DIRECT EXAMINATION,

QUESTIONS BY DANIEL J. COZZI:

Q Can you, please, state your full name for the record.

A Michael D. Larson.

Q And what does the D stand for?

A Dean.

Q Let the record reflect that this is the deposition of Michael Larson being taken in

Page 7

accordance with the Northern District of Illinois rules and all applicable local rules.

Mr. Larson, have you given a deposition before?

A Yes.

Q How many times?

A Three or four.

Q And have they been in the context of property taxation issues?

A Yes.

Q So I'm sure Mr. Tzur has done an excellent job preparing you for your testimony today. I'm just gonna go over a couple of the basic rules. I won't go over everything because you've done this before.

If you need a break at any point, we talked a little bit about you might need a phone call, that's, of course, fine.

Try to wait for me to finish asking my question before you start giving your answer and I'll try to extend the same courtesy to you just so it makes Brandy's life easier. And she's already had an interesting morning because of things outside of her control, so let's try to do that. You're already doing a good job of

Page 8

that.

Try to keep your answers verbal and out loud so that Brandy can accurately take down your responses.

And then, I guess, most importantly, will you let me know if there's a question I ask you that's unclear to you in any way?

A Yes.

Q If you do answer the question, can I then assume that you understood the question?

A Yes.

Q Great. I represent the Cook County Treasurer in this case. Do you know that -- strike that. Do you know anything that the Cook County Treasurer did wrong with respect to the taxation of River Oaks Mall?

A No.

Q Do you have any criticisms of the Cook County Treasurer?

A No.

Q I also represent Cook County in this case. Do you know of anything that Cook County did wrong with respect to River Oaks taxation?

A Yes.

Q And what is that?

Page 9

A In our opinion, they assessed the property at a value that is higher than what we believe the appropriate value is for the property.

Q A higher fair market value?

A Higher fair market value which would correspond to a higher assessed value.

Q Do you have any other criticism of Cook County?

A Not that I can think of at the moment.

Q Okay. And what is your criticism, if any, of the Cook County Assessor with respect to the taxation of River Oaks Mall?

A Well, it's my opinion that the value they assigned to the property is higher than what it should be.

Q The fair market value?

A The fair market value and the assessed value. They're corresponding.

Q Other than the Cook County Assessor saying an unfair, in your opinion, assessed value and fair market value to River Oaks Mall, do you have any other criticism of the Cook County Assessor?

A Not that I can think of at this moment.

MR. TZUR: Can we, please, go off the record for a second?

THE VIDEOGRAPHER: We are going off the

Page 10

record at 11:04 a.m.

(A discussion was held off the record.)

THE VIDEOGRAPHER: We are back on the record at 11:06 a.m.

Q Mr. Larson, have you ever communicated with the Cook County Treasurer as far as you know?

A No, I have not.

Q Has anybody from your department since you've been a head of the Property Tax Department communicated with the Cook County Treasurer?

A I'm not aware of any.

Q Okay. Do you know of any taxpayer in Cook County that received better treatment than River Oaks Mall by the Cook County Assessor?

A No.

Q Do you believe that the Cook County Assessor treated Simon Property's other Cook County properties fairly when it was assessing their values?

MR. TZUR: Objection. Relevance.

A Not in each and every case, not in each and every year.

Q Okay. Do you have any -- strike that. Do you know of any evidence that the Cook County Assessor's Office was somehow targeting River

Page 11

Oaks in particular for unfair tax treatment?

A I have no personal knowledge of that.

Q Do you have any evidence to suggest that the Cook County Assessor's Office was targeting Simon Property for unfair tax treatment?

A I'm not aware of any of that.

Q To your knowledge, did Simon Property Group have some sort of unique poor relationship with the Assessor's Office?

MR. TZUR: Object to form.

A I'm not aware of any poor relationship with the Assessor's Office.

Q Okay. Do you have any criticism of the Cook County Board of Review with respect to its involvement in River Oaks Mall's taxes?

A Can you restate the question?

Q Sure. Do you have any criticism of the Cook County Board of Review related to this case?

A Other than them in several years not making an adjustment based upon our opinion of the value, I have no personal animus towards the board.

Q Okay. And let me just drill down on that a little bit. In your opinion, you believe that the Cook County Board of Review set an inflated assessed value and fair market value for River

Page 12

Oaks Mall for certain tax years; correct?

A No, they don't set the value. They just make a determination when presented with evidence whether or not an adjustment is warranted or not. And, in some of the years at issue, they made no adjustment, which, in our opinion, was wrong.

Q Okay. Part of what the Board of Review does is determine the fair market value of a property when it's deciding whether to make an adjustment; correct?

A Correct.

Q And, in your opinion, the Board of Review did not reach the correct fair market value for River Oaks Mall for certain tax years; correct?

A Correct.

Q Do you have any other criticism of the Board of Review?

A Not that I can think of at this moment.

Q You're aware that the Cook County Board of Review supersedes the determination of the Cook County Assessor?

MR. TZUR: Object to form.

A Yes.

Q What's your understanding of the role of the

Page 13

Cook County Board of Review versus with respect to its -- strike that. What's your understanding of the role of the Cook County Board of Review vis-a-vis the role of the Cook County Assessor?

A That's a multifaceted question. Can you restate it a little bit clearer?

Q Sure. Basically, does the -- strike that. Is it your opinion that the Board of Review is sort of an appellate court to the assessor?

MR. TZUR: Object to form.

A It is a first-level finder of fact.

Q The Cook County Board of Review's fact-finding supersedes the fact-finding that's done by the assessor; correct?

MR. TZUR: Object to form.

A That's my understanding, yes.

Q And the assessor has no discretion about whether or not to accept the decision of the Board of Review; correct?

A Say that again, please.

Q Does the Cook County Assessor have any discretion in deciding whether to accept the determinations made by the Board of Review?

A I believe that they have the opportunity to

Page 14

appeal any decision of a Board of Review.

Q The Cook County Assessor has that?

A I believe so. It's my understanding they can file an appeal for the next level seeking an adjustment in the value.

Q Have you ever heard of that happening?

A I have not, not in Cook County.

Q And what's your basis for saying that the Assessor's Office can appeal the determination of the Board of Review?

A My experience in property tax matters.

Q Do you know any ordinance or law that says they can do that?

A No.

Q And, just to be clear, you've never heard of them doing it; correct?

A No, I have not.

Q Are you one of the people at Simon Property who determined whether or not to appeal the property taxes on River Oaks Mall from 2009 to 2014?

A Yes.

Q Was that ultimately your decision whether to pursue an appeal during those tax years?

A It was my decision in conjunction with conferring with outside counsel on matters of

Page 15

whether or not we should appeal, yes.

Q Alright. It's my understanding from the deposition of Mr. Paz, but correct me if I'm wrong, that the decision whether to appeal the Cook County Assessor's initial determination of the assessed value is made internally in the Property Tax Department before conferring with outside counsel; is that correct?

A Well, it's -- no, I will confer with outside counsel. I'll confer with my staff and weigh the cost benefits and whether or not we believe that the assessment is significantly overassessed and we'll make that determination and I will then instruct the outside counsel, in this case O'Keefe Lyons & Hynes, to file appeals.

Q Okay. So you're saying that in every case you -- strike that. In every case someone at the Property Tax Department at Simon Property will confer with outside counsel before determining whether an appeal of property taxes should be pursued?

MR. TZUR: Object to form.

A We will seek their input, but, ultimately, the decision rests with us.

Page 16

Q Do you formally retain them in writing before an appeal is pursued?

A We have a retainer agreement with O'Keefe Lyons & Hynes.

Q For how long has Simon Property had a retainer agreement with O'Keefe Lyons & Hynes?

A Well, every year that I've been in the role and I believe I've seen retainer agreements that precede my assuming the responsibility as the vice president of property tax, so at least 2009 and perhaps several years earlier.

Q Okay. So, at the very least, there's been a retainer agreement between Simon Property and O'Keefe Lyons & Hynes from 2009 to the present?

A Correct.

Q Do they still use O'Keefe Lyons & Hynes?

A "They" being who?

Q Simon Property.

A Well, let's be clear. They're retained by Simon Property on behalf of each individual property, so we have multiple properties in Cook County and there's a retainer agreement for each one of those properties.

Q And is O'Keefe still being used for other properties at Simon?

Page 17

A Yes.

Q Except for this property; correct?

A Correct. We don't own it.

Q Okay. Have you ever looked at the Third Amended Complaint in this case?

A Third Amended Complaint? Can you --

Q That's the current version of the Complaint.

A It would help if I could be refreshed. I don't recall without seeing it.

Q Okay. That's fair. Are you aware that -- strike that. Let me just ask you kind of a broad question. So it's my understanding that Simon Property performs valuations of its properties for multiple different purposes. Is that, generally speaking, true?

A That's possible. I do know and have specific knowledge of the valuations that we perform. I am not as well informed on what other organizations departments in the company derive value.

Q Okay. Let me -- you've been at the company since 2009; correct?

A Correct.

Q And we've seen your e-mail. We know that you interact and e-mail with people from other

Page 18

departments all the time; correct?

A   Correct.

Q   Including about this property, River Oaks Mall?

A   Yes.

Q   And just give me some examples of the other departments that you would communicate with over e-mail about a mall like River Oaks.

A   Well, we could be communicating with property management, development, the leasing organization, the executive management team, perhaps the lease accounting group.

Q   And those are all separate departments?

A   Yes.

Q   Why would you be communicating with property management about a property like River Oaks Mall?

A   I would be communicating with them to get an understanding of the operations at the property, the challenges that the property faces, the issues, both physical in nature and external in nature, and the property operations group which comprises not only individuals at the headquarters office but the staff at the property. And who knows the property better than those individuals at the subject property?

Page 19

Q   Who was the contact person for property management for River Oaks Mall from 2009 to 2014?

A   I don't recall, but there would be more than one during that time frame.

Q   What would their title be?

A   Mall manager or general manager.

Q   And then you said you would also communicate over e-mail with the Development Department?

A   Correct.

Q   About a mall like River Oaks?

A   Yes.

Q   Why would you do that?

A   To understand if there was any activity that is being planned for the property, to determine what challenges the Development Department sees in the property because they have a lot of institutional knowledge and a lot of knowledge with respect to the economic forces that affect the property.

Q   So all of those issues are relevant to what you do in property tax; correct?

A   Yes.

Q   And they're ultimately relevant to this lawsuit because of that; correct?

Page 20

A   Yes.

Q   You said that you would also communicate about River Oaks with executive management; is that right?

A   Correct.

Q   What is executive management?

A   It would be anyone that is in an executive position that makes decisions at the corporate level with respect to capital investment, with respect to asset acquisition disposition, and the executive management obviously oversees the financial operations and evaluates the performance of the property to determine how it fits in our core competency and our portfolio.

Q   Who in executive management made decisions about River Oaks Mall from 2009 to 2014?

MR. TZUR:  Object.  Foundation.

A   There could be any number of executives that, you know, participate in decision-making.  I'll name just a few.  It would be -- it could've been David Contis, it could've been individuals within legal, and it could've been executives within the leasing organization.

Q   Who within legal?

A   We would be discussing things with legal that

Page 21

would include, you know, various levels within the organization over that time frame.  I have no personal recollection of, you know, the correspondence within legal, but they are often consulted with in matters that the executive team deems appropriate.

Q   And you would consult legal about issues even -- strike that.  Your department, Property Tax Management -- or strike that.  The Property Tax Department would communicate with legal about property tax issues even outside of the context of active litigation; correct?

MR. TZUR:  Objection to foundation and form.

A   Restate the question, please.

Q   Sure.  From time to time, would the Property Tax Department communicate with the Legal Department at Simon Property about issues even outside of active litigation about those issues?

MR. TZUR:  Objection.  Foundation and form.

A   I'm not sure I really understand the question.

Q   Part of what the Property Tax Department does is figuring out what the correct property taxes that should be assessed for each of Simon's properties; correct?

Page 22

A   Correct.

Q   And that's done even before there is a formal assessment done on the properties; correct?

A   Well, it can be before and after, yes.

Q   Okay.  And do you ever communicate with the Legal Department before there's even an assessment done for a given year?

A   Yeah, there are times when I would reach out to legal for advice.

Q   Okay.  And what sort of advice, generally speaking, would legal give about the management of a property like River Oaks Mall?

MR. TZUR:  So object to the extent that it's calling for you to give an answer about legal advice that you received.  I direct you not to answer as privileged.

MR. COZZI:  But I think he just said some of the legal advice -- or some of the legal communications that he engages in are outside of litigation because it's before even an assessment is done.

MR. TZUR:  He said it's not in active litigation.  That was your question.  And it might be in anticipation of litigation.  That is seeking legal advice from the company counsel.

Page 23

Q   So let me ask this.  Do you anticipate filing litigation for a tax year before you even get the assessment?

A   It depends on the history of the property.

Q   Okay.  So, for River Oaks Mall, did you anticipate filing a lawsuit before you even received the assessment on River Oaks Mall?

MR. TZUR:  Object to form.

A   No.

Q   You also would communicate with lease accounting you said?

A   Yes.

Q   What sort of things would you communicate with lease accounting about?

A   Lease accounting is an organization that is responsible for determining the distribution of expenses to the tenants.  So, in the case of property tax, we're looking to determine what recoveries are being collected on things like property taxes because if we don't collect all of the property taxes from the tenants, that leakage, if you will, is incurred by ownership.  So what we need to do is determine what the recovery is because that goes into the mathematical computation of determining a value.

Page 24

Q   Determining a value of what?

A   The fair market value of the property.

Q   Okay.  So part of the fair market value that you guys determine is the recovery rate?

A   We don't determine the recovery rate.  We utilize the recovery rate in our analysis.

Q   How do you utilize the recovery rate to determine the fair market value of a property like River Oaks?

A   We use the recovery rate to, first of all, determine what revenue is being recovered by the property, and we utilize the recovery rate to determine what the percentage of the capitalization rate is loaded to reflect the component of property taxes that's not collected from the tenants.

Q   Okay.  So, all else being equal, like a higher recovery rate, would that tend to increase the fair market value of a property?

A   All else being equal, yes.

Q   In some of the documents that we'll look at, there's tables talking about various components to the value of River Oaks and it says "rec." percentage.  Is that the recovery rate percentage?

Page 25

A   Yes.

Q   What's your date of birth?

A   12/12/59.

Q   Where do you live?

A   Fond du Lac, Wisconsin.

Q   Do you work remotely?

A   Hang on.  F-o-n-d d-u L-a-c, the common spelling.

Q   Are you from Wisconsin originally?

A   Yes.

Q   Where in Wisconsin are you from?

A   I grew up in the middle part of the state near Oshkosh in a small town called Winneconne, W-i-n-n-e-c-o-n-n-e.

Q   Let me go back to the question of just kind of general valuation topics.  So one of the reasons why Simon would perform a valuation of a property is for ad valorem purposes; correct?

A   Yes.

Q   And what does ad valorem mean?

A   Value added.

Q   And that's for essentially for -- well, that's the Latin translation of ad valorem?

A   Yes.

Q   That's good.  And ad valorem refers to property

Q tax appeals?

A Well, ad valorem is the ultimate outcome of a valuation. Ad valorem tax is, you know, it's a culmination of taking a value times a tax rate.

Q Okay. One of the other reasons why Simon would perform a valuation of a property like River Oaks is for budgeting purposes; correct?

A I'm not aware of any valuations being done for budgeting purposes.

Q Are you aware of any forecasting of what Simon's properties' property taxes would be in future years?

A Yes.

Q And who performs those forecasts?

A The Property Tax Department.

Q One of the other reasons why Simon would have to assign a value to its properties would be for property insurance; correct?

A Yes.

Q Which department at Simon is responsible for procuring insurance for a property?

A The Insurance Risk Management Group.

Q And who is the head of the Insurance Risk Management Group from 2009 to 2014?

A There were two individuals that I'm aware of and

I can't recall either one of their name at the moment.

Q Are they still at the company?

A One retired, the first one retired, and the second one is still in the position.

Q Another reason why Simon would need to perform a valuation of its properties like River Oaks is so that they can properly disclose the value of its assets to shareholders; correct?

MR. TZUR: Object to foundation.

A No, that's incorrect.

Q Did Simon Property ever disclose the value of River Oaks Mall to shareholders?

A I'm not aware of any situation like that.

Q You're aware that River Oaks Mall was transferred to Washington Prime Group in May of 2014?

A Yes.

Q Washington Prime Group was formerly a trust under Simon Property Group, Inc.?

A Yes.

Q And in May 2014 it officially spun off into a separate company?

A Correct.

Q And, as part of this spin-off, there was a

transfer of certain properties that were previously owned by Simon that were transferred to Washington Prime Group?

A Correct.

Q Was there a valuation done by Simon at or around the time of the transfer of its property to Washington Prime Group?

MR. TZUR: Object to form and foundation. Go ahead.

A I'm not aware of a valuation occurring.

Q Did Washington Prime Group ever perform a valuation of River Oaks Mall to determine the value of the asset that it was acquiring?

MR. TZUR: Object to form and foundation.

A I'm not aware of any.

Q Is there someone at Washington Prime Group that I should ask that question to?

A I wouldn't know who to direct a question like that to.

Q Does Washington Prime Group have a property tax department like Simon does?

A It did at one time, but I'm not aware of that organization which has evolved. It's no longer just Washington Prime. I don't know if they have their own internal property tax group or

not at this moment.

Q Fair enough. From 2014 to 2016, did it have its own property tax department?

A 2014 the answer is no. Simon Property Group continued to assist Washington Prime in the first two years of their new existence so we assisted them and oversaw the property taxes for two years. One of the years only on the River Oaks because the assessment notice came in later and there was already a transition taking place to an internal organization.

Q Did anybody from your Property Tax Department at Simon work for the eventual Property Tax Department at Washington Prime Group?

A Say that again.

Q Yeah. Did they take any of your property tax employees from -- take them from Simon and bring them to Washington Prime?

A No.

Q Do you know the name of the person who is the head of the Property Tax Department at Washington Prime when it was formed?

A Early on in their tenure, it was Andrew Thompson. I don't know if he's still in that role or not. Again, that organization has

Page 30

evolved and we don't have any interaction with that organization.

Q T-h-o-m-p-s-o-n?

A I believe so, yes.

Q And you don't know where he's at right now?

A I do not know.

Q What's your current business address?

A 225 West Washington Street.

Q Is that the headquarter -- strike that. Is that the business address of the headquarters of Simon Property?

A Yes.

Q And what's your e-mail address?

A Mlarson@simon.com.

Q Have you had any other e-mail addresses at Simon besides that one?

A No.

Q Have you sent any e-mails on your personal e-mail relating to this lawsuit or River Oaks Mall?

A I don't recall, but I doubt it.

Q What's your personal e-mail address?

A Aaamlarson@yahoo.com.

Q Have you ever gone through your personal e-mails to see if there's anything about this case?

Page 31

A No.

Q Has anyone else done that?

A No, best of my knowledge.

Q Have you -- strike that. One of the people that works in your department is Juan Paz?

A Yes.

Q You worked with him from 2009 to the present?

A Yes.

Q He's a property tax manager?

A He's a director.

Q Have you ever e-mailed Juan Paz about this lawsuit?

A Yes.

Q How often have you done that?

A We communicate quite regularly on all of our appeals, and e-mails is one of the ways that we communicate.

Q And you continue to e-mail him about this lawsuit?

A Yes.

Q What's your estimate of how often you and Juan Paz exchange e-mails about this lawsuit?

MR. TZUR: Object to form.

A Rephrase the question, please.

Q What's your best estimate of how frequently you

Page 32

and Juan Paz exchange e-mails about this lawsuit?

MR. TZUR: Same objection.

A Recently, it's very infrequent. He sits right next to me in my office. I can walk out my office and right into the next office, so it's very infrequent. It's only rare times when he or I may be out of the office that we communicate. I don't know if that answers your question. It's a very vague question to begin with.

Q Fair enough. Have you exchanged any e-mails with Mr. Paz about his deposition?

A No, I do not recall any.

Q Typically when you e-mail Mr. Paz about this lawsuit, is it fair to say that attorneys are not on those e-mails?

A Yes.

Q And the e-mails that you exchange are basically e-mails between two non-attorneys talking about what the status of this lawsuit is?

A Can you rephrase that again?

Q Sure. Are you an attorney?

A No.

Q Is Mr. Paz an attorney?

Page 33

A No.

Q Are any attorneys included on the e-mails that you and Mr. Paz have exchanged about this lawsuit?

A I can't recall any.

Q And, typically speaking, when you two would exchange e-mails about this lawsuit, it's just about what the status of this case is?

A I think that's -- in a broad context, yes.

Q Okay. And it might be about other things such as like appraisals and other issues relating to this lawsuit?

A I don't recall any discussions about appraisals.

Q Have you ever spoken with Mr. Paz about his deposition?

A Very briefly.

Q And what did he say?

A The question was: How did it go? And he said it went fine.

Q Did you two discuss anything about the subject matter of the questioning?

A I don't recall any.

Q How many times have you spoken with Mr. Paz about his deposition testimony?

A Maybe a half a dozen.

Page 34

Q Okay. And do you recall anything substantive that was said about his deposition testimony in those half a dozen or so conversations?

A Anything substantive? Can you define what you mean by substantive?

Q About the types of questions that he was asked.

A Only in broad terms.

Q Did he give you any advice about your deposition?

A No.

Q Have you exchanged any text messages about this lawsuit?

A Text messages. I text messaged Juan Paz this morning.

Q Do you have your phone with you?

A Yeah.

Q Can you tell me what that was about?

A I wanted about I wanted to know the quantity of properties that we manage in the department.

Q Are you able to look at the exact exchange, though?

A Yeah.

Q Okay. Do you have your phone with you right now?

A Yeah.

Page 35

MR. TZUR: Object. To the extent that the exchange was in connection with -- and I don't know what this is. To the extent that this is in connection with any prep that we were doing or advice I was giving on behalf of Simon Property for this deposition, I direct him not to answer, but if it's something else, then --

A It's not a big issue. You want me to read it?

Q Yeah, sure.

A Okay.

Q And tell me like the time of the text messages.

A Okay. The time was 10:03. I called him earlier and I asked him to give me a count of the total entities that we manage in the Property Tax Group. And he responded back that the count in our property tax management software system is 366. And that text message was delivered at 10:34.

Q What's your cell phone number?

A (317) 625-8634.

Q Who is your carrier?

A Verizon.

Q How long have you had Verizon?

A Two or three years, maybe four. I don't know.

Q Have you exchanged any other text messages with

Page 36

Juan Paz besides the exchange that you just read to us?

A Not to my recollection.

Q Have you ever taken any notes about this case?

A Yes.

Q Tell me about that.

A It was notes that were taken in my review of the discovery documents and the interrogatories that I anticipated to be deposed on.

Q When did you take those notes?

A I've taken those notes in the last three or four days.

Q Were you told by an attorney to take those notes or was it done by you to help you just feel more prepared for the disposition?

A To feel more prepared for the deposition.

Q Did any attorney tell you to take those notes?

A No.

Q Have you shown those notes to any attorney?

A No.

Q Do you have the notes with you now?

A No.

Q Where are they?

A In my office.

Q I'd ask that those notes be produced.

Page 37

MR. TZUR: And same objection as we've had. Those are -- if I may.

Mr. Larson, you met with me and my colleagues to prepare for your deposition that you're taking today; correct?

THE WITNESS: Yes.

MR. TZUR: And the notes that you took, were they for purposes of becoming prepared for this deposition?

THE WITNESS: Yes.

MR. TZUR: And were those notes taken in connection with communications I was having with you and my colleagues were having with you about this preparation --

MR. COZZI: Objection as to form. You can answer, if you know.

THE WITNESS: Can you repeat the question, please?

MR. TZUR: Sure. Were the notes that you took in connection with communications I was having with you and my colleagues were having with you in preparation for this deposition?

THE WITNESS: Yes.

MR. COZZI: Okay. There's gonna be no more of that.

Page 38

QUESTIONS BY DANIEL J. COZZI:

Q I thought you just told me that you took the notes when you were looking at interrogatories and other topics that you thought you were gonna be questioned about.

A Yes.

Q Were there attorneys around you when you were taking notes?

A Yes.

Q Okay. What attorneys?

A Mr. Tzur and Sam Ventresca.

Q Okay. And whose idea was it to take the notes?

A Mine.

Q And how many pages of notes do you have?

A Four pages.

Q If I wanted to obtain the applications for property insurance for River Oaks Mall that were made, who would I ask about that?

A Well, you would ask the attorneys in this case and they would go to the risk management vice president overseeing insurance.

Q Okay. Fair to say that there was property insurance in effect for River Oaks Mall for every year that Simon owned it?

A I don't know that personally. I've not seen

Page 39

that, but I would assume that to be the case.

Q That would be the typical practice for Simon?

A Yes.

Q What's your understanding of what this lawsuit is about?

MR. TZUR: Object. Relevance. Go ahead.

A Well, the lawsuit began in district court after each of the years that we were denied an adjustment by the Board of Review and that case or those cases, as they built up, lingered in district court for many years due to a variety of legal reasons and, as a result, the matter was filed in federal court on the basis of the lack of due process, the ability of not getting an adequate resolution to the appeals at issue at district court level and the uniformity issue.

Q What is Simon's criticism of the defendants in this lawsuit?

MR. TZUR: Object to form and relevance.

A Define who you mean by defendants.

Q The Cook County Treasurer, the Cook County Assessor, and Cook County.

MR. TZUR: Same objection.

A I'm not personally aware of any objections that

Page 40

the subject property have with respect to the treasurer or the overall Cook County, but the discrepancy we have is with the Assessor's Office and the value which we believe is -- fair market value is in excess of its true fair market value.

Q Do you have a resume or a curriculum vitae?

A An old one.

Q Were you asked to provide that to Simon's attorneys in the case?

A No, to the best of my knowledge.

Q Could you flip to Exhibit 1? Is this a copy of your LinkedIn profile?

A It looks like a summary. I see Page 1 and Page 2 of 7. I don't know what's on Pages 3, 4, 5, or 6.

Q You put all the information about your background on LinkedIn; correct?

A Yes.

MR. TZUR: Actually, hold on, Dan. I see seven pages in my version. The binder looks like he only has two.

MR. COZZI: Oh. I think that -- there's no reason to talk about it, to be honest, because it's all fluff. There's nothing with his

Page 41

backgrounds.

MR. TZUR: I'm gonna show the seven pages (inaudible) --

MR. COZZI: I'm not asking any questions about those pages.

Q So let me just go through some of the information about your background. You went to undergrad at University of Wisconsin - Stout?

A Yes.

Q What year did you graduate?

A December of '84, as I recall.

Q And then did you get an MBA at the University of Rochester?

A Yes.

Q When was that?

A I believe that was 2 -- I believe it was 2005. I'm recalling it's 2005.

Q Alright. And then in the Experience section on Page 2 of Exhibit 1, that lists the jobs that you've held over the course of your career?

A Yes.

Q 1984 to 2000 you worked for a company called American Appraisal Associates in Milwaukee?

A Yes.

Q What kind of company is that?

Page 42

A   Valuation consulting firm.

Q   What was your position there?

A   Started out as a staff appraiser and ended as assistant vice president and principal.

Q   Were you ever -- strike that.  Did you ever received a certification as an appraiser?

A   Yes.

Q   When was that?

A   I received the senior designation from the American Society of Appraisers.  I don't recall the year that I had that, but it would be in the 1995 time frame.

Q   Do you consider yourself an appraiser now?

A   If you define appraiser as an appraisal which is a value opinion, yeah.

Q   How long have you worked as an appraiser?

A   I spent 16 years with American Appraisal and that was valuing property throughout the United States and Canada and then from there I went to Xerox, headed up their property tax group, and part of my responsibilities there, I was developing opinions of value for determination of whether or not we were overassessed, and I continue to do that at Simon Property Group.

Q   Did Xerox have any properties in Cook County

Page 43

that you were responsible for determining whether there should be an appeal filed?

A   I don't believe they did.

Q   So the first time that you became involved in deciding whether to appeal an assessment by the Cook County Assessor would be when you started at Simon in 2009?

A   No, the first time I would have been in the decision-making role for River Oaks would be 2010.  2009 was already cast and I joined Simon on June 15th of 2009 and I think the new 2009 appeal was already underway, as I recall.

Q   So who made the decision whether to file -- strike that.  Who made the decision whether to appeal the tax year 2009 taxes?

        MR. TZUR:  Object to foundation.

A   That likely would have been Juan Paz in consultation with Ron Hanson.

Q   Who is Ron Hanson?

A   Ron Hanson was the interim manager that oversaw the Property Tax Group between the start of my tenure with the company and the ending tenure of Frank Lima.

Q   How long was Ron Hanson in that position?

A   Probably -- I'll give you a rough approximation

Page 44

-- six months.

Q   Generally speaking, was the way that Xerox valued its properties in a property -- strike that.  In Xerox was it called the Property Tax Department as well?

A   Yes.

Q   And you were the head of the Property Tax Department?

A   I headed up the Property Tax Department when I joined that organization in 2000 and then I was promoted to controller which included the responsibilities overseeing sales and use tax, business license tax, transfer tax, and all the other indirect taxes including property tax.

Q   Did you kind of bring the same practices for providing opinions of value for properties to Simon Property that you were using at Xerox?

A   To a large extent.  Xerox's properties were more personal property in nature.  They lease document-processing devices/copiers and so the heavy lifting or the largest portion of the property tax organization was business personal property, but there was some real property involved as well.

Q   You've been an employee of Simon Property from

Page 45

June 15, 2009 to the present?

A   Yes.

Q   Have you ever applied for any other positions since that time?

A   No.

Q   Have you had the same title at Simon Property since June 15th, 2009?

A   No.

Q   Tell me about how the title has changed.

A   When I joined the organization I was a vice president and this year I was promoted to senior vice president.

Q   Congratulations.  Is there any change in your responsibilities for becoming a senior vice president?

A   To become the senior vice president, no.

Q   And on your LinkedIn it says that you are the Vice President of Property Tax and Credits & Incentives?

A   Yes.

Q   What does "Credits & Incentives" refer to?

A   Credits and incentives is an activity that involves working with local jurisdictions during development phases to seek incentives or reimbursements for various costs associated with

some new development. Generally, it's off-site costs that we have to incur to redevelop or expand a property and we seek reimbursement of those through either tax incremental financing agreements or STIFs, sales tax incremental financing, so --

Q Okay. I'm gonna ask you about something else in your LinkedIn. It says that you were an instructor and former chair of the Real Property School for an organization called The Institute for Professionals in Taxation from 1997 to 2019?

A Yes.

Q Were you an instructor for that entire time?

A Yes.

Q What sort of instruction did you provide?

A I was an instructor of the Real Property Tax School.

Q What is that?

A It's a one-week course that's offered to members of The Appraisal Institute for purposes of advancing their education and skills in valuing real property.

Q What was your one-week course about?

A I'm sorry?

Q What was the subject matter of your one-week

course?

A It was the valuation of property. We would instruct the students on the various approaches to valuing a property, some of the challenges that a property tax consultant or expert might run into as far as evaluating assessments, evaluating assessor's records, and then conducting educational coursework on the valuation of a property including, you know, how to prosecute a cost approach, how to prosecute an income approach and a sales comparison approach.

Q Okay. The Institute for Professionals in Taxation, are you still a member of that?

A Yes.

Q Why did you stop working as an instructor there?

A Because after about 18 years it was about time to turn it over and it was interfering more and more with my day-to-day responsibilities at the organization and I felt I gave back to the organization, and I had another individual that was also teaching at the same time and to have both of us instructing for a full week became a bit of a challenge.

Q Who was that other individual?

A Melanie Brigante.

Q She worked at Simon Property as well?

A Yes.

Q What was her position?

A Director.

Q Director of what?

A Property tax.

Q When?

A I believe she started about 2011.

Q Is she still at the company?

A Yes.

Q Does she still work as an instructor for the IPT?

A No, no longer. She gave that up last year.

Q When you were an instructor -- strike that. Is the IPT a reliable source of information about property taxation?

MR. TZUR: Objection. Foundation. Withdraw. Withdraw.

A Restate the question, please.

Q Sure. Based on working as an instructor there and being the former chairman of the Real Property School for IPT, do you believe that the IPT is a reliable source of information about taxation?

A It's a -- I would say it's a reliable source of valuation. It's just another tool to put in the toolbox to educate people on how to develop values for property tax purposes.

Q Did Melanie Brigante have the -- strike that. Does she have the same title as Juan Paz?

A Yes.

Q Did she have any involvement with River Oaks Mall?

A No.

Q Is The Appraisal Institute a reliable source of information about valuation?

A Yes.

Q Is the IAAO a reliable source of information about assessment issues?

A I really haven't been involved with the IAAO so I can't render an opinion on that.

Q Are there any internal communications that you've seen at Simon Property referencing the IAAO?

A I get e-mails from the IAAO. I am an associate member of that group.

Q How long have you been a member of the IAAO?

A Well, be careful, that's associate member, not member. I don't think I have the requisite

Page 50

requirements that they set for a member, but I'm on their mailing list. I get their material.

Q Okay. How long have you been an associate member at the IAAO?

A Somewhere between probably 2009 and 2015.

Q So the exact years at issue in this case almost?

A I'm sorry?

Q Almost the exact tax years at issue when you were the head of the property tax manager?

A (Inaudible), I guess.

Q Yep. How long have you been getting e-mails with materials from the IAAO?

A Every time they want to send information about the courses that they offer and material and, you know, information about the organization.

Q Does Simon Property pay for your membership in the IAAO?

A Yes.

Q Are you still an associate member?

A Yes.

Q So why did you --

A To the best of my recollection. I don't remember if the membership is up to date and current or not.

Q Fair enough. I'm just trying to figure out why

Page 51

did you say that you were an associate member up until 2015?

A No, you asked the question when did you become a member of IAAO.

Q My mistake.

A That's alright.

Q From time to time, have you read the IAAO standards?

A I don't recall reading their specific standards, no.

Q Do you have a copy of any IAAO standards?

A No.

Q Have you ever been to any IAAO courses?

A No.

Q Have you ever been to any IAAO conferences?

A No.

Q What benefits do you get from being an associate member of the IAAO?

A I get to be aware of some of the activities, training, and matters that are important to the assessing community that they communicate to their members and associate members. It's just an intelligence tool to see what's going on out there.

Q Simon Property pays for other people on the

Page 52

Property Tax Department to be members in the IAAO as well; correct?

MR. TZUR: Object to foundation.

A No, I don't believe so.

Q So Juan Paz has never been a member of the IAAO?

A You said "never." I don't know.

Q I'm gonna go back to this one-week course. So you've told us the subject matter of the one-week course that you taught for the IPT. Did you teach that same course from 1997 to 2019?

A Yes.

Q Was it delivered in person to students or was it by video or both?

A It was in person up until 2020, the COVID pandemic, and that year it was offered virtually.

Q Did you ever teach it virtually?

A No.

Q What course materials did you use during the one-week course for the IPT?

A Well, there was a large body of information that was provided to the students that they could refer to and that was going to be instructed during the one-week course.

Page 53

Q Did you create the course materials for the week?

A I was not part of the foundation group that developed the course, but I came the second year after and I had a significant involvement in reworking and improving various elements of that course.

Q Was there any textbook that you would refer to when you were teaching that course?

A The IPT has a textbook that they will use and refer to. The Appraisal Institute is also a resource that is pointed out to the students as a reliable foundational educational tool.

Q Would you refer to the IPT textbook in the course of teaching this one-week course?

A There were modules that would refer to that book, yeah.

Q And what was a module for your course?

A Well, there were -- the course was divided up into a five-day session. The first day would be the cost approach. We would teach all of the elements of the cost approach, how to prosecute and how to prepare a cost approach. Tuesday we would've discussed the sales comparison approach and how to prepare and conclude a value via the

Page 54

sales comparison approach. Wednesday would've been the income approach, and then we had an ethics module as well as a ratio study module. And the order of those may vary from year to year depending upon the availability of instructors.

Q Did you consider yourself to be an expert in ratio studies?

A What do you define as an expert?

Q Well, did you lecture students about ratio studies?

A Did I personally, no.

Q Who at the IPT when you were teaching this one-week course lectured students or prepared modules about ratio studies?

A Instructor for that module would have been Ted Jones.

Q Who is he?

A Ted Jones was a -- he worked for Stewart Title and he was -- I'm trying to think of what his title was. I don't recall.

Q It's okay. Okay. So Monday was the cost approach, you said?

A As I said, it could vary from year to year, the order, because each module each day was

Page 55

conducted by different individuals, and, so, we wouldn't typically have two individuals for each one of the modules, so to speak. And if, for example, I or another individual teaching the cost approach weren't available, we might switch it to Tuesday, so we're flexible with respect to the order and sequence of those modules, if you full.

Q Which of the modules did you lecture on?

A I primarily lectured on the cost approach.

Q Any other ones, though?

A I also participated at times on the income approach.

Q How about ethics?

A No, that was taught by an attorney who has a unique skill set in ethical aspects of property taxation.

Q Who is that?

A Mark --

Q Davis? I'm just kidding.

A No. I can't think of his last name, but it will come to me three questions from now.

Q How about did you lecture about the sales approach, sales comparison approach?

A Only insofar as the sales comparison approach

Page 56

affects the other approaches because they're all three approaches are intertwined and you use various elements of each one of them, each one of the individual approaches, in the other approach. So, for example, in cost approach you may do a present value calculation. That's an income approach type of analysis in calculation. So there is an interaction in all three approaches.

Q I see. What is present value?

A Present value is the derivation of taking an income string over time and bringing it back to current cost, to current value.

Q What sources did you cite to when you were lecturing students about the cost approach, the sales comparison approach, or the income approach?

A Say that again.

Q Yeah. What sources would you refer to in your course work?

A Well, IPT had its own body of information. We would also refer to other industry resources, primarily The Appraisal Institute's valuation, The Valuation of Real Estate manuals. It's a book, The Valuation of Real Estate.

Page 57

Q Did you ever refer to any materials from the IAAO?

A Me personally, no.

Q Did the person, I guess Ted Jones who was lecturing about ratio studies, refer to materials from the IAAO?

A He may have.

Q Do you know any other group that provides standards about ratio studies besides the IAAO?

A I can't think of any at this moment.

Q Have you read the IAAO standard on ratio studies?

A No.

Q Have you ever seen the ratio study that was performed by Dr. Daniel McMillan in this case?

A No.

Q Are you qualified to give an opinion about whether a ratio study has been properly performed?

MR. TZUR: Object to form.

A Repeat the question, please.

Q Sure. Are you qualified to offer an opinion in this case about whether a ratio study has been properly performed?

MR. TZUR: Object to form.

A    As I sit here, I don't believe so.

Q    Have you ever testified about any ratio study in any other case?

A    No.

Q    Do you have a syllabus for the course that you taught?

A    I probably do somewhere.

Q    Do you have a PowerPoint for the course that you taught?

A    I probably do.

Q    And is that at home on your personal computer or is that at work?

A    That would probably be in my personal computer.

Q    What other course materials do you think you have in your personal computer besides a syllabus and PowerPoint?

A    For the IPT course?

Q    Yes.

A    Well, as chair, I was responsible for all aspects of it during my tenure as a chair so I would have all of the training materials for those particular years or I have access to those particular years.  Obviously, the course material does change and it's been a while, so, you know, five years, I can't be certain I have

it all.

Q    Okay.  Were your lectures ever recorded?

A    My lectures, no.

Q    When were you the chair at IPT?

A    I'm estimating between the time frame 2016 to 2019.

Q    So, when you decided to leave IPT, you were the chair?

A    Yes.

Q    Are you familiar with USPAP?

A    Yes.

Q    What is it?

A    Uniform Standards of Professional Appraisal Practice.  It's a body of guidelines and regulations regarding how appraisers are to prepare appraisals, prepare appraisal reports, review appraisals, and prepare review reports as well as providing information on how to conduct business valuations.

Q    An appraiser who's performing an appraisal of a property like River Oaks Mall is required to follow USPAP; correct?

A    Yes.

Q    Have you ever been a member of something called the APTC?

A    APTC?

Q    Yes.

A    No, I don't believe so.

Q    Are you a member of any other groups relating to taxation?

A    At this moment, no.

Q    How about formerly?

A    As I indicated earlier, I was a senior member of the American Society of Appraisers.  I have since relinquished that certification.  I was a candidate for The Appraisal Institute's MAI designation, and I held over the course of my tenure at American Appraisal probably 8 to 12 Certified General Appraiser license in various states.

Q    In what states have you been certified as an appraiser?

A    Wisconsin was the first one.  I also was certified in Missouri, New York, Michigan, South Carolina, and I'd be guessing after that list.  It's been --

Q    Fair enough.  Have you ever been licensed as an appraiser in Illinois?

A    I don't believe I was certified in Illinois.

Q    Has your license as an appraiser ever been

disciplined in any way?

A    No.

Q    Do you have any active licenses as an appraiser?

A    Certified General Appraisal license, no.

Q    You said you were an MAI candidate for The Appraisal Institute?

A    Yes.

Q    What does that mean to be a candidate?

A    That means that you're pursuing the full designation MAI, Member of The Appraisal Institute, and as a candidate, you know, that's how you come into The Appraisal Institute and you start by taking the requisite courses that they believe are appropriate to achieve the MAI designation.

Q    Did you achieve the designation?

A    No.

Q    Why is that?

A    Because I left the appraisal profession before I completed it.  I completed all the course work.  I had not prepared/submitted a designation report for review and nor did I take the comprehensive exam.

Q    Are you familiar with a body called The International Council of Shopping Centers?

Page 62

A   Yes, ICSC.

Q   Are you a member of them?

A   Yes. Well, okay, let's be careful because, like a lot of organizations, they treat the "member" title uniquely. I think I'm a member, but, you know, if there is a specific designation, I may not have achieved that, but I do subscribe and I get material from the ICSC.

Q   How long have you been subscribed to material from them?

A   A guess would be 10 years.

Q   Are they a reliable source of information?

       MR. TZUR: Object. Foundation.

A   They can be. You know, certainly they provide a lot of information to their members. They aggregate a lot of data. It may or may not be deemed, in my opinion, reliable, but they do have information that they prepare.

Q   If you, in fact, have been a member of them, would that have been paid for by Simon Property?

A   Yes.

Q   Are you a CPA?

A   No.

Q   Do you have any training whatsoever in accounting?

Page 63

A   Yes.

Q   Tell me about that.

A   Both in my undergraduate and graduate programs I took courses in accounting and that would be the experience and the educational experience that I have gained as well as working with accountants at companies like Simon.

Q   For a property like River Oaks Mall would there be a specific accountant assigned to the mall?

A   Yes, there's -- yes.

Q   Do you know someone named Teresa Tom?

A   Yes.

Q   Who is she?

A   She's a regional vice president of financial accounting.

Q   Was she ever the accountant that was assigned to River Oaks Mall?

A   I don't know that.

Q   Do you know of any accountant who was assigned to River Oaks Mall?

A   I don't know the specific person assigned. I don't recall the specific person assigned to the mall, no.

Q   How would I figure that out?

A   Well, we can ask the -- I can ask the senior

Page 64

vice president of financial accounting to determine who that person was.

Q   For the person who was the accountant assigned to River Oaks Mall, what would their job responsibilities be?

A   Well, there'd be more than one individual. It's like any organization. You have an analyst that would be doing all of the financial accounting work, you know, recording the debits and credits and recording whatever financial element that needs to be managed. That person will report to a senior individual that oversees multiple property-level accountants and then they would have a senior vice president who would oversee many of those managers, so it's a multi-tiered financial accounting organization.

Q   Does Simon Property employ anyone who is like an internal appraiser for their properties?

A   Well, I'm an appraiser. Juan is appraiser. Our directors are appraisers because appraiser's job is to develop opinions of value, so --

Q   Okay. So you would consider Juan Paz to be an appraiser?

A   In the context that he develops an opinion of value, yes. In the technical term, he doesn't

Page 65

have the designations or necessarily all of the experience of a trained appraiser, but he's got a lot of education and I trust and value his -- the work that he does.

Q   Mr. Paz has been the person in your depart -- strike that. Mr. Paz was assigned to be the property tax manager for River Oaks in 2009?

A   I don't know when he was assigned that role. It would have been -- he would've been the successor to Lisa Clemmons who had that role prior to him, so it would've been probably 2008, 2009.

Q   As long as you were the head of the Property Tax Department, Mr. Paz was providing opinions of value for River Oaks Mall until Simon got rid of the property; correct?

A   Yes, he was the first-level individual that developed the valuations.

Q   What is an opinion of value for a mall like River Oaks? What does that mean?

A   Rephrase the question, please.

Q   Sure. When you say "opinion of value" for River Oaks, what does opinion of value refer to?

A   Well, opinion of value is a conclusion to an analysis that takes into consideration the

Page 66

elements that someone measures and considers value. You are valuing the fee simple interest in the property. That is the basis of value in most states. And what we're doing is we're evaluating the revenues that are being generated at the property. We're evaluating and deducting the appropriate market vacancy and collection losses, the appropriate expenses to derive what is known as the NOI, the net operating income, and, from that, you capitalize that NOI into an indication of value which represents what is believed to be the appropriate value of the property for fee simple market value purposes.

Q How often would Juan provide an opinion of value for River Oaks Mall?

A It would likely be on an annual basis.

Q Where was it documented?

A Well, it's -- when you say where is it documented, it's part of the data that is in our electronic data files.

Q Is there a name of a document that contains opinions of value?

A It's generally an Excel spreadsheet that we use to calculate, you know, the value of property. It's a valuation model that I developed early on

Page 67

in my tenure at the company. It was a more simplified yet advanced tool used to derive the market value of the property.

Q Okay. Are opinions of value sometimes contained in direct capitalization reports?

A Well, the direct capitalization -- the conclusions derived in a direct capitalization approach are an opinion of value.

Q And the conclusions would be like the end of a report where it says FMV or fair market value?

A Well, FMV or fair market value of the fee simple interest, yes.

Q So, just so I understand, an opinion of value for a River Oaks -- strike that. When Mr. Paz provides an opinion of value for River Oaks Mall, that would be a fair market value opinion of the fee simple interest in the mall?

MR. TZUR: Object to form.

A That would be his opinion.

Q Okay. And he -- strike that. Do you know of anybody else besides Lisa Clemmons and Mr. Paz that provided opinions of value for River Oaks Mall from 2005 to 2014?

A I don't recall anyone else.

Q Based on what you learned when you started

Page 68

working at Simon Property, was it your understanding that Lisa Clemmons had previously provided opinions of value for River Oaks?

A That's my understanding.

Q And she would do that on an annual basis?

A I can't speak to how frequent she would prepare those analyses.

Q Does Simon Property still have the opinions of value for River Oaks Mall from 2005 to 2014 for those tax years?

A If we did have them, they would've been turned over in discovery.

Q Do you know if they have them?

A I believe in review of some of the discovery materials, I did see information of Lisa Clemmons, so I can't speak to every year, but I can say that I have seen some documents with Lisa Clemmons', you know, work in it.

Q Would those be Excel spreadsheets?

A What I would have seen would have been hard copies that were prepared and produced in discovery. I didn't come across or I'm not aware of any Excel spreadsheets.

Q Did you see opinions of value for every tax year from 2005 to 2014 for River Oaks Mall?

Page 69

A I can't say that I did because when I came in 2009 I would not have been interested in any value conclusions for the prior years that I was not there.

Q But how about in conjunction with this lawsuit?

A Again, in reviewing some of the discovery, I did observe analyses. I can't tell you if I saw and I don't recall seeing one for every year, 2005 through 2014.

Q Was there a title of the document, the hard copy document, where you said that you've seen an opinion of value for River Oaks Mall from Lisa Clemmons?

A If there was, I didn't observe it, didn't note it, didn't take notice of it.

Q Have you ever gone and compared the Simon Property Tax Department opinion of value for a given tax year to what the Board of Review's ultimate determination was for that year?

A Over time during my tenure, I would have reviewed those.

Q Were any of Simon Property's opinions of value for River Oaks from 2005 to 2014 higher than what the Board of Review determined?

A I don't recall.

Page 70

Q  Would Simon Property -- strike that.  Do you believe it would be appropriate for Simon Property to pursue a property tax appeal when their internal opinion of value is higher than what the assessor or Board of Review determined?

MR. TZUR:  Objection.  Form and speculation.

A  It depends upon the circumstances and how the value was derived.  Not only will I take into consideration the value that may have developed internally, I'll also look at the historical history of the values at the property and if there was a material difference, we may still file an appeal, but I know in this case that there was one year in particular we decided not to file an appeal because we felt that the value in that year was appropriate.

Q  Was year was that?

A  20 -- was it '12 or '13?

Q  I think it's '13.

A  '13.

Q  Okay.  So you're saying in certain circumstances Simon will still pursue a property tax appeal for one of its properties when Simon's internal opinion of value is higher than the amount

Page 71

that's determined by the assessor or the Board of Review?

MR. TZUR:  Object.  Form and speculation.

A  You said "will" pursue and I will say we "may" pursue.

Q  Okay.

A  We may not.

Q  Okay.  So let me just phrase that in a way --

A  Okay.

Q  -- that I think is consistent with what you're saying.  In certain circumstances, Simon Property may pursue a property tax appeal even if it's own opinion of value is higher than what the assessor or Board of Review determined?

MR. TZUR:  Object.  Form and speculation.

A  That's possible.  I, at this time sitting here, I don't have any personal recollection as to whether or not that occurred, but I can tell you as the final arbiter of whether or not we file an appeal, I will take things like that into consideration.

Q  Okay.  And that was gonna be my next question.  You don't know one way or another if you've actually -- strike that.  You don't know one way or another if Simon has pursued an appeal of

Page 72

River Oaks property taxes in the circumstance where their opinion of value was higher than that determined by the assessor or Board of Review?

A  Sitting here, I don't recall.

Q  Okay.  Does the Property Tax Department have any attorneys in it?

A  No.

Q  Did it ever?

A  No, to the best of my knowledge.  I'm speaking from the time frame 2008 to current.

Q  Okay.  How many people are in the Property Tax Department currently?

A  13.

Q  In the 2009 to 2014 time frame, who was your supervisor?

A  It varied.  When I was originally hired, my supervisor was a gentleman by the name of Tim Ernest.  He was the executive vice president of the property management group.  From there and when he left the organization, I reported to David Contis who was an executive vice president or a title similar to that.  After David Contis left the organization, I reported to -- good Lord -- Dave Campbell.  He was the senior vice

Page 73

president of the financial accounting group, and after David Campbell I was reporting to Don Frey who was the current treasurer of the organization.

Q  Okay.  From what you know, which individuals in the Property Tax Department had any involvement with the property taxes at River Oaks Mall from 2009 to 2014?

A  Juan Paz would've had the primary experience, but we do have tax analysts that handle the what I'll call back-office activities and that would include tracking assessment notices, tracking tax bills, processing check requests, and making the payments.

Q  So which individuals did that from 2009 to 2014 for River Oaks?

A  That would vary.  I can't tell you year by year who that was because they do circulate that responsibility and we've had, you know, turnover over the years that would have required us to assign it to someone else.

Q  Karen Couch was one of the people who worked in the Property Tax Department?

A  Karen Couch was a tax analyst that worked in our organization for a short period of time.

Page 74

Q  Did she work for Simon for over 20 years?

A  I don't know how long she worked, but she, during my tenure, it was just a couple years.

Q  Oh, okay.  You're saying a short period of time with you?

A  Yes.

Q  Okay.  Did David Contis leave Simon voluntarily?

MR. TZUR:  Object to foundation.

A  I believe so.

Q  By the way, who else have you communicated besides your attorneys and Juan Paz about this lawsuit?

A  My boss, Don Frey, and internal legal.

Q  Have you sent Don Frey any e-mails about this lawsuit?

A  I don't recall any.

Q  Is Don an attorney?

A  He's not a practicing attorney, but he has a law degree.

Q  Have you ever sought out legal advice from him?

A  No.

Q  Would you consider River Oaks Mall, at least from 2009 to 2014, a non-core asset of Simon?

A  Non-core asset is a designation that is oftentimes assigned by the executive management

Page 75

team.  I don't know specifically if it was deemed a non-core, but I would characterize it as a non-core because it was a property that was significantly declining in value.  It was a property that was nearing the end of its economic use for life and, as evidenced by the fact we transferred it to Washington Prime Group, it was determined that it wasn't going to be a core asset to be retained by the company.

Q  What's your understanding of why River Oaks Mall was transferred to Washington Prime Group?

A  Primarily because it didn't fit the portfolio type that the company wanted and it was what I would probably characterize a third-tier property and I'm assuming that the company didn't feel that it had a long-term growth opportunity.

Q  Starting in 2010, can you take me through what you did to determine whether or not the assessor's determination of the taxes for River Oaks should be appealed?

A  On a year-by-year basis?

Q  Yeah.  Take me through the typical process. Like in 2010 you receive a notification of what the assessment is and tell me what your thought

Page 76

process and procedure was for determining whether to file an appeal.

A  Well, either early before we expected the assessment notices or after the assessment notice was received, Juan Paz would evaluate the value assigned to the property, and, through an internal analysis taking into consideration the revenues that were being generated, the recoveries that were being generated, the CAM expenses that were being generated, we'd come up with an effective gross income for the property and we would take and then evaluate all the expenses that were being incurred and deduct those from the effective gross income to arrive at an NOI and that NOI then is capitalized into an indication of value.

And, once we have that, I would sit down with Juan, go through all of his back-up detail and discuss thoroughly how he arrived at his conclusions, looking at the operations of the property, looking at the trends in revenues, the trends in occupancy, the trends in vacancy, and we will come to a conclusion what we feel the appropriate market value is at the property and then compare that to the assessment to determine

Page 77

whether or not it warrants filing an appeal.

Q  That was the procedure that was used for River Oaks Mall from 2010 to 2014?

A  Generally speaking, yes.

Q  When you met with Juan about the value that he assigned, was that the opinion of value that he created?

A  I'm sorry, say that again.

Q  Yeah.  I thought you said a part of the procedure of what you would do is you'd meet with Juan to talk about his opinion of value.

A  Yes.

Q  Okay.  And was it like an in-person meeting or was it discussed over e-mail?

A  Again, he sits 10 feet from me so it would be in person.

Q  Okay.  Did you typically agree with his opinions of value?

A  "Typically" is a very vague word, okay?  I will say that, you know, we were not that different, but there are numerous times when the elements, the input elements, would be reviewed by me and changed by me, and, so, there oftentimes are gonna be adjustments that are gonna be made through that process.

Page 78

Q One more question. Then you want to take a break after this? When Juan would document his opinion of value when you would make an adjustment, would you document that adjustment?

A It depends on how you describe the word "document." Do I sign off on a final value, no. If there are adjustments that need to be made, I will mark them up on the worksheets and on the valuation Excel spreadsheet where I think the changes need to be made. He'd go back, he would make the necessary changes that we discussed, and it would come up with a revised indication of value and that final document would be the so-called documentation.

MR. COZZI: You wanna take a break?

MR. TZUR: Yeah, if we could.

THE VIDEOGRAPHER: We are going off the record at 12:34 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: We are back on the record at 12:45 p.m.

DIRECT EXAMINATION CONTINUING,

QUESTIONS BY DANIEL J. COZZI:

Q Does the Property Tax Department train its employees?

Page 79

A Yes.

Q How does it train its employees?

A It's typically through on-the-job training. When we bring a new individual into the organization, we generally bring them in as a valuation analyst and we train them by taking it through the process of valuing a property and giving bits and pieces of the valuation analysis in support of the tax manager.

Q Is there any written materials that you give to new employees to help orient them to the department?

A No, to my recollection.

Q Are you the person responsible for training?

A Well, I'm the individual that is responsible for ensuring they get the training, but a lot of the training is done by the individuals like Juan Paz and other directors but I am certainly involved.

Q Have you ever been terminated from a position or asked to leave?

A Yes.

Q What position is that?

A I worked for Marshall Erdman, first job out of college.

Page 80

Q What did you do there?

A I was hired into a role that wasn't what was expected and neither one of us were happy.

Q Okay. Was that relating to property tax valuation?

A No.

Q Were you terminated or asked to leave any other position?

A No.

Q Do you know someone by the name of Frank Lima?

A Yes.

Q Was he the person who was the head of the Property Tax Department before Ron Hanson was the interim head?

A Yes.

Q Have you ever met Frank Lima?

A Yes.

Q When did you meet Frank Lima?

A He actually took the IPT course that we offered at Real Property Tax School. I met him there, and I believe I bumped into him in some of the symposiums or conferences that IPT offers.

Q Okay. So you actually were the instructor for a course that Frank Lima took about valuation?

A About real property valuation, yes.

Page 81

Q It's my understanding that he was terminated from Simon Property?

A Yes.

Q And why was he terminated?

MR. TZUR: Object to foundation.

A I don't know the specific reasons. It obviously had to do with performance. He wasn't meeting expectations.

Q Well, what did you hear when you took over the department about why Mr. Lima left?

MR. TZUR: Objection. Hearsay.

A I just heard that the work that he was performing and the methods he was utilizing in the department weren't consistent with what was expected or desired of him in that role.

Q He was the head of the department for tax years 2005, 2006, 2007, and 2008, and 2009 for River Oaks; correct?

A I believe so, yes, but keep in mind 2009 there was a transition. I don't think he was involved with the 2009.

Q Do you ever hear that Mr. Lima was receiving kickbacks from vendors that the department was using?

A I heard that he would receive gifts from some of

Page 82

our attorneys that were retained.

Q To file property tax appeals?

A Pardon me?

Q That he was receiving gifts from attorneys that Simon retained to file property tax appeals?

MR. TZUR: Objection. Hearsay.

A You know, I don't know the specifics of it, but it's my understanding that he, you know, would receive various gifts that might be offered to him. Some of them were -- it was brought to my attention by various individuals he was a collector of these little figurines and when some of the consultants, I guess, became aware of that either through direct or indirect forums, they would provide him with these little trinkets that he had in a glass case in the office. And, you know, I've heard other things that he was, you know, given by way of gifts and perhaps, you know, tickets to various sporting events, things like that.

Q Does Simon Property allow the head of the Property Tax Department to accept gifts like that?

A There's a corporate policy that, I think, defines that, but I think it's common sense

Page 83

what, you know, someone should and should not expect. For example, is a notebook, you know, a gift? Yeah, you would consider it a gift. It could be considered a gift, but is that something that is meaningful? No.

So there are times when he would go out with consultants, when I say consultants, attorneys or maybe consultants, and they may pick up the dinner bill, but I fully expect those to come through on our bill eventually, so I don't see that as a gift necessarily, so --

Q And are appraisers consultants?

A Are appraisers consultants? Yes, we retain appraisers.

Q Like would REAC be a consultant of Simon Property?

A Yeah, we're the ones that would be engaging REAC.

Q Does Simon Property still use REAC?

A Yes.

Q Who do you work with at REAC?

MR. TZUR: Object to form.

A We currently work with Brad Braemer.

Q So he's an appraiser who appraises other properties for Simon currently?

Page 84

A Yes.

Q Do you work with anyone else at REAC?

A No, he's the only individual that I work with, but understand that in 2010 that Mike Kelly was also an appraiser with REAC and I interacted with him as well.

Q Since you started at Simon Property, can you give me your best estimate of how many times Simon has asked REAC to perform an appraisal?

A 10 times perhaps.

Q What other properties besides River Oaks?

A (Inaudible) Advisory Services has provided appraisals for Woodfield Mall, Orland Square, and Pleasant Prairie Premium Outlet in Wisconsin.

Q Who is Lisa Clemmons?

A Lisa Clemmons was a tax manager with Simon Property Group.

Q Was she terminated from Simon?

MR. TZUR: Objection to foundation.

A Was Lisa terminated?

Q Was she terminated?

A Yes.

Q Okay. And why was she terminated?

A I don't know.

Page 85

Q Did you hear anything about the circumstances that led to her being terminated?

MR. TZUR: Objection. Hearsay.

A I have not been told what the purpose was other than she wasn't performing, you know, to the level that was expected.

Q Did you hear that she was having a personal relationship with somebody else at Simon Property?

MR. TZUR: Objection. Hearsay.

A I'm not aware of that.

Q Did you hear that she was using her Simon Property office and e-mail to improperly conduct personal business?

MR. TZUR: Objection. Hearsay.

A I have no personal knowledge of that.

Q You never heard of that, though?

A No.

MR. TZUR: Objection. Hearsay.

Q Was Karen Couch terminated from Simon?

A Yes.

MR. TZUR: Objection. Foundation.

Q Were you the person who did that?

A Yes.

Q Why did you terminate her?

Page 86

A   Her performance was not at the level that I would expect.

Q   What specifically about her performance was not at the level?

A   She just didn't have good decision-making skills and her electronic spreadsheet skills left a lot to be desired and we needed a reliable individual in that role so that I could properly manage the department's responsibilities.

Q   Okay.  So, if I looked, for example, at her HR file, that's what it would say about why she left the company?

A   I don't know what's in her HR file.

Q   Okay.  Did you have to create any documentation about that?

A   I don't recall.

Q   Who is Jodi Calisto?

A   Jodi Calisto is regional vice president of financial accounting.

Q   And what is her role?  Like how would you describe what her job responsibilities --

A   As I previously described, there's a tiered level of responsibilities in the accounting group.  As a regional vice president, she would oversee managers, a multiple number of managers,

Page 87

who in turn manager accountants at the property level.

Q   Are you aware that Simon Property Group is a real estate investment trust?

A   Yes.

Q   It consists of a number of smaller trusts?

A   Yes.

Q   One of the -- strike that.  What is the relationship between --

A   Can I clarify?

Q   Yeah.

A   You said Simon Property, but you didn't define Simon Property Group.  It's a multi-tiered organization.  There's Simon Property Group, Inc. which is a corporation that holds interest in Simon Property Group, Limited Partnership.

        MR. COZZI:  Okay.  Can you just tell that person we'll be probably about 30 or 45 minutes?  Thank you.

A   So let me back up again.  Simon Property Group, Inc. is the publicly-traded company that holds an interest in Simon Property Group, LP, and Simon Property Group, LP holds interest in some capacity all of the properties that we manage unless it's a third-party-owned property in

Page 88

which case we're only managing it.

Q   Okay.  I read somewhere that Simon Property Group is the largest owner of shopping malls and concert centers in the world.  Is that true?

A   I've not done the calculation myself, but I can only believe what I read that's published by the company.

Q   And is that something that's published by the company?

A   Yes.

Q   Is there something called a Treasury Department at Simon Property Group?

A   Yes.

Q   Who was in charge of the Treasury Department from 2009 to 2014?

A   That changed during -- and I'm going from my recollection.  Andy Jester would have been, I think, the treasurer in the early years.  That transition when he retired to Brian McDade for a short duration, and then that title was ultimately transferred to Don Frey who I report to.

Q   Do you know what employee or employees handled the accounts receivable and collections for River Oaks Mall from 2009 to 2014?

Page 89

A   No.

Q   How would I go about finding that information?

A   You would ask counsel and they would reach out to in-house counsel and identify the individuals that are responsible for those activities.

Q   The formal name for the Property Tax Department is Property Tax Management, LLC?

A   Not exactly.

Q   Okay.  Tell me why that's not right.

A   The formal name of the Property Tax Group is the Property Tax Group.  Property Tax Management, LLC is a separate legal entity that was created to track the income and expenses of the department and holds no employees, but it's simply a, you know, a legal entity that it uses to evaluate, you know, the performance of the department and handle all the accounting entries that are necessary to be tracked and managed.

Q   What purpose does the Property Tax Department serve for Simon Property Group, Inc.?

A   Well, the purpose of the Property Tax Department is to, first of all, its No. 1 priority is to timely and accurately pay its taxes.  That's our first and foremost responsibility.

        The second responsibility, which consumes a

Page 90

lot of our time, is to evaluate property values assigned by the jurisdictions to determine if they're fair because, you know, it's our goal to make sure we pay no more than our fair share of taxes because we have a fiduciary responsibility to the tenants. And, so, we will evaluate the level of assessment on a property-by-property basis and if we feel that there's a need to appeal that property to bring it into a more appropriate level, we will do so.

Q   What fiduciary duty did Simon owe to the tenants of River Oaks Mall?

A   The tenants at River Oaks Mall are ultimately -- many of them, not all of them, but many of them ultimately pay the property taxes. We talked about the recovery earlier. Each tenant may or may not be responsible for contributing to the property taxes at River Oaks. If they're contributing to it and the property is assessed at an amount that we believe is higher, they're gonna end up having to bear a higher tax liability.

Q   Okay. So let me just see if I can break that down. Ultimately, the tenants of River Oaks are the ones who pay the property taxes for River

Page 91

Oaks?

A   In a perfect environment, all of the tenants will contribute, but the reality is, typically at River Oaks, a lot of those tenants had negotiated not having to be required to, you know, pay the property tax liabilities. That's what I called the recovery leakage, okay?

Q   Depends on whose version of perfect. I mean, that's the perfect world for --

A   In a retail world, every property should be a triple net property where you collect the taxes that are paid, but that's not how the mall industry works because each lease is negotiated uniquely based upon the terms and conditions that the parties, the lessee and the lessor, come to agree upon.
         And, in a lot of cases in properties like River Oaks where the property is declining, the tenants negotiate the property tax liability away and they don't have to pay it, so it's -- the amount of tenants that do contribute is the recovered amount or recovered percent that I indicated that lease accounting would calculate.

Q   Okay. So that recovered amount or the recovery rate just refers to what percentage of River

Page 92

Oaks' taxes are paid by tenants?

A   Correct.

Q   And for the amount that aren't paid by tenants, who pays that remaining balance?

A   That responsibility would fall on River Oaks Mall, LLC, the legal entity.

Q   Okay. So, having said that, in a given year it looks like well over 50% of the taxes for River Oaks were paid for by the tenants themselves?

A   I don't have any specific knowledge as we sit here if it's well over 50%, but --

Q   Fair enough.

A   Let's just say it's not anywhere close to 100%.

Q   And what is a gross lease, by the way?

A   A gross lease would be a lease that the tenant pays all of the -- they pay their base minimum rent; they pay a full CAM, Common Area Maintenance tax or a Common Area Maintenance expense, CAM, C-A-M; they would pay their full pro rata share of property taxes and any other ancillary charges that may be incurred at the property.

Q   If the tenants are paying for property taxes, do they also pay for the legal fees associated with appealing property taxes?

Page 93

A   Yes.

Q   How is that delineated in their leases?

A   Well, there are specific terms that talk about real estate taxes and what their responsibility would be.

Q   And Simon has a fiduciary duty not only to pursue property tax appeals but it's also to distribute any refunds acquired from those appeals to the tenants to the extent that the tenant is paying property taxes?

A   To the extent that the tenant paid the taxes, yes, unless there was some extenuating circumstances.

Q   Okay. And what would the extenuating circumstances be?

A   If a tenant leaves or re-negotiates a lease, there could be an agreement by and between the parties that they relinquish any of the potential refunds for an appeal.

Q   If this lawsuit results in a verdict in favor of Simon or a settlement in favor where Simon collects some amount of funds, would those be distributed to the tenants who paid taxes during those tax years?

A   I don't know, given the situation, how that

would be handled. That's not in my swim lane, so to speak.

Q Okay. And whose lane would that be?

A That, first of all, would be individuals in legal leasing to determine what the terms of each individual lease was at the time.

Q Okay. You talked about some people in the Property Tax Department who are not -- whose performance was let's just say not optimal. Did the Property Tax Department since you've been there have any metrics for how employees' performance are measured?

A We have goals on an annual basis. They're not always -- they don't always change, but there would be expectations, written or could be oral, during the annual review process.

Q What goals would you have for Property Tax Managers?

A To ensure that they timely and accurately approve tax bills, to ensure that they have done their due diligence as to whether or not the properties that they manage are appropriately assessed, and it becomes a qualitative measure at how good they are at their job.

Q Were any goals set for property tax managers

that determine how much they were able to achieve in refunds for their properties?

A Repeat the question, please.

Q Sure. Have you ever set any goals for property tax managers that try to measure how much that manager was able to achieve in property tax refunds?

A No.

Q So would it be even relevant to the performance of a property tax manager how much money they're able to recover in refunds?

A No.

Q Has Juan Paz always hit his goals that you set for him?

A Well, that's a qual -- that calls for a qualitative answer. My job is to (audio malfunction) are times when I may coach him on how to do things better and be more efficient, but he's been a reliable member of the property tax group.

Q Does the Property Tax Department try to follow IAAO standards?

A No.

Q Does the Property Tax Department try to follow USPAP requirements?

A I don't lay out specifically a requirement to follow either of those organizations. It's my job to, you know, evaluate the performance of each individual regardless of, you know, the standards or goals of those organizations.

Q Who do you receive your paycheck from, what entity?

A Simon Property Group Administrative Services, I believe, is the entity that pays our compensation.

Q Is Property Tax Management, LLC an Illinois company?

A I don't know the answer to that.

Q Do you know if it's an Illinois taxpayer?

A I don't know the answer to that.

Q From time to time, would you have departmental meetings in the Property Tax Department?

A Yes.

Q What written materials were generated regarding those meetings?

A Just general outline of some of the issues that are current and that our team needs to be aware of, activities that we may have -- that we may have been successful in, but it's more process and procedural in nature.

Q Was River Oaks Mall ever discussed at one of the departmental meetings?

A I don't recall it ever coming up in a department meeting.

Q Has this litigation ever been discussed?

A Not in a department meeting that I can recall.

Q And who creates like the meeting agenda?

A I do.

Q Do you have that saved on your computer?

A I have probably some historical archived items, but, you know, when I had an administrative assistant I would provide them the information and they may have it. I don't have an administrative assistant any longer.

Q Sorry to hear that.

A Yeah. That's the times these days; right?

Q Who was your administrative assistant from 2009 to 2014?

A There were probably four or five. Started out with Courtney Masbaum and, good Lord, you're really challenging me because it's been a while since I've had one. Kris Proctor was another individual that we had and Kristy Slate was a third individual and there were two more that were in the position that at this moment I don't

Page 98

recall their names.

Q  Did Ms. Masbaum actually pass away?

A  Yes.

Q  Could you flip to Exhibit 2, please, specifically Page 77 of Exhibit 2 which is the 2006 Annual Report by Simon.

A  Okay.

Q  I think this is gonna be pretty straightforward. It says at the top that these are properties, I believe, owned by Simon as of December 31st, 2006?

A  It doesn't say that. It says "PROPERTIES at December 31, 2006."

Q  Is it your understanding that these are Simon's properties as of December 31st, 2006?

A  Not necessarily without studying it and really going back because there are properties that are partnership properties and in some years there are properties that we simply manage on behalf of other owners.

Q  I see. Okay. Let's look at the Illinois section. Some of these properties are in Cook County besides River Oaks; correct?

A  I'm sorry, repeat that question.

Q  Yeah. Some of the properties in the Illinois

Page 99

section are also in Cook County?

A  Yes.

Q  That includes Orland Square?

A  Yes.

Q  Do you know if Simon owned Orland Square?

A  I believe we wholly own that property.

Q  Did the way that you handle property tax appeals change between whether Simon owned the property versus managed the property?

A  No.

Q  Lincolnwood Town Center was another Cook County property that Simon had?

A  Yes.

Q  Juan was the property tax manager assigned to all of those properties?

MR. TZUR: Object to form.

Q  And by "all," I mean the Cook County ones that we just referenced the deposition.

A  He would have been the property tax manager for Lincolnwood and Orland Square, yes.

Q  Did REAC perform appraisals for those other Cook County properties?

A  REAC has performed appraisals for Orland Square. I don't recall if REAC did any appraisals for Lincolnwood Town Center.

Page 100

Q  Do you have any reason to believe that the Board of Review was ever treating -- strike that. Do you believe that the Board of Review ever behaved in a way that was contrary to the law when it was determining the value of Simon's properties?

A  I have no personal knowledge that they have.

Q  Okay. Do you ever prepare documents at the request of attorneys?

A  Can you be more specific?

Q  Well, yeah. Can you name any documents regarding River Oaks Mall that you were asked to prepare at the advice of an attorney?

A  I can't recall any.

Q  Okay. When you say that Simon has a fiduciary duty to tenants about appealing their property taxes, is there a document that forms the basis of that fiduciary duty?

A  To the best of my knowledge, there is not anything that speaks specifically to fiduciary responsibility other than the terms of the lease which state, you know, the duties and obligations of the tenants, but it goes without saying, in my opinion at least, that we owe that to the tenants because they shouldn't be paying

Page 101

more than their fair share of taxes.

Q  When you say "we owe that to the tenants," what is that?

A  As a landlord, we have a responsibility and duty to maintain a property physically and I think that, by extension, we have a responsibility to ensure that the taxes are fair and reasonable.

Q  Okay. And is fair and reasonable based on what the people in the Property Tax Department determine is fair and reasonable; correct?

A  That's the starting point, but, ultimately, it's the determination by a finder of fact that determines what is fair and reasonable. So we could file an appeal and prevail and get a reduction in the assessment. We may file an appeal and not get any relief, and, so, it's -- it varies.

Q  Do tenants ever provide any input about whether to pursue property tax appeals?

A  On rare occasions tenants will inquire as to whether or not we're filing appeals because tenants obviously are watching their expenses and property tax is a very large component of those expenses, and, so, we don't get the specific inquiries but our lease accounting and

Page 102

our leasing group do get those inquiries and then they will pass those inquiries on to us.

Q Okay. So let me just see if I can summarize this. If there are any inquiries by tenants about whether property tax appeals are being pursued, that would typically be communicated by the tenant to lease accounting who would then pass on that communication to you in the Property Tax Department?

A Yes.

Q Okay. Do you know whether any of the tenants at River Oaks Mall sent any communications to lease accounting about pursuing property taxes from 2005 to 2014?

A I don't recall any.

Q The place to look for that would be lease accounting?

A Well, the place to look for that would be in communications to us because the individuals within the organization would be communicating with us on those inquiries.

Q Can you name any individuals in lease accounting who would be responsible for River Oaks Mall from 2005 to 2014 at any point?

A I can't as I sit here today.

Page 103

Q And when lease accounting would communicate with the Property Tax Department, would they typically send you an e-mail or Juan an e-mail or someone else an e-mail?

MR. TZUR: Object to form.

A Let me just first clarify. It's just not only lease accounting. Their leasing organization could also be receiving that because they are different entities, so I just want to make that clear. And, so, with that, can you repeat the question?

Q When lease accounting or the leasing organization would communicate with the Property Tax Department about tenant inquiries about filing a property tax appeal, who would be contacted specifically in the Property Tax Department?

A Typically, it would be me and the tax manager, but it could be just the tax manager or it could be just me. There is communications with the group and then we discuss that as a tax manager/department manager conversation.

Q Those would typically be communicated via e-mail to you and/or Juan?

MR. TZUR: Object to form.

Page 104

A Not necessarily.

Q What other forms besides --

A There could be a phone call and say, hey, we've got a tenant that is inquiring about property taxes, and we could have a conversation with the individual that received the inquiry or someone in that organization that came to us. Other times it's gonna be by e-mail.

Q Did tenants ultimately pay for the appraisals that REAC performed on River Oaks?

A Yes.

Q That was through the recovery rate --

A Hang on. Let me back up, clarify. Those tenants that paid property tax also participated in the cost of the appraisal. If the tenant was not contributing to property taxes, they would not contribute to the expense of the appraisal report.

Q Okay. What is Simon Tax Services, LLC?

A Simon Tax Services, LLC?

Q Yes.

A Never heard of that.

Q Okay. How would tenants be, I guess, billed for their share of the property taxes? Like what communications would they receive about how much

Page 105

they're paying in property taxes that year?

A On an annual basis, the lease accounting group is responsible aggregating all of the costs that tenants are responsible for reimbursing, both common area maintenance often called CAM, C-A-M, and property taxes. And tenants who contribute to property taxes typically accrue, on a monthly basis, an estimate of what the tax liabilities will be, and at the end of every year at some point in time the lease accounting group will reconcile the accruals with the actual expenses.

Q Would tenants receive some sort of estimate of how much they could expect to pay in the future for property taxes?

A The answer is yes, that's part of the accrual figure that is established.

Q And what -- strike that. What's the name of the documents where lease accounting would communicate this accrual figure to tenants?

A I don't know the name of the document.

Q If there was a successful property tax appeal where Simon achieved a refund before either an arrear review by the assessor or before the Board of Review or in circuit court, how would the refund or savings be distributed to tenants?

Page 106

A    At the time the accrual reconciliation process occurs, if all remedies have been exhausted and we know it's final and we've either -- when we received a refund, that would be calculated as part of a credit towards their expenses that are billed on that annual basis.

Q    Okay.  And you say that it would be documented as a credit.  Would it say credit for property tax appeal?

A    I don't know the document that they communicate.  I have not seen the document they communicate to tenants to know what terminology they use.

Q    Did the Property Tax Department have separate policies, procedures, or a separate handbook than what applied to Simon Property Group generally?

A    We have procedures for the back-office activities which includes the processing of tax bills, the processing of assessment notices, and other activities that we have in the department.

Q    So those are written procedures?

A    Yes.

Q    Have you written those procedures yourself?

A    No.

Q    Who prepared them?

Page 107

A    They were prepared under my instruction and direction and they would have been prepared by our tax analyst staff.

Q    Who specifically in the tax analyst staff prepared the procedures?

A    It varies and it's reviewed on an annual basis.  Every year the procedures that we have are regularly refreshed, reviewed to determine if there's any procedural changes, but it would be any number of individuals over the years that have a hand in preparing and updating the procedures.

Q    How would -- strike that.  Are you able to find the historical procedures that were in place, for example, from 2009 to 2014?

A    We looked for those because that was part of the request and the supplemental request that we received in the last couple months --

Q    Yeah.

A    -- and there were no procedures that we could locate that the time frame that was outlined in the supplemental request.

Q    Was there any procedures before that time frame?

A    I believe there were, but there aren't any archived.  We were not able to find any archived

Page 108

versions of that because they're evergreen and they're kept in a data repository.  What happens is when they refreshed, the old version gets overwritten.

Q    Okay.  Were there any procedures in place in 2009 to 2014 about valuation of properties?

A    Not to my knowledge.  I had no -- I developed no procedures for that process.

Q    Are there currently any procedures relating to that?

A    No.

Q    How about hiring appraisers or attorneys?

A    Don't understand the question.

Q    Were there any procedures about that at any time in place in the Property Tax Department?

A    Procedures for hiring appraisers or consultants, no.

Q    Can you flip to Exhibit 3?  Have you ever seen a document like this before?

A    I can't say that I've seen this document, but I've seen corporate policies.

Q    Okay.  And there's been corporate policies in effect at Simon Property Group from 2009 to the present?

A    Yes, in some capacity, yes.

Page 109

Q    And those policies would also apply to employees of the Property Tax Department; correct?

A    Yes.

Q    Where are those policies stored at Simon?

A    Simon has an electronic data repository that houses all of the policies that you're referring to here.  These are owned by Human Resources, typically.

Q    So they're kept by the Human Resources Department at Simon?

A    Yeah.  Well, there's a central repository.  Today's day and age, you know, everything is electronic and it's stored electronically in some form or fashion in a computer system and these are documents that can be referenced on an as-need basis.

Q    Did you ever have to -- strike that.  Can you flip to this page here that's got a signature of somebody?  I think this person is Patrick Brady.

A    What page is that on?  Okay.  Got it.

Q    Just, for example, have you ever needed to sign a document like this?

     MR. TZUR:  Object to form.

A    I'm not sure what you mean by "sign a document like this."

Q Okay. So this is called Simon Property Group Field Policies and Procedures. Do you see that at the top of the document?

A Yes.

Q Have you ever signed a Simon Property Group Field Policies and Procedures document?

A I don't know if I've signed a document called Simon Property Group Field Policies and Procedures. When I was hired, I do believe I was required to read and attest to the Business Code of Conduct.

Q If you flip a little bit further in Exhibit 3, there's something called the Employee Policy Handbook.

A Yep.

Q Have you ever seen that?

A Can't say that I've seen this specific version, but I've seen an employee handbook, a version of the employee handbook. As I said, like anything else, procedures and policies and things like this are periodically refreshed.

Q Have you ever needed to sign the employee handbook?

A I don't recall. That may have been part of the Business Code of Conduct that I signed.

Q Does Simon's Human Resources Department create the employee handbook?

MR. TZUR: Objection. Foundation.

A I don't know who created that document.

Q Have you ever heard of something called a Best Practices Manual at Simon?

A I can't say that I have.

Q Can you flip to Exhibit 4? Do you see this is a document called the Simon Property Group, Inc. Code of Business Conduct and Ethics?

A I do, yes.

Q And it's dated on the first page April 20th, 2011?

A Yes.

Q Have you ever seen this document before?

A Again, this is a Business Code of Conduct that's dated April 20th, 2011. I have seen the Business Code of Conduct and read the Business Code of Conduct when I came to the company in 2009. Don't know and I don't recall ever reading the 2011 version.

Q As the head of the Property Tax Department, you're responsible for following the Simon Code of Conduct; correct?

A Yes.

Q If you flip to the last page where it has a signature and a name and a date. My question is: Did you ever sign the Code of Conduct acknowledging it?

A Yes, I believe I did in 2009.

Q Have you ever been convicted of a crime?

A Yes.

Q What is that?

A College, hung around with the wrong people and we got in trouble in a grocery store and I was cited.

Q What did you do in a grocery store?

A We -- the group tried to walk off with some merchandise. It was a stupid move, but after a few beers in downtown Menomonie I did a stupid thing, something I'm not proud of.

Q Okay. And what crime were you convicted of?

A I don't know what the name of the crime was.

Q It was some sort of retail theft?

A I think so.

Q Besides that, have you ever been convicted of or pled guilty to any crime?

A No.

Q Have you ever had any of your licenses investigated --

A No.

Q -- or disciplined? You mentioned, I think, that you had done three or four depositions in the past?

A Yes.

Q Tell me about -- in what context have you given depositions in those other cases?

A It was in property tax matters and it was prior to a testimony in a property tax litigation.

Q Okay. Do you remember the names of the properties in those cases?

A Yes, one was McDonnell Douglas, the manufacturing facility in St. Louis, Missouri, and I believe we also had a deposition on the Boeing manufacturing company in St. Louis, Missouri.

Q Any other ones?

A I'm not recalling any at this moment, but I do recall those two specifically.

Q Did you testify any New York case?

A Yes.

Q Tell me about that.

A I testified in several New York cases. First case that I testified in was the appeal of the Joseph C. Wilson Center for Technology in

Page 114

Webster, New York. I also testified in the GE, General Electric, Waterford manufacturing facility in Waterford and Schenectady, New York. I also testified in the General Electric Corporate Research & Development facility appeal in Niskayuna, New York.

Q When was the Niskayuna testimony?

A Let's see, that would be after -- probably 2006 or 2007. It was between -- no, actually, I take that back. My apologies. In 2000 I was at Xerox, so it would have been 19 -- between 1995 and 2000. All three of those, actually.

Q Okay. How many times have you testified either in a deposition or at a hearing or trial regarding one of Simon Property's properties?

A Probably a half a dozen times.

Q Okay. Tell me about those.

A Okay. I testified in the Pleasant Prairie Premium Outlet appeal that occurred in 2021 roughly; right? 2020, 2021. I've testified in several cases in California, the most recent and notable would be Del Amo board hearing. We've got so many properties. I've got to mentally go through all those state to state. Those are the only two that I can recall specifically.

Page 115

Q And the Pleasant Prairie case, that's relating to the Wisconsin property that REAC appraised?

A Yes.

Q What year was it that you actually testified? I think you said 2021. Was that the --

A It was in the '21, actually maybe '21/'22 time frame. Those appeals still haven't been decided.

Q Did you give a deposition in that case?

A No.

Q In what context did you testify? Was it a hearing or a trial?

A It was a trial.

Q What attorney represented you at the trial?

A That would be Sara Rapkin and Don Millis.

Q Are they in Wisconsin?

A Yes.

Q Are they in the Milwaukee area?

A Sara is an attorney in the Milwaukee office. Don Millis is an attorney in the Madison office of the firm that they --

Q Who was the defendant in that case?

A The Town of Pleasant Prairie.

Q Do you remember who represented the defendant?

A Amy Seibel.

Page 116

Q How do you spell that name?

A S-e-i-b-a-l-d.

Q And Ms. Seibel was the one who cross-examined you at trial?

A Yes.

Q Were you ever given a copy of your testimony in that case?

A We have transcripts so the answer is yes.

Q And you were sent the transcript by e-mail?

A Yes.

Q Okay. What other testimony do you have transcripts from?

A My personal testimony or just --

Q Anybody in your department.

A We likely have transcripts for a matter in Massachusetts, a litigation matter for the Cape Cod Mall. We likely have transcripts for an appeal of -- I'm trying to think of the name of the property. We actually turned it back. Another property in the list.

Q 77.

A Where was that list? It would help me if I go through the properties.

Q Yeah, yeah, it's Page 77.

A Thank you.

Page 117

Q Exhibit 2.

A It may not be up to date, but it will tickle my -- there's a lot of properties in Texas that there would have been oral testimony at the board, but I don't think we have any of the transcripts on that. Washington (inaudible). There would have been transcripts of some type for the Del Amo Mall in California. It could be electronic; in other words, audio instead of written. There would be transcripts -- actually, that wasn't -- that was mediation. Sorry. As I scan this, those are the only ones that I can think of that might have transcripts.

Q When is the most recent time that you've given a deposition before this occasion?

A Me?

Q Yes.

A Personally?

MR. TZUR: Did you say (inaudible)?

MR. COZZI: Besides this case.

MR. TZUR: Oh, I'm sorry.

A Besides this one, it would be a deposition given for a property in Nassau County, New York, and it was our Roosevelt Field Mall.

Q Okay. And when is the most recent time that

Page 118

you've given trial testimony?

A In a legal form?

Q Yes.

A It would be Pleasant Prairie Premium Outlet.

Q Do you have any trial testimony scheduled in the future?

A There are trials in the future, yes. They're scheduled, yes. Will I testify? I don't know.

Q I can appreciate that as an attorney. And do you have any depositions scheduled in the future?

A No.

Q Who else in your department has given a deposition or testified at trial besides Juan?

A Besides Juan? Nobody, to my recollection as I sit here today.

Q When you say that you guys have transcripts, are those transcripts typically e-mailed to you after you testify?

A They're not typically e-mailed to us, but there are times when we request copies of the transcripts.

Q Where do you save them?

A They're electronically saved in our electronic files.

Page 119

Q Is there a name for the system where you save electronic files?

A Right now it's SharePoint. Before and prior to that, it was just your typical M drive, hard drive, you know, that we all used to be familiar with until we got into the new-age era.

Q Has Simon Property been represented by Blank Rome in any other cases?

A Yes.

Q How many other cases that you know of?

A One other case. Well, two other cases.

Q One is the Pennsylvania case?

A No. The first case would be -- one case would be the Nassau County case I previously referenced. That was a dispute on the requirement to turn over confidential information. And the other case is a case in the State of Pennsylvania.

Q Okay. What was the Pennsylvania case about?

A It's a case where the jurisdiction has filed a reverse appeal seeking an increase in the assessment and we're opposing that increase.

Q Is the case pending?

A Yes.

Q Who has testified in that case at Simon Property

Page 120

to your knowledge?

A I don't know that anybody testified in that case.

Q The name of the Pennsylvania case is Duffield?

A Is what?

Q Duffield. Is that the name of the case?

A That doesn't ring a bell.

Q Oh, okay. And what was the result of the Nassau County case?

A I think it's still pending.

Q These cases never seem to go away, this one included; right?

A Yep. A wonderful judicial process we have; right?

Q Do you often sign written discovery responses on behalf of Simon Property when there's a case involving property taxes?

    MR. TZUR: Object to form.

A Okay. Repeat the question, please, so I can --

Q Yeah. Do you ever sign written discovery documents in litigation like answers to interrogatories or responses to requests for production?

A Yes.

Q Okay. Have you ever served as an expert

Page 121

witness?

A Not while I was employed by Simon Property Group, but I have served as an expert witness in many cases, yeah.

Q And those all happened before you started work at Simon?

A Yes.

Q What types of cases were those?

A Valuation cases.

Q Do you have the transcripts of your testimony in any of those cases?

A No.

Q Did you give depositions in any of those cases?

A No, that I can recall.

Q Did you prepare reports in any of those cases?

A Yes.

Q What attorneys retained you in those cases, to the best of your memory?

A I don't think any of the attorneys retained us. It would be the property owner that retained us.

Q And what property owners retained you?

A Xerox Corporation retained us for the Joseph C. Wilson Center for Technology on a couple occasions. And we were retained by General Electric on the Corporate Research & Development

Page 122

facility in Niskayuna, the Waterford and Schenectady manufacturing facility, and the third was the -- Niskayuna, Waterford, and what was the third one? I just had it. I forgot it.

Q Do you know of any evidence to suggest that the Cook County Assessor applied a different level of assessment to Simon Property between 2010 and 2014 than what the Cook County Assessor applied to other properties owned by Simon?

MR. TZUR: Object to form.

A Can you define what you mean by "level of assessment"?

Q Assessment ratio.

A The assessment ratio. I --

MR. TZUR: Same objection.

A I don't know that they have treated us differently than anyone else. Didn't endeavor to study that personally.

Q Have you ever given testimony relating to assessment ratios or the level of assessment applied by an assessor to a property?

A No.

Q Were you involved in determining -- strike that. Were you involved in collecting documents that would be produced in this litigation?

Page 123

A In some capacity, yes; not in all the data collection.

Q And you just told us, I think, maybe 10 minutes or so ago about searching for procedures that would have been in effect between 2005 and 2014; correct?

A Correct.

Q What else did you search for?

A Well, it was in response to the supplementary request that was received about a couple of months ago. We went through that and with legal counsel and identified what the tasks would be to search for certain information and we endeavored to go out and see if we could find any additional documents that may be responsive to those requests.

Q Did you identify any new opinions of value about River Oaks Mall that had not been produced?

A I can't tell you that there was a cross-reference to the documents we identified and were ultimately produced and what was previously produced.

Q Okay.

A I can't tell you that they were new or they may have been repetitive.

Page 124

Q Understood. Let me ask a better question. Did you find any opinions of value when you were looking for information that was responsive to what you said were the supplemental (inaudible)?

A Yes, there were some valuations using our typical method of deriving opinions of value and that was in some of the supplementary documents that I reviewed, identified, and we turned over.

Q And did you find those in SharePoint?

A Well, I guess the answer to that is yes because that's the only item I can search now because the former system is no longer available to me.

Q Okay. When you said before that sometimes after Mr. Paz provided an opinion of value, like, in a spreadsheet, you would write up the spreadsheet with changes?

A We would talk about them. I would annotate them, you know. He would give me a copy and he'd have a copy and we'd walk down each element of the analysis and, you know, he would show me the sources and how he arrived at his conclusions for each one of the different elements, and if after reviewing the inputs I felt that there was an adjustment that needed to be made, I would direct him to make that. He

Page 125

would go back, make that adjustment, and bring the analysis back for a valuation to determine what the final value might be.

Q Would both the original analysis and the amended analysis be saved?

A No. As I mentioned before, we talked about this, the spreadsheet that he would have used as the basis for that would have been modified, so there wouldn't be an archived copy of both. We just make the change in the same spreadsheet.

Q Understood. So does that mean for the spreadsheets that have been produced in this case that include an opinion of value for River Oaks from 2010 to 2014 that both you and Mr. Paz have signed off on those?

A No, not necessarily because there may be times when there were multiple spreads -- he may have saved a Rev 1, a Rev 2, Rev 3, so there could be iterations that he archived that I'm not aware of, but -- and I will do the same when I'm evaluating that. I may save different versions in the event I want to go back to it. So it can be done on an overwrite basis or it can be done on an (inaudible) what I'll call a leap-frog basis where you have multiple versions.

Page 126

Q   Understood.  What's your understanding of whose e-mails have been searched in this case?

A   My understanding is that my e-mails have been searched and Juan Paz's e-mails have been searched for all of the information that would be responsive to the discovery.

Q   Why haven't Frank Lima's e-mails been searched?

MR. TZUR:  Objection to foundation.

A   I don't know if his e-mails would've been searched.  I don't know if his e-mails exist because that would've been prior to 2009 and, you know, the corporate policy of retention would have expired, so it's very possible those -- any documents that contain some of that information may no longer exist.

Q   But the corporate document retention policy also indicates that documents and e-mails about a pending litigation cannot be destroyed; right?

A   That's correct.

Q   How does Simon learn about -- strike that.  Are you familiar with like a litigation hold notice?

A   Yes.

Q   And what is that?

A   That's a notice that is sent out by internal legal counsel identifying a property that needs

Page 127

to be on litigation hold and nothing to be destroyed.

Q   Is River Oaks on litigation hold now?

A   Yes.

Q   How long has it been on litigation hold?

A   I seem to recall that that would have been in the 2018/'19 time frame, by recollection.  I have a copy of it in my office, but I'm not sure that that '18/'19 time frame is precisely accurate.

Q   Okay.  Were documents about River Oaks destroyed before the 2018 or 2019 litigation hold letter?

MR. TZUR:  Objection.  Foundation.

A   I have no personal knowledge that anything was destroyed.

Q   Do you know if Frank Lima's e-mails are searchable now?

MR. TZUR:  Objection.  Foundation.

A   I don't know.

Q   Do you know if Lisa Clemmons' e-mails are searchable?

MR. TZUR:  Same objection.

A   I don't know.

Q   Other than looking for materials on SharePoint, have you personally looked for responsive

Page 128

documents at any point in this case in any other locations?

A   Yes.

Q   Where did you look?

A   We searched our records retention storage location.  We call it Iron Mountain.  So we have an inventory of the documents that have been sent off site for storage.  I reviewed the inventory sheets and pulled the documents that had information regarding River Oaks and collected the documents and transmitted those as part of the supplementary discovery that was recently provided.

Q   Does Simon have something called a cap rate study?

A   We don't have our own personal cap rate study.  We use cap rate surveys from a variety of sources.  We also derive our own cap rate through a financial analysis.

Q   And who does that, the property tax managers?

A   Well, the surveys are public surveys and we aggregate those and we use those as a resource to evaluate what cap rate might be an appropriate cap rate.  There's sources like Green Street Advisors, PricewaterhouseCoopers,

Page 129

Cushman Wakefield, CBRE, Korpacz Realty Advisors.  Those are just a few of the capitalization rate resources.  We also develop our own capitalization rate using a mortgage equity analysis.

Q   What is a tenant access platform?

A   The tenant?

Q   Access platform.

A   I'm not familiar with that.

MR. COZZI:  I think this is a good time to take a break and we can switch out the video.

MR. TZUR:  Okay.

THE VIDEOGRAPHER:  We are going off the record at 1:53 p.m.

(A recess was taken.)

THE VIDEOGRAPHER:  We are going back on the record.  The time is currently 2:51 p.m.

MR. TZUR:  Okay.  Yeah, and thank you, Dan.  Just while we were on break, did you, Mr. Larson, have a moment to think about the questions you were asked about prior convictions?

THE WITNESS:  Yes.

MR. TZUR:  And could you just say what you're thinking about now about in connection

Page 130

with those questions?

THE WITNESS: Yes, I seem to recall that when we were talking about that, you asked if I was convicted of a crime, and, as I sit here today, I don't know if I was convicted of a crime.

MR. TZUR: It's possible you were?

THE WITNESS: It's possible I was. I can tell you I did pay a penalty, but I didn't have to go to court, didn't have to do anything else. So I don't know what it is and I don't know what level it is, so just want to make sure the record is clear, at least to that effect.

DIRECT EXAMINATION CONTINUING,

QUESTIONS BY DANIEL J. COZZI:

Q Is there any other aspect to your testimony thus far that you'd like to change?

A I can't think of anything. You did ask a question about properties we may have transcripts on and there was another property. It was Emerald Square Mall in Massachusetts. And then you asked about some cases that I was also involved with in New York, and, in addition to the GE R&D facility, the GE main plant turbine generator facility, Xerox, there was

Page 131

also the Waterford silicone manufacturing plant.

Q Okay. The Massachusetts case, did you say the Emerald Square?

A Emerald Square Mall.

Q Okay. And what testimony did you give in that case?

A I don't think I did any testimony. You asked if there were transcripts and I had -- and we would have transcripts of that because it was recorded, but I don't recall ever giving testimony, no.

Q Okay. And you have recordings of who?

A It would be the transcripts of our expert in that particular case as well as the opposing experts.

Q Okay. And was that a case involving valuation?

A Yes.

Q Who was your expert in that case?

A Don Bouchard and Peter Korpacz, K-o-r-p-a-c-z.

Q Is Peter Korpacz the same Korpacz as you mentioned before provides a cap rate survey?

A Peter Korpacz began the Korpacz Realty -- or the Korpacz Investor Survey which is a survey that he authored. He eventually was -- that survey was bought and he joined PwC and it continued on

Page 132

as a PwC -- or, excuse me, the Korpacz Investor Survey, and then when Peter Korpacz left PwC, they eventually changed the name to the PwC Investor Survey and that's the cap rate survey I mentioned.

Q Does Peter Korpacz have any involvement in this case?

A No.

Q Does Don Bouchard?

A No.

Q Is Don Bouchard an appraiser?

A Yes.

Q Simon Property used him to appraise a number of properties over the years?

A Yes.

Q Are they typically located in one geographic area?

A They're typically in the northeast, but he has done work in Tennessee and New Jersey.

Q Do you keep some sort of personal either electronic or paper file relating to Simon's different properties?

A Yes.

Q Did you do that for River Oaks Mall?

A Yes.

Page 133

Q Is it paper or electronic or both?

A It's both. Well, it's electronic which when we print it it becomes hard copy.

Q And you do print them?

A Occasionally, yeah. Well, yes, I would say the answer is yes.

Q Have you printed the River Oaks Mall electronic file?

A Yes.

Q And you have that in your office now?

A It was turned over in the latest discovery.

Q Okay. Your entire file that you keep for River Oaks Mall was turned over in the most recent round of discovery?

A I want to be clear. I believe everything that I had would be part of the discovery. I know that in the supplementary discovery I did additional research on my personal folder and turned that material over, and I know, through looking at the discovery, a lot of the reports that we generate are also in the discovery documents that were produced in advance of this deposition.

Q Okay. You would agree that Simon Property does not destroy documents about a property where

Page 134

that property is the subject of pending litigation?

A  I believe that to be the case, yes.

Q  You'd agree that Simon's document retention policy --

A  Can I clarify that?

Q  Sure.

A  I do not know of any situations where we've knowingly destroyed documents.

Q  Okay.  Simon's document retention policy applies to e-mails as well; correct?

A  Yes, I believe so.

Q  Does the Property Tax Department have some sort of database that's used to maintain tax bills and assessment notices?

A  Yes.

Q  What is that called?

A  It was originally known as the ePropertyTax system.  It changed to the ONESOURCE property tax system and now it's the OPT system.  All of the systems were just different generations and different ownerships.  ePropertyTax was owned by one organization.  It was sold to ONESOURCE and then, ultimately, ONESOURCE sold it to Ryan.

Q  Okay.  When did Simon use ePropertyTax?

Page 135

A  It would have been before I joined the organization.

Q  When did Simon use ONESOURCE?

A  Again, it was a continuation.  We continued to use ePropertyTax which was changed to name ONESOURCE when it was sold to Thomson.

Q  That's Thomson Reuters?

A  Thomson Publishing.  I don't know if it's Thomson Reuters.  It's Thomson.  I know it as Thomson.

Q  And then when did you start using OPT?

A  In the last couple years when Ryan acquired the rights to the software.

Q  Has ONESOURCE been searched for information relating to River Oaks in this case?

A  Yes.

Q  And, to your knowledge, has all of the ONESOURCE information been produced?

A  Yes.

Q  What sort of information is contained about River Oaks in ONESOURCE?

A  It would be factual data such as the property name, the entity number, the various values that are published by the Assessor's Office or estimated during our budgeting process including

Page 136

land value, improvement value, total value, equalized value, market value, which are all a function of the mathematical computations, assessed value provided by the 38% equals market value.

Also included in that would be the tax rates by each parcel.  Each parcel is separately identified.  Any additional other taxes that are paid beyond the typical tax rate and commentary on each parcel identifying the assets that are contained, the improvements that are contained in that parcel.

Q  Does ONESOURCE contain Simon's opinions of value about a property?

A  It contains our opinion of the value that we believe that the assessor will apply to the property.  It does not contain the value that we have derived independently in our fee simple analysis.  So, when we go through our budgeting process, we will look at the history of the assessments on a property and the changes in tax rates and we will budget each fall what we think is gonna happen in the upcoming year based upon historical view of the actual assessments applied to the property and the actual market

Page 137

values and the historical tax rates.

It does not -- I want to make clear -- does not represent the fee simple value that we derive in our evaluation for appeal purposes.

Q  So the budgeted value is what you predict the assessors will do?

A  Yes.

Q  And your opinion of value is what the assessor should do?

A  Yes.  Great way of putting it.

Q  Thank you.  Who determines the budgeted value for a property?

A  It starts with the tax manager and ends with me.  Each tax manager is responsible for preparing a budget and during the budgeting process I sit down with each tax manager and review their projection of the budget and decide if that's reasonable, it is not reasonable, should be adjusted based upon my review of the historicals and expectations of what might happen.

Q  Is Simon's internal opinions of value always lower than the budgeted amount for that year?

A  As I sit here, I don't know if that's the case or not.

Q  And then with respect to River Oaks you don't

Page 138

know either?

A   Well, there were two years that we did not file appeals, 2007 and 2013. I don't know if the budgeted value was above or below that number.

Q   If -- strike that. Explain to me why again you didn't file an appeal in 2013.

A   Because in that particular year, as I recall, we didn't believe that the market value that was rendered by the Assessor's Office was in excess of our opinion of the market value for that property.

Q   Actually, the market value was lower that was rendered by the assessor than what you internally believed the market value was for 2013.

A   As I sit here, I don't know that to be a fact, but we didn't file an appeal so --

Q   Obviously, if the assessor determines a lower market value than what Simon internally believes the market value, Simon keeps the excess number. It keeps the amount of taxes that it believed it should've had to pay but it didn't have to pay for a property. Does that make sense?

        MR. TZUR: Object to the form.

A   Yeah, no, I don't understand.

Page 139

Q   If Simon's taxes are lower as determined by the assessor than what Simon internally believed that they should be, Simon gets the benefit of that; correct?

        MR. TZUR: Also object to form.

A   I don't know if it's the benefit because the value determined by the assessor is deemed to be the appropriate assessment, so I don't know if you can say that there is a "benefit." But, if you want to parse words, if our estimate is higher and the assessment comes in lower, yeah, there is a benefit.

Q   Do you believe that the assessment determined by the assessor is the appropriate amount?

        MR. TZUR: Object to form.

Q   I mean, clearly, Simon believes that sometimes the assessor's determination is not the appropriate amount; correct?

A   Correct.

Q   And when was the Property Tax Department created at Simon?

A   I don't have an answer to that.

Q   Do you know who created it?

A   No.

Q   What did you do to prepare for your deposition

Page 140

today?

A   I reviewed the documents that were produced in advance of this, a deposition by, I'm assuming, your team. I reviewed the interrogatories that I executed and there were some other discovery documents that I reviewed.

Q   How long did you spend preparing for your deposition?

A   By way of time, I would say that it would be perhaps six hours.

Q   By the way, you said that budgeting for the next year's property taxes is based on what you believe the assessor will do; correct?

A   Correct.

Q   May be a dumb question. Why doesn't Simon budget based on what they believe the assessor should do?

A   Because if we were to budget at the value that we believe it should be and the assessment comes in higher and later the tax bill comes in and we've underbudgeted, the accrual that the tenants pay is gonna be undercollected and there's gonna be a shortfall. And we're gonna end up having to bill the tenants the additional amount which tenants are not fond of, and, so,

Page 141

we're better off projecting what the assessor might come up with so that we can guard against any unforeseen pushback or disputes with the tenants.

Q   What is the difference in methodology between when Simon prepares an opinion of value for a property and when Simon budgets the estimated property taxes for the following year for that property?

A   I'm sorry. Say that one more time, please.

Q   Yeah. What is the difference in methodology between preparing a budgeted amount of taxes for a property and preparing an opinion of value for that property for the same tax year?

A   When we budget for a property, we're looking at all the historical assessments and we're looking at the trends in the actual assessments and actual market values and actual tax rates and the changes in tax rates. So we're looking at a retrospective analysis of those annual assessments and liabilities. When we are evaluating whether or not the assessment is proper, we go through the fee simple interest market value analysis that we talked about earlier, evaluating the true performance of the

Page 142

property, evaluating the trends in leasing, the trends in the recoveries of the property, the EBITDA, earnings before interest, depreciation, and taxes, and we look at other market sources like market leases, cap rates, and, you know, vacancy and collection losses. So we're looking at it in two different completely processes.

Q. Okay. But the same people who prepare opinion of value for a property also prepare the budgeted amount for that property?

A. Yes.

Q. For the years 2009 to 2014, that person was Juan Paz who did both of those numbers?

A. 2009 to 2014 did you say?

Q. Yes.

A. Yes.

Q. And Lisa Clemmons would've done that for every year she was the property tax manager?

A. I don't know how the department was operated, so I can't speak to that.

Q. Does anybody else in, for example, financial reporting or leasing or any other individuals have any input on how much should be budgeted for a property's property taxes for the following year --

Page 143

MR. TZUR: Object to form.

Q. -- besides the property tax manager?

MR. TZUR: Objection. Foundation.

A. Juan Paz will estimate the budget. I will review the budget. We transmit that to financial accounting. There could be inquiries on the budget that's been prepared, but, ultimately, the decision rests with us.

It's possible that financial accounting could, of their own volition, make a change, but that's not something I would have visibility to.

Q. Do you know if any change was made to River Oaks' budgets?

A. I don't know.

Q. Did you approve every budget prepared for Juan Paz for the following year's property taxes from 2010 to 2014?

A. Yes, I believe that would be the case.

Q. That's part of your job responsibility as the head of the department?

A. Yes.

Q. And who specifically would that budget be transmitted to once it's been approved by you?

A. A budget for our entire portfolio of which River Oaks would be a part of is transmitted with

Page 144

financial accounting group.

Q. And what do they do with that?

A. They will record the estimated and projected liability.

Q. I'm sorry, you already said this. How long did you spend preparing for your deposition today?

A. About six hours.

Q. What days did you prepare?

A. Monday. Well, let's see, I think it started last week and then at the end of the week, perhaps Friday, then Monday, Tuesday, and a little bit -- well, Monday, Tuesday, Wednesday.

Q. Did you meet with Simon's attorneys?

A. Yes.

Q. How many times?

A. Each one of those times.

Q. Who specifically was present for those meetings?

A. Paul Tzur was present as well as Sam, Sam V.

Q. Yeah. Ventresca?

A. Ventresca. Thank you.

Q. Was any other person present?

A. No.

Q. Like, for example, was Juan Paz present for any of those things?

A. No.

Page 145

Q. Have you ever read the transcript of any of Juan Paz's depositions?

A. No.

Q. Or of Lisa Clemmons' deposition?

A. No.

Q. Did you bring any documents with you today for the deposition?

A. No.

Q. Did you review all of the pages of potential exhibits that would be referenced at this deposition?

A. I scanned them. I think there were 1,995 pages. So I started at Page 1 and scanned on through. There was a lot of repetition, but I think I went through each page albeit pretty quickly because of the repetition.

Q. One of your job responsibilities from 2010 to 2014 was to decide whether to pursue an appeal of the property taxes for River Oaks Mall; correct?

A. Yes.

Q. Was anyone at Simon outside the Property Tax Department involved in that decision?

A. Outside of Simon Property Group? Yes, we would've conferred with outside legal counsel.

Page 146

Q And I think I asked a little bit different question. My question was: Was anyone at Simon outside of the Property Tax Department?

A Oh, I'm sorry. I misunderstood. Outside of the property tax, so repeat the question, please.

Q Sure. Did anybody at Simon, besides people in the Property Tax Department, have any input on the decision whether to pursue an appeal of the River Oaks Mall property taxes from 2010 to 2014?

A No. Let me clarify that. The answer "could be" because we were managing the property taxes in '14 for WPG. I recall seeking permission from WPG's general counsel.

Q Who was that?

A Rob Demchak.

Q I'm sorry. You said you sought permission from him?

A Yes.

Q To do what?

A To file an appeal and engage an appraiser.

Q And was that engaging an appraiser from REAC?

A Yes.

Q Did you send an e-mail to him?

A I don't know the answer to that.

Page 147

Q Rob Demchak, at the time that you e-mailed him, was in-house counsel in a different company; correct?

MR. TZUR: Objection. Misstates what he just said.

A I'm sorry. Repeat the question.

Q Sure. When did you reach out to Rob Demchak?

A Sometime in 2014, as I recall.

Q Did you reach out to him by e-mail?

A I don't know the answer to that.

Q And when you reached out to Rob Demchak what company did he work for?

A Washington Prime Group.

Q Okay. So he was not the attorney for Simon; correct?

A Correct.

Q Have you ever searched for any communications you've had with Rob Demchak?

A I have not specifically searched for any communications with Rob Demchak.

Q How many times would you say that you communicated with Rob Demchak about this litigation?

A Three or four maybe.

Q And when was that?

Page 148

A It would have been around the time that we had to make an appeal decision and engage outside counsel and an appraiser.

Q All of those were in 2014?

A Yes, as I recall.

Q Is Rob Demchak still at Washington Prime?

A No.

Q Is Washington Prime still in existence, by the way?

A Good question. They -- well, they spun off. They were acquired by another firm, kept the Washington Prime name, went through bankruptcy court, and I think they went private. I don't know if they're still under the name Washington Prime Group or WPG. I recall, but I can't be certain.

Q And do they have some affiliation with the company Glimcher?

A Glimcher was the company that they merged with/they bought. There was a transaction that took place. After Simon Property we spun them off. Glimcher and WPG entered into a merger of type, an acquisition of type, but they kept the WPG name.

Q What did Rob Demchak say to you about whether to

Page 149

pursue this appeal?

A I would've asked him if he grants us permission to file an appeal and retain counsel and an appraiser.

Q What did he say?

A Yes.

Q Would you have specifically recommended REAC as the appraiser or did you just keep it generic in terms of retaining an appraiser?

A I would have recommended REAC.

Q Why would you have recommended REAC at the time?

A Because they had firsthand knowledge of the property.

Q In the -- for the 2014 tax year, who was responsible for paying the property taxes that the tenants did not pay? Was it Simon or was it Washington Prime?

MR. TZUR: Object to foundation.

A After the spin-off, the uncollected property taxes would be the responsibility of Washington Prime Group.

Q And, so, assuming that the spin-off was on May 28th, 2014, any uncollected property taxes that would become due after that date would be the responsibility of Washington Prime Group to pay?

Page 150

MR. TZUR: Object. Foundation.

A That's my understanding.

Q And those taxes were no longer the responsibility of Simon Property Group?

MR. TZUR: Same objection.

A That's my understanding.

Q So, if there's some sort of recovery in this litigation for the 2014 tax year, who would that money go to?

MR. TZUR: Objection. Calls for a legal conclusion.

A I don't know this for certain, but it's my belief that it will be a proportionate distribution of that and the tenants would be reimbursed.

Q So there would be a proportion distribution to the tenants that contributed to paying property taxes and to Washington Prime for the rest?

A Provided -- well, you gotta go back to the lease and determine what the lease states with respect to the landlord/tenant obligations, but what typically occurs is that the tenants that are due refunds would receive the refunds. The residual would then be proportionately shared with Simon up until the 28th of May and after

Page 151

that with Washington Prime Group.

Q Has there been any communication with Washington Prime Group about that?

MR. TZUR: Object. Foundation.

A I don't know.

Q So, ultimately, any, in your opinion, excessive taxes that were paid on River Oaks Mall after May 28th, 2014 were taxes that were paid for by Washington Prime and its tenants?

MR. TZUR: Object. Form and foundation.

A Repeat the question.

MR. COZZI: Sure. in, could you repeat that one?

(The reporter read back the previous question.)

Q Let me try to rephrase that one. Any excessive taxes that were paid for River Oaks Mall after May 28th, 2014, were ultimately paid for by the tenants of River Oaks Mall and by Washington Prime Group; correct?

MR. TZUR: Object. Foundation.

A Yes, that's my understanding.

Q Simon Property did not pay those taxes; correct?

MR. TZUR: Same objection.

A Correct. And let me just clarify. Correct as I

Page 152

understand it.

Q What's the relationship between Fox Valley/River Oaks Partnership and Simon Property Group, Inc.?

A Simon Property Group, Inc. is the incorporated corporation which owns Simon Property Group, LP, partnership, and, through a series of ownership structures, Fox Valley/River Oaks would be owned by Simon Property Group, LP which in turn is owned by Simon Property Group, Inc.

Q Can you flip to Exhibit 5, please.

A Tab 5?

Q Yeah, Tab 5, Exhibit 5. And this is a document that's titled Second Amended Rule 26(a)(1) Initial Disclosures of the Plaintiff. Can you go to Page 6 of that exhibit?

A Okay.

Q Do you see Paragraph 27 on Page 6 lists your name?

A Michael Larson, yes.

Q Do you see starting with the second sentence of your paragraph, it says "Mr. Larson has knowledge as to Fox Valley/River Oaks Partnership and Simon Property Group (Delaware), Inc.'s ownership of its property at issue in this case during the tax years at issue, as well

Page 153

as the payment of property taxes for said property."

Do you see that?

A Yes, I do. I'm not sure you read it right because I was switching my glasses.

Q Is that description of your knowledge accurate?

A Yes.

Q Can you flip to the next page? Do you know somebody by the name of Michael J. Kelly?

A Yes.

Q Have you ever met him?

A Yes.

Q How many times?

A Three or four times in person and conversations on the phone numerous times.

Q Where did you meet him in person?

A Well, I know he was involved in the Pleasant Prairie case. He was the appraiser for the River Oaks case, and I probably met him at various times either through property inspections or reviews of the reports.

Q Did he testify at trial in the Pleasant Prairie case?

A No.

Q Did anybody from REAC testify?

Page 154

A   Yes.

Q   Who testified?

A   Brad Braemer.

Q   Do you know why Michael Kelly didn't testify and Brad Braemer did?

A   It was a decision by and advice of counsel.

Q   Is it your understanding that Michael Kelly is no longer involved in this litigation?

MR. TZUR:  Object to foundation.

A   I'm not sure what you mean by "involved."

Q   Fair point.  Are you aware that Michael Kelly, as it describes here, was involved in preparing the sales ratio study conducted by Daniel McMillan?

A   I'm not aware of that.

Q   So you have no idea what Michael Kelly did with respect to the sales ratio study?

A   That's correct.

MR. TZUR:  Objection.  Misstates prior testimony.

Q   You are aware that Michael Kelly appraised River Oaks Mall multiple times; correct?

A   Yes.

Q   Michael Kelly's appraisals of River Oaks Mall were one of the pieces of data that you used

Page 155

when deciding to file an appeal of the assessor's assessment; correct?

MR. TZUR:  Object to form.

A   Michael Kelly was part of the appraisal team. It also included other member of the firm REAC. Brad Braemer was also involved in that effort.

Q   What other members of the appraisal team at REAC were involved in appraising River Oaks?

A   The primary appraisers would be Mike Kelly and Brad Braemer.  I know no other individuals that would have been specifically involved, but they have other people in the office that could have participated.

Q   When was the last time you've communicated with Michael Kelly?

A   It would have been as part of the Pleasant Prairie Premium Outlets case in perhaps '18/'19 time frame.

Q   Is your understanding that he's retired now?

A   That is my understanding.

Q   Do you know who Daniel McMillan is?

A   Pardon me?

Q   Do you know who Daniel McMillan is?

A   Daniel McMillan is the statistician or the consultant that was retained to do the ratio

Page 156

studies.

Q   Have you ever spoken with him?

A   No.

Q   Have you ever communicated with him in any way?

A   No.

Q   Do you know anything about whether he's qualified to do a ratio study?

A   No.

Q   Do you know if he's ever done a ratio study in any other context besides this litigation?

A   I'm not aware of anything other.

Q   Okay.  Do you know someone by the name of Robert Gloudemans?

A   Who?

Q   Robert Gloudemans.

A   No, I don't know that name.

Q   Do you know of any other appraiser who has performed an appraisal or any other determination of value for River Oaks besides Michael Kelly and Brad Braemer?

A   No, I do not.

Q   I guess maybe you and Juan Paz.

A   Well, while I am an appraiser, trained as an appraiser, I would be deemed biased.  So an appraiser by my definition is someone that

Page 157

provides an independent indication of value unbiased, and I would be deemed biased.  So, as much as I'd like to be deemed an appraiser on that, that would be not appropriate.

Q   So do you think that the opinions of value -- strike that.  Is Juan Paz biased as well?

A   No.

Q   So you said you would be biased but Juan Paz wouldn't be?

A   I would be perceived as being biased.  If I were to testify to value, someone would look at me and say you're biased because who you work with.

Q   You work for the company who is trying to pay less property taxes; right?

A   Correct.

Q   That looks like it's biased; correct?

A   Yeah, that could be perceived that way, and in the appraisal profession under USPAP you're required to be unbiased.

Q   Michael Kelly was required to be unbiased; correct?

A   Correct.

Q   Brad Braemer was required to be unbiased; correct?

A   Correct.

Page 158

Q Do you have -- strike that. Do you have any knowledge about how many times REAC was retained by the O'Keefe firm?

A I don't.

Q Do you know how many millions of dollars has paid the O'Keefe's firm over the years?

A They have paid?

Q Strike that. Do you know how much money REAC has received from the O'Keefe firm over the years?

A I do not.

Q Part of the bias contemplated under USPAP is a financial bias; correct?

A It could be.

Q Do you believe that REAC had any financial bias in favor of the O'Keefe Lyons & Hynes firm?

MR. TZUR: Object to foundation and speculation.

A The answer is no, I do not.

Q Why not?

A Because at least insofar as it pertains to River Oaks we were the ones that paid the appraisal fees, not O'Keefe Lyons & Hynes.

Q Who was the one who directed Simon Property to use REAC?

Page 159

MR. TZUR: Objection. Foundation.

A The decision during my years of overseeing the property, it was my decision.

Q But you know that River Oaks was getting appraised by REAC before you ever got to the company?

A Yes.

Q So who decided to have REAC get appraised -- strike that -- to have REAC appraise River Oaks Mall before you got there?

MR. TZUR: Objection. Foundation.

A I don't know.

Q And the -- strike that. Okay. So the reason you believe that REAC was not biased in favor of O'Keefe Lyons & Hynes is because Simon Property was the one that actually paid REAC?

A Well, that's not the only reason. I just believe that the work they did was ethical and unbiased.

Q What was that based off of?

A My experience as an appraiser.

Q Did -- strike that. Did REAC ever perform appraisals for financing purposes?

A I'm not aware of that being done.

Q Did REAC ever perform appraisals on behalf of

Page 160

any assessment officials?

A I'm not aware of any.

Q REAC only performs appraisals for taxpayers in ad valorem taxation matters; correct?

MR. TZUR: Object to form.

A I don't know that. I don't know what their book of business is.

Q Do you know of REAC doing any work other than doing appraisal for a taxpayer in an ad valorem appeal?

A I don't know what other work they may do.

Q Do you believe it would be appropriate for you to have REAC perform appraisals if you believed that they were a biased company?

MR. TZUR: Object. Speculation.

A If I believed they were biased, I wouldn't retain them.

Q Were you a certified appraiser at any point from 2010 to 2014?

A I may have been. The last state certification that expired, because I didn't want to continually pay the continuing education fees and credits, occurred while I was at Xerox, so I was at Xerox from 2000 to 2009 so during that time I did hold a Certified General Appraiser

Page 161

license.

Q Are certified appraisers responsible for following USPAP when they're involved in an appraisal?

A Yes.

Q And part of what you would have been required to follow in USPAP is the requirement that a property not be appraised by a biased appraiser; correct?

A Well, the appraiser attests under the certificate of appraisal that he's unbiased in the work that he's performing.

Q It would be inappropriate for you to knowingly hire an appraiser for River Oaks who you believe is biased; correct?

A Yes.

Q So if --

THE WITNESS: Can we take a break?

MR. COZZI: Sure.

THE WITNESS: I had too much liquids at lunch.

MR. COZZI: Yeah, yeah, yeah, let's take a break.

THE VIDEOGRAPHER: We are going off the record. The time is currently 3:32 p.m.

Page 162

(A recess was taken.)

THE VIDEOGRAPHER: Back on the record. The time is currently 3:39 p.m.

DIRECT EXAMINATION CONTINUING,
QUESTIONS BY DANIEL J. COZZI:

Q Do you believe that REAC had any bias in favor of O'Keefe Lyons & Hynes?

A No.

Q I asked you earlier whether you're an expert about sales ratio studies. You said, you know, define "expert." Have you ever analyzed a sales ratio study?

A In this case?

Q In any case.

A Yes.

Q In what context was that?

A As an appraiser with American Appraisal, we occasionally bid sales ratio studies for our appraisal reports, and, so, as a participant in some of those appraisals, I had the need to evaluate those and review those. I didn't conduct those, but they were part of our appraisal reports.

Q What sources would you look to in determining how to perform a sales ratio study?

Page 163

A If I were doing one, I would look to The Appraisal Institute's body of knowledge to determine how to go about conducting those as well as any other resources that might be available to me.

Q How about the IAAO standard on ratio studies?

A I might look at an IAAO body of knowledge associated with that.

Q You would agree that a key requirement for performing a valid sales ratio study is making sure that the data used has been sufficiently screened?

A You're asking a question that is not defined because you indicated that the verification -- accurate verification? Define accurate.

Q According to the standards set forth by the IAAO.

A Well, while the IAAO and Appraisal Institute and other bodies may have guidelines on sales ratio studies, sometimes the data doesn't exist in the perfect world that a process or procedure is laid out, so you're only able to use the data that's available to you and you try to use the best data available. So, to the extent I define accuracy as the best information available, then

Page 164

I would agree with that.

Q Part of performing a sales ratio study is performing sales screening, though; correct?

A It may. It doesn't have to. You can do sales ratio studies on different classes at higher levels without drilling down into specific details.

Q What source says that?

A What source says that?

Q Yeah.

A I can't name a specific source, but, again, sales ratio studies, like appraisals, can be done at very detailed levels and at higher levels with less detail. It depends on the quantity of data that you're dealing with.

Q Yeah. Does The Appraisal Institute have standards for sales screening for a sales ratio study?

MR. TZUR: Foundation.

A I'm not aware of standards that The Appraisal Institute may publish or require.

Q Does it have any guidelines for sales ratio studies?

A As I sit here, I don't know the answer to that question.

Page 165

Q Can you name anything that The Appraisal Institute has published regarding sales ratio studies?

A Not as I sit here.

Q And am I correct that you're not gonna be offering any opinions in this case about Dr. McMillan's ratio study?

A I will not.

Q Have you ever received an appraisal from REAC that where the fair market value determined by REAC was actually lower than what the assessing official determined -- excuse me, it was actually higher than the assessing official determined?

A I don't recall any.

Q When you have -- strike that. When Simon has a new property that it wants to perform -- wants to have a third-party appraiser appraise for the first time and Simon has outside counsel retained already, is it outside counsel's decision which appraiser to use or is it Simon's decision?

MR. TZUR: Objection. Speculation.

A It's my decision.

Q Okay. So it would be the head of the Property

Page 166

Tax Department's?

A Yes.

Q And was that the case when Frank Lima was the head of the Property Tax Department?

A I don't know.

Q Was any appraisal performed on River Oaks for any purpose other than ad valorem taxation?

A I'm not aware of any.

Q Are you aware that REAC has dropped out of this case as experts?

A I don't know that they were in the case. When you say in the case/out of the case, I don't know what you mean by that.

Q Well, I mean, I showed you a disclosure by your company that says Michael Kelly and REAC are witnesses in the case; right?

A Correct.

Q That's the page we're looking at?

MR. TZUR: Objection. Form.

Q Did you assist Simon's attorneys in preparing answers to written discovery in this case, like answers to interrogatories?

A Yes.

Q Did you assist in providing the responses to requests for production in this case?

Page 167

A Yes.

Q Did you go through all of the answers to interrogatories to make sure all the answers were accurate and complete?

A To the best of my knowledge and belief, yes.

Q And did you sign the answers to interrogatories verifying that all that information is accurate and complete?

A Yes.

Q You said that you reviewed the answers to interrogatories to prepare for your deposition today?

A I reviewed some of the interrogatories that I signed, not all of them.

Q Do you still believe that the answers to interrogatories are accurate and complete?

A To the best of my knowledge and belief, yes.

Q What damages do you believe that Simon Property Group experienced as a result of the Cook County Assessor's conduct in this case?

MR. TZUR: Objection. Form.

A It's unquantifiable damage, but, in my opinion, when tenants have to pay taxes that are higher than they otherwise should be, tenants have options to go to other properties and so it's

Page 168

very possible that tenants left the property to go to competing properties that had lower taxes. So that would be one element of potential damage, but, again, it's not easily quantifiable.

Q Any other damages?

MR. TZUR: Same objection.

A I can't think of anything as I sit here.

Q Is there anything that would refresh your memory on that?

A I would have to go through a thorough review of all of the analysis and all of the background material to obtain that knowledge.

Q Can you point to a single piece of evidence that any tenant left River Oaks Mall because of its property taxes?

A As I sit here now, no.

Q In all of the documents you've seen in this case, have you seen one piece of evidence to suggest that a tenant left River Oaks because of property taxes?

MR. TZUR: Objection. Incomplete.

A As I sit here, I don't recall any specific documents.

Q So to say that any tenant left River Oaks

Page 169

because of property taxes would be speculation; correct?

A As I sit here now, yes.

Q What is a capital expenditure?

A Capital expenditure is a cost incurred to repair or improve building or land improvement components. It's repair and maintenance costs that are incurred at the property.

Q How does Simon Property document capital expenditures for a mall like River Oaks?

A The capital expenditures would be tracked and managed by the property management group and because of our capitalized threshold of any expenditure capital improvement over $5,000 would be recorded in the fixed assets books and books and records generally, there may be exceptions to that, but our fixed assets would be one source of that as well as the property management group.

Q Are you aware that Simon Property is not disputing the 2007 tax year in this case?

A Yes.

Q What's your understanding of why they're not disputing the 2007 tax year?

A Because I wasn't there, I don't know the reason

Page 170

why it wasn't appealed.

Q And you already mentioned that they're not disputing the 2012 tax year either; correct?

A '12? '12 or '13.

Q Sorry. Simon isn't disputing the 2013 tax year; is that correct?

A That's my understanding, yeah. One of those two years. I'm going from recollection, so --

Q I'll represent to you it's 2013.

A Okay.

Q Is it -- strike that. Is it your understanding that the Cook County Assessor assessed River Oaks Mall appropriately in 2013?

A I don't care for the choice of words they assessed it "appropriately," but the value conclusions derived did not warrant filing an appeal.

Q Do you have any criticism of the way that the Cook County Assessor assessed River Oaks for tax year 2013?

A I don't have a detailed knowledge of how they derived the value, but I know that the value was a value we did not dispute. I could have a dispute with how they arrived at that value along the way, selection of rents and all of the

Page 171

elements that go into it, but the conclusion was a conclusion that we did not believe was something we should appeal.

Q Okay. My question today is a little bit different from what you're saying here. My question is this. Sitting here today, do you have any specific criticism of the way that the Cook County Assessor assessed River Oaks in 2013 for that tax year?

A No.

Q Do you know of any significant capital expenditures that were made for River Oaks Mall from 2000 to 2016?

A Yes, I know that there was a demolition that took place at the property. The office building was demolished and that would be deemed a significant capital expenditure.

Q When was that completed?

A I believe it was 2013.

Q Was that what resulted in a lower assessment in 2013?

MR. TZUR: Objection. Speculation.

A I don't know.

Q You met with the Assessor's Office about that; right?

Page 172

A We met with the Assessor's Office once. I don't know if it was before or after the demolition took place.

Q Would the demolition have to be completed before the tax benefit of the demolition was realized?

A It varies by jurisdiction. I do recall reviewing some discovery documents where Juan had done some research in discussing with the Assessor's Office what would constitute removal of that asset and the information that I read indicated that the site would have to be seeded before they would provide relief on that. I don't know if that actually held, but I do know that there were certain criteria the Assessor's Office outlined that would be required in order to move that improvement value from the assessment.

Q When you said the site needed to be "seeded," what word is that?

A Seeded, s-e-e-d-e-d, grass seed.

Q Oh, I see. Would there need to be grass over the --

A It would have to be seeded. That's what I recall in reviewing the discovery documents.

Q Okay. And that's what Juan's research showed?

Page 173

A That was part of it, yes.

Q Okay. And, I guess, consistent with that, after the demolition of the office in 2013, Simon received a significant reduction in the assessor's determination of value for the River Oaks property; correct?

A They received a reduction. I don't know if it was significant or not. That's a qualitative measure.

Q Okay. What was the purpose of the demolition project?

A To remove an asset that was at the end of its economic use for life.

Q Was the purpose of the demolition basically to benefit Simon and its tenants from a property taxes standpoint?

A You know, I take issue with the word "benefit," okay? The purpose of the demolition and the evaluation was to determine whether or not there would be an appropriate return on the cost of demolishing that property against the present value of the taxes paid. There was a reduction due to the demolition, so, to the extent the reduction constitutes a benefit, then I would agree with the premise, but it was an

Page 174

appropriate reduction.

Q Okay. Would you agree that capital expenditures are recorded on balance sheets as an asset?

A Yes.

Q Simon Property Group, Inc. is a publicly-traded company; correct?

A Yes.

Q And it being a publicly-traded company, Simon Property Group, Inc. has filed certain SEC disclosures?

A Yes.

Q Is the Property Tax Department at all involved in helping either prepare or verify information in any of Simon Property Group, Inc.'s SEC disclosures?

A No.

Q You're aware that some of the disclosures filed by Simon Property Group, Inc. include 10-Ks, 8-Ks and 10-Qs?

A That's my understanding.

Q Generally speaking, do Simon's SEC disclosures include the company's assets and liabilities?

A In some form or fashion, yes. It could be high level. They're generally high-level assets and liability disclosures.

Page 175

Q Would River Oaks Mall be one of Simon's -- strike that. Was River Oaks Mall one of Simon Property Group's assets from 2005 to 2014?

A Yes.

Q Would -- strike that. How did Simon prepare SEC disclosures from 2010 to let's say 2014?

A I don't understand the question.

Q What department at Simon was responsible for helping prepare SEC disclosures?

A That would be the financial reporting organization.

Q Can you name any person from financial reporting who was involved in that process from 2010 to 2014?

A Steve Broadwater would be one individual.

Q Does Steve still work at Simon Property?

A Yes.

Q How would the value of Simon's assets be determined for purposes of the SEC disclosures?

A They are reported on a book cost basis. The investment in the property, whether built or acquired, is the starting point, the cost associated with that, the cost to acquire it or the cost to build, with additions as they occur offset by book and tax depreciation, so it's a

Page 176

book and tax recitation.

Q And would the ultimate value be the net book value?

A Yes.

Q So the net book value for a property is ultimately what's reported in an SEC disclosure?

A That's correct.

Q Would financial reporting at Simon work with any third parties to help prepare an SEC disclosure?

A Yes, their outside accounting firm.

Q And was that Ernst & Young?

A I believe it was Ernst & Young. It's been Ernst & Young for as long as I can remember.

Q Would Simon have to transmit information about the value of its assets to Ernst & Young --

MR. TZUR: Object.

Q -- in order for Ernst & Young to help prepare SEC disclosures?

MR. TZUR: Sorry. Object. Foundation.

A Can you repeat the question, please? I'm sorry.

Q Sure. As part of working with Ernst & Young to help prepare SEC disclosures, would Simon provide information about the value of its assets to Ernst & Young?

MR. TZUR: Object. Foundation.

Page 177

A I don't know what they transmit to Ernst & Young and at what level.

Q Okay. And when you were talking about the book cost basis, you were talking about certain additions and then I think you were talking about depreciation; correct?

A Correct.

Q Okay. So let's focus on the additions. What additions to the property would be contemplated in the book cost basis value?

A Any of the capital improvements that may have occurred during the time frame that it's being discussed.

Q Anything else?

A As far as capital improvements?

Q In terms of any other additions.

A It would simply be any capital improvements that were invested in the property.

Q Okay. And then how would depreciation be calculated?

A The standard tables defined by the Securities and Exchange Commission and generally-accepted accounting principles.

Q Have you seen any -- strike that. Have you looked at any SEC disclosures in this case?

Page 178

A No.

Q Do you know anything about any value that was included in SEC disclosures of Simon regarding River Oaks Mall?

A I'm not aware of any.

Q This is probably a dumb question. Simon prepared annual shareholder reports?

A Annual reports.

Q Okay. And are those different than SEC disclosures?

A No, they should not be. The SEC disclosures would be 10-K disclosures, as I understand it. Accounting is not my, you know, area of expertise, but --

Q Mine either, if you couldn't tell.

A -- the 10-K is the foundation for the annual report. Annual report is more of a glossy, high-level recitation of all of the elements that go into the company's operations.

Q Who writes the annual report at Simon?

MR. TZUR: Objection. Foundation.

A Don't know.

Q Who writes the 10-K disclosures?

MR. TZUR: Objection. Foundation.

A I don't know.

Page 179

Q Are those done internally at Simon or are they done by an outside auditor?

A I don't have the answer to that.

Q Would Steve Broadwater be a good person to ask that?

MR. TZUR: Objection. Foundation.

A Yes.

Q Let me ask about this term "shareholder." What does the term "shareholder" mean?

MR. TZUR: Objection. Foundation.

A Shareholder is an individual that has a monetary interest in the company.

Q So even if someone had as little as like one stock of a company, they would be a shareholder; correct?

MR. TZUR: Same objection.

A Correct.

Q Are you a shareholder of Simon Property?

A Yes.

Q When did Simon acquire River Oaks Mall?

A As I recall, 1997.

Q How much did they pay for River Oaks Mall?

A I don't know.

Q Who did they acquire River Oaks Mall from?

A I don't know.

Page 180

Q Where did you see that was in 1997?

A In the fact sheet that was provided as part of the discovery and I have access to.

Q Did any of Simon's or Fox Valley's tax returns mention anything about River Oaks Mall?

MR. TZUR: Objection. Foundation.

A Repeat the question.

Q Yeah. Did any of the tax returns filed by Simon Property Group reference River Oaks Mall?

A I'm not -- I have no knowledge of what or may not have been disclosed.

Q Okay. The Property Tax Department -- strike that. Does the Property Tax Department have any involvement in providing information that's used on tax returns?

MR. TZUR: Objection to form.

Q Like an income tax return.

A The answer is directly, no, but, of course, the budgets and the monthly tax liabilities will be transmitted to financial accounting which would become part of the corporation's financial records, so only on an indirect basis. No direct involvement whatsoever.

Q Has Ernst & Young been independent auditors for Simon Property for as long as you've worked

Page 181

there?

A I don't know the answer to that.

Q Do you ever have any communication with Ernst & Young about any of their work for Simon?

A We occasionally are requested to provide sample -- not sample -- data for some of their spot audits, so we do get contacted occasionally.

Q You said spot audits?

A Yeah.

Q What is that?

A Well, Ernst & Young has an obligation to validate the books and records of the company and property tax is probably the second largest expense in the company, so there are individual -- there are audits that Ernst & Young is constantly doing and, on occasion, they will request information from us to understand certain aspects of the property tax that we're managing.

Q Do you know if there were any communications with Ernst & Young about River Oaks Mall?

A I'm not aware of any.

Q Property -- strike that. Your understanding is that paying property taxes is the second biggest expense of Simon Property?

Page 182

A I believe it is.

Q What is the biggest?

A Debt service.

Q What does that mean?

A Mortgages that we hold.

Q Were any mortgages held on River Oaks from any time that you've been involved in the company -- or in the property?

A No.

Q Are you aware of something called a budget score card?

A Let me back up a second. I know that there was a mortgage on the property. When you said "when you were involved," so that would be 2009. I don't know. I'd have to -- I don't know as I sit here when that mortgage was retired.

Q Okay. I'm sorry. What mortgage are you talking about?

A There was a mortgage as part of the discovery that was presented. I don't know when that mortgage was, as I sit here, when it was retired. So you said "during your" --

Q Involvement with River Oaks.

A -- involvement with River Oaks, yes.

Q Yeah. Okay. So it's your understanding that at

Page 183

some point there was a mortgage on River Oaks?

A Yes.

Q Do you know what company -- strike that. Do you know who the lender for that mortgage was?

A No, but it would probably be in these documents or the documents you received in discovery.

Q Was an appraisal performed at River Oaks in conjunction with that mortgage?

A I don't know.

Q Would that be typical to do?

MR. TZUR: Objection. Speculation.

A The answer is yes.

Q And would Simon get a copy of that appraisal?

A No. And, again, I don't even know that the mortgage was secured under Simon's ownership as I sit here.

Q Do you know if the Illinois Department of Transportation ever performed an audit of River Oaks or any part of River Oaks?

A I'm not aware of any.

Q What's a budget score card with respect to Simon's tax liability?

A The budget score card is a way of tracking adjustments during the budget process. Our budget process takes a fair amount of time to

Page 184

aggregate throughout the company. And we will submit a budget to financial accounting which they will book into the upcoming year's financials. If there is a material change in the estimated tax liability that occurs after the budget is submitted but before the budget is finalized, that change is recorded on a budget score card.

Q I see. Would you agree that one of the purposes of the Property Tax Department is to reduce the property taxes of Simon's tenants?

A Is to reduce the property taxes --

Q Of Simon's tenants.

A -- of the property's tenants? Only indirectly. Our responsibility is to make sure that we pay no more than our fair share of taxes, so the tenants would benefit if we do reduce the taxes.

Q What you told me before is that one of the -- strike that. Simon has a fiduciary duty to appeal tenants' income taxes based on the terms of leases; correct?

A Yes.

Q One of the purposes of having a Property Tax Department is to file appeals to reduce the tax liability of tenants; correct?

Page 185

A That's part of the responsibility.

Q And, to use your example, Simon becomes more attractive to tenants if the tenants are paying lower property taxes; correct?

A Can you repeat the way --

Q Sure.

A -- or rephrase that question?

Q Simon's malls, for example, become more attractive to potential tenants when the tenants would have to pay lower property taxes?

A It would become potentially more attractive if their total cost of occupancy is lower.

Q And you describe that concept as kind of unquantifiable; correct?

A No, that's not what I said.

Q Oh, I thought -- what did you say because I thought that was --

A You asked the question: Has the property been damaged by its property taxes? And I indicated that it's very likely that tenants, if their total cost of occupancy is too high, have choices to go to other competing retail properties, and that's -- a tenant leaving may or may not be a part of the decision-making process as to the taxes that's paid, but tenants

Page 186

pay not only property tax but common area maintenance tax, rent, and other ancillary costs which add up to the total cost of occupancy. So, if their property taxes go up, their total cost of occupancy goes up. If their total cost of occupancy goes up, they're less profitable.

They have choices and, at the end of their lease, they can leave and go to a competing property if the competing property has a lower total cost of occupancy. Quantifying the amount of damage resulting from an accepted tax, is highly difficult, but it does go into the decision-making process that tenants have because they're looking at their total cost of occupancy and property tax is an important and large part of that.

Q Okay. But, as to the specifics of whether any tenant chose not to stay or stay at or go to River Oaks Mall because of property taxes, you can't point me to any specifics; correct?

A As I sit here today, no.

Q Am I correct that Simon had monthly operating statements for all of its malls from 2010 to 2014?

A Define what you mean by "monthly operating

Page 187

statements."

Q Well, I saw that in some of the documents that were produced in this case that there would be monthly operating statements. Are you familiar with that?

A If you can point one out to me, I can better answer that question.

Q That's okay. Are you familiar with what an operating statement is for a mall?

A I have my own idea what a monthly operating statement is, but --

Q What is your idea?

A A monthly operating statement would be basically a recordation of the revenues and expenses achieved at the property and on a monthly basis those revenues and expenses are available. And, so, if you're referring to the income and expense statement that's performed on a monthly basis, if that's what you're referring to as an operating statement, but an operating statement is not a specific report that I can recall being cited.

Q What department in Simon prepares income expense statements for its malls?

A Financial accounting.

Page 188

Q Can you take a look at this exhibit that's marked as Exhibit 5.1? Do you see this exhibit contains an e-mail from Julie Leer to you on July 16th of 2009?

A Yes.

Q And that looks like that was shortly after you started with the company?

A Yes.

Q Who is Julie Leer?

A Julie Leer is a regional vice president in the financial accounting group, or at least she is now. I don't know if that was her title in 2009.

Q Okay. On the bottom of this first page, it actually includes an e-mail from you to Julie; correct?

A Yes.

Q And one of the things you do is enclose a pending appeals report relating to certain properties?

A Yes.

Q What are pending appeals reports?

A Pending appeals reports are reports that we record all of the appeals that we have pending in our portfolio at any given point in time and

Page 189

it identifies the property, the initial value that has been rendered by the jurisdiction, our opinion of what that value should be, and it's just a way of tracking all of our appeals.

Q How -- strike that. What is your -- strike that. What is Simon's opinion of what the value should be described in a pending appeals report?

A In a pending appeals report it would be a target value.

Q So, if it says Target FMV, that's the target -- that is the value that Simon is targeting for the appeal?

A That is the value that Simon believes it should be when the pending appeal is entered into the system and that can be in advance of our actual full derivation and analysis and any appraisals that might occur, so it's just a point in time.

Q Okay. I'm gonna ask you about the second to last paragraph on the first page of Exhibit 5.1. You say "as you will see below, we intend to expand our reporting to include financial metrics on overall the Property Tax Liabilities, Recoveries and Property Tax Liabilities Net of Recoveries." Do you see that?

A Yes.

Page 190

Q  What did you mean by that?

A  Well, it seems obvious.  What this report was meant to educate the readers is that we're going to share with them the property tax liabilities of any particular property that is under appeal, we were gonna cite the recoveries that we understand to be the case at the property at the time, and the net property tax liabilities would be the gross liabilities minus the amount that is recovered.

Q  Okay.  And, so, let me just try to define some -- or I'm gonna ask you to define a couple of these.  What do you mean by property tax liabilities?

A  It's the amount of tax that is paid to the jurisdiction plus any costs associated with prosecuting appeals on the property.

Q  Which would include attorney's fees and appraisal fees?

A  It could, yes.

Q  Could it include anything else?

A  Filing fees, things like this.

Q  And then what is meant by "recoveries" in the sentence?

A  Again, this was the tax recoveries I've

Page 191

mentioned a couple times.  Recoveries are the amount of property taxes that are collected from the tenants.

Q  For a property tax appeals report, how did Simon determine the target fair market value?

A  That was our best estimate and that would be our best estimate at the time we opened the appeal in the pending appeals system.

Q  And how is that best estimate created?

A  It can be created any number of ways as simple as looking at prior years' appeals and determining what value either we had or was valuated by the jurisdiction and our estimate of change.  We can do a simple calculation of taking property and dividing it by our estimate of the capitalization rate.  It can be sourced from any number of different methods.

Q  Okay.  Can you flip to Page 41172 in this exhibit?

A  Okay.

Q  This is a pending appeals report that's current as of June 2009?

A  Yes.

Q  Who at the Property Tax Department would've created this appeals report?  Can you read this?

Page 192

A  I'm trying to determine if I can read the footer on that to see if I have any insight to this.  The information would have ultimately been sourced from Juan Paz.  You asked who created this spreadsheet.  I can't tell you as I sit here.

Q  So the target fair market value for River Oaks Mall that's described in the columns on Page 41172, those are all -- strike that.  How are those numbers created?

   MR. TZUR:  Object to form.  Which numbers?

A  Yeah.  Which?

Q  The target fair market values for tax years 2005, 2006, and 2007.

A  As I said, as I sit here now, I can't tell you what went into the calculations of those numbers and I -- if the text were bigger on the status update, I might be able to understand that better.  As I sit here, I can't read it and I don't know if that would even tell me how those estimates were prepared at the time the pending appeals was recorded.

Q  Okay.  I'm gonna ask you a few more questions about direct capitalization reports.  Those are sometimes known as direct cap reports?

Page 193

A  Okay.

Q  Is that true?

A  Well, direct capitalization is a method of a valuation.

Q  Okay.

A  And we have models, valuation models, that we call our direct capitalization model.

Q  Have they been -- strike that.  Has Simon generated those from 2010 to the present?

A  On a periodic basis we do use the direct capitalization model to value our properties, yes.

Q  How often does that happen?

A  Well, it happens almost every year when we're sitting at a position where we have to evaluate whether we're gonna appeal or not appeal.

Q  Would the direct capitalization report include any information from an outside appraiser like REAC?

A  No.

Q  Were direct capitalization reports being generated before you got to Simon Property?

   MR. TZUR:  Object.  Foundation.

A  I believe so.

Q  Did Simon Property make any decision based --

strike that. Did Simon Property make any decisions based on what's contained in direct capitalization reports?

MR. TZUR: Object. Speculation.

A Repeat the question.

Q Sure. Has Simon Property made any decisions based on information contained in direct capitalization reports?

MR. TZUR: Same objection.

A "Decision" is a broad term. What do you mean by "decision"?

Q Any sort of business or legal decisions.

MR. TZUR: Same.

Q It's intentionally broad.

A The answer is yes, the direct capitalization reports would feed into the decision as to whether to appeal or not appeal.

Q Okay. I forget if you've already said this. Do you go over all of the direct capitalization reports for properties in the Property Tax Department and ultimately approve them?

A I can't say that I do that on every direct capitalization approach, but it's my practice particularly on high-visible properties to make sure that I am comfortable with the analysis.

Q Has Simon Property destroyed any of the direct capitalization reports for River Oaks from tax years 2005 to 2014?

MR. TZUR: Objection. Foundation.

A To the best of my knowledge, no.

Q Are they stored on SharePoint?

A Well, they're stored in the SharePoint system currently. Prior to that, they were on some sort of server that Simon used to manage its electronic data.

Q Could you flip open to Exhibit 6, please?

A 6?

Q Yes. Is this document an example of a direct capitalization report?

A Yes.

Q Okay. So, at the top of the second page of Exhibit 6, it says the date of value is January 1st, 2013. Do you see that?

A The first page? It's not numbered, but on the first page you're referring to?

Q Yeah, I mean technically this.

A Second, yeah.

Q Yeah.

A Correction, it's the second page. Yes.

Q Okay. And then it says next to that "YE:

2012." What does that mean?

A Year end 2012.

Q So for what tax year is this direct capitalization report?

A Tax year 2013.

Q Okay. This direct capitalization report would've likely been prepared by Juan Paz and reviewed by you?

MR. TZUR: Objection. Form and foundation.

A Likely, yes.

Q Okay. There's a section on this page, Page 2, it says Potential Gross Income. Do you see that?

A Yes.

Q Underneath that it says Vacancy and Collection Loss?

A Yes.

Q It says Market 7.5. What does that mean?

A That means that, based upon the analysis being performed here, that the level of vacancy in the market that this property competes in is estimated to be 7.5%.

Q And does the sales approach for appraisal include some consideration of market vacancy? Or did I say income or sales?

A You said sales.

Q I meant income. Sorry. Let me ask the question again. Does the income approach for appraising include some consideration of market vacancy?

A Yes.

Q Can you flip to the page that talks about net operating income? Do you see that?

A Yes.

Q I think you earlier had said that there's an abbreviation called NOI. Is that net operating income?

A Yes.

Q Okay. So, for tax year 2013, at least based on this direct cap report, the net operating income was $4,418,820?

A Yes.

Q And then there's a table underneath that. Do you see that?

A Yes.

Q And then underneath the table are several different corresponding market values?

A Yes.

Q Is that referring to a fee simple fair market value?

A Yes.

Page 198

Q Okay. Can you explain what each of those market values signify vis-a-vis the capitalization rate table above it?

A Yes. The, in simple terms, the table that you see below the Net Operating Income line and above the Market Value line represents a sensitivity analysis that we do to determine, after weighing all the factors that go into the elements above, what the appropriate capitalization rate should be. Capitalization rates represent the present value of the future benefits and it's a measure of quantity, quality, and durability of that income stream.

So, when we go through a review like this or when Juan goes through a review or when Juan prepares and I go through the review, I look at all of the elements that go into the NOI, so I would look at the rental rates that go into the NOI -- or, excuse me, into the potential gross income, I'll look at the vacancy and collection loss, determine whether that's reasonable and achievable, I'll look at the expenses to determine the trends in the expenses. If they're going up, there's gonna be more risk. If they're going down, there's gonna be less

Page 199

risk. If the rents are going up, there's gonna be certain levels of risk, and all of those elements are on a quantitative basis used to determine what is the appropriate capitalization rate to use for this property.

Q And, based on what you're looking at in Exhibit 6, what is the appropriate capitalization rate for this property as of the date of this report?

A As I sit here without having the knowledge that went into all of this and all that back-up data, I'm not ready to tell you which market value is the appropriate market value. It's the sensitivity analysis that goes into our decision whether to appeal or not appeal.

Q So where is it determined -- strike that. Where is it documented what is the appropriate market value based on this direct capitalization report?

A We don't necessarily, when we're making an appeal/no appeal decision, land on any specific number. We just look at the range of the sensitivity analysis. We weigh the inputs and the risks associated with the property. If this is a, like this property, it's a declining property. Its economic life is coming up very

Page 200

-- the end of its economic life is coming up very quickly, so we're gonna view that as much more risky than if this property were improving. And, if a property is improving, the capitalization rate is likely going to be lower because there's less risk. If the property is declining, there's gonna be more risk of it coming to the end of its useful life faster.

So I will -- as I sit here without having all of the information that goes into this, and we do a lot of analysis, I would tend to lean towards the higher capitalization rate as the indicator of what this property is probably worth.

Q Is it documented anywhere, though?

A When we make an appeal decision, no, it's not necessarily documented other than this. This document is the document that Juan and I go through. We review and we decide, okay, do we appeal or don't we appeal.

And evaluating this, evaluating what I know about the property, it's gonna be in the 33 to $35 million range. We'd file it. We say file an appeal, and we go to the attorney and say we want to file an appeal. Then it goes to the

Page 201

appraiser, and, ultimately, at the end of the day, the body of information the appraiser includes is the evidence that would be presented at trial and, therefore, becomes the foundation of any appeal.

Q Do you ever provide any direct capitalization reports to an assessor or a Board of Review?

A Yes.

Q Did you ever provide it to the Cook County Assessor?

A Me personally, no. Oh.

Q Did anybody at Simon Property Group?

A Wait. We had the one meeting with the Cook County Assessor on this property. We did a presentation. I don't recall if in that presentation we had a direct capitalization approach or an indication of value, but it's not uncommon for us to turn and to provide our body of evidence a direct capitalization approach.

Q Okay. And I'm not talking about an approach. I'm talking about the direct capitalization report such as the one we're looking at. How common is it for Simon Property to actually provide the direct capitalization report to an assessment official?

Page 202

MR. TZUR: Object to form.

A It depends on the jurisdictions. There are a lot of jurisdictions throughout the United States that welcome that information and that we can come in and have a meaningful discussion as to the differences of opinion. We may go on a preemptive basis before the assessment is rendered, come in and say, look, before you consider all your information, here's what we believe the property is and here's why we believe it. That's what the direct capitalization is, along with the back-up data.

So we do provide direct capitalization analysis to jurisdictions depending upon, you know, the jurisdiction and its perceptiveness.

Q Did you ever provide -- strike that. Did Simon ever provide direct capitalization reports to the Cook County Assessor?

A As I said, we met with the assessor on River Oaks at least once and, as I sit here, I don't recall if a direct capitalization was part of that body of information or not.

Q Okay. So, sitting here today, you cannot name a single time, though, when you provided a direct capitalization report to an assessor in Cook

Page 203

County?

MR. TZUR: Objection. Misstates his testimony.

A As I sit here, I'm telling you that I don't know without looking at that presentation if a direct capitalization approach was presented to the assessor. That would have been likely the only time we presented a direct capitalization approach to the assessor.

Q What time -- strike that. What year was that meeting in?

A I think it's 2015.

Q Why didn't Simon provide any direct capitalization reports to the Cook County Assessor before 2015?

A Because, as I recall, conversations with outside counsel was that it likely was not useful.

Q Do you have any evidence that the Cook County Assessor was not receptive to fair market value data such as the type contained in a direct capitalization report?

A As I sit here, I don't have any knowledge or evidence of that.

Q Did Simon make a strategic decision about whether providing a direct capitalization report

Page 204

to the Cook County Assessor would help its appeal or not?

MR. TZUR: Objection. Form.

A Repeat the question, please.

Q Sure. Did Simon make a strategic decision about whether providing the direct capitalization report to a Cook County Assessor as part of an appeal would benefit Simon's appeal?

MR. TZUR: Objection. Form.

A One more time. I'm sorry. (Inaudible).

Q No, that's okay. Did Simon ever make a strategic decision about whether providing a direct capitalization report to the Cook County Assessor would benefit their appeal or not?

MR. TZUR: Object to form.

A Strategic decision, I don't recall any.

Q Can you point to any evidence to suggest that the Cook County Assessor did not want to receive information such as direct capitalization reports?

MR. TZUR: Object to form.

A I cannot point to anything.

Q Okay. Did Simon ever provide direct capitalization reports to the Board of Review?

A As I sit here, I cannot think of any body of

Page 205

information that would have been provided to the Cook County Board of Review, but those presentations were led by O'Keefe Lyons & Hynes and I would have to look at the body of information that was provided in each of the board reviews to better answer that question.

Q Do you have any criticism of the Board of Review in this case?

MR. TZUR: Object to form.

A Yes.

Q What is your criticism of them?

A That they didn't reduce the value.

Q Do you have any other criticism?

A No.

Q Do you have any criticism of the Board of Review's methodology for determining the fair market value of River Oaks Mall?

MR. TZUR: Object to foundation. Form.

A To the extent that they didn't consider all of the information provided to them to render their opinion of the Board of Review at the Board of Review hearing, I would have that criticism.

Q Do you have any evidence that they didn't consider any information provided to them at the Board of Review hearing?

Page 206

A   No, I don't have any evidence, but evidence was provided and if an assessment wasn't changed and the assessor's value is upheld, I don't think that would be an appropriate decision, in my opinion.

Q   Okay.  Were you present for any of the hearings before the Board of Review?

A   No.

Q   Were you present for any meetings with the Cook County Assessor's Office or any officials at the Assessor's Office besides the 2015 meeting that you mentioned?

A   No, that I can recall.

Q   Do you know why the direct capitalization report that we looked at for tax year 2013 was the only direct capitalization report produced in this case up until August 2025?

        MR. TZUR:  Objection.  Speculation.

A   One more time.  I'm sorry.

Q   Sure.  Do you know why the direct capitalization report that's labeled as Exhibit 6 was the only direct capitalization report produced to the defendants in this case up until August 2025?

        MR. TZUR:  Same objection.

A   I don't know.

Page 207

Q   Those were available at Simon Property the entire time, correct, the other direct capitalization reports?

A   Yes, they would've been in our records.

Q   And they contain fair market value information?

A   They contain our opinion of the fair market value and fee simple interest.

Q   And there's a conclusion section here that's described as Market Value; correct?

A   Yes.

Q   Did Simon Property have a strained relationship with the Board of Review in any way?

A   I'm not aware of any.

Q   Did the Board of Review target Simon Property in any way?

A   I'm not aware of any targeting.

Q   Do you have any evidence that the Cook County Assessor deliberately attempted to shift the tax burden of Cook County onto Simon Property and away from other taxpayers?

        MR. TZUR:  Object to form and foundation.

A   I have no evidence of that.

Q   Do you have any reason to believe that the Cook County Assessor specifically targeted River Oaks Mall for high property taxes?

Page 208

        MR. TZUR:  Object.  Asked and answered.

Q   You can answer the question.

A   Repeat the question, please.

Q   Sure.  Do you have any reason to believe that the Cook County Assessor specifically targeted River Oaks Mall for high property taxes?

A   I have no evidence of that.

Q   What's your understanding of what level of assessment was applied to River Oaks Mall for tax year 2010?

A   You're talking about the ratio?

Q   Yes.

A   The ratio in 2010 should have been 25%.

Q   But what ratio was applied by the Cook County Assessor?

A   Well, I'm sitting here assuming it was 25%.  If it was not, then my answer would change.

Q   Okay.  And is it your understanding that the 25% assessment ratio was applied to River Oaks Mall from 2010 to 2014?

A   That's my recollection.

Q   Okay.  Do you have any evidence to the contrary?

A   Hang on a second.  There were other parcels, too.  There was a parcel that is assessed at the 25% ratio and there's a small sliver of a land

Page 209

parcel that is at a different ratio.

Q   Good point.  And these questions are assuming that we're not talking about that small sliver --

A   Okay.

Q   -- that's got a different assessment ratio.  Do you have any evidence whatsoever that River Oaks Mall had any assessment level applied to it by the assessor other than 25% from 2010 to 2014?

A   I have no evidence that that may have occurred.

Q   What's your understanding of what assessment ratio was applied by the Board of Review to River Oaks Mall from 2010 to 2014?

A   Well, I think the answer is that I'm assuming that they used the 25% ratio which is the statutory ratio at the time.  I have no reason to believe that they varied from the statutory requirements.

Q   Can you flip to Exhibit 7, please.  Okay.  So the top page here is a June 5th, 2013 e-mail from somebody named Kirk Moffitt to Juan Paz copying you; correct?

A   Yes.

Q   And underneath that is an e-mail of Juan Paz to Kirk Moffitt copying you, and that one is on

Page 210

June 24th, 2013?

A  Yes.

Q  And in that e-mail from Juan Paz he indicates that the Cook County Assessor would be at the River Oaks Mall management office on June 28th, 2013; correct?

A  Yes.

Q  And the official from the Assessor's Office was scheduled to meet with you at the time to tour the River Oaks property in anticipation of a value reduction for tax year 2013?

A  Yes.

Q  Did you set up this meeting?

A  I did not set up this meeting, no.

Q  Who did you meet with at the Assessor's Office?

A  Who did we meet with?

Q  Yeah.

A  I don't know the individual at the Assessor's Office that attended this.

Q  Do you remember anything that was said during that meeting?

A  No.

Q  Was the Assessor's Office open to meeting with you?

A  Yes, because they did, in fact, meet with us.

Page 211

Q  What was the purpose of that meeting?

A  The purpose of that meeting was to allow the assessor to see the condition and operations at the property, the physical layout, the challenges the property faced, the vacancy that the property faced, the conditions of the office building.

Q  Can you name any time when the Cook County Assessor's Office refused to meet with you about River Oaks?

A  I cannot as I sit here.

Q  Did you exchange any e-mails with the Cook County Assessor's Office?

A  I did not personally exchange any e-mails with the Cook County Assessor Office, no.

Q  Can you name anyone specifically from the Assessor's Office who you've communicated with?

A  I don't recall personally communicating with anyone at the Assessor's Office by e-mail. I did have conversations with individuals at Cook County at the meeting that was conducted in June of 2015.

Q  Can you flip to Exhibit 8, please?

A  8?

Q  Yes. I'm sorry, this table setup isn't really

Page 212

conducive to looking sideways. This is the size font that we received, but if you look at the bottom right of this page, it's dated July 31st, 2015. Do you see that?

A  Yes.

Q  Okay. This is a document that's described as Simon Property Group Pending Appeals Probability Analysis?

A  Uh-huh.

Q  Is that a yes?

A  Yes.

Q  Who prepared this?

A  It was prepared by Courtney Masbaum.

Q  You said she was like an administrative assistant?

A  She started out as the administrative assistant when I started the company and she then took on a role of a tax analyst.

Q  This table contains information about the fair market value of River Oaks from 2005 to 2014; correct?

A  Repeat that one more time.

Q  Sure. This table contains information about the fair market value of River Oaks from 2005 to 2014; correct?

Page 213

A  Yes. The proposed value is rendered by the county.

Q  Okay. So the proposed value is the decision that was made by the Cook County Assessor?

A  It would be the -- to the best of my knowledge and belief, it's the initial value that was noticed by the county to Simon.

Q  Okay. And then if that value was reduced by the Board of Review, would that be reflected in this table?

A  Depending on the timing, it may or may not.

Q  Okay. And if it was, it would be reflected in the Proposed Value section?

A  Yes, it should be.

Q  Yeah, and, like, just to be transparent, my understanding is that for this first tax year 2005 that this proposed value of $57,757,111 was the decision rendered by the Board of Review. Is that generally consistent with what your understanding would be?

A  I think that's my understanding, but if you wanted certainty, I would have to refer back to the decisions.

Q  Fair enough. Okay. So, for tax years 2005, 2006, and 2008, the Simon target value was

Page 214

44,800,000 for each of the years?

A   That's what it says.

Q   How was that target value created?

A   Well, first of all, I've reviewed this document as part of my discovery and I think it's wrong because the numbers do not make sense to me. So the target value should not have been the same for all of the years at issue, and I don't know if this is an early draft iteration of the probability analysis because it certainly does not, in my belief, represent the final probability analysis that would have been prepared for this property.

Q   Okay. So it's your opinion that multiple of the target values listed on Exhibit 8 are wrong?

A   Yes, I believe they are wrong.

Q   Okay. Which ones are wrong?

A   Well, it would appear to me that certainly the 2008 is wrong, but to have three numbers exactly identical does not make sense to me. It looks like it could've been a possible inadvertent copying or citing information that was not accurate.

Q   If Simon has an appraisal performed by REAC, how many years does that appraisal apply to?

Page 215

A   It's a triennial reassessment, so it would apply to three years.

Q   So it would be inappropriate, for example, if the REAC appraisal was 44,000,800 to apply that -- strike that -- and that appraisal was in 2005, it would be inappropriate to apply that to the tax year 2008; correct?

A   It may be, yes.

Q   Is any other information in Exhibit 8 wrong besides the 44,000,800 numbers?

A   Well, and I look at the last column on the estimated net refunds, the reason I believe that this is an early version of the pending appeals probability analysis because those are reference errors, and, so, it doesn't make sense to me that this is the final version.

Q   Sorry. Which column says estimated --

A   That would be the last two columns, the Estimated Net Refund Savings where it says reference, "#REF" -- I think that's an exclamation point.

Q   Okay. It says "OS Appeal Year." That's one of the columns. What does that refer to?

A   ONESOURCE. That's the tax year that is assigned to each one of these years by the ONESOURCE

Page 216

system.

Q   Okay. It says Third-party Consultants and it's "No" for all these tax years. What does that mean?

A   That means that we did not hire any third-party consultants to oversee the assessment administration of this property. We handled it in-house.

Q   Who would be potential third-party consultants?

A   In today's day and age, it would be companies like Ryan, Altus. There are any number of different property tax consulting companies that historically, before I got to Simon, we used, but we changed our operational process to handle the vast majority of the assessment appeal management in-house.

Q   Why is the Target Value column in green?

A   It's just -- it was a way of identifying, as the probability analysis was prepared, the columns that were important to calculating the probability.

Q   Okay. Do you see the column that says Target Value - Tax Dollars at Issue?

A   Yes.

Q   How is that value created?

Page 217

A   That value would be created in this spreadsheet or should be created in this spreadsheet by taking the target value times an effective tax rate.

Q   Okay. And do you see for tax year 2008 the Tax Dollars at Issue, it looks like it's $382,050.20 in parentheses. What does that mean?

A   That means a negative.

Q   And what does that mean, a negative?

A   Well, that means that the tax dollars -- negative means we would owe more taxes under the theory that the target values were correct, but, as I indicated, that clearly does not make sense to me and it's my opinion that this was an early version of this pending appeals probability analysis.

Q   Does anything on this document say it was a draft or an early version?

A   No.

Q   Okay. So do you see for tax year 2014 in the column Target Value - Tax Dollars at Issue it lists $.15?

A   Yes.

Q   What does that mean?

A   Well, that means that if you take the proposed

Page 218

value and subtract the targeted value and you multiple that by the effective tax rate, the refund in that particular year would be $.15. And, again, I believe that this is an early version and not a clean final version.

Q  Would Simon Pursue a property tax appeal over $.15?

A  No, but that's not what the purpose of this report is.

Q  And what is the purpose of this report?

A  The purpose of the report is to apply and provide information to executive management what we think at any given point in time the tax dollars at issue and the probability of receiving those in any particular year -- in any particular calendar year so that financial accounting and senior management can judge what the ultimate performance of a property is.

Q  Okay.

A  And this was a report that was generated across all properties at the request of someone senior to me and, as I said, I strongly believe that this is a draft and not the final because of the errors that I observed in this.

Q  Okay.  So you basically think this is riddled

Page 219

with errors and several things here aren't correct?

A  I do.

Q  Okay.  What are the two columns in blue?

A  The two columns in blue represent the probability that we may resolve the appeal in the current year, so it was a 50/50, either we are gonna get it or not, so we think it's a 50% probability.  And the probability that we achieve the target value is 50%.  So we take the tax dollars at issue and you multiple that by .5 and on the probability it is resolved this year and 50 times .5 to reflect the probability of achieved target value and that would provide you an indication of what, on a global basis, the property's tax liabilities may be adjusted.

Q  Okay.  And you probably just said this, and I apologize.  Just looking at the column that's called SPG Target --

A  Uh-huh.

Q  -- explain what that column means.

A  Well, in this report, that would have been information that was in the pending appeal database and extracted or exported for purposes of creating this probability analysis.

Page 220

Q  And what I'm trying to figure out is what does the 50% number refer to, that there's a 50% chance of --

A  You're flipping a coin whether or not you resolve it this year.  You resolve it this year, that's a certain probability and achieving the target value is another probability, so it's just a way of providing executive management with our best estimate of what tax refunds might be achieved in that particular year across the entire portfolio.

Q  And does the SPG Target column mean the likelihood of achieving the target refund in any year?

A  I'm sorry.  Say that again.

Q  Sure.  Just the SPG Target blue column here that we're --

A  Yes.

Q  -- looking at, does that refer to the assessment by Simon of the likelihood of ever achieving their target reduction?

A  Well, yes, because the percentage for this year represents what happens this year, but the percentage that is assigned to the achieving a target value is through the length of the

Page 221

appeal.

Q  Okay.  So, based on this report that's Exhibit 8, Simon believed that for the tax years 2005 through 2012 they had a 50% chance of ever getting to their target in property taxes appeal litigation?

A  Yes.

Q  And, for the 2014 tax year, Simon believed that they had a 25% chance of ever getting their target reduction?

A  Yes.

Q  Who at Simon determined those numbers?

A  The probabilities were initially established, as I recall, by the tax managers and then reviewed by me because I'm the ultimate individual responsible for communicating the potential results we may achieve.

Q  Do you have any reason to believe that any of the information in the SPG Target column is inaccurate?

A  Well, okay, let's be clear on the word "accurate."  These are estimates.  They're conservative estimates because I'm communicating this to executive management in financial accounting and I don't want to overestimate.

Page 222

So, at least at this moment on July 31st when this was prepared, this is the probabilities we assigned to this property. I can't tell you as I sit here if that was the final probability. And, certainly, I believe that the target values are wrong, so that's the reason why I believe it's recorded wrong.

Q Okay. So, as of July 31st, 2015, it was being reported to financial accounting that Simon had a 75% chance of not achieving its target in the 2014 tax year P/L?

A Well, keep in mind that 2014 was a split year so part of it went to WPG and part of it goes to Simon, so that was likely part of the reason for reducing the SPG Target because the transfer took place in May of 2014 so WPG would have been a recipient of part of that and Simon would've been a recipient of part of it.

Q But what does the fact that part of the 2014 tax year belongs to Washington Prime Group have to do with Simon's probability of prevailing in a tax appeal case for that tax year?

A Because these are simply, you know, financial estimates to derive what we think the refund and savings might be to Simon for our financial

Page 223

books and records.

Q Okay. I mean, do you still think that for the 2014 tax year appeal that there's a 75% chance that Simon will not achieve its target?

A As I sit here -- as I sit here and I consider the fact that the value, the proposed value, is 26 million, there was not a lot of additional reduction that could be achieved, so that, in part, goes into the decision what is it going to be, okay?

Q Yeah.

A So you're talking 26 million, 25%, let's say we're expecting $6 million reduction. The numbers, because the value gets smaller, the percentages are gonna be affected by that. The reliability of the projections are gonna get impacted.

MR. TZUR: Hey, Dan, whenever you have time for a break.

MR. COZZI: Yeah, let me ask two quick questions --

MR. TZUR: Sure.

MR. COZZI: -- and then we can take a break.

Q Do you believe that -- strike that. Do you have

Page 224

any evidence that the Cook County Assessor was biased against Simon Property from 2010 to 2014?

MR. TZUR: Objection. Asked and answered, but go ahead.

A I have no evidence that they were biased.

Q Do you have any evidence that the assessor was biased against Simon Property at any point?

MR. TZUR: Same objection.

A I have no specific evidence of that.

Q Do you have any evidence that the Board of Review was biased against Simon Property Group?

MR. TZUR: Objection. Asked and answered. Go ahead.

A I do not have any evidence to that effect.

Q Do you have any evidence that Cook County was somehow biased against Simon Property Group?

MR. TZUR: Objection. Asked and answered. Go ahead.

A I have no evidence of that.

Q Do you have any evidence that the Cook County Treasurer was somehow biased against Simon Property Group?

MR. TZUR: Same objection.

A I have no evidence of that.

MR. COZZI: Okay. We can take a break.

Page 225

THE VIDEOGRAPHER: We are going off the record. The time is currently 5:03 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: We are going back on the record. The time is currently 5:19 p.m.

DIRECT EXAMINATION CONTINUING,
QUESTIONS BY DANIEL J. COZZI:

Q Mr. Larson, how often would one of these documents, SPG Pending Appeals Probability Analysis, be prepared?

A It was very rare. It only occurred a few times early in my tenure as the department head. It was really an abandoned process because executive management committee didn't need it, didn't want it.

Q And who would rely on these reports when they were used?

A It would be the financial accounting group that we were transmitting this to and my boss at the time, Tim Earnest, in property management.

Q So -- strike that. In the Property Tax Department you would try to make these documents such as Exhibit 8 as accurate as possible because you knew that financial accounting would be relying on them?

Page 226

A    Well, again, "accuracy" is a term that can be interpreted by an individual, but it is an estimate of what we believed at the time the probability was of achieving results throughout the portfolio of appeals and it was a conservative estimate so that we didn't overstate, you know, any estimates.

Q    Are you familiar with a document called River Oaks PAF?

A    PAF, yes.

Q    What is a PAF?

A    A PAF is a Property Approval Form.  It is a form in a process whereby development will identify potential projects that could be undertaken at a property and all the costs and revenues that that project may generate, and, so, it was a way of determining whether or not there was an appropriate return on investment for the particular project being considered.

Q    Who at Simon would prepare a PAF?

A    The PAF documents were aggregated by the development, the financial development team, or FP&A, Financial Planning & Analysis team.  The inputs would come from various individuals in the organization.

Page 227

Q    Such as whom?

A    Leasing could have some input into it.  The development team themselves could have input into it.  The construction team could have input into it.  Property tax could have input into it.

Q    And these were documents that were regularly generated as part of the business that Simon was conducting?

A    It's documents that are regularly prepared for proposed developments throughout the organization.

Q    And they basically consisted of like financial analysis?  They consisted of financial analysis of projects?

A    Correct.  It was ultimately used to determine what the projected return on investment was and that went into the decision as to whether executive management wanted to proceed with the development or abandon the development.

Q    And whether a development would be abandoned or proceeded with, was that like a business decision?

A    Yes.

Q    You've regularly reviewed PAF documents over the course of your employment at Simon?

Page 228

A    Yes, we are regularly asked to provide our input on the tax impact.

Q    When did Simon stop using these SPG pending appeals probability analysis?

A    As I said, it was something that was requested on occasion early on, but they were largely abandoned in the 2010/'12 time frame, '14 time frame.  I don't know specifically as I sit here.

Q    Can you give me an estimate of how many SPG pending appeals probability analysis reports were prepared for River Oaks Mall from 2005 to 2014?

A    As I sit here, I can't really give you a confident number.

Q    Even after the probability analysis reports stopped being used by the Property Tax Department, did the Property Tax Department create some other documentation that estimated their chances of prevailing in getting their target in property tax appeals litigation?

A    No.

Q    So they just stopped documenting that?

A    It's a tool we can deploy if requested, but it hasn't been asked for and so we're not actively managing the probabilities of any particular

Page 229

success.

Q    Why isn't the Board of Review a defendant in this case?

        MR. TZUR:  Objection.  Speculation and foundation.

A    I don't know.

Q    You agree that the fair market value of a property for ad valorem purposes shouldn't be any different than the fair market value of that property for other purposes?  Does that make sense?

        MR. TZUR:  Object to form.

A    Define "other purposes."

Q    Preparing a budget.

A    Preparing a budget of what?

Q    Of next year's property taxes.

A    No, I don't believe it is appropriate because we have to rely upon what we are going to be assessed and there's no guarantee that we're gonna be successful on appeal so we have to use the best information available and at any given point in time, it's gonna be the notice, the level of value in the notice, or the decision of the Board.

Q    Understood.  I think that was actually a bad

Page 230

question by me. Let me ask it this way. As an appraiser when you're trying to determine the fair market value of a property, it really shouldn't matter for what reason you're trying to determine the fair market value. Is that fair?

A No, I would disagree.

Q Okay.

A It's important to know the reason for the appraisal.

Q Okay. So, if you're an appraiser who is asked to, for example, appraise River Oaks for tax year 2014 for ad valorem purposes and then appraise River Oaks for 2014 for financing purposes, should there be two sets of fair market values for that appraisal?

A There very much can be, yes.

Q Okay. What's your definition of fair market value?

A Fair market value would be the price at which a property would sell between a willing buyer and a willing seller, neither under any undo compulsion, equity both and with each participant having full knowledge of the elements that impact the property and it's

Page 231

marketed in the open market for a reasonable time to find a buyer.

Q Did Simon Property Group sell River Oaks to Washington Prime Group?

A I don't think I'd use the word "sell." They spun it off, you know, out of the holdings of Simon Property Group.

Q Okay. So there was no -- strike that. Washington Prime didn't purchase the property; correct?

A Correct.

Q Was there any valuation of the fair market value of River Oaks at the time of that spin-off?

A Yeah, you asked me that earlier, and I'm not aware of any.

Q Okay. Can you flip to Exhibit 9, please. Alright. If you go to Page 39999, it starts with an e-mail from Jodi Calisto to you on March 19, 2013; correct?

A Yes.

Q And there's two estimates that she's providing as part of her e-mail about River Oaks?

A Yes.

Q And then if you go to the first page of the exhibit, there's an e-mail from you to Juan Paz

Page 232

on March 19th saying that you spoke with Ms. Calisto about the 2013 and 2014 impact that the Sears closing may have on River Oaks and you received an attached financial impact analysis from her?

A Yes.

Q Okay. And Ms. Calisto was the person who prepared the financial impact analysis for River Oak?

A I don't know if she prepared it or someone on her staff.

Q Okay. Why is it that she was involved in providing a financial analysis for River Oaks at that time?

A Because she is the regional vice president that oversees the team that manages the specific financial accounting of that property.

Q Okay. And part of what Ms. Calisto and her team did was to provide forecasts about how certain developments with River Oaks would impact their financials?

A What she provided is a forecast for the impacts should the tenants exercise their co-tenancy rights with the departure of Sears.

Q Sears was one of the anchor tenants for River

Page 233

Oaks for a time?

A Yes.

Q Was Sears involved -- strike that. Was the Sears store part of the property tax appeal that Simon would file?

A I don't think they were part of the main law, but I can't be certain about that.

Q Sometimes did anchor tenants file their own property tax appeals?

A Yes. Well, yeah, the answer is yes.

Q Did Sears do that at River Oaks?

A I don't know.

Q Do you know if Sears ever had its store appraised?

A I don't know that.

Q The tables that are at the end of Exhibit 9 here, were those tables that are created through Ms. Calisto's department?

A I believe so.

Q Why is it that Ms. Calisto was sending these tables to the property tax department?

A Because we requested them.

Q Why did you request them?

A Because the departure of an anchor and the triggering of co-tenancy is gonna have an impact

Page 234

on the value of the property. There is risk that the tenants that have a co-tenancy clause could leave the property. If they leave the property, the income stream is going to be impacted and, as a result, by extension, the value would be impacted.

Q Okay. Can you flip to Exhibit 10, please. This is the Robyn Cates e-mail that you mentioned before during one of the breaks.

Alright. Do you see the -- I guess the first e-mail on Exhibit 10 is a June 19th, 2014 e-mail from Robyn Cates to a number of people in Simon Property?

A Yes.

Q And it was being sent as a pending and settled property tax appeals report for Washington Prime Group?

A Yes.

Q And that was because Simon's Property Tax Department was still performing analysis for Washington Prime Group at the time?

A Yes.

Q Even though this was after the spin-off had been completed?

A Correct.

Page 235

Q Oh, there's somebody copied in this e-mail by the name of Rachelle Eisenmann, E-i-s-e-n-m-a-n-n. Do you see that?

A Yes.

Q Who is she?

A She was a tax manager in the property tax group that handled our business personal property activities.

Q Did she provide any services for River Oaks?

A Not that I recall.

Q Who is Aaron Carter?

A Aaron Carter is a tax manager in our group.

Q And then Ms. Brigante, what's her first name again?

A Melanie Brigante.

Q Did you hire her?

A Yes.

Q Did you train her?

A She didn't have to be trained.

Q Did you bring her in as an instructor for IPT?

A No, actually, she was at the IPT school before I was. She was a founder of it and has more tenure there than I.

Q Okay. Did Simon Property -- strike that. Did the tax department at Simon Property send

Page 236

Washington Prime Group information about the status of property tax appeals affecting Washington Prime Group such as River Oaks?

A Yes, that's what these reports are. The pending appeals would cite what appeals are pending in their portfolio and the various aspects of the data as you previously seen in the pending appeals report.

Q But that was actually transmitted to people at Washington Prime?

A Yes.

Q And it was important for the Property Tax Department at Simon to transmit accurate information to the people at Washington Prime?

A Say that one more time.

Q Sure. Was it important for the Property Tax Department at Simon to only transmit accurate information to the people at Washington Prime?

A Yes.

Q Okay. Can you flip to Page 4194 in Exhibit 10, I suppose. Alright. So this is a pending appeals report that's current as of June 19th, 2014?

A Yes.

Q Who drafted this?

Page 237

A Sorry, I didn't hear you.

Q Who drafted this?

A This is the pending appeals that's part of our pending appeal database so it's really not drafted by anyone in particular. It's a database in access at this time and everyone has the ability to input and make commentary as necessary to the database.

Q Okay. So, if I went into the database now, could I generate a report like this?

A Yes, not for Washington Prime because they're no longer a part of our portfolio.

Q Okay. Go through a couple things here. So the column that says Appeal Year, that's the tax year; right?

A Correct.

Q And then the column that says "Rec. %," that's the recovery rate?

A Correct.

Q Do you have any reason to doubt that the recovery rate that's listed here for tax years 2005 through 2008 is accurate?

A Well, the recovery rate that's cited in our database is the recovery rate that existed when the appeal was first entered into the system.

Page 238

Recovery rates can change over time and often do.  And you can even see here that '5, '6 and '8, the recoveries are consistently going down.

Q  Okay.  So let me just look at tax year 2005. The recovery rate is listed as 74%?

A  Yes.

Q  Do you have any reason to think that that has changed?

A  Since when?

Q  Since June 19th, 2014.

A  The answer is yes.

Q  Okay.  What is the recovery rate now for tax year 2005?

A  I can't tell you what that is.  I don't know. It's not in our portfolio any longer, but recovery rates will change.  The recovery rates that you see here are just as a point in time.

Q  Okay.  Do you have any subsequent information of what the recovery rate has changed to after this June 19th, 2014 report?

A  Not as I sit here, no.

Q  Okay.  The recovery rate for tax year 2006 is 69%?

A  That's as of that point in time, yes.

Q  Do you have any reason -- strike that.  Do you

Page 239

have any specific data about what it's changed to since that date?

A  I don't have the specific recovery rate as I sit here.

Q  Okay.  The recovery rate listed in this report for tax year 2008 is 58%?

A  Yes.

Q  Do you have any more updated information about the recovery rate?

A  Not as I sit here.

Q  Where would you look if you wanted to find the most updated information about the recovery rate for River Oaks Mall?

A  For those particular years?

Q  Yes.

A  I would have to go to Washington Prime to ascertain that information.

Q  Okay.

A  Take that back.  Let me correct that.

Q  Yeah.

A  These are for '5, '6, and '8.  I don't have to go to Washington Prime for that because '5, '6, and '8 would have been under Simon's ownership, so I can, if I wanted to know what the final recoveries in '5, '6, or '8, I would go to

Page 240

financial accounting or lease accounting to determine what that is.

Q  Okay.  And you'd be able to do that tomorrow, for example?

A  I don't know.

Q  Okay.  In terms of how any verdict, for example, in this case would be distributed to tenants, would you look at the recovery rate at the time of the appeal was filed or would you look at the recovery rate at the time of a verdict?

A  It would be at the time that the -- for that particular year, it would be the year-end recoveries and it would also take into consideration the tenants that left.  So, if tenants left, we had a tenant in 2005 and this was decided in 2025, lease accounting would have to go back and determine what tenants still existed; what were the terms in the lease; if they left, what would be the terms upon their departure because there are oftentimes settlements and agreements at the termination date that both parties absolve each other of any future expenses.  So there's a lot of decisions and analysis that would have to go into how much is recovered and how much is going to be

Page 241

returned back to tenants.

Q  Okay.  If any refund or verdict in this case isn't returned back to tenants even though the tenant paid the property tax in the first place, wouldn't that just be a windfall to Simon?

MR. TZUR:  Objection.  Speculation.

A  I take issue with the term "windfall." Obviously, there's a lot of costs that have gone into this case as well, but, depending upon the termination agreement in the lease, that tenant may still be responsible -- or not responsible -- be able to receive the refund.

Q  Do you know of any tenants who have left River Oaks Mall who have some sort of agreement with Simon where the tenant no longer will receive a portion of any refund in a property tax appeal?

A  Not as I sit here, no.

Q  Okay.  And if you flip to the next page, let me just quickly go through the recovery rates for these two.  So for tax year 2009 the listed recovery rate is 56%?

A  Yes.

Q  For tax year 2010 the recovery rate is 40%?

A  Yes.

Q  Tax year 2011 the recovery rate is 36%?

Page 242

A   Yes.

Q   And then for tax year 2012 the recovery rate is 34%?

A   Yes.

Q   And for tax years 2009 to 2012, is it correct that you don't know of any more updated recovery rates than those that we just listed?

A   Not for those years, no, not as I sit here.

Q   Of all of the documents that you reviewed about River Oaks Mall, did you ever see any document that indicates that River Oaks Mall was receiving a different level of assessment than other similarly situated properties in Cook County?

A   I have no knowledge as I sit here of that.

Q   The column on Page 4195 here that says Proposed FMV, explain again what that means.

A   The proposed FMV in this case is the amount of -- is the value that the assessor -- the market value that was on the notice. In other words, it was market value of the property as determined by Cook County.

Q   Can you tell from looking at this page what fair market value Simon was targeting for tax years 2009 to 2012?

Page 243

A   If you do the calculation, the proposed value is 57 million. The fair market value dispute is what we are disputing, so you do the mathematical computation of taking the proposed value minus the fair market value. That would, in essence, give you what we believe the tax dollars or the market value should be.

Q   Okay. And that's what I was actually getting at, so let me just see if I can regurgitate this because you obviously understand it way better than me. So even though these pending appeals reports that we're looking at don't explicitly say the target fair market value for Simon, you could actually calculate the target fair market value by taking the proposed fair market value for a tax year and subtracting the fair market value in dispute?

A   Yes.

Q   Could you flip to Exhibit 11, please.

A   And, again, just to be clear, those proposed are what we know to be the assessment that we would received. The fair market value dispute is a single point in time when the appeal was entered into the system, not necessarily reflective of the ultimate downstream valuation performed by a

Page 244

third-party appraiser. We don't update those when we get those appraisal reports.

Q   Okay. So the fair market value in dispute number is determined at the time the appeal is filed?

A   On or about the time that the appeal is filed, yes.

Q   Okay. And you're saying that might change over time?

A   Yes.

Q   Can you flip to Exhibit 11? This document is -- strike that. It was printed on April 30th, 2010 by Karen Couch?

A   Yes.

Q   And how would you describe what this document is?

A   It's a canned report that comes out of the ONESOURCE property tax management software system -- and, to correct the record, it is Thomson Reuters as you can see down by the copyright.

Q   Yeah.

A   -- and it sets forth specific information about the subject property as well as the breakdown of the land, land improvements and the land value,

Page 245

the taxable land value, the taxable land value per acre, the total value of the improvements per square foot, the total value of the property, the total value per square foot, the assessed value, and the estimate of taxes that would ultimately come out of the system when the tax bill is estimated.

Q   Okay. So the column that says "TV," is that the total value of the property?

A   Yes.

Q   The years that are at the far left of this table, those are the tax years?

A   Yes.

Q   And how is the total value column -- strike that. How is the data in the total value column created?

A   The input for that should be the noticed values that were received from the county.

Q   So you're saying that the total value numbers on Exhibit 11 are all market value data from the county?

A   Should be, yes.

Q   Is there anything about what Simon was targeting for the value?

A   No.

Page 246

Q   And how is a report like this used?

A   This report is a report generated out of ONESOURCE. It's just one of the evaluation tools that can be used. It's primarily used to understand what the assessed values were, what the tax liabilities either are or are estimated to be.

Q   Okay. So for -- excuse me. So for tax year 2006, the total value is $58,816,637?

A   That's what it says.

Q   Okay. For tax year 2009, let's look at that one, the total value of River Oaks was $65,100,230?

A   That's what it says here, yes.

Q   Okay. And your understanding is that that number comes from either the assessor or the Board of Review?

A   That's what it should.

Q   Okay. Well, I'll represent to you that the Board of Review's final valuation for River Oaks for tax year 2009 was $56,717,990. How do you account for the fact that Simon's total value number here says $65,100,230?

A   Because this report may have been generated before the decision was rendered.

Page 247

Q   Okay. Well, the decision of the assessor for that tax year was $56,717,990. So, if neither the assessor nor the Board of Review determined the value of $65,100,230, where did that number come from?

A   I can't tell you as I sit here. If what you're representing is correct that the assessor had a different number than this and that the Board had a different number than this, I can't tell you the reason why there's a different number there.

Q   Okay. All you can tell me is that the total value that Simon has listed for 2009 is $65,100,230?

A   Yes.

Q   Okay. And then similar question for 2010.

A   now, keep in mind that part of this may be the theater. The theater is not part of the appeal, but it is part of River Oaks so that could explain the difference.

Q   Okay. So you're saying that the difference of $9 million could be attributable to this theater?

A   Yes.

Q   When was the theater destroyed?

Page 248

A   I don't know that as I sit here.

Q   Okay. So let's look at 2010. The total value listed for tax year 2010 is $63,736,160?

A   I'm sorry. Repeat that again, please.

Q   Yeah, sure. So, according to Exhibit 11, the total value of River Oaks for tax year 2010 is $63,736,160?

A   That's what it says here, yes.

Q   Okay. And do you have any explanation for that if both the assessor and the Board of Review for tax year 2010 determined that the value of River Oaks was $45,000,106?

A   And, again, as I sit here, I can't tell you what -- explain the difference other than the theater could be a contributing factor to that.

Q   Okay. So you're -- strike that. Are you saying that the assessor or Board of Review would have considered the theater in their assessed values or what are you saying about the theater?

    MR. TZUR: An objection to form and speculation.

Q   Let me ask a slightly different question. Are you saying that the assessor or the Board of Review may have considered the value of the theater for the total value numbers here in 2009

Page 249

and 2010?

    MR. TZUR: Objection to form and speculation.

A   You're gonna have to rephrase that because I don't know what you're quite asking.

Q   Okay. So, if the theater was demolished in 2013, would that have any effect on the total value of River Oaks in 2009 and 2010, for those tax years?

A   Well, I'm not sure that the theater was totally demolished then. I'm looking at a real estate tax transmittal for 1/1/14 and there's still some improvement value there, but for 2010 the theater could be a contributing element to why there's difference in the values you cited and what is shown on this report.

Q   So you think the difference of almost $20 million is attributable to the theater for 2010?

A   I don't -- without going back and looking at all my records, I can't answer that question.

Q   Do you have any other explanation?

A   No.

Q   Okay. Regardless -- strike that. If you flip to Exhibit 12, please.

A   Sure.

Page 250

Q So the cover e-mail for this is a November 23rd, 2010 e-mail that you sent to Juan Paz enclosing a River Oaks office analysis?

A Yes.

Q And there's two tables there that you sent to Juan Paz that day; correct?

A Uh-huh.

Q The first is a table about what the assessor's opinion was about River Oaks; correct?

A Correct.

Q And the second table is about what Simon's opinion was about River Oaks; correct?

A Yes.

Q What tax year was this for or tax years was this for?

A 2009 pay 2010.

Q So is that 2010 tax year?

A 2009 tax year.

Q Okay. And is it your understanding that since you sent this, these tables to Juan Paz as of November 23rd, 2010 that the tables would be current as of that date?

A That would be my belief, yes.

Q And if I wanted to determine what Simon's opinion about the value of River Oaks as of this

Page 251

2009 tax year as based on the SPG opinion table, how would I do that?

A Repeat that question, please.

Q Sure. If I wanted to take the data in the SPG opinion table that's listed here in Exhibit 12 and use that to calculate what Simon's opinion about the fair market value of River Oaks was for tax year 2009, how would I do that?

A For 2009 you would take the 10,634,119 and for -- if that's 2009, you would divide that by 25%.

Q Will you flip to Exhibit 13, please. Alright. This is a document that's called a Preliminary Pro Forma & Cash Flows - Incremental Tax Impact Report. Do you see that?

A Yes.

Q And it was sent to you in e-mail from Juan Paz on September 27th, 2011?

A Yes.

Q Alright. There's kinda two components to the tables that are on Page 41244 and that's the table on top which is with the construction that Simon was contemplating and then there's a component of the as-is value without the construction; correct?

A Preconstruction? Say that again.

Page 252

Q Yeah. What's the difference between the table on the top of this page and the table on the bottom of this page?

A The table on the top represents a project that is being contemplated and the revenues that might be generated by that project. The bottom is a representation of the property as is.

Q Who prepared this report?

A I don't know.

Q You were sending -- strike that. Mr. Paz was sending it to you -- strike that. Why was Mr. Paz sending it to you on September 2011?

MR. TZUR: Object. Speculation.

A As I sit here, I don't know what the purpose of this was.

Q Okay. Regardless, this report provides an analysis of what the fair market value of River Oaks was for tax years 2011 through 2017?

A It cites the fair market value, yes.

Q And how is that fair market value -- strike that. How were the fair market values on Page 41244 determined?

A Well, as set forth here, it cites projections of the revenues in the redevelopment project, which would be the top portion of the table, along

Page 253

with a deduction of the actual estimated expenses, and that derives a net operating income. And, from there, you, using a stabilized expenses at 30% would come up with a stabilized net income and it's capitalized into an indication of value of the fair market value.

Q Okay. So the -- strike that. Simon's projected fair market -- strike that. The years that are at the columns at the top, those are the tax years; correct?

A Correct.

Q Okay. So, for the tax year 2011, with the construction project the fair market value of River Oaks was projected to be $62,993,351?

A Based upon the actual projected gross income and the actual expenses, that fair market value would represent a leased fee value, not a fee simple value.

Q Okay. Well, it says fair market value; correct?

A Well, fair market value, there are various types of value. You have fair market value in the fee simple and you have fair market value in the lease fee.

Q Okay. So the leased fee fair market value for 2011 was projected to be $62,993,351 both with

Page 254

or without the construction; correct?

A   Yes, because there wasn't any construction taking place.

Q   By the way, where else in Simon's records are leased fee values documented for a mall like River Oaks?

A   I don't think anyone documents leased fee values at Simon.

Q   Why is it documented here?

A   Because someone is asking what the relative impact is for determining whether or not that project is a worthwhile project to go forward with.

Q   Okay.  So is this the only page that you know of, Page 41244 of the Simon document production, that lists a bunch of values for fair market value where the values are actually leased fee?

A   Well, I'm only looking at one document.  I can't speak to any document I'm not looking at, but I can tell you in this particular instance the projections on the revenues would be actual projections provided by individuals within the organization and the as-is would take into consideration the revenues that would be generated without the project, but those are

Page 255

actual projected, not market projected.  And the market is gonna be much different because you're taking in external forces where leased fee you're taking in the contract rents and the changes in contract rents, so therein lies the biggest difference between the fair market value, which I would represent here is a leased fee value analysis.

Q   Okay.  So you're saying Simon Property would never even document the lease fee value of River Oaks Mall except for this sort of a document?

A   I didn't say that.

Q   Okay.  Where else would it document it then?

A   I'm saying that I know of no source where there's a regular documentation of a leased fee value.

Q   Do you know -- strike that.  In reviewing materials for your deposition today or at any time over the course of the case, did you see anywhere else where there was a lease fee value documented for the fair market value of River Oaks besides this page?

A   No.

Q   Okay.  Is a sales ratio study, does that consist of the leased fee value of the properties or is

Page 256

that the fair market value of properties?

    MR. TZUR:  Objection.  Speculation.

A   I don't know how the sales ratio is performed so I would have no knowledge as to what that value would represent.

Q   Okay.  And you don't know, for example, how a sales ratio study should be performed in terms of whether it should include leased fee or fee simple?

    MR. TZUR:  Objection.  Form and speculation.

A   It depends on the objective of a sales ratio study and the -- I was not involved in any of the decisions so I don't know how it was performed.

Q   Okay.  Alright.  So all of the fair market values that are listed on Page 41244 are leased fee values?

A   That's my representation, yes.

Q   Okay.  And you're aware that all of the leased fee values on this page are higher than the fair market value that Simon was pursuing before the Cook County Assessor?

A   That's what I recall, correct.

Q   And it's higher than what they were claiming

Page 257

before the Board of Review?

A   That's what I recall.

Q   And it's higher than what Simon is claiming in this lawsuit?

A   Say that last one again.

Q   Yeah.  The leased fee values on this page are also higher than what Simon is claiming as damages in this case?

A   Yes, and it doesn't surprise me that leased fee would be higher.

Q   Why not?

A   Because it takes into consideration contract rents and not market rents.  Contract rents are based upon the negotiation between the lessee and lessor with annual step-ups and if you got a 10-year lease and there's annual step-ups, that rent will continue to increase; however, markets and the market forces in this property were telling us that the rents were declining, so there's gonna be a disparity between the leased fee value and the fee simple value.

Q   So what is the benefit of preparing a leased fee fair market value analysis for this document instead of fee simple?

A   It was an element that we were apparently asked

Page 258

to provide and it goes into the decision-making on whether or not we're gonna embark on a property because the fact of the matter is Simon owns the leased fee interest in the property, but that's not how that property is valued for assessment purposes. The fee simple is the basis of value.

Q Who asked you to perform a leased fee analysis here?

MR. TZUR: Objection to form.

A I don't know where the request came from --

Q So you're saying that the analysis --

A -- as I sit here.

Q You're saying that the analysis here in Exhibit 13 is projecting -- is based on projections of rents that were in contracts between Simon and their tenants even though the tenants weren't paying that amount of rent?

A Well, I disagree with your underlying premise.

Q Why?

A If we were provided with the gross rental income for each year, those would take into consideration the prevailing rents for each of the years as provided to us by financial accounting. And I can tell you with further

Page 259

evidence this is leased fee is because there's no vacancy allowance. In a market value appraisal you would have a vacancy allowance. There's no vacancy allowance on this spreadsheet which, again, reinforces the belief that this is a leased fee analysis.

Q Does anywhere in the document say that it's leased fee?

A No.

Q Would you agree that in a given tax year that the leased fee value is gonna be fairly similar to the market value for that property?

A No, I would not agree with that premise.

Q Okay. So you're saying that what this suggests is that Simon was able to negotiate rents that were significantly above market?

MR. TZUR: Object. Misstates testimony.

A Yeah, I would ask you to just repeat that and restate it if you can, please.

Q What is the explanation for why the rents that Simon apparently was able to negotiate that led to what you're describing as a leased fee fair market value are higher than what the market rent was?

MR. TZUR: Objection. Asked and answered.

Page 260

Oh, withdrawn. Withdrawn. Go ahead.

A Okay. So repeat the question, please, again. I apologize.

Q Yeah, yeah, yeah.

A I got distracted there.

Q No, that's okay. What's your explanation for why the actual rents that Simon was able to negotiate with tenants, for example, for the tax year 2011, were higher than what the market rent was for that same year?

MR. TZUR: Objection. Speculation.

A I'm sorry. One more time. I apologize.

Q What's your explanation for why the rents that Simon was able to negotiate for, for example, 2011 tax year were higher than what the market rents were for that year?

A Well, I'm looking at this and I can see the gross revenue study in 2011 at 18.6 million. Each year the gross revenues are increasing. Now, that's based upon someone's projection to what the gross rate is gonna be. I know for a fact over this time frame that the rents, the market rents, were not increasing. They were decreasing based upon our annual fair market value fee simple analysis.

Page 261

So I look at that and I see that there's a projection of going rents, there's no vacancy, which is contrary to any of the foundations in a fee simple analysis, and the operating expenses are simply projected at some amount provided by someone in the organization. So we get a stabilized net income, and the capitalization rate at 9% I can tell you for all these years is not a type of capitalization rate that we would use in a fee simple analysis as previously shown on some of the direct capitalization analyses.

Q So why would this report indicate that there's no vacancy at River Oaks? Does that mean that there was no vacancy at the time?

A No, that means that the gross revenues that are being cited here include consideration of the vacant spaces.

Q Okay. And that's what a vacancy allowance means?

A Yes.

Q Okay. Alright. Can you flip to Exhibit 14.

A Okay. I'm there.

Q Alright. At the bottom of the first page of Exhibit 14 there's an October 11th, 2011 e-mail from Juan Paz to you including an estimate of

Page 262

the taxes at River Oaks for 2012 and 2013? I'm just looking at the e-mail here.

A   Well, the e-mail says all the work, the demo work, would start in 2012 and would finish in 2012 as per the timing given to development. These changed are captured in 2013.

So it's not necessarily '12 and '13 until we get to the analysis if you've included that.

Q   Okay. Alright. Can you look to the last page of this exhibit which is 40009?

A   Uh-huh.

Q   Okay. Do you see the row in this table that says Indicated Fair Market Value?

A   Yes.

Q   Okay. Well, I should say this. Who created this table?

A   It would appear, based on the e-mail chain, that Juan Paz created it, but it also indicates that we had a conversation so it would have been with my input, I suspect.

Q   It would have been created on or around October 11th, excuse me, October 11th, 2011?

A   Yes, I believe so.

Q   Okay. And it includes the fair market value for River Oaks for tax years 2012 and 2013?

Page 263

A   Yes.

Q   Okay. So the fair market value for River Oaks as of 2012 tax year -- strike that. As of the 2012 tax year, the fair market value of River Oaks was $60,584,162?

A   Based upon this analysis, yes.

Q   Okay.

A   And that, again, is going to be predicated on a leased fee value because that's the basis that we're working on until a decision is rendered.

Q   Okay. So this is another document that you're claiming is a leased fee value?

A   Yes.

Q   Okay. So both this type of analysis and the analysis in Exhibit 13, are those the only two types of leased fee analyses that would be performed in your department?

MR. TZUR: Objection to form.

A   We perform analyses like these to provide information to decision-makers on various projects. This case, it's the projected and possible demolition of the theater, the office building, and the junior anchor. We have to utilize the existing assessments as a predicate for that because we don't have any other

Page 264

foundation to utilize because the decision is not made in the appeal. If an appeal would have been decided, we would have used the decision of that appeal if we've exhausted all our remedies.

So, in order to provide, you know, the estimated tax impact, we have to use the existing values to provide, you know, intelligent information for executives to make a decision on whether there's a cost benefit of demolishing these improvements.

Q   Okay. And the fair market value determination for the 2012 tax year was $60,584,162?

A   Based upon the analysis that you see there, yes.

Q   And then the fair market value for the 2013 tax year was $58,999,774?

A   Yes, based upon the inputs there. And, again, you see in this case the cap rate remains constant so what we're trying to do is measure, for cost benefit evaluation purposes, what the savings would be if we demolished those buildings.

Q   And this assumes no vacancy?

A   This, again, assumes the information that was provided to us, likely from financial accounting, on the gross income of the mall and

Page 265

the River Oaks office building, and that would be based upon the contract rents that would be achieved in both of those improvements. And you'll see for each one of the elements that the as-is, the Scenario 1, 2, and 3 have the same gross potential income for the mall and the office building. But we have to be consistent in order to measure the benefit of the demolitions.

Q   Who were these fair market value numbers given to in Simon?

A   Those individuals that requested it. There was requests made by Rod Vosper, there were requests made by Tim Earnest, there were requests made by eventually David Contis, so all of those individuals were a part of the evaluation as to whether or not certain projects were going to go forward.

Q   Okay. Can you flip to Exhibit 15, please?

A   Pardon me?

Q   Can you flip to Exhibit 15?

A   Okay.

Q   Alright. The first page of Exhibit 15 is a November 3rd, 2014 e-mail from Courtney Masbaum to you?

Page 266

A   Kathryn Church.

Q   Oh, to Kathryn Church and copying you?

A   Yes.

Q   Who is Kathryn Church?

A   Kathryn Church was one of my admins.

Q   Okay.

A   You can add that to the list of admins I had.

Q   So why would one of your admins be sending a document to another one of your admins?

A   Because it was requested for some purpose.

Q   Okay.  How long did Kathryn Church serve as your admin?

A   A couple years.

Q   Did she ever receive e-mails directed to you that you yourself weren't sent directly?

A   Did she ever --

Q   Did anyone ever send anything to Kathryn saying this is for Michael Larson?

A   Not to my knowledge.

Q   Okay.  It says that these are appeals reports for budget BUM.  What is budget BUM?

A   BUM stands for the Business Unit Meeting.

Q   Okay.  What is that?

A   On a periodic basis, executive management would have meetings about the business operations and

Page 267

they called it the BUM meeting, the Business Unit Meeting, and we just adopted the acronym for information that we would be preparing for executive review.

Q   Okay.  Can you look at Page 39545 of this exhibit?  This is current as of November 3rd, 2014?

A   Yes.

Q   What does it mean that this is a settled appeals detail by platform?

A   Well, that means that there was a decision rendered at either an assessor level or board level or court level and that's the results of that appeal.  So, in this particular instance, you can see that the proposed value was 29,461,010 and the settled fair market value was 29,162,123.

Q   What does the settled fair market value refer to?

A   Pardon me?

Q   What does the settled fair market value refer to?

A   That should reflect the settled value by some sort of decision rendered on the property.

Q   Decision by who?

Page 268

A   It could be assessor, it could be the Board, it could be, you know, any level of the appeal.

Q   Okay.

A   Hang on a second.  Okay.  So what this represents is a letter property wherein you can seek a re-review of the Assessor's Office, as it states in the comments, and we asked for a re-review on this and, as it indicates here, that if we do not achieve, you know, the results that were our goal is, we will be appealing to the Board.  It's hard to read.

Q   Okay.  So your understanding of what the Settled Fair Market Value column means for tax year 2014 is what the most recent governmental body determining the fair market value had arrived at?

A   At the time, this indicates in the comments that a $300,000 market value reduction was the result of a letter property re-valuation.

Q   Okay.  So do you have any explanation -- strike that.  The settled fair market value here is listed as $29,162,122?

A   Yes.

Q   Okay.  Do you have any explanation how that number was arrived at given that the assessor

Page 269

for that tax year determined the value of the property to be $27,980,690 and the Board of Review determined that it was $26,659,558?

A   Again, as I sit here, I can't tell you if there's other components that were included in that particular cited fair market value and settled value.

Q   Is there any indication to you that there was other components?

A   Well, again, there are multiple parcels on that property and the appeals did not include all the parcels, so there could be other parcels that contribute to the proposed and the settled fair market value.

Q   Do you know of any such parcels?

A   Not as I sit here.

Q   When it lists a property ID here for River Oaks Center of 4671, what is the point of having a property ID number?

A   It's a tracking number for -- that's used throughout the company.

Q   Does it always refer to specific parcels?

A   Not necessarily because there are times when some properties will have two different tracking entity numbers for the same property.  It

Page 270

depends on how financial accounting and, you know, other decision-makers divide the property up.

Q Well, I'll represent to you -- and maybe you know this -- that River Oaks sometimes is Property ID 4671 and then sometimes it is Property ID 4672. Do you know why that is?

A Not as I sit here.

Q Who would be knowledgeable about that at Simon?

A Juan Paz could possibly know that. Otherwise, we would go back to our financial accounting records, but, ultimately, our group can determine that.

Q What does estimated net to ownership mean?

A Estimated net to ownership represents the amount of the refund that will go to ownership after all of the legal fees are paid.

Q That's if there's a successful appeal?

A Yes. And, in this case, they're citing a $300,000 reduction so the net to ownership after satisfying all those expenses is 45,000.

Q Okay. So if -- I just want to make sure I understand this. So if Simon gets everything it's requesting in this 2014 appeal, 2014 tax year appeal, Simon would receive net $45,482?

Page 271

A No, the tax savings is 45,482. There are no legal expenses associated with that so 45,482 would be the amount that ultimately would be distributed to any of the tenants that deserve a refund.

Q Okay. So the ownership is what's distributed to tenants and not to Simon?

A Yeah, ownership would be the legal entity, River Oaks.

Q Okay. And then it would be distributed through River Oaks to the tenants who paid property taxes?

A Correct.

Q And explain again what it means to be a letter property.

A As I recall, the Assessor's Office on occasion had sent out or we requested a re-review of the assessment of the property and, as a product of that letter property, we provide information that is given consideration by the Assessor's Office for further adjustment, if they believe warranted, to the assessed value.

Q Okay. Were you one of the people that determined what market value data to provide to the Assessor's Office at the time of an appeal

Page 272

or a re-review?

A I, certainly, I'm the one that makes the final decision on what we share and don't share.

Q And am I correct that you're not gonna share something that's gonna ultimately lead to your fair market value getting increased?

A That's not correct. I may not share information and we are very careful with what we share because all of the information is confidential and we have to have a protective order or a confidentiality agreement in order to really share information.

Q Okay. Are those difficult to get?

A In a lot of jurisdictions they are, yes.

Q How about in Cook County?

A I don't recall if we ever engaged in a confidentiality agreement with Cook County because I don't recall providing any information to Cook County other than that in that June 2015 meeting.

Q Well, did you provide rent tolls to Cook County?

A I don't believe we did, but as I sit here I can't tell you for certain.

Q Are rent rolls confidential?

A They're treated as confidential, yes.

Page 273

Q Okay. Did you provide them to REAC when they were doing appraisals?

A Yes.

Q And was the REAC appraisal and the documents they considered publicly filed with the Board of Review?

A The confidential information was not provided as part of that. Our appraisers, our consultants are always bound by a confidentiality agreement they sign before they get any information from us and I do not believe that any confidential information went into the body that went before the Board.

Q Okay. Can you flip to Exhibit 16, please. Unfortunately, the three-hole puncher punched right through the date of this document. I think that's actually at the bottom right where it says 2009 May, and I'll represent to you that it does say --

A What page are you on? I'm sorry.

Q The first page of Exhibit 16.

A Oh, that's 16.1. Okay.

Q Okay. This is another pending appeals report for River Oaks?

A Okay.

Page 274

Q Tell me how this document was created.

A Well, this document was the original generation of the pending appeals report that I inherited. It's an Excel spreadsheet.

Q Okay. Who put it together?

A As I sit here, I do not know.

Q What does the Effective Tax Rate column refer to?

A Pardon me?

Q What does the Effective Tax Rate column refer to?

A That refers to the effective tax rate of the jurisdiction when you take into consideration the tax liability paid and the fair market value.

Q So how do you calculate the effective tax rate for River Oaks for a given tax year?

A You would take the assessed fair market value as proposed and divide it by the tax expense, either the -- I'm not sure which column is being used here, but either the original budgeted tax expense or the forecasted actual tax expense.

Q Who created the comments that are in the Status Update column?

A The comments would have been provided by the tax

Page 275

manager at the time.

Q So that was Jan Paz?

A This is 2005. I'm not sure in the early years if that was Juan Paz or not, but certainly in the later years Juan would have had input into that.

Q Okay. So there's a column here that's described as Target FMV?

A Yep.

Q How were the Target FMV numbers created for tax years 2005 to 2008?

A As I indicated, when the appeal is filed a ballpark estimate is rendered as far as what we believe the target value should be for the property and it's cited on this so that we have some way of tracking what our possible liabilities might be upon completion of an appeal.

Q Well, what is your way of calculating that?

A Pardon me?

Q What is your way of calculating that?

A The target fair market value?

Q Yeah.

A It can be, as I've testified before, it can be something as simple as looking at the prior year

Page 276

assessment and making a decision what they think the target value should be. It could be based upon a back-of-the-envelope analysis which is simply taking an NOI, dividing it by a cap rate. There are any number of ways that a target value can be cited and it's -- it can be just a best estimate. There's no necessary -- there's not necessarily a specific and standard method of deriving a target value. It could be something as simple as saying I think it should be $47 million.

Q So is there some subjectivity to Simon's target values?

A On the target value, yes, because keep in mind the target value is, as I said before, is placed into the pending appeals database at the time that the appeal is entered into the system and once it's entered in the system the target value is populated and we may not have anything more than a best guess.

Q Okay. So the target value might just be the best guess by Simon.

A That's right, it could be a guess.

Q Am I correct that there's no standardized methodology for determining the target value at

Page 277

Simon?

A That's correct.

Q Okay. Can you flip to Exhibit 16.1?

MR. TZUR: Before we do, quickly, we've been going for another hour and 10. Do you want to take a quick break or are you good to keep going?

THE WITNESS: Well, are you moving on to a different topic? If we are, then I'll take a quick break.

MR. TZUR: Yeah, let's take a quick break. You just moved to a different exhibit.

THE VIDEOGRAPHER: We are going off the record. The time is currently 6:33 p.m.

(A recess was taken.)

THE VIDEOGRAPHER: We are going back on the record. The time is currently 6:41 p.m.

DIRECT EXAMINATION CONTINUING,
QUESTIONS BY DANIEL J. COZZI:

Q You said that, generally speaking, when you're appraising a property there's such thing as a sales approach, an income approach, and, I'm sorry, what is the third approach?

A Cost approach.

Q Cost approach. What's your understanding of

Page 278

which approach the Cook County Assessor used to value River Oaks from 2005 to 2014?

A  I don't have any specific knowledge as to how they derived their value conclusions.

Q  Is there one of those approaches that you believe would be more appropriate for them to have used?

A  I think that the income approach is a valid approach, but I also think sales comparison approach is an approach that should be considered if there's market evidence of transactions.

Q  And sales approach is most useful when there's a high volume of sales; correct?

A  It doesn't have to be high volume of sales. You have to have sufficient sales to render an opinion. You can render an opinion on a property with as few as four or five properties in my experience as an appraiser. Oftentimes, you can't find a plethora of sales, particularly of these types.

Q  Fair enough. Would you agree that it's generally common for assessors in large urban areas to use the income approach to value commercial properties?

Page 279

A  It depends on the type of commercial property.

Q  How about a commercial property like River Oaks Mall?

A  Like River Oaks Mall an income approach is likely the approach that's used.

Q  Okay. And you agree that that's reasonable?

A  Yeah, that's reasonable.

Q  Will you flip to 16.1? So this starts with a June 7, 2012 e-mail from Courtney Masbaum, your assistant?

A  Well, I don't know if she was assistant as of 2012. She was an assistant as of 2009. She may have been in her tax -- is likely in her tax analyst position at that time.

Q  Okay. And in this e-mail she's relaying some information from you to Aaron Carter, Andrew Thompson, Harry Spell, Juan Paz, and Ms. Brigante?

A  Yes.

Q  Okay. And what she said was "Specifically, Mike would like everyone to re-review the comments, check the ETR for accuracy as well as the target FMV, which will be hidden when the FINAL is published." Did I read that accurately?

A  Yes.

Page 280

Q  Okay. So what is the ETR?

A  Effective tax rate.

Q  Why did you want these people to check the effective tax rate for accuracy?

A  Because I want to ensure that the appropriate effective tax rate is cited in the report. Not having the appropriate effective tax rate will have an implication on the calculations of the tax liability.

Q  And you wanted these people to also check the target fair market value for River Oaks?

A  Yes.

Q  But you also wanted the target fair market value for River Oaks to be hidden when this was published?

A  Yeah.

Q  Why did you want to hide that?

A  Because this is -- the pending appeals report at the time was being distributed throughout the organization and the more information you provide the more questions you get and the more opinions you may get as to what, you know, the target value should be. Your opinion might be different than my opinion.

Q  So, in June 2012, you were trying to hide the

Page 281

target fair market value of River Oaks?

MR. TZUR: Objection to form. Misstates his testimony.

A  Okay. What we're trying to do is distill it down to the necessary information. It's not hiding it to cloak anything or to mislead anyone. It's just because everyone is gonna have a different opinion as to what the target value should be.

Q  You just told me that you were trying to hide the fair market value to avoid getting questions from other people; correct?

A  Yeah.

Q  What did you not want to get questions about?

A  This is going to a broad distribution at that time. We don't share this any longer. The very reason is that we get a lot of inquiries and questions about how we're prosecuting our appeals, what our targets are, and, at the end of the day, the target value is largely irrelevant. At the end of the day, what is most important is the body of evidence that is prepared by an appraiser. That becomes the foundation for the appeal.

Q  Okay. So, in your opinion, the target value

Page 282

that Simon documented for its properties was largely irrelevant?

A   It's irrelevant for purposes of an appeal insofar as I'm not gonna rely upon a target value to go in to appeal it. I'm gonna hire an appraiser, most often, or we're gonna do our own more detailed analysis. And the target value is the target value when the appeal is first entered into the system and that can change after we do our direct capitalization approach and it can change further once we get an appraisal.

Q   So why would you document a target value for a property when you've told me now that the target value is subjective based on no methodology and largely irrelevant?

A   Because it's an information point that we feel could be used to evaluate, you know, any particular situation.

Q   Who are you hiding the fair market value information from specifically?

A   We are not displaying the column of the target value in the pending appeals report.

Q   Well, in fairness, it's more than not displaying it. What she -- what Courtney wrote on your

Page 283

behalf was that it would be "hidden," correct?

A   Well, hidden means it's not gonna be displayed, yeah.

Q   It means to hide something.

A   Okay, but it's not hiding to misrepresent something. It's hiding it so that it's just not an element that's questioned by people.

Q   You were hiding it to avoid questions about the fair market value of River Oaks?

A   We were not displaying the information for the reason that that may not be our final value that we are trying to defend in an appeal.

Q   You keep saying "not displaying." The direct words that you wanted Courtney to use to your tax department was to hide the information.

A   That's her word.

Q   Well, it's actually your word. Let's look on Page 42041. Can you flip to that page?

A   Which one?

Q   42041.

A   Okay.

Q   Okay. Do you see the two columns that say "HIDE"?

A   Yeah.

Q   Okay. So that's what you wanted Courtney to

Page 284

relay is that these two pieces of information need to be hidden?

A   That's correct.

Q   Okay. It says "HIDE" specifically in two different columns of this page; right?

A   Yes.

Q   And the information that you wanted to be hidden about River Oaks was the target fair market value; correct?

A   Yes.

Q   And the effective tax rate; correct?

A   Yes.

Q   Because you wanted to avoid questions from shareholders of River Oaks?

    MR. TZUR: Objection. Misstates testimony.

A   That's wrong. We're not hiding it from shareholders. This doesn't go to shareholders, okay? This is an internal document, confidential internal document, that is distributed so that people who need to understand what properties are under appeal can see the properties that are under appeal. They don't need to see the target fair market value. They don't need to see the effective tax rate. We're distilling it down to the essence of the

Page 285

information that they need to see.

Q   Did you hide the target fair market value of River Oaks from the assessor?

A   The assessor does not get a target fair market value, of course.

Q   So you did hide it from them?

    MR. TZUR: Objection. Misstates testimony, but please answer.

A   Okay. This report does not go to the assessor. Assessor has no need for this information. We don't disclose this information. This is an internal report that we use simply for managing the appeals that we have.

Q   How would you know what the assessor needs?

A   Because I'm an appraiser. I understand what an assessor needs to do in order to provide an indication of market value.

Q   Do you know the employees of the Assessor's Office ask commercial properties to provide fair market value information that they have internally?

A   I have not ever heard an assessor ask for fair market value information internally.

Q   Did the assessor or the Board of Review ask for rent rolls for this property?

Page 286

A    I don't recall at any time the assessor asking for rent rolls.

Q    Did the Board of Review ask for rent rolls?

A    I don't recall. First of all, I was not at the board, so I don't know what the board may have or may not have requested, but we don't provide that because, again, it's confidential information.

Q    So you're saying you never provided rent rolls to the Board of Review for River Oaks?

     MR. TZUR: Objection. Misstates testimony.

A    Ask the question again, please.

Q    Did Simon Property ever provide rent rolls to the Board of Review for River Oaks?

A    I don't believe we did.

Q    Okay. And never -- strike that. Did Simon hide the target fair market value from the Board of Review as well for River Oaks?

A    That's a misrepresentation of what I've just testified to. We do not give this report to the assessor. We do not provide an assessor with a target value. We provide the assessor with a body of evidence that's generated by the appraiser.

Q    I'm asking about the Board of Review. You're

Page 287

talking about the assessor; right?

A    And I'm talking about the Board of Review.

Q    Okay. So you're saying you're not hiding target fair market value from the Board of Review, you're just choosing not to provide it to them; correct?

A    It's not -- it's not that we're choosing to not provide it to them or not choosing to hide. It is not relevant because it does not have a foundation. There's no body of evidence behind that number until we do our own direct capitalization approach or until we obtain an appraisal report from an unbiased appraiser. That's the number that is the most important that a board should see and make a decision upon.

Q    And your definition of an unbiased appraiser is REAC?

A    Yeah.

Q    So you're basically saying that the target fair market value would be useless to provide to any assessment official because it's really based on nothing?

A    It's not based on nothing. It's based upon someone's opinion, but it may not have the full

Page 288

body of analysis that is required to present to a board in a hearing.

Q    Does Simon ever disclose to shareholders any of the fair market values that are determined for Simon's properties for ad valorem purposes?

A    No.

Q    Why not?

A    Because that's information that has never been shared with shareholders and it's not relevant to what shareholders need.

     MR. TZUR: Same objection to foundation on the last question.

Q    Does Simon disclose the value of its assets in SEC disclosures?

A    No.

Q    Does Simon disclose the ad valorem values determined by your department to the SEC?

A    No.

Q    Do you remember this conversation with Courtney when you asked her to hide the fair market value information?

A    No.

Q    Okay. Do you stand by your decision in 2012 to tell the people in your department that the target fair market value needs to be hidden?

Page 289

A    Yes.

Q    Okay. And explain to me how that process went. Did you guys have like one set of spreadsheets that you would have the target fair market value with a bubble that says "hide" and then there'd be a final version that was distributed to everybody else?

A    Repeat the question.

Q    Sure.

A    I want to make sure I understand it.

Q    I just want to figure out what each version of the document said. Did you have some pending appeals reports that had a target fair market value with a bubble above it that said "hide" and those were distributed within the Property Tax Department?

A    Yes.

Q    And then you had a different version without the target fair market value that was distributed outside of the property tax department?

A    Yes.

Q    Was that done at all to avoid the impression -- strike that. Was that done at all to avoid creating the impression that Simon's properties were actually worth less than what was

Page 290

understood in different departments in Simon?

A   No, it had nothing to do with anything like that.

Q   Okay.  You just didn't want questions from other departments about the fair market value?

MR. TZUR:  Objection.  Asked and answered and misstates prior testimony.  Go ahead.

A   We only provide the necessary data to educate the recipients of this.  We do not provide the information that's unnecessary and superfluous to the purpose of the report.

Q   Okay.  So everything in this table was absolutely necessary to provide except for the target fair market value and the effective tax rate?

MR. TZUR:  Objection.  Misstates testimony and form.  Go ahead.

A   In my opinion, yes.

Q   How long have you been hiding the target fair market value from other departments?

MR. TZUR:  Objection.  Misstates testimony and form.

A   I resent the characterization we're hiding anything.  We're simply --

Q   Your e-mail says "hide," right?

Page 291

A   It says "hide," but we're not displaying it for purpose of being deceptive.  It's for purposes of transmitting information to the recipients that they need to know.

Q   I mean, what is your definition of hide?  I just want to make sure that we're using this in the same way.  Does it mean to conceal from the view of others?

A   Yes, but it's not deceptive.  There's a difference between hiding for purposes of not necessarily needing the information and being deceptive to hide something from somebody because you're afraid of something, okay?  It's not deception.

Q   Well, you were afraid of getting questions about it.

A   Yes.

MR. TZUR:  Objection.  Misstates the testimony.

Q   Okay.  So you were afraid of something; right?

A   I wasn't afraid of it.  I didn't want a plethora of people calling and saying, well, why did you have this target value?  Why isn't it this?  We don't need that type of business interruption.

Q   Was that happening before?

Page 292

A   Was what happening before?

Q   Were you getting a plethora of questions about your target market values?

A   We were getting a lot of questions about our target market value and it was on discussions with my senior management, my senior manager, that we don't need to provide that.

Q   Was that David Contis?

A   It would have been Tim Earnest.

Q   Okay.  So why did Tim Earnest say that you should start hiding the target fair market value?

A   I'm not telling you that he said not to provide that or to hide it.  I'm saying that that decision was made, likely by me, because it was superfluous information to the readers of this document.

Q   Did you get any e-mails about questions about the target fair market values of properties?

MR. TZUR:  Objection to form.

A   Of properties, yeah, occasionally, and before this procedure was put in place we did get questions.

Q   And were they questions along the lines of why the target fair market value was so low?

Page 293

A   I don't recall what the questions were.

Q   You understand that the assessor and the Board of Review both believe that the target fair -- that the actual fair market value of River Oaks was higher than what you believed internally at Simon; correct?

A   That is correct.

Q   And are higher than what REAC believed; correct?

A   Yes.

Q   Okay.  Did you talk to any other senior management besides Tim Earnest about the plethora of inquiries that you were getting about the targeted fair market value?

A   I don't recall.

Q   When did you start to hide the target fair market value?

A   I don't recall.

Q   Was it only your decision to start hiding the target fair market value?

MR. TZUR:  Objection and misstates the "starting to."

A   So can you restate the question, please?

Q   When did you make the decision to start hiding the target fair market value of Simon's properties?

Page 294

MR. TZUR: Same objection.

A  I don't recall.

Q  How often were these pending appeals reports generated?

A  They are maintained on an evergreen basis.

Q  What does that mean?

A  At the time -- evergreen?  What does that mean?

Q  Yeah.

A  That they're constantly being updated.

Q  Oh, okay.

A  And these reports, at least initially, I think, were prepared on either a -- on a quarterly basis, but, as I've indicated in my prior testimony, we terminated the broader distribution of these reports because it was deemed unnecessary.

Q  Was there a broader distribution of these reports without those two columns or did the reports just altogether not get distributed?

A  The reports are no longer being distributed throughout the organization.

Q  When did that happen?

A  I don't recall.

Q  Was it after 2014?

A  I would be speculating to give you any answer.

Page 295

Q  Okay.  So, for some period of time, there should really be two versions of these pending appeals reports for River Oaks; correct?

MR. TZUR: Objection.

Q  There would be one with the columns that say "hide" and then ones with the columns -- without the columns that say "hide."

MR. TZUR: Objection.  Misstates testimony.

A  It's one report.

Q  But there's two versions of the report; right?

A  There's two versions of the report.

Q  And for approximately how long were there two versions of the pending appeals reports?

A  As I stated, I don't recall when we instituted the removal of those two columns of information and then we totally ceased distributing this to the broader recipients of this report.

Q  Can you flip to Exhibit 17, please.  This exhibit includes an e-mail at the top on August 29, 2013 from you to David Contis and copying Tim Earnest and Juan Paz?

A  Yes.

Q  And there's a table that's on the first page of this exhibit?

A  Yes.

Page 296

Q  That table includes fair market value numbers for tax years 2012 and 2013?

A  Yes.

Q  Who created that table?

A  I don't know.  It may have been me.  It may have been someone at my direction.

Q  Okay.  And what does the fair market value number contained in this table mean?

A  That is, as I believe, probably the rendered fair market value as presented to us by the Assessor's Office.

Q  Okay.  I'll represent to you that that's not the rendered 2012 fair market value from the Assessor's Office.  I'll also represent to you that the -- strike that.  Did Simon create this fair market value number themselves for tax year 2012?

A  Okay.  What was your question?

Q  Did Simon create the 2012 fair market value number $43,674,038 itself?

A  Well, I don't have the real estate tax transmittal so I cannot verify that number, so, as I sit here, I can't answer that question.

Q  If it's not what the assessor determined for that tax year, where else would it be from

Page 297

besides Simon?

MR. TZUR: Objection.  Speculation.

A  As I sit here, I can't tell you what the answer to that is.

Q  If you flip to the next page of this exhibit, it contains an August 27, 2013 e-mail from you about River Oaks Mall.  Do you see that?

A  Yes.

Q  And it references the fact that the total assessed value came in at 29.5 million and it says "This is slightly lower than what was originally reported and likely due to our follow-up meeting and property inspection."

What meeting and property inspection are being referenced here?

A  Well, as you recall, you asked me questions.  The assessor inspected the property and that would have been the inspection that's being cited here.

Q  And is that something that's common for assessing officials to do to go out to an individual property at the property owner's request and inspect the property themselves?

MR. TZUR: Objection.  Speculation.

Q  Based on your experience over the course of your

Page 298

career.

MR. TZUR: Same.

A There are times where we will invite assessors to come out and see a property, particularly one that is significantly challenged like this one. We did express a desire to have them come out. They did come out and see the property. That's not uncommon for us to do. We often try to engage assessors in discussions and, if warranted, get them out to the property, but it doesn't happen that often.

Q Did you ask the Assessor's Office to come out and inspect River Oaks for any of the tax years at issue in this case?

A I didn't personally invite them to do that.

Q Did your department?

A I think Juan Paz is the one that reached out, either Juan Paz or staff at O'Keefe Lyons & Hynes, to seek an inspection by the Assessor's Office.

Q Did Simon or anybody on their behalf ever reach out to the Assessor's Office about inspecting the property for any of the tax years at issue in this case?

A Yes, and we just said that the assessor came

Page 299

out. Someone from the Assessor's Office came out and inspected the property.

Q But that was for tax year 2013, right, that's not at issue in this case?

A Well, if you read the e-mail, what it says is the assessment came in lower than was originally reported and due to a follow-up meeting. So, if this is '13, and August -- it says August '13 and I'm not sure if that's tax year '13 or tax year '12, but the point of the matter is is that there was a reduction after the assessor did the property inspection.

Q Did Simon ever -- strike that. Did Simon or anybody on behalf of Simon ever ask the assessor to come out and inspect River Oaks and the assessor refused to do so?

A I'm not aware of any request and response like that.

Q Okay. Can you flip to Exhibit 17.1? So the top here is an e-mail on February 13, 2014 from you to Mike McCarty.

A Yes.

Q And who is he?

A Michael McCarty was the head of development at that time.

Page 300

Q And do you see where it says "We preemptively met with the Cook County Assessors last spring to seek reductions in the assessed ... value" and "Our meeting and follow-ups resulted in a 32.5% reduction" 2013?

A Correct.

Q Alright. Flip to the next exhibit which is 18. And this has a -- starts with a November 1st, 2013 e-mail that you sent to Tim Earnest and copied Ron Hanson, Juan Paz, and Jodi Calisto.

A Yes.

Q As well as yourself in this. This was a new projection for the property tax liability for River Oaks Mall?

A Yes.

Q Who prepared that?

A It was either me or Juan Paz at my direction.

Q And you would have checked it regardless?

A Well, this is indicating the anticipated reduction and this is an anticipated reduction due to the reduction we got in '13. So, as I've indicated, when we prepare budgets we look at historical trends and when we're preparing the 2014 budget we're gonna, obviously, take note of the fact that the 2013 assessment was reduced,

Page 301

and, therefore, as part of the budget meeting and the budget process, we indicated to them that the tax liability would likely decline.

Q Can you flip to Page 40368? This is a document called a Real Estate Tax Transmittal?

A Yes.

Q What is that?

A Real Estate Tax Transmittal is another report that is part of the reports we can generate on our property tax ONESOURCE system.

Q This was generated by somebody named dmelvin?

A Yes.

Q Who is that?

A Don Melvin was a temporary employee that we had at Simon.

Q And it was generated on November 1st, 2013?

A Yes.

Q The listed market value of River Oaks as of this report was $29,461,010?

A Yes.

Q Where did that number come from?

A Those were -- that would be based upon the initial notices that were received on the property.

Q Notices from who?

Page 302

A The Assessor's Office.

Q Can you flip a couple pages later on 40370?

A Okay.

Q This is a document called a 5 Year Value Comparison Report?

A Yes.

Q What is that?

A That is another report that is available on the property tax ONESOURCE system. It shows the assessed values and the fair market values and the billable taxes and the effective tax rates along with the year-over-year changes for a five-year period. In this case, the period starts at 2012 and goes through a projection of 2016.

Q Okay. And the estimated fair market value of River Oaks for tax year 2014 as of the day of this report was 29,461,000?

A Yes.

Q And remind me how you came up with that number.

A Well, it's likely part of the triennial re-assessment and the year-over-year values that do not change unless there's a change in the property. However, I don't know what the first year of the triennial is as I sit here, but --

Page 303

Q You would've got an appraisal the first year of the triennial?

A Yes.

Q And if you had gotten appraisal in 2014 or for the 2014 tax year, does that make sense?

A Well, hang on a second. We did not appeal 2013. So, if we did not appeal 2013, we're not gonna commission an appraisal report.

Q For tax year 2014?

A For 2013. Now, I'd have to --

Q Hold on a second. I think maybe either I misspoke or you misheard me. I'm saying the first year of the triennial my understanding is 2014.

A If the first year of the triennial is 2014 -- and I'll take your word on that because I'd have to go back and tally it and I don't have that in front of me, but if the first year of the triennial is 2014, we wouldn't be making a decision on whether or not we're gonna commission an appraisal until we get the notice. So this is a report that's run as of 11 of 2013 and that would reflect the value of 2013. 2014, 2015, and 2016 would all be projections.

Q Correct. So the projected fair market value of

Page 304

River Oaks for 2014 was $29,461,010?

A That was our estimate, yes.

Q Okay. And that was as of November 1st, 2013?

A Correct.

Q And are you aware that that's about $3 million more than what the Board of Review determined for that tax year?

A Not as I sit here, but --

Q Okay. Why would Simon still be pursuing that tax year when their projection for the fair market value of that tax year was $3 million more than what the Board of Review determined?

MR. TZUR: Objection. Speculation. Go ahead.

A You're gonna have to rephrase anyways because you're saying "that year." I'm not sure what "that year" you're referring to.

Q This question is about tax year 2014.

A Okay.

Q You're saying that as of November 1st, 2013, Simon's projection about the fair market value of River Oaks for tax year 2014 was $29,461,010; correct?

A Correct.

Q And why would Simon continue to pursue an appeal

Page 305

of that tax year if the Board of Review's determination of the fair market value is approximately $3 million less than what Simon themselves projected?

A For '14?

Q For '14.

A Well, first of all, again, the report that you're seeing here is run as of '13. We would not have had, to the best of my belief, the 2014 assessment notice. Regardless of that, the economic conditions of the property may have changed sufficiently to warrant a further reduction from what we were projecting here.

Q Okay. So you're saying that the -- strike that. You're saying that Simon's projection on Page 40370 is inaccurate about the tax year 2014?

MR. TZUR: Objection. Misstates his testimony.

A That is a misstatement. These are projections based upon the historical trends in the rendered values or decision values of the Assessor's Office and/or Board. That's why it carries doubt to 2016. We are projecting based upon trends that we think that they will not change '14 and we're projecting a 5% increase to '15

Page 306

and a 3% increase to '16. That's what we're estimating the liability to be.

Q  Okay. Let's look at tax year 2012. So it lists here that the total fair market value for River Oaks for 2012 was 43,674,038?

A  That's what it says.

Q  Okay. Where did that number come from?

A  That should have come from the real estate tax transmittals.

Q  And where did the information from the real estate tax transmittals come from?

A  That would come from the assessment notices that were received from the Assessor's Office.

Q  So what was the target fair market value for tax year 2012 as of the date of this report?

A  I don't know that.

Q  Would that be relevant?

A  No.

Q  Okay. The only thing that you would actually -- strike that. What would be relevant in deciding whether to appeal the 2012 tax year?

A  The analysis that we perform utilizing the direct capitalization approach taking into consideration the economic performance and future projections of the property.

Page 307

Q  Okay. Look at Exhibit 19, please. Alright. There's an e-mail -- will you flip to Page 42715, please.

A  7?

Q  715.

A  Thank you.

Q  Do you see the last e-mail here is July 10th, 2024 e-mail from Michael McCarty saying "Have we received the tax benefit of tearing down the office building"?

A  Yes, I see that.

Q  And you responded to him on July 10th "yes."

A  Yes.

Q  And you e-mailed Rod Vosper on July 10th and you said that the tax savings from the demolition had been realized for the 2013 tax year?

A  Where are you seeing 2013? Where are you reading from?

Q  I think it's on the first page here.

A  Okay. And your question again was?

Q  Yeah. Basically you're saying that the tax savings from the demolition project that was being done on River Oaks were realized for tax year 2013. Is that accurate?

A  Okay. So --

Page 308

Q  Let me amend my question a little bit.

A  Okay.

Q  Juan Paz is saying that?

A  Yes, Juan Paz sent this.

Q  Okay.

MR. TZUR: So let him answer your question, though. He just confirmed that Juan Paz sent it, but he didn't answer the prior question.

MR. COZZI: I'll withdraw. Doesn't need to.

Q  Can you flip to Page 42717 of this exhibit. And this is something called a Pro Forma Comparison Report?

A  Yes.

Q  It's dated on the bottom right portion of the document May 28th, 2013?

A  Yes.

Q  What is this type of document?

A  This is what we refer to as the PAF report. It's the Property Approval Form or the process we go through to approve projects and this is generated by FP&A. That's F-P-ampersand-A.

Q  By the way, who at Simon do you think would be most knowledgeable about what the fair market value is for River Oaks for tax years 2010 to

Page 309

2014?

A  What basis of value, leased fee or fee simple?

Q  Fee simple.

A  It would be our department.

Q  Who specifically in your department?

A  It would be Juan Paz and myself.

Q  How about leased fee?

A  Pardon me?

Q  How about leased fee?

A  As I said, there would -- I know of no department that actually goes out and calculates a leased fee value because there's no need for a leased fee value opinion in the organization.

Q  But you guys did it twice; right? That's --

A  Yes, we did it twice because we were asked to compare and contrast a before-and-after and a what-if type of analysis. And, so, in order to do that, we chose to utilized the actual expenses because that would be reflective of the actual income and expenses incurred at the property.

Q  Could you flip to Exhibit 20, please.

A  Page?

Q  Exhibit 20. Alright. This is another 5 Year Value Comparison Report?

Page 310

A Yes.

Q It's something that was generated by Juan Paz on May 9th, 2014 using your ONESOURCE software?

A Yes.

Q And this report contains information about the fair market value of River Oaks from tax years 2005 through 2009?

A This represents the value rendered by the jurisdiction and not necess -- and does not reflect the fair market value of the fee simple interest, in our opinion, but the ONESOURCE system is used to track actuals until we have results. We do not record the results of our appeals until such time as we get a stipulation of settlement.

Q But ONESOURCE also has information about your projections if it's for tax years in the future?

A It depends. We do use it for projections, but those projections, again, are gonna be based upon our projection of what we think the Assessor's Office is gonna do, not necessarily representative of our opinion of value or the fee simple interest.

Q I mean, don't you think a fair amount of property taxes to pay is what the assessing

Page 311

officials in that jurisdiction are going to do?

MR. TZUR: Objection. Form.

A Okay. Could you --

Q Sure. Don't you think that it's fair to say that the amount of property taxes that you should pay fairly in a jurisdiction is what the assessment officials determine is the value of the property?

A No.

Q Because of your own internal information and the REAC information?

MR. TZUR: Object to form.

A It's based upon our opinion. What we believe and, ultimately, the appraiser has concluded is that value is lower than the opinion of the Assessor's Office.

Q So, looking at Page 44389 to this Exhibit 20 again, the fair market value listed for River Oaks in tax year 2009 is $57,840,834?

A No, you're reading the wrong number, I think. 2009?

Q Yes.

A The fair market value -- I don't think the number you cited is the right number. You want to repeat it?

Page 312

Q Well, Sure. What is the total fair market value for tax year 2009 based on Exhibit 20?

A It's based on the assessed value of 14,459,805 which when adjusted for the assessment ratio at 25% would be 57,840,834.

Q And I apologize, I think that's what I said, but regardless --

A I didn't hear it that way. I'm sorry.

Q No, that's okay. Do you know whether that's actually higher than what the Board of Review ultimately determined for this property?

A I do not know that, but that could be the result of the fact that this report was done before the Board of Review rendered a decision.

Q Well, the Board of -- strike that. The report was rendered on -- strike that. The report was generated on May 9th, 2014; correct?

A Yes.

Q And you're saying that the Board of Review may not have made a decision about River Oaks' fair market value for tax year 2009 five years later?

A Yeah, no, I was reading the wrong number, so I was misstating because I saw the lien date and I was looking at the 2009, so my apologies.

Q That's okay.

Page 313

A So this should represent the 2009 fair market value of the fee simple -- should represent the fair market value as rendered by the Assessor's Office adjusted, if any, by the Board.

Q Okay. Can you flip to Exhibit 21, please. Oh, for Christ's sakes. This also is cut off. Alright. Well, I'll represent to you that this is a Real Estate Tax Transmittal that's dated September 30th, 2014.

Okay. So, again, the market value for River Oaks that's included in this report is the 29,461,000 number?

A Yes.

Q And that's based on the most recent determination by the assessing official?

A That should be representative of the value as of that date either as rendered by the Assessor's Office or determined as a result of the board appeal.

Q Okay.

A And what was the date that you indicated was cut off?

Q September 30th, 2014.

A September 30th, okay.

Q Okay.

Page 314

A   I don't know if the board would have convened and rendered a decision by then or not, but --

Q   Sure.

A   -- this should represent the latest known market value --

Q   Okay.

A   -- from the Assessor's Office or board.

Q   I'm gonna show you a document that we'll mark as Exhibit 20.2.

MS. SCHNAKE:  I bet I have a hard copy of that.

MR. COZZI:  Yeah.  Do you?

MS. SCHNAKE:  What tax year are you talking about?

MR. COZZI:  2009.

Q   Okay.  And we'll keep going.  Can you flip to Exhibit 22?  Okay.  So this is a 5 Year Value Comparison Report that you printed on September 4, 2015?

A   Yes.

Q   Do you know why you would have been printing it at that time?

A   We were still engaged by WPG to assist them in managing their property taxes through sometime in 2015.  I don't recall when the full

Page 315

transition took place.

Q   I want you to look at the total fair market value for River Oaks as of tax year 2014.

A   Okay.

Q   Tell me what that $27,840,990 figure reflects.

A   It would reflect the market value of all the parcels that were part of the River Oaks Center Entity 4671 and the -- that would be reflected off of the real estate tax transmittal for the same period which breaks it down by parcel.

Q   Okay.  Could you go back to Exhibit 20 again?  Sorry.  So your description of why the 2009 tax year fair market value is listed as $57,840,834 is you're saying that that would have been the final number that you guys input from the Board of Review determination for that year?

A   I can't say that without looking at the real estate tax transmittal which would provide me with more information than what's here.

Q   Okay.  I'm gonna show you a document that we're gonna mark as Exhibit 20.2.  And I'm looking here at the page that ends 15565.  Now, I direct you on that page to Line No. 17.

A   What page?

Q   65 at the end.

Page 316

A   Thank you.

Q   And do you see where it says in Line 17 that the 2009 Board of Review final fair market value was $56,717,990?

A   Yes.

Q   And how do you explain the discrepancy between that number and then the number that's listed as the total real estate fair market value on Exhibit 20?

A   Without looking at the real estate tax transmittal, I can't answer that as I sit here.

Q   Okay.  If you --

A   Because that difference is not that significant and could be the result of other parcels that are not part of the appeal.

Q   But, sitting here today, you don't specifically know why there's a discrepancy?

A   No, that's correct.

Q   Okay.  If you look at the first page of Exhibit 20.2, this is a document that's from the Cook County Board of Review.

A   What page are you on?

Q   The first page.

A   Okay.  Yep.

Q   And do you see that Simon's attorneys here are

Page 317

listed as O'Keefe Lyons & Hynes?

A   Yes.

Q   Alright.  Do you see on Line 22 of this document that O'Keefe Lyons & Hynes began representing Simon for this property in 1997?

MR. TZUR:  Where are you?  What page?

MR. COZZI:  65 at the end.  Line 22.

Q   Do you see that?

A   Yes, but, okay, I think we acquired it in 1997, so yes.

Q   So literally the first year that Simon acquired River Oaks Mall it started using O'Keefe Lyons & Hynes to appeal the property taxes for it?

A   Yes.

Q   Alright.  Could you flip to Exhibit 23, please.

A   You want this back?

Q   You can keep it if you want.

A   We're back on 22, yep.

Q   Okay.  So Exhibit 23 is --

MR. TZUR:  23.  Are you on 22 or 23?

A   You're on 23?

Q   I'm on 23, I think.

A   Okay.

Q   Okay.  This is another 5 Year Value Comparison Report?

Page 318

A  Yes.

Q  It was printed by somebody rokelly?

A  Yes.

Q  Who is that?

A  Robin Kelly, an administrative assistant for me at one point in time.

Q  So that's another one?

A  Yeah.

Q  We'll maybe somehow piece together this whole puzzle.

A  Yeah, piece together, that's right.

Q  Okay.  So she printed this -- is Robin a man or a woman?

A  A man.

Q  He printed this on February 3rd, 2014?

A  Yes.

Q  And this lists the fair market value of River Oaks for tax years 2010 through 2014?

A  Yes.

Q  The fair market value of River Oaks for 2010 was $46,122,946?

A  The assessor's opinion was that, yes.

Q  Was it the assessor or the Board of Review?

A  Well, it was either the assessor on their initial notice or if the board rendered a

Page 319

decision which resulted in a change, then it would've been the board's value conclusion, fair market value conclusion.

Q  Okay.  And do you know why this number, 46,122,946, is actually higher than what both the assessor and the Board of Review determined for the tax appeal for 2010?

A  I do not.

Q  Okay.

A  Now, again, it could be because there were parcels that the board rendered a decision on that were not included that were -- it could be that the property contains more parcels than what were appealed.

Q  And what would show that?

A  The decision would be as set forth on the real estate tax transmittal.  You know, referring back to the real estate tax transmittal, there is a column that identifies the status of the valuation.  Either it's a budgeted, initial, or a decision, and with the multiple parcels on there, some of the parcels may not have been appealed so we'd only have decisions on those parcels that were appealed.

Q  Okay.  And would the 5 Year Value Comparison

Page 320

Report include the value of parcels that were not appealed?

A  Yes.

Q  Okay.  Alright.  If you could flip to Exhibit 24, please.  And this is a spreadsheet that's dated November 12th, 2013, or, excuse me, 2010; correct?

A  Yes, 2010 at 3:55 p.m.

Q  It was printed at 3:55, okay.  What is this spreadsheet?

A  This is a spreadsheet that's prepared by O'Keefe Lyons & Hynes.  It's a spreadsheet that they use to track the original fair market values for the years at issue, the taxpayer's claim, in this case based upon the REAC appraisals at the ordinance level.  It shows the tax liabilities based upon original assessment, the tax liabilities based upon the REAC appraisal, the corresponding refunds that would be received if a decision was rendered at the appraised value, and, you know, various other items of information including the interest that could be due and payable at the time that this was generated.  So you've got a total interest, refund plus interest, and, you know, any legal

Page 321

fees that would be required to be paid as well as the net recovered on the property.

Q  You would agree that based on this document the REAC fair market value for River Oaks was projected to be the exact same number for 2005 tax year and the 2006 tax year?

A  Yes, because '5 and '6 may be the second or third year of the triennial, and '8 and '9 are the first two years of the triennial.

Q  Okay.  So, when you use an appraisal that's done every three years, based on the triennial, to project the tax years for the years after the triennial, what that means is you're not really adjusting the fair market value of the property for the two years after the triennial appraisal; correct?

       MR. TZUR:  Objection.  Misstates prior testimony.

Q  Does that make sense?

A  Can you --

Q  Probably not.

A  -- restate it?

Q  When you use an appraisal from REAC to determine what the fair market value is for three years in a row, effectively what that means is that it

Page 322

assumes that the value of the property is not gonna change for the two years after the appraisal?

MR. TZUR: Same objection.

A  Correct.

Q  And you said correct?

A  Correct.

Q  Okay. And this document here that's marked as Exhibit 24 describes what was believed as of this November 12th, 2010 date to be the amount of damages that Simon was entitled to in this litigation for tax years 2005, 2006, 2008, and 2009?

A  That is correct, assuming that a finder of fact would render a decision completely in favor of the appraisal report.

Q  You would agree that Simon Property has an obligation to provide accurate information about market value to the assessor?

A  I take some issue with the word "accurate" because accuracy implies a definitive number. Appraisals are opinions of value, but, to the extent that we're providing information to the board, we're providing the best information, in our opinion, based upon an appraisal report

Page 323

presented to us by an expert appraiser.

Q  So let me ask it this way. When you were the head of the Property Tax Department, did your department always seek to provide accurate and complete information to the Cook County Assessor about River Oaks?

A  Provide it to the Cook County --

Q  The assessor.

A  The assessor?

Q  Yes.

A  We didn't provide any information to the assessor in most of the years simply because there was no confidentiality agreement or protective order.

Q  Oh. So you never provided additional information when you asked the assessor to do a re-review?

A  There may have been some information provided. I don't -- as I sit here, I don't know what information may have been provided in the re-review.

Q  Okay. So you can't tell me if you guys provided accurate and complete information to the assessor?

MR. TZUR: Objection. Misstates testimony.

Page 324

A  We have a duty to provide accurate information that is not misleading and, to the extent we provided the assessor, I'll represent that that's not misleading.

Q  Okay. You -- strike that. Simon has a duty to provide accurate information that is not misleading to the Cook County Assessor; correct?

A  Yes.

Q  Simon has an -- strike that. Simon has a duty to provide accurate information that is not misleading to the Board of Review?

A  Yes.

MR. TZUR: Asked and answered. Objection.

Q  Simon has an obligation to provide accurate information that's not misleading to the Circuit Court of Cook County when there's a property tax appeal that's in the circuit court?

A  Yeah, I would agree with that.

Q  And Simon has a duty to provide accurate information that's not misleading in this federal lawsuit as well; correct?

MR. TZUR: Objection to the extent it calls for a legal conclusion, but go ahead.

A  Yes, I believe that to be the case.

Q  At any point do you remember Simon providing

Page 325

market value data about River Oaks to the Board of Review?

MR. TZUR: Objection. Asked and answered, and form.

A  Do I answer?

Q  Yeah, you can answer.

A  Repeat the question then. I was --

MR. COZZI: Robin, can you repeat that one?

(The reporter read back the previous question.)

A  Yes, we would've provided market value data as part of our appeal. That would have been provided to the board through O'Keefe Lyons & Hynes.

Q  Did you provide market value data about your target fair market value?

A  No.

Q  Did Simon provide market value data to the Cook County Assessor when it was asking for a re-review?

A  As I sit here, I don't know.

MR. TZUR: And, Dan, we've been going for over seven hours now.

MR. COZZI: Okay. I'm on Exhibit 25 of what, 32. I think these are going pretty

Page 326

quickly, so --

MR. TZUR: I don't know what that means.

MR. COZZI: Oh, that means I still have more questions and exhibits to ask him about.

MR. TZUR: Well, yeah, but, like we talked about by e-mail, we're gonna stick to the rule of one hour -- or one day, seven hours' worth of testimony.

MR. COZZI: We didn't talk about that, No. 1.

MR. TZUR: Yeah, we did.

MR. COZZI: No, we didn't. No. 2, you took over seven hours for assessor witnesses, so, and, No. 3, this is a witness who has -- who had 2,000 pages of documents referencing him before the document production that we just received this week. So I have additional questions. Are you invoking the seven-hour rule or no?

MR. TZUR: I will let you go for -- how much longer do you think you need to finish this binder?

MR. COZZI: I would say probably 45 minutes.

MR. TZUR: No. I'll let you go for another 15 minutes or so because it is getting late. We

Page 327

didn't start this deposition until 11 o'clock this morning.

MR. COZZI: Through no fault of mine.

MR. TZUR: Well, I mean, you didn't have a reporter here or a videographer.

MR. COZZI: The videographer and the court reporter made a mistake through no fault of my offices or me, so if you're trying to use that against me --

MR. TZUR: I'm just saying that it's pushing up against 8 o'clock and we're over seven hours. If you want another 15 minutes, great.

MR. COZZI: I don't want another 15 minutes. I need more than that.

MR. TZUR: Well --

MR. COZZI: So, if you're invoking the seven-hour rule, that's fine. We will certainly file a motion about that.

MR. TZUR: Okay.

MR. COZZI: So --

MS. SCHNAKE: Just for the record, I still haven't gotten to ask my questions either.

MR. TZUR: Okay. That's, I mean --

MR. COZZI: So what are you doing, Paul?

Page 328

What is your decision here?

MR. TZUR: I'm telling you if you want another 15 or so minutes to go, I will allow you to do that, but if not, then you'll finish and I will ask my questions and we'll be done for the night.

MR. COZZI: Well, I need more than 15 minutes.

MR. TZUR: So you don't want the 15 minutes I'm offering?

MR. COZZI: No, I want the 15 minutes, then the additional time to ask about my remaining exhibits.

MR. TZUR: I'm giving you 15 minutes. Do you want the extra 15 minutes or not?

MR. COZZI: I'm not agreeing to limit it to 15 minutes.

MR. TZUR: I'm asking you if you want the extra 15 minutes or not, simple as that.

MR. COZZI: I'm not agreeing to limit it to 15 minutes. That's what my response is and I'll file a motion. That's fine.

MR. TZUR: Okay. Alright. Wait. Do you want 15 minutes?

MS. SCHNAKE: I have more than 15 minutes.

Page 329

That's not gonna do it. If we're cutting it, then cut it.

MR. TZUR: Okay.

MS. SCHNAKE: (Inaudible.)

MR. TZUR: Again, I've given the defendants 15 minutes. We're past seven hours already. If you want the 15, great. You're saying no, so I'll just ask the questions I have to clean up earlier testimony and we'll call it a night.

MR. COZZI: Okay. Well, we'll file a motion because I have more than 15 minutes.

MR. TZUR: Okay.

MR. COZZI: And there's 2,000 pages plus the document dump we got this week, so we're gonna have to get another deposition then. That's fine.

MR. TZUR: I mean, that will be up to the Court to figure out.

MS. SCHNAKE: Okay. Okay.

MR. TZUR: Okay. Do you need a break?

THE WITNESS: No.

MR. COZZI: Paul, will you give us a second just to talk?

MR. TZUR: Sure. Let's take a five-minute break.

Page 330

THE VIDEOGRAPHER:  We are going off the record.  The time is currently 7:50 p.m.

(A recess was taken.)

THE VIDEOGRAPHER:  We are going back on the record.  The time is currently 7:58 p.m.

CROSS-EXAMINATION,

QUESTIONS BY PAUL H. TZUR:

Q  Alright.  So, Mr. Larson, earlier today you were asked questions by Mr. Cozzi about how this dispute involves fair market value and you were asked about criticisms of the defendants.  Do you remember those questions?

A  Yes.

Q  And you gave answers that the criticisms involved how you believe that the assessor charged or assessor assessed fair market value at levels higher than you understood the fair market value of River Oaks to be.

A  My belief of the fair market value --

Q  Okay.

A  -- of the fee simple interest, yes.

Q  Is that the only criticism that you have about the defendants in this case?

A  Well, I think I also testified, perhaps not on that question but somewhere along the way, about

Page 331

the length of time in the due process, the lack of due process, and, as stated in the Complaint, it's the uniformity and the lack of uniformity because we're being assessed according to the sales ratio study at a value higher than other competing properties.

Q  Okay.  And that's what you mean by a lack of uniformity?

MR. COZZI:  Objection.  Foundation.

A  Yes.

Q  Those are you criticisms?

MR. COZZI:  Foundation.

A  Yeah, typically call it, in many states, uniform and equal or uniformity.

Q  You were also asked questions earlier today about Lisa Clemmons.  Do you remember those questions you were asked?

A  I remember answering questions about Lisa Clemmons, yes.

Q  And some of the questions involved when she was terminated.  Do you remember that?

A  Yes.

Q  Did you ever work with Lisa Clemmons?

A  No.

Q  Do you know -- withdrawn.  Were you at Simon

Page 332

Property when Lisa Clemmons left the company?

A  No.

Q  So do you have firsthand knowledge about when Lisa Clemmons left the company?

A  No.

Q  Or why Lisa Clemmons left the company?

A  Well, she was terminated.

Q  Okay.  You were also asked questions earlier today about the amount of damages.  The word "damages" was used to describe the case.  Do you remember those questions?

MR. COZZI:  Form and foundation.

MR. TZUR:  I'm just asking questions -- I'm just asking to refresh him about questions you asked, Dan.

A  Damages, yes.

MR. COZZI:  But you misstated it.

Q  Okay.  And, if I remember correctly, you said that the damages might have been "unquantifiable."  Do you remember using that word?

MR. COZZI:  Form.

A  I recall the unquantifiable response to be the unquantifiable nature of trying to determine the resulting diminution of value due to the loss of

Page 333

tenants because property taxes are too high.  That was what I recall to be the questions involving the unquantifiable nature, not the damages that we're seeking by way of refunds in this particular property.

Q  So what do you mean by that?

A  Well, as was just recently testified to on Tab 24, there's a tally or a recitation of what we believe the opinions of value are based upon the REAC appraisals compared to the original assessments, and going through the calculations, there is a refund claim that is being sought along with the interest and that would be the damages that we'd be seeking.

Q  Okay.  Does that also come from this disuniformity claim that you were just talking about?

MR. COZZI:  Form and foundation.

A  Yes.

Q  You also testified about, I believe, the ratio -- the level of assessment that you understood or believed that the assessor charged in 2010 through 2014.  Do you remember those questions?

A  Yes.

Q  I'm gonna show you what I'm gonna mark as

Plaintiff's Exhibit 1 and I'm gonna show it through Zoom.

MR. COZZI: I'm gonna object to the use of any exhibits. We had an agreement that's on the record that you were gonna share exhibits seven days before the deposition. We did that and you didn't.

MR. TZUR: It's in response.

MR. COZZI: And I object to using any exhibits because we didn't get any and it's in violation of our request for production, too.

Q Mr. Larson, do you see what I'm marking as Plaintiff's Exhibit 1 on the screen, on your screen?

MR. COZZI: Same objection.

A Yes. Am I able to --

Q I'm controlling it.

A No, but I've got Brandy on screen here. Can I minimize that?

Q Yes.

A Okay. Thank you.

Q I'm gonna -- well, looking at the first page and the title of the first page, do you recognize this document, sir?

MR. COZZI: Same objection.

A Yes.

Q What do you recognize it to be?

MR. COZZI: Same objection.

A This is the Supplemental Responses to the Defendants' Supplemental Interrogatories.

Q I'm gonna scroll down to Page 37 of 38. Do you see this page called Title Verification?

A Yes.

MR. COZZI: Leading and same objection.

Q And I'm gonna go down to the bottom of Page 37. There's a signature there. Do you recognize that signature?

MR. COZZI: Same objection.

A Yes.

Q Whose signature is it?

MR. COZZI: Same.

A It's mine.

Q Alright. Did you have a chance to review this document and then sign it after you reviewed it?

MR. COZZI: Same.

A Yes.

Q Okay. Sir, I direct you to Page 21 of Exhibit -- Plaintiff's Exhibit 1. Do you see a paragraph numbered 13 there?

MR. COZZI: Same objection.

A Yes.

Q Alright. Can you, please, read that Paragraph 13?

MR. COZZI: Same objection and leading.

A "State the level of assessment that you allege was applied to the subject property by the assessor for tax year 2010."

Q You understand that the plaintiffs were asked to answer that question?

MR. COZZI: Same objection.

A Yes.

Q And if I go to midway through Page 22, do we see an amended supplemental response?

MR. COZZI: Same objection.

A Yes.

Q Alright. At the end of the first paragraph in the amended supplemental response, could you, please, read that sentence.

MR. COZZI: Same objection.

A Okay. "As a result of the assessment levels applied to PIN 30-19-100-128 was 30.54%, based on the assessed value of 11,249,354 divided by the fair market value of 36,835,000 as set forth in the Petition."

Q So focus first on the $11,249,354. What do you

understand that number to represent?

MR. COZZI: Same objections.

A That represents the initial assessed value rendered by the assessor.

Q Initial or final?

MR. COZZI: Same objections.

A Initial assessed value.

Q Okay. And then if we go a little higher in that same paragraph, I'm highlighting the paragraph -- the sentence that starts "As stated..." Does this sentence explain the $36 million number?

MR. COZZI: Same objections.

A Yes.

Q Can you, please, read that sentence?

MR. COZZI: Same objections.

A "As Stated in the Petition, Simon/Fox Valley sought a reduction of the assessed value based upon a fair market value of $36,835,000."

Q Where did that number come from?

MR. COZZI: Same objection.

A That number comes from the appraisal.

Q Okay. So am I right that your view is that the assessor imposed a level of assessment of about 30.5% in 2010?

MR. COZZI: Same objections and leading for

Page 338

all these questions.

A   If you were to divide the rendered assessed value of 11,249,354 into the 36-835, you would have a calculated ratio of 30.54%.

Q   Okay. Let's go to Page 25. And you see Paragraph 16?

MR. COZZI: Same objections.

A   Yes.

Q   Paragraph 16 is the same question for tax year 2011?

MR. COZZI: Same objections.

A   Yes.

Q   Alright. And going to Page 26, the amended supplemental response. Do you see that?

MR. COZZI: Same objections.

A   Yes.

Q   Alright. Go to the last sentence. Can you, please, read that last sentence --

MR. COZZI: Same objections.

MR. TZUR: Let me finish, please.

MR. COZZI: I'm sorry.

Q   -- the last sentence in the first paragraph under amended supplemental response on Page 26.

MR. COZZI: Paul, can I have a standing objection that all of these questions violate

Page 339

our request for production, violate our agreement and are leading and I object to the form? Or do you want me to keep making the objections?

MR. TZUR: I mean, it's fine. You can have a standing objection. Obviously, I disagree with the objection. I'm not waiving --

MR. COZZI: Okay. I don't want to interrupt you.

MR. TZUR: That's fine. Okay, sure.

MR. COZZI: Thanks.

Q   Alright. So, with that, if I may, could you, please, read the last sentence in the first paragraph of amended supplemental response for tax year 2011.

A   "As a result of the assessment level applied to PIN" -- capital P-I-N, solid cap -- "30-19-100-135 was 31.62% based upon the value of 11,239,465 which is divided by the fair market value of 35,550,000 as set forth in the Petition."

Q   And, so, the $11,239,456 number, where did that come from?

A   That's the assessed value rendered by the assessor.

Page 340

Q   Alright. And the 35 million number, where did that come from?

A   The appraisal.

Q   Okay. And, so, based on that, your view is that the assessor imposed a level of assessment of about 31.6%?

A   That would be the mathematical computation resulting from the two.

Q   Okay. Let's go to tax year 2012. Paragraph 19 on Page 29, is that for tax year 2012?

A   Yes.

Q   And if we go to the amended response starting at the bottom of Page 29 and then going to the top of Page 30, could you, please, read the last sentence there?

A   "As a result, the assessment level applied to PIN 30-19-100-135 was 29.92 based upon an assessed value of $10,637,129 divided by the fair market value of $35,550,000 as set forth in the Petition."

Q   So does that mean that your view is that the assessor imposed a level of assessment of about 29.9% in 2012?

A   Based upon the appraisal divided by the assessed value rendered by the assessor, the resulting

Page 341

assessment ratio would be 29.92, yes.

Q   Okay. 2013 is -- no 2013. 2014.

MR. COZZI: I was gonna say, please, don't tell me you're disputing '13 now.

MR. TZUR: My mistake.

Q   Paragraph 22 is 2014; correct?

A   Correct.

Q   On Page 32 of the document?

A   Correct.

Q   And if we go down to the amended supplemental response on Page 33, could you, please, read that last sentence?

A   "As a result, the assessment level applied to PIN 30-19-100-135 was 26.03% based upon an assessed value of 6,664,217 divided by the fair market value 25,606,456. There was no change to the assessed value of PIN 30-19-300-006."

Q   So what do you believe, based on these numbers, was the level of assessment applied by the assessor in tax year 2014?

A   The level of assessment would be 26.03%.

Q   Okay. If we could go to the County and Treasurer's Exhibit 10. And if we turn to Page 40194. You were asked questions about this page. Do you remember being asked about the

what's marked as "rec. %" at the top of 40194?

A   Yes.

Q   And am I right that "rec. %" means recovery rate?

A   That is correct.

Q   Could you explain -- because I may have missed it -- what does the recovery rate mean?

A   Recovery rate represents the amount of tax that is collected from the tenants that are obligated to pay a reimbursement for the property taxes levied on the property.

Q   If we can go to 16.1, County and Treasurer's Exhibit 16.1. If you recall, you were asked a lot of questions about Courtney Masbaum's use of the word "hidden" in the second line of the e-mail that's on the first page of this exhibit?

A   It's the third page.

Q   No, the first page.

A   Oh, hidden. I'm sorry. Yes.

Q   For how long have you been using Microsoft Excel in your career?

A   Probably since 2000 after I migrated from Lotus 1-2-3. I'm old.

Q   In your time since joining Simon in 2009, can you describe some of the ways that you've used

Excel in your job?

A   Oh, Excel is a vital tool that we use. We use it for all of our model valuation analysis. We use it for preparing spreadsheets, preparing, you know, graphs, any number of different activities that go into supporting the property tax responsibilities we have.

Q   Based on your decades of experience -- sorry to date you -- using Excel, are you familiar with the function in Excel called "Hide"?

A   Yes.

Q   What does the hide function do in Excel?

A   Well, it depends on what you're trying to do. You can hide worksheets within a workbook. You can hide rows, you can hide columns, but the whole purpose is to remove it from visibility so that you can utilize that report for either printing or for other purposes.

Q   And, so, focusing on the use of "hide" to hide rows and columns, not the hiding of worksheets.

A   Uh-huh.

Q   Hiding rows and columns. When you hide something, does that mean that that row or column disappears forever, goes away forever?

A   No, it's just not visible on the screen or in

print mode.

Q   What does a user need to do to make that row or column visible again?

A   You would either actually drag the column back open by going up to the column alpha character identification or you can click on the left-hand corner and unhide everything in the document.

Q   So let's go back to 16.1, that e-mail where Courtney Masbaum is asking for things to be hidden. Assuming that her instructions were followed, would the recipients of these spreadsheets have been able to unhide the columns that were hidden?

MR. COZZI: I'm objecting on top of my standing objections to your characterization of Courtney Masbaum making this direction when she didn't and her doing the hiding, so I object in addition on that basis.

A   Okay. So can you repeat the question, please?

Q   Yeah, let me rephrase it. Assuming that -- withdrawn. Assuming that the columns identified here, Target FMV and ETR, indeed were hidden before this spreadsheet was sent out to the recipients, what would the recipients have needed to do to be able to see those hidden

columns?

A   Well, if it's internal, our tax managers would be getting the electronic version, the Excel version, but what was transmitted was PDFs.

Q   I see.

A   So PDFs were transmitted to the broader recipients that were receiving this for that period of time we were distributing it.

Q   Okay. And PDFs they wouldn't have been able to unhide the --

A   Correct.

Q   -- rows or columns?

A   Correct.

Q   Okay. But there weren't two versions of the Excel workbook, one that had the columns Target FMV and ETR and one with those columns deleted?

A   No.

Q   If we could go to County and Treasurer Exhibit 17.1. You were asked questions about the reduction following the meeting with the Cook County Assessor. Do you remember those questions?

A   Yes.

Q   Could you, please, read the first sentence of your e-mail here at the top of Exhibit 17.1.

Page 346

A "We obtained a reduction in the assessed value of the property due to the declining nature of the financials, the impact of the Sears and CPS closure and the demolition of the office and theaters."

Q Okay. And you still agree with that sentence that those are the reasons why you received -- you obtained a reduction in the assessed value of the property?

A Yes.

Q Let's go to Exhibit 24.

(A discussion was held off the steno record.)

Q You were asked questions about --

A What exhibit?

Q We're on Exhibit -- County and Treasurer Exhibit 24.

A Okay.

Q You were asked questions about the FMV for 2005 and 2006 in the upper left corner of that exhibit. You see those?

A Yes.

Q Same number, 57.757 million in each of the two years?

A Yes.

Page 347

Q And you testified that that could be because, if I remember, and tell me if I'm wrong, that could be because it was the start of a triennial and you just pulled from one year to the next; right?

A Yes.

Q What about how would you -- how did you in these relevant years go about modifying within a triennial to adjust for a decline in -- property decline in anything going on at the property, projections on what sales were going on at tenants, et cetera?

A Can you rephrase the question?

MR. TZUR: Yeah, that's a terrible question. No, you know what, withdrawn. Withdrawn because I don't know at this hour I can do better.

MR. COZZI: I'm glad I'm not the only one who feels that way, Paul. I felt that way starting hours ago.

MR. TZUR: Yeah, I hear you. I'm done with questions.

MR. COZZI: Alright. I guess we're done here.

MR. TZUR: Thank you, everybody.

Page 348

THE VIDEOGRAPHER: We are going off the record. The time is currently 8:21 and this concludes the deposition for today.

AND AT 8:21 P.M. FURTHER THE DEPONENT SAITH NOT.

_____
MICHAEL LARSON

Page 349

STATE OF INDIANA        )
                        ) SS:
COUNTY OF HAMILTON      )

I, Brandy L. Bradley, RPR, a Notary Public in and for the County of Hamilton, State of Indiana at large, do hereby certify that MICHAEL LARSON, the deponent herein, was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth in the above-captioned cause;

That the foregoing deposition was taken on behalf of the Defendants Pappas & Cook County at the remote location of the witness, Indianapolis, Marion County, Indiana, on the 21st day of August, 2025, pursuant to the Applicable Rules;

That said deposition was taken down in stenograph notes and afterwards reduced to typewriting under my direction, and that the typewritten transcript is a true record of the testimony given by said deponent, and thereafter presented to said deponent for his/her signature;

That the parties were represented by their aforementioned counsel.

I do further certify that I am a disinterested person in this cause of action; that I am not a relative or attorney of either party, or otherwise interested in the event of this action, and am not in

Page 350

the employ of the attorneys for either party.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 2nd day of September, 2025.

_____
Brandy L. Bradley, RPR

Commission No. NP0682101

My Commission Expires:
April 13, 2032

---

### Exhibits

---

**EX 0001 Michael Larson 082125**
4:5 334:1,13 335:23

**EX 0001 Michael Larson DEFT 082125**
3:4 40:12 41:19

**EX 0002 Michael Larson DEFT 082125**
3:4 98:4,5 117:1

**EX 0003 Michael Larson DEFT 082125**
3:5 108:18 110:12

**EX 0004 Michael Larson DEFT 082125**
3:5 111:8

**EX 0005 Michael Larson DEFT 082125**
3:6 152:10, 12

**EX 5.1 Michael Larson DEFT 082125**
3:7 188:2 189:19

**EX 0006 Michael Larson DEFT 082125**
3:7 195:11, 17 199:6,7 206:21

**EX 0007 Michael Larson DEFT 082125**
3:8 209:19

**EX 0008 Michael Larson DEFT 082125**
3:8 211:23 214:15 215:9 221:2,3 225:23

**EX 0009 Michael Larson DEFT 082125**
3:9 231:16 233:16

**EX 0010 Michael Larson DEFT 082125**
3:10 234:7, 11 236:20 341:23

**EX 0011 Michael Larson DEFT 082125**
3:10 243:19 244:11 245:20 248:5

**EX 0012 Michael Larson DEFT 082125**
3:11 249:24 251:5

**EX 0013 Michael Larson DEFT 082125**
3:11 251:11 258:14,15 263:15

**EX 0014 Michael Larson DEFT 082125**
3:12 261:21, 24

**EX 0015 Michael Larson DEFT 082125**
3:13 265:19, 21,23

**EX 0016 Michael Larson DEFT 082125**
3:13 273:14, 21

**EX 16.1 Michael Larson DEFT 082125**
3:14 277:3 342:13

**EX 0017 Michael Larson DEFT 082125**
3:14 295:18

**EX 17.1 Michael Larson DEFT 082125**
3:15 299:19 345:18,19,25

**EX 0018 Michael Larson DEFT 082125**
3:16

**EX 0019 Michael Larson DEFT 082125**
3:16 307:1

**EX 0020 Michael Larson DEFT 082125**
3:17 309:22, 24 311:17 312:2 315:11 316:9

**EX 0025 Michael Larson DEFT 082125**
3:20 325:24

**EX 0026 Michael Larson DEFT 082125**
3:21

**EX 0027 Michael Larson DEFT 082125**
3:22

**EX 0028 Michael Larson DEFT 082125**
3:22

**EX 0029 Michael Larson DEFT 082125**
3:23

**EX 0030 Michael Larson DEFT 082125**
3:23

**EX 0031 Michael Larson DEFT 082125**
3:24

**EX 0032 Michael Larson DEFT 082125**
4:2

**EX 0033 Michael Larson DEFT 082125**
4:2

**EX 0034 Michael Larson DEFT 082125**
4:3

**EX 20.2 Michael Larson DEFT 082125**
3:17 314:9 315:21 316:19,20

**EX 0021 Michael Larson DEFT 082125**
3:18 313:5

**EX 0022 Michael Larson DEFT 082125**
3:19 314:17

**EX 0023 Michael Larson DEFT 082125**
3:19 317:15, 19

EX 0024 Michael Larson DEFT 082125
3:20 320:4,5
322:9
346:11,16,17

# #

#REF
215:20

# $

$.15
217:22
218:3,7
$10,637,129
340:18
$11,239,456
339:22
$11,249,354
336:25
$20
249:17
$26,659,558
269:3
$27,840,990
315:5
$27,980,690
269:2
$29,162,122
268:22
$29,461,010
301:19
304:1,22
$3
304:5,11
305:3
$300,000
268:18
270:20
$35
200:23
$35,550,000
340:19

$36
337:11
$36,835,000
337:18
$382,050.20
217:6
$4,418,820
197:15
$43,674,038
296:20
$45,000,106
248:12
$45,482
270:25
$46,122,946
318:21
$47
276:10
$5,000
169:14
$56,717,990
246:21 247:2
316:4
$57,757,111
213:17
$57,840,834
311:19
315:13
$58,816,637
246:9
$58,999,774
264:15
$6
223:13
$60,584,162
263:5 264:12
$62,993,351
253:14,25
$63,736,160
248:3,7
$65,100,230
246:13,23
247:4,14
$9
247:22

# 1

1
3:4 4:5
40:12,14
41:19 89:22
125:18
145:13 265:5
326:10
334:1,13
335:23
1,995
145:12
1-2-3
342:23
1/1/14
249:12
10
3:10 62:11
77:15 84:10
123:3 234:7,
11 236:20
277:5 341:23
10,634,119
251:9
10-K
178:12,16,23
10-ks
174:18
10-qs
174:19
10-year
257:16
100%
92:13
108
3:5
10:03
35:12
10:34
35:18
10th
307:7,12,14
11
3:10 5:2
243:19

244:11
245:20 248:5
303:22 327:1
11,239,465
339:19
11,249,354
336:22 338:3
11:04
10:1
11:06
10:4
11th
261:24
262:22
12
3:11 60:13
70:19 170:4
249:24 251:5
262:7 299:10
12/12/59
25:3
12:34
78:18
12:45
78:21
12th
320:6 322:10
13
3:11 70:19,
20,21 72:14
170:4 251:11
258:15 262:7
263:15
299:8,9,20
300:21 305:8
335:24 336:3
341:4
14
3:12 146:13
228:7
261:21,24
305:5,6,25
14,459,805
312:3
15
3:13 45:1
265:19,21,23

305:25
326:25
327:12,14
328:3,7,9,
11,14,15,17,
19,21,24,25
329:6,7,11

**151**
2:13

**152**
3:6

**15565**
315:22

**15th**
43:11 45:7

**16**
3:13 42:17
273:14,21
306:1 338:6,
9

**16.1**
3:14 273:22
277:3 279:8
342:12,13
344:8

**1650**
2:4

**16825**
5:17

**16th**
188:4

**17**
3:14 295:18
315:23 316:2

**17.1**
3:15 299:19
345:19,25

**18**
3:16 47:17
300:7

**18.6**
260:18

**18/'19**
127:9 155:17

**188**
3:7

**19**
3:16 114:11
231:19 307:1
340:9

**195**
3:7

**1984**
41:22

**1995**
42:12 114:11

**1997**
46:11 52:10
179:21 180:1
317:5,9

**19th**
232:1 234:11
236:22
238:10,20

**1:53**
129:14

**1st**
195:18 300:8
301:16
304:3,20

---

**2**

---

**2**
3:4 40:15
41:16,19
98:4,5 117:1
125:18
196:11 265:5
326:12

**2,000**
326:15
329:13

**20**
3:17 70:19
74:1 309:22,
24 311:17
312:2 315:11
316:9

**20.2**
3:17 314:9
315:21
316:20

**2000**
41:22 44:10
114:10,12
160:24
171:13
342:22

**2005**
41:16,17
67:23 68:9,
25 69:8,23
81:17
102:14,24
123:5 175:3
192:14 195:3
212:20,24
213:17,24
215:6 221:3
228:11
237:22
238:4,13
240:15
275:3,11
278:2 310:7
321:5 322:12
346:19

**2006**
3:4 81:17
98:6,11,13,
15 114:8
192:14
213:25
238:22 246:9
321:6 322:12
346:20

**2007**
81:17 114:9
138:3
169:21,24
192:14

**2008**
3:20 65:11
72:11 81:17
213:25
214:19 215:7
217:5 237:22
239:6 275:11
322:12

**2009**
14:20 16:10,
14 17:22
19:2 20:16
26:24 31:7
43:7,10,11,
15 45:1,7
50:5 65:7,12
69:2 72:15
73:8,15
74:23 81:17,
19,21 88:15,
25 97:17
107:15
108:6,23
111:20 112:5
126:11
142:12,14
160:24
182:14
188:4,13
191:22
241:20
242:5,25
246:11,21
247:13
248:25 249:8
250:16,18
251:1,8,9,10
273:18
279:12 310:7
311:19,21
312:2,21,24
313:1 314:15
315:12 316:3
322:13
342:24

**2010**
3:17 43:10
75:18,24
77:3 84:4
122:7 125:14
143:17
145:17 146:9
160:19
175:6,13
186:23 193:9
208:10,13,20
209:9,13

224:2 241:23 244:12 247:16 248:2,3,6,11 249:1,8,13, 18 250:2,16, 17,21 308:25 318:18,20 319:7 320:6, 8 322:10 333:22 336:7 337:24

**2010/'12**
228:7

**2011**
48:9 111:13, 17,21 241:25 251:17 252:12,18 253:12,25 260:9,15,18 261:24 262:22 338:10 339:15

**2012**
170:3 196:1, 2 221:4 242:2,5,25 262:1,4,5,25 263:3,4 264:12 279:9,12 280:25 288:23 296:2,13,17, 19 302:14 306:3,5,15, 21 340:9,10, 23

**2013**
138:3,6,15 170:5,9,13, 20 171:8,19, 21 173:3 195:18 196:5 197:13 206:15

209:20 210:1,6,11 231:19 232:2 249:7 262:1, 6,25 264:14 295:20 296:2 297:6 299:3 300:5,9,25 301:16 303:6,7,10, 22,23 304:3, 20 307:16, 17,24 308:16 320:6 341:2

**2014**
14:20 19:3 20:16 26:24 27:17,22 29:2,4 67:23 68:9,25 69:9,23 72:15 73:8, 15 74:23 77:3 88:15, 25 97:18 102:14,24 107:15 108:6 122:8 123:5 125:14 142:12,14 143:17 145:18 146:10 147:8 148:4 149:14,23 150:8 151:8, 18 160:19 175:3,6,14 186:24 195:3 208:20 209:9,13 212:20,25 217:20 221:8 222:11,12, 16,19 223:3 224:2 228:12 230:13,14 232:2 234:11 236:23

238:10,20 265:24 267:7 268:13 270:24 278:2 294:24 299:20 300:24 302:17 303:4,5,9, 14,15,19,23 304:1,18,22 305:9,16 309:1 310:3 312:17 313:9,23 315:3 318:15,18 333:23 341:2,6,20

**2015**
50:5 51:2 203:12,15 206:11 211:22 212:4 222:8 272:19 303:24 314:19,25

**2016**
29:2 59:5 171:13 302:15 303:24 305:23

**2017**
252:18

**2018**
127:12

**2018/'19**
127:7

**2019**
46:11 52:11 59:6 127:12

**2020**
6:12 52:15 114:20

**2021**
114:19,20 115:5

**2024**
307:8

**2025**
5:2 206:17, 23 240:16

**209**
3:8

**20S-MS-236**
6:12

**20th**
111:12,17

**21**
3:18 115:6 313:5 335:22

**21/'22**
115:6

**211**
3:8

**21st**
5:2

**22**
3:19 314:17 317:3,7,18, 20 336:12 341:6

**225**
30:8

**23**
3:19 317:15, 19,20,21,22

**231**
3:9

**234**
3:10

**23rd**
250:1,21

**24**
3:20 320:5 322:9 333:8 346:11,17

**243**
3:10

**249**
3:11

**24th**
210:1

**25**
  3:20 325:24
  338:5
**25%**
  208:13,16,
  18,25 209:9,
  15 221:9
  223:12
  251:10 312:5
**25,606,456**
  341:16
**2500**
  2:13
**251**
  3:11
**26**
  3:21 223:7,
  12 338:13,23
**26(a)(1)**
  152:13
**26.03%**
  341:14,21
**261**
  3:12
**266**
  3:13
**27**
  3:22 152:17
  297:6
**273**
  3:13
**277**
  3:14
**27th**
  251:17
**28**
  3:22
**28th**
  149:23
  150:25
  151:8,18
  210:5 308:16
**29**
  3:23 295:20
  340:10,13
**29,162,123**
  267:17

**29,461,000**
  302:18
  313:12
**29,461,010**
  267:16
**29.5**
  297:10
**29.9%**
  340:23
**29.92**
  340:17 341:1
**295**
  3:14
**299**
  3:15
**2:51**
  129:17
**2nd**
  3:6

---

**3**

**3**
  3:5 40:15
  108:18
  110:12
  125:18 265:5
  326:14
**3%**
  306:1
**30**
  3:23 87:18
  340:14
**30%**
  253:4
**30-19-100-128**
  336:21
**30-19-100-135**
  339:18
  340:17
  341:14
**30-19-300-006**
  341:17
**30.5%**
  337:24
**30.54%**
  336:21 338:4

**300**
  3:16
**307**
  3:16
**309**
  3:17
**30th**
  244:12
  313:9,23,24
**31**
  3:24 6:12
  98:13
**31.6%**
  340:6
**31.62%**
  339:18
**313**
  3:18
**314**
  3:19
**315**
  3:17
**317**
  3:19
**317 625-8634**
  35:20
**31st**
  98:10,15
  212:3 222:1,
  8
**32**
  4:2 325:25
  341:8
**32.5%**
  300:5
**320**
  3:20
**33**
  4:2 200:22
  341:11
**330**
  2:9,23
**3300**
  2:9
**334**
  4:5

**34**
  4:3
**34%**
  242:3
**35**
  340:1
**35,550,000**
  339:20
**36%**
  241:25
**36,835,000**
  336:23
**36-835**
  338:3
**366**
  35:17
**37**
  335:6,10
**38**
  335:6
**38%**
  136:4
**39545**
  267:5
**39999**
  231:17
**3:32**
  161:25
**3:39**
  162:3
**3:55**
  320:8,9
**3rd**
  265:24 267:6
  318:15

---

**4**

**4**
  3:5 40:15
  111:8 314:19
**40**
  3:4
**40%**
  241:23

**40009**
262:10
**40194**
341:24 342:1
**40368**
301:4
**40370**
302:2 305:16
**41172**
191:18 192:9
**41244**
251:20
252:22
254:15
256:17
**4194**
236:20
**4195**
242:16
**42041**
283:18,20
**42715**
307:3
**42717**
308:11
**43,674,038**
306:5
**44,000,800**
215:4,10
**44,800,000**
214:1
**44389**
311:17
**444**
2:4
**45**
87:18 326:22
**45,000**
270:21
**45,482**
271:1,2
**46,122,946**
319:5
**4671**
269:18 270:6
315:8

**4672**
270:7

**5**

**5**
3:6,17,19
40:15
152:10,11,12
219:11,13
238:2
239:21,22,25
302:4 309:24
314:17
317:24
319:25 321:7
**5%**
305:25
**5.1**
3:7 188:2
189:19
**50**
219:13
**50%**
92:8,11
219:8,10
220:2 221:4
**50/50**
219:7
**56%**
241:21
**57**
243:2
**57,840,834**
312:5
**57.757**
346:23
**58%**
239:6
**5:03**
225:2
**5:19**
225:5
**5th**
209:20

**6**

**6**
2:21 3:7
40:16
152:15,17
195:11,12,17
199:7 206:21
238:2
239:21,22,25
321:7
**6,664,217**
341:15
**60606**
2:4,14
**60611**
2:9
**65**
315:25 317:7
**69%**
238:23
**6:33**
277:14
**6:41**
277:17

**7**

**7**
3:8 40:15
209:19 279:9
307:4
**7.5**
196:18
**7.5%**
196:22
**715**
307:5
**74%**
238:5
**75%**
222:10 223:3
**77**
98:5 116:21,
24

**7:50**
330:2
**7:58**
330:5

**8**

**8**
3:8 60:13
211:23,24
214:15 215:9
221:3 225:23
238:3
239:21,23,25
321:8 327:11
**8-ks**
174:19
**84**
41:11
**8:21**
348:2,4

**9**

**9**
3:9 231:16
233:16 321:8
**9%**
261:8
**98**
3:4
**9th**
310:3 312:17

**A**

**A.F.**
5:9
**a.m.**
5:2 10:1,4
**Aaamlarson@ yahoo.com.**
30:23
**Aaron**
235:11,12
279:16

**abandon**
227:19
**abandoned**
225:13
227:20 228:7
**abbreviation**
197:10
**ability**
39:14 237:7
**able**
34:20 95:1,
6,11 107:13,
25 163:22
192:18 240:3
241:12
259:15,21
260:7,14
334:16
344:12,25
345:9
**above**
138:4 198:3,
6,9 259:16
289:14
**absolutely**
290:13
**absolve**
240:22
**accept**
13:19,23
82:22
**accepted**
186:11
**access**
58:22 129:6,
8 180:3
237:6
**accordance**
7:1
**account**
246:22
**accountant**
63:9,16,19
64:3
**accountants**
63:6 64:13
87:1

**accounting**
18:11 23:10,
14,15 62:25
63:4,15
64:1,8,16
73:1 86:19,
23 89:17
91:23 101:25
102:7,13,17,
22 103:1,7,
12 105:2,10,
18 143:6,9
144:1 176:10
177:23
178:13
180:20 184:2
187:25
188:11
218:17
221:25 222:9
225:18,24
232:17
240:1,16
258:25
264:25
270:1,11
**accounts**
88:24
**accrual**
105:15,19
106:1 140:21
**accruals**
105:11
**accrue**
105:7
**accuracy**
163:25 226:1
279:22 280:4
322:21
**accurate**
127:10 153:6
163:15
167:4,7,16
214:23
221:22
225:23
236:13,17
237:22

307:24
322:18,20
323:4,23
324:1,6,10,
14,19
**accurately**
8:3 89:23
94:19 279:24
**achievable**
198:22
**achieve**
61:14,16
95:2,6
219:10
221:17 223:4
268:9
**achieved**
62:7 105:22
187:15
219:14
220:10 223:8
265:3
**achieving**
220:6,13,20,
24 222:10
226:4
**acknowledging**
112:4
**acquire**
175:23
179:20,24
**acquired**
93:8 135:12
148:11
175:22
317:9,11
**acquiring**
28:13
**acquisition**
20:10 148:23
**acre**
245:2
**acronym**
267:2
**across**
68:22 218:20
220:10

**action**
5:19
**active**
21:12,19
22:22 61:3
**actively**
228:24
**activities**
51:19 73:11
89:5 96:23
106:18,20
235:8 343:6
**activity**
19:14 45:22
**actual**
105:11
136:24,25
141:17,18
189:15
253:1,15,16
254:21 255:1
260:7 274:22
293:4
309:18,20
**actuals**
310:12
**ad**
25:18,20,23,
25 26:2,3
160:4,9
166:7 229:8
230:13
288:5,16
**add**
186:3 266:7
**added**
25:21
**addition**
130:23
344:18
**additional**
123:15
133:17 136:8
140:24 223:7
323:15
326:17
328:12

additions
175:24
177:5,8,9,16
address
30:7,10,13,
22
addresses
30:15
adequate
39:15
adjust
347:9
adjusted
137:19
219:16 312:4
313:4
adjusting
321:14
adjustment
11:20 12:4,
6,11 14:5
39:9 78:4
124:24 125:1
271:21
adjustments
77:24 78:7
183:24
admin
266:12
administratio
n
216:7
administrativ
e
96:8 97:11,
14,17
212:14,16
318:5
admins
266:5,7,8,9
adopted
267:2
advance
133:22 140:3
189:15
advanced
67:2

advancing
46:21
advice
22:9,10,15,
18,25 34:8
35:5 74:20
100:13 154:6
Advisors
128:25 129:2
Advisory
84:12
affect
19:19
affected
223:15
affecting
236:2
affects
56:1
affiliation
148:17
afraid
291:13,15,
20,21
age
109:12
216:10
agenda
97:7
aggregate
62:16 128:22
184:1
aggregated
226:21
aggregating
105:3
ago
123:4,11
347:20
agree
5:4 77:17
91:16 133:24
134:4 163:9
164:1 173:25
174:2 184:9
229:7
259:10,13

278:22 279:6
321:3 322:17
324:18 346:6
agreeing
328:16,20
agreement
16:3,6,13,22
93:17
241:10,14
272:11,17
273:9 323:13
334:4 339:2
agreements
16:8 46:5
240:21
ahead
28:9 39:6
224:4,13,18
260:1 290:7,
17 304:14
324:23
albeit
145:15
allege
336:5
allow
82:21 211:2
328:3
allowance
259:2,3,4
261:18
alpha
344:5
alright
15:2 41:18
51:6 231:17
234:10
236:21
251:11,19
256:16
261:21,23
262:9 265:23
300:7 307:1
309:24 313:7
317:3,15
320:4 328:23
330:8 335:18
336:2,16

338:13,17
339:12 340:1
347:23
altogether
294:19
Altus
216:11
amend
308:1
amended
3:6 17:4,6
125:4 152:13
336:13,17
338:13,23
339:14
340:12
341:10
American
41:23 42:10,
17 60:9,13
162:17
Amo
114:22 117:8
amount
70:25 90:20
91:21,22,24
92:3 93:22
137:22
138:21
139:14,18
140:25
141:12
142:10
183:25
186:10
190:9,15
191:2 242:18
258:18 261:5
270:15 271:3
310:24 311:5
322:10 332:9
342:8
Amy
115:25
analyses
68:7 69:7
261:11
263:16,19

**analysis**
3:7 24:6
56:7 65:25
76:7 79:8
124:20
125:2,4,5
128:19 129:5
136:19
141:20,24
168:12
189:16
194:25
196:19 198:7
199:13,22
200:11
202:14 212:8
214:10,12
215:14
216:19
217:16
219:25
225:10
226:23
227:13
228:4,10,15
232:4,8,13
234:20
240:24 250:3
252:17 255:8
257:23
258:8,12,14
259:6 260:25
261:4,10
262:8 263:6,
14,15 264:13
276:3 282:7
288:1 306:22
309:17 343:3

**analyst**
64:7 73:24
79:6 107:3,4
212:18
279:14

**analysts**
73:10

**analyzed**
162:11

**anchor**
232:25
233:8,24
263:23

**ancillary**
92:21 186:2

**and/or**
103:24
305:22

**Andrew**
29:23 279:16

**Andy**
88:17

**animus**
11:21

**annotate**
124:17

**annual**
3:4 66:16
68:5 94:13,
16 98:6
105:2 106:6
107:6 141:20
178:7,8,16,
17,20
257:15,16
260:24

**answer**
7:20 8:9
22:14,16
29:4 35:7
37:16 95:16
96:13,15
105:15 116:8
124:10 133:6
139:22
146:11,25
147:10
158:19
164:24 179:3
180:18 181:2
183:12 187:7
194:15 205:6
208:2,17
209:14
233:10
238:11
249:20 285:8

294:25
296:23 297:3
308:6,8
316:11
325:5,6
336:9

**answered**
208:1 224:3,
12,17 259:25
290:6 324:13
325:3

**answering**
331:18

**answers**
8:2 32:9
120:21
166:21,22
167:2,3,6,
10,15 330:14

**anticipate**
23:1,6

**anticipated**
36:9 300:19,
20

**anticipation**
22:24 210:10

**anybody**
10:8 29:12
67:21 116:14
120:2 142:21
146:6 153:25
201:12
298:21
299:14

**anyone**
20:7 31:2
64:17 67:24
84:2 122:17
145:22 146:2
211:16,19
237:5 254:7
266:17 281:7

**apologies**
114:10
312:24

**apologize**
219:18
260:3,12

312:6

**apparently**
257:25
259:21

**appeal**
14:1,4,9,19,
23 15:1,4,21
16:2 43:2,5,
12,15 70:3,
14,16,23
71:12,20,25
76:2 77:1
90:9 93:19
101:14,16
103:15
105:21 106:9
113:24
114:5,19
116:18
119:21 137:4
138:6,17
145:18
146:8,21
148:2 149:1,
3 155:1
160:10
170:17 171:3
184:20
189:12,14
190:5 191:7
193:16
194:17
199:14,20
200:16,20,
24,25 201:5
204:2,8,14
215:22
216:15 218:6
219:6,23
221:1,5
222:22 223:3
229:20 233:4
237:4,14,25
240:9 241:16
243:23
244:4,6
247:18
264:2,4

267:14 268:2
270:18,24,25
271:25
275:12,18
276:17
281:24
282:3,5,8
283:12
284:21,22
303:6,7
304:25
306:21
313:19
316:15
317:13 319:7
324:17
325:12

**appeal/no**
199:20

**appealed**
75:21 170:1
319:14,23,24
320:2

**appealing**
92:25 100:16
268:10

**appeals**
3:8,13 15:16
26:1 31:16
39:15 82:2,5
93:7,9 99:7
101:19,21
102:5 115:7
138:3 184:24
188:19,22,
23,24 189:4,
7,8 190:17
191:4,8,11,
21,25 192:22
212:7 215:13
217:15 225:9
226:5 228:4,
10,20 233:9
234:16
236:2,5,8,22
237:3 243:11
266:20 267:9
269:11

273:23 274:3
276:16
280:18
281:19
282:23
285:13
289:13 294:3
295:2,13
310:14

**appearances**
5:23

**appellate**
13:10

**applicable**
7:2

**applications**
38:16

**applied**
45:3 106:15
122:6,8,21
136:25
208:9,14,19
209:8,12
336:6,21
339:16
340:16
341:13,19

**applies**
134:10

**apply**
109:1 136:16
214:25
215:1,4,6
218:11

**appraisal**
41:23 42:14,
17 46:20
49:11 53:11
56:23 59:13,
16,20 60:11,
13 61:4,6,
10,12,19
84:9 104:15,
17 155:4,7
156:18
157:18
158:22 160:9
161:4,11

162:17,19,23
163:2,18
164:16,20
165:1,9
166:6 183:7,
13 190:19
196:23
214:24,25
215:4,5
230:10,16
244:2 259:3
273:4 282:12
287:13
303:1,4,8,21
320:18
321:10,15,23
322:3,16,25
337:21
340:3,24

**appraisals**
33:11,13
59:16,17
84:13 99:21,
23,24 104:9
154:24
159:23,25
160:3,13
162:20
164:12
189:16 273:2
320:15
322:22
333:10

**appraise**
132:13 159:9
165:18
230:12,14

**appraised**
115:2 154:21
159:5,8
161:8 233:14
320:20

**appraiser**
42:3,6,13,
14,16 59:20
60:14,17,23,
25 61:3
64:18,19,23

65:2 83:24
84:5 132:11
146:21,22
148:3 149:4,
8,9 153:18
156:17,23,
24,25 157:3
159:21
160:18,25
161:8,10,14
162:17
165:18,21
193:18
201:1,2
230:2,11
244:1 278:19
281:23 282:6
285:15
286:24
287:13,17
311:14 323:1

**appraiser's**
64:20

**appraisers**
42:10 59:15
60:9 64:20
83:12,13,14
108:12,16
155:9 161:2
273:8

**appraises**
83:24

**appraising**
155:8 197:3
277:21

**appreciate**
118:9

**approach**
47:10,11,12
53:21,22,23,
24 54:1,2,23
55:5,10,13,
24,25 56:5,
7,15,16,17
67:8 194:23
196:23 197:3
201:17,19,20
203:6,9

277:22,23,
24,25 278:1,
8,9,10,13,24
279:4,5
282:10
287:12
306:23
**approaches**
47:3 56:1,2,
4,9 278:5
**appropriate**
9:3 21:6
61:14 66:7,
8,12 70:2,17
76:24 90:10
128:24
139:8,14,18
157:4 160:12
173:20 174:1
198:9 199:4,
7,12,16
206:4 226:18
229:17 278:6
280:5,7
**appropriately**
94:22
170:13,15
**Approval**
226:12
308:20
**approve**
94:20 143:15
194:21
308:21
**approved**
143:23
**approximately**
295:12 305:3
**approximation**
43:25
**April**
111:12,17
244:12
**APTC**
59:25 60:1
**arbiter**
71:19

**archived**
97:10 107:25
125:9,19
**area**
92:17,18
105:5 115:18
132:17
178:13 186:1
**areas**
278:24
**around**
28:5 38:7
112:9 148:1
262:21
**arrear**
105:23
**arrive**
76:14
**arrived**
76:19 124:21
170:24
268:15,25
**as-is**
251:23
254:23 265:5
**as-need**
109:16
**ascertain**
239:17
**asked**
34:6 35:13
40:9 51:3
79:21 80:7
84:9 100:12
129:21
130:3,22
131:7 146:1
149:2 162:9
185:18 192:4
208:1 224:3,
12,17 228:1,
24 230:11
231:14
257:25 258:8
259:25 268:7
288:20 290:6
297:16
309:15

323:16
324:13 325:3
330:9,11
331:15,17
332:8,15
336:8
341:24,25
342:13
345:19
346:14,19
**asking**
7:19 41:4
163:13 249:5
254:10
286:1,25
325:19
328:18
332:13,14
344:9
**aspect**
130:16
**aspects**
55:16 58:20
181:18 236:6
**assessed**
9:1,6,16,19
11:25 15:6
21:24 90:19
94:23 136:4
170:12,15,19
171:8 208:24
229:19 245:5
246:5 248:18
271:22
274:18
297:10 300:3
302:10 312:3
330:16 331:4
336:22
337:3,7,17
338:2 339:24
340:18,24
341:15,17
346:1,8
**assessing**
10:18 51:21
165:11,13
297:21

310:25
313:15
**assessment**
15:12 22:3,
7,21 23:3,7
29:9 43:5
49:15 73:12
75:25 76:4,
25 90:7
101:15
106:19
119:22
122:7,12,13,
14,20 134:15
139:8,11,13
140:19
141:22 155:2
160:1 171:20
172:17
201:25 202:7
206:2 208:9,
19 209:6,8,
11 216:6,15
220:19
242:12
243:21 258:6
271:18 276:1
287:22 299:6
300:25
305:10
306:12 311:7
312:4 320:17
333:21
336:5,20
337:23
339:16
340:5,16,22
341:1,13,19,
21
**assessments**
47:6 136:21,
24 141:16,
17,21 263:24
333:11
**assessor**
2:12 6:10
9:10,18,21
10:14,16

12:22 13:5,
10,15,18,22
14:2 39:23
43:6 70:5
71:1,14 72:3
105:23
122:6,8,21
136:16 137:8
138:13,18
139:2,7,14
140:13,16
141:1
170:12,19
171:8 201:7,
10,14
202:18,19,25
203:7,9,15,
19 204:1,7,
14,18
207:18,24
208:5,15
209:9 210:4
211:3,15
213:4 224:1,
6 242:19
246:16
247:1,3,7
248:10,17,23
256:23
267:12
268:1,25
278:1 285:3,
4,9,10,14,
16,22,24
286:1,21,22
287:1 293:2
296:24
297:17
298:25
299:11,14,16
318:23,24
319:6 322:19
323:5,8,9,
12,16,24
324:3,7
325:19
326:13
330:15,16
333:22 336:7

337:4,23
339:25
340:5,22,25
341:20
345:21
**assessor's**
10:25 11:4,
9,12 14:9
15:5 40:3
47:7 75:20
135:24 138:9
139:17 155:2
167:20
171:24
172:1,9,14
173:5 206:3,
10,11 210:8,
15,18,23
211:9,13,17,
19 250:8
268:6
271:16,20,25
285:18
296:11,14
298:12,19,22
299:1 302:1
305:21
306:13
310:21
311:16
313:3,17
314:7 318:22
**assessors**
137:6 278:23
298:3,9
300:2
**asset**
20:10 28:13
74:23,24
75:9 172:10
173:12 174:3
**assets**
27:9 136:10
169:15,17
174:22,24
175:3,18
176:15,24
288:13

**assign**
26:17 73:21
**assigned**
9:13 63:9,
16,19,21,22
64:3 65:6,8
74:25 76:6
77:6 90:2
99:14 215:24
220:24 222:3
**assist**
29:5 166:20,
24 314:23
**assistant**
42:4 97:12,
14,17
212:15,16
279:10,11,12
318:5
**assisted**
29:7
**associate**
49:21,24
50:3,19
51:1,17,22
**associated**
45:25 92:24
163:8 175:23
190:16
199:23 271:2
**Associates**
5:10 41:23
**assume**
8:9 39:1
**assumes**
264:22,23
322:1
**assuming**
16:9 75:15
140:3 149:22
208:16
209:2,14
322:14
344:10,20,21
**attached**
232:4

**attempted**
207:18
**attended**
210:19
**attention**
82:11
**attest**
110:10
**attests**
161:10
**attorney**
32:23,25
36:13,17,19
55:15 74:17,
18 100:13
115:14,19,20
118:9 147:14
200:24
**attorney's**
190:18
**attorneys**
32:16 33:2
38:7,10,19
40:10 72:7
74:11 82:1,4
83:8 100:9
108:12
121:17,19
144:13
166:20
316:25
**attractive**
185:3,9,11
**attributable**
247:22
249:18
**audio**
5:2 95:16
117:9
**audit**
183:18
**auditor**
179:2
**auditors**
180:24
**audits**
181:7,8,15

**August**
  5:2 206:17,
  23 295:19
  297:6 299:8
**authored**
  131:24
**availability**
  54:5
**available**
  55:5 124:12
  163:5,23,24,
  25 187:16
  207:1 229:21
  302:8
**Avenue**
  2:9
**avoid**
  281:11 283:8
  284:13
  289:22,23
**aware**
  10:11 11:6,
  11 12:20
  17:10 26:8,
  10,25 27:14,
  15 28:10,15,
  22 39:25
  51:19 68:23
  82:13 85:11
  87:3 96:22
  125:19
  154:11,15,21
  156:11
  159:24 160:2
  164:20
  166:8,9
  169:20
  174:17 178:5
  181:22
  182:10
  183:20
  207:13,16
  231:15
  256:20
  299:17 304:5

———————
**B**
———————

**back**
  10:3 25:15
  35:15 47:20
  52:7 56:12
  78:10,20
  87:20 98:17
  104:13
  114:10
  116:19
  125:1,2,22
  129:16
  150:19
  151:14 162:2
  182:12
  213:22 225:4
  239:19
  240:17
  241:1,3
  249:19
  270:11
  277:16
  303:17
  315:11
  317:16,18
  319:18 325:9
  330:4 344:4,
  8
**back-of-the-
envelope**
  276:3
**back-office**
  73:11 106:17
**back-up**
  76:18 199:10
  202:12
**background**
  40:18 41:7
  168:12
**backgrounds**
  41:1
**bad**
  229:25
**Bahramirad**
  2:7 6:5

**balance**
  92:4 174:3
**ballpark**
  275:13
**bankruptcy**
  148:12
**base**
  92:16
**based**
  11:20 48:21
  67:25 91:14
  101:8 136:23
  137:19
  140:12,16
  159:20
  184:20
  193:25
  194:2,7
  196:19
  197:13
  199:6,17
  221:2 251:1
  253:15
  257:14
  258:15
  260:20,24
  262:17 263:6
  264:13,16
  265:2 276:2
  282:15
  287:22,24
  297:25
  301:22
  305:20,23
  310:19
  311:13
  312:2,3
  313:14
  320:15,17,18
  321:3,11
  322:25 333:9
  336:21
  337:17
  339:18
  340:4,17,24
  341:14,18
  343:8

**basic**
  7:13
**basically**
  13:8 32:19
  173:14
  187:13
  218:25
  227:12
  287:20
  307:21
**basis**
  14:8 39:13
  66:3,16 68:5
  75:22 90:8
  94:13 100:17
  105:2,8
  106:6 107:6
  109:16
  125:8,23,25
  175:20
  177:4,10
  180:22
  187:15,19
  193:10 199:3
  202:7 219:15
  258:7 263:9
  266:24
  294:5,13
  309:2 344:18
**bear**
  90:21
**beers**
  112:15
**before-and-
after**
  309:16
**began**
  39:7 131:22
  317:4
**begin**
  32:10
**behalf**
  5:16,22 6:2,
  6,9 16:20
  35:5 98:19
  120:16
  159:25 283:1
  298:21

299:14
**behaved**
100:4
**behind**
287:10
**belief**
150:13
167:5,17
213:6 214:11
250:23 259:5
305:9 330:19
**believe**
9:2 10:16
11:23 13:25
14:3 15:11
16:8 30:4
40:4 41:16
43:3 48:9,23
52:4 58:1
60:3,24
61:14 68:14
70:2 74:9
80:21 81:19
88:6 90:20
96:9 98:10
99:6 100:1,3
107:24 110:9
112:5 113:14
133:15
134:3,12
136:16 138:8
139:13
140:13,16,19
143:18
158:15
159:14,18
160:12
161:14 162:6
167:15,18
171:2,19
176:12 182:1
193:24
202:10,11
207:23 208:4
209:17
214:16
215:12
218:4,22

221:18
222:5,6
223:25
229:17
233:19 243:6
262:23
271:21
272:22
273:11
275:14 278:6
286:15 293:3
296:9 311:13
324:24
330:15
333:9,20
341:18
**believed**
66:12
138:14,21
139:2
160:13,16
221:3,8
226:3 293:5,
8 322:9
333:22
**believes**
138:19
139:16
189:13
**bell**
2:8 120:7
**belongs**
222:20
**below**
138:4 189:20
198:5
**benefit**
139:3,6,9,12
172:5
173:15,17,24
184:17
204:8,14
257:22
264:9,19
265:8 307:9
**benefits**
15:11 51:17
198:12

**besides**
30:16 36:1
57:9 58:15
67:21 74:11
84:11 98:23
104:2 112:21
117:20,22
118:14,15
143:2 146:6
156:10,19
206:11
215:10
255:22
293:11 297:1
**best**
31:3,25
40:11 50:22
72:10 84:8
100:19 111:5
121:18
163:24,25
167:5,17
191:6,7,9
195:5 213:5
220:9 229:21
276:6,20,22
305:9 322:24
**bet**
314:10
**better**
10:13 18:24
95:18 124:1
141:1 187:6
192:19 205:6
243:10
347:17
**bias**
158:12,13,15
162:6
**biased**
156:24
157:2,6,8,
10,12,16
159:14
160:14,16
161:8,15
224:2,5,7,
11,16,21

**bid**
162:18
**big**
35:8
**bigger**
192:17
**biggest**
181:24 182:2
255:6
**bill**
83:9,10
140:20,24
245:7
**billable**
302:11
**billed**
104:23 106:6
**bills**
73:13 94:20
106:19
134:14
**binder**
40:21 326:21
**birth**
25:2
**bit**
7:17 11:23
13:7 47:24
110:12
144:12 146:1
171:4 308:1
**bits**
79:8
**Blank**
2:3 6:2
119:7
**blue**
219:4,5
220:16
**board**
11:14,18,21,
24 12:8,13,
17,20 13:1,
4,9,13,19,24
14:1,10 39:9
69:18,24
70:5 71:1,14

72:3 100:1,3
105:24
114:22 117:5
201:7 204:24
205:2,6,7,
15,21,25
206:7
207:12,14
209:12
213:9,18
224:10
229:2,24
246:17,20
247:3,8
248:10,17,23
257:1 267:12
268:1,11
269:2 273:5,
13 285:24
286:3,5,10,
14,17,25
287:2,4,15
288:2 293:2
304:6,12
305:1,22
312:10,14,
15,19 313:4,
18 314:1,7
315:15
316:3,21
318:23,25
319:6,11
322:24
324:11
325:1,13

**board's**
319:2

**bodies**
163:19

**body**
52:22 56:21
59:14 61:24
163:2,7
201:2,18
202:22
204:25 205:4
268:14
273:12

281:22
286:23
287:10 288:1

**Boeing**
113:15

**book**
53:17 56:25
160:6
175:20,25
176:1,2,5
177:3,10
184:3

**books**
169:15,16
181:12 223:1

**Bor**
3:17

**boss**
74:13 225:19

**bottom**
188:14 212:3
252:3,6
261:23
273:17
308:15
335:10
340:13

**Bouchard**
131:19
132:9,11

**bought**
131:25
148:20

**bound**
273:9

**Brad**
83:23 154:3,
5 155:6,10
156:20
157:23

**Bradley**
5:21

**Brady**
109:19

**Braemer**
83:23 154:3,
5 155:6,10

156:20
157:23

**Brandy**
5:21 8:3
334:18

**Brandy's**
7:22

**break**
7:16 78:2,15
90:23
129:11,19
161:18,23
223:19,24
224:25
277:6,10,11
329:20,25

**breakdown**
244:24

**breaks**
234:9 315:10

**Brian**
88:19

**briefly**
33:16

**Brigante**
48:1 49:5
235:13,15
279:18

**bring**
29:17 44:15
79:4,5 90:9
125:1 145:6
235:20

**bringing**
56:12

**Brittany**
2:7 6:5

**broad**
17:12 33:9
34:7 194:10,
14 281:15

**broader**
294:14,17
295:17 345:6

**Broadwater**
175:15 179:4

**brought**
82:10

**Brown**
2:16

**Brynn**
6:6

**bubble**
289:5,14

**budget**
136:22
137:15,17
140:16,18
141:15
143:4,5,7,
15,22,24
182:10
183:21,23,
24,25 184:2,
6,7 229:14,
15 266:21
300:24
301:1,2

**budgeted**
137:5,11,22
138:4 141:12
142:10,23
274:21
319:20

**budgeting**
26:7,9
135:25
136:19
137:15
140:11

**budgets**
141:7 143:13
180:19
300:22

**build**
175:24

**building**
169:6 171:15
211:7 263:23
265:1,7
307:10

**buildings**
264:21

built
  39:10 175:21
BUM
  4:3 266:21,
  22 267:1
bumped
  80:21
bunch
  254:16
burden
  207:19
Burton
  2:8 6:6
business
  30:7,10
  44:13,22
  59:19 85:14
  110:10,25
  111:10,16,18
  160:7 194:12
  227:7,21
  235:7
  266:22,25
  267:1 291:24
buyer
  230:21 231:2

_____

**C**

_____

C-A-M
  92:19 105:5
calculate
  66:24 91:23
  243:14 251:6
  274:16
calculated
  106:4 177:20
  338:4
calculates
  309:11
calculating
  216:20
  275:19,21
calculation
  56:6,7 88:5
  191:14 243:1

calculations
  192:16 280:8
  333:11
calendar
  218:16
California
  114:21 117:8
Calisto
  86:17,18
  231:18
  232:2,7,18
  233:20
  300:10
Calisto's
  233:18
call
  7:17 73:11
  104:3 125:24
  128:6 193:7
  329:9 331:13
called
  25:13 35:12
  41:22 44:4
  46:10 59:24
  61:24 88:11
  91:7 105:5
  110:1,7,13
  111:5,9
  128:14
  134:17
  182:10
  197:10
  219:19 226:8
  251:12 267:1
  301:5 302:4
  308:12 335:7
  343:10
calling
  22:14 291:22
calls
  95:15 150:10
  324:22
CAM
  76:9 92:17,
  19 105:5
Campbell
  72:25 73:2

Canada
  42:19
candidate
  60:11 61:5,
  8,11
canned
  244:17
cap
  128:14,16,
  17,18,23,24
  131:21 132:4
  142:5 192:25
  197:14
  264:17 276:4
  339:17
capacity
  87:24 108:25
  123:1
Cape
  116:16
capital
  20:9 169:4,
  5,9,11,14
  171:11,17
  174:2
  177:11,15,17
  339:17
capitalizatio
n
  24:14 67:5,
  6,7 129:3,4
  191:16
  192:24
  193:3,7,11,
  17,21 194:3,
  8,15,19,23
  195:2,14
  196:4,6
  198:2,10
  199:4,7,17
  200:5,12
  201:6,16,19,
  21,24
  202:12,13,
  17,21,25
  203:6,8,14,
  21,25 204:6,
  13,19,24

  206:14,16,
  20,22 207:3
  261:7,9,11
  282:10
  287:12
  306:23
capitalize
  66:10
capitalized
  76:15 169:13
  253:5
captured
  262:6
card
  182:11
  183:21,23
  184:8
care
  170:14
career
  41:20 298:1
  342:21
careful
  49:24 62:3
  272:8
Carolina
  60:20
carrier
  35:21
carries
  305:22
Carter
  235:11,12
  279:16
case
  6:11 8:13,21
  10:21 11:18
  15:15,17,18
  17:5 23:17
  30:25 33:8
  36:4 38:19
  39:1,9 40:10
  50:6 57:15,
  23 58:3
  70:14 82:16
  88:1 113:20,
  24 115:1,9,

22 116:7
117:20
119:11,12,
13,14,17,19,
20,23,25
120:3,4,6,9,
16 125:13
126:2 128:1
131:2,6,14,
16,18 132:7
134:3 135:15
137:23
143:18
152:25
153:18,19,23
155:17
162:13,14
165:6 166:3,
10,11,12,16,
21,25 167:20
168:19
169:21
177:25 187:3
190:7 205:8
206:17,23
222:22 229:3
240:7 241:2,
9 242:18
255:19 257:8
263:21
264:17
270:19
298:14,24
299:4 302:13
320:15
324:24
330:23
332:10

**case/out**
166:12

**cases**
39:10 91:17
113:7,11,23
114:21
119:8,10,11
120:11
121:4,8,9,
11,13,15,17

130:22

**Cash**
251:13

**cast**
43:10

**Cates**
3:10 234:8,
12

**CBRE**
129:1

**ceased**
295:16

**cell**
35:19

**Center**
99:11,25
113:25
121:23
269:18 315:7

**Center/cost**
3:21,22

**centers**
61:25 88:4

**central**
109:11

**certain**
12:1,15 28:1
58:25 70:22
71:11 123:13
148:16
150:12
172:14 174:9
177:4 181:18
188:19 199:2
220:6 232:19
233:7 265:17
272:23

**certainly**
62:14 79:18
214:10,18
222:5 272:2
275:4 327:18

**certainty**
213:22

**certificate**
161:11

**certification**
42:6 60:10
160:20

**certified**
60:14,16,19,
24 61:4
160:18,25
161:2

**cetera**
347:12

**chain**
262:17

**chair**
46:9 58:19,
20 59:4,8

**chairman**
48:22

**challenge**
47:24

**challenged**
298:5

**challenges**
18:19 19:16
47:4 211:5

**challenging**
97:21

**chance**
220:3 221:4,
9 222:10
223:3 335:18

**chances**
228:19

**change**
45:13 58:24
94:14 99:8
125:10
130:17
143:10,12
184:4,7
191:14
208:17
238:1,16
244:8 282:9,
11 302:23
305:24 319:1
322:2 341:16

**changed**
45:9 77:23
88:16 132:3
134:19 135:5
206:2 216:14
238:8,19
239:1 262:6
305:12

**changes**
78:10,11
107:9 124:16
136:21
141:19 255:5
302:12

**character**
344:5

**characterizat
ion**
290:23
344:15

**characterize**
75:2,14

**charge**
88:14

**charged**
330:16
333:22

**charges**
92:21

**chart**
3:10

**Chase**
5:17

**check**
73:13 279:22
280:3,10

**checked**
300:18

**Chicago**
2:4,9,14

**choice**
170:14

**choices**
185:22 186:7

**choosing**
287:5,7,8

| | | | |
|---|---|---|---|
| **chose** | 151:25 | **Code** | **columns** |
| 186:18 | **classes** | 3:5 110:11, | 192:8 |
| 309:18 | 164:5 | 25 111:10, | 215:18,23 |
| **Christ's** | **clause** | 16,18,19,23 | 216:19 |
| 313:6 | 234:2 | 112:3 | 219:4,5 |
| **Church** | **clean** | **coin** | 253:9 283:22 |
| 266:1,2,4,5, | 218:5 329:8 | 220:4 | 284:5 294:18 |
| 11 | **clear** | **colleagues** | 295:5,6,7,15 |
| **circuit** | 14:15 16:19 | 37:4,13,21 | 343:15,20,22 |
| 105:24 | 103:10 | **collect** | 344:13,21 |
| 324:15,17 | 130:13 | 23:20 91:11 | 345:1,12,15, |
| **circulate** | 133:15 137:2 | **collected** | 16 |
| 73:18 | 221:21 | 23:19 24:15 | **come** |
| **circumstance** | 243:20 | 128:11 191:2 | 55:22 61:12 |
| 72:1 | **clearer** | 342:9 | 68:22 76:10, |
| **circumstances** | 13:7 | **collecting** | 23 78:12 |
| 70:8,22 | **clearly** | 122:24 | 83:10 91:16 |
| 71:11 85:1 | 139:16 | **collection** | 141:2 202:5, |
| 93:13,15 | 217:13 | 66:7 123:2 | 8 226:24 |
| **cite** | **Clemmons** | 142:6 196:15 | 245:6 247:5 |
| 56:14 190:6 | 65:10 67:21 | 198:20 | 253:4 298:4, |
| 236:5 | 68:2,16 | **collections** | 6,7,12 |
| **cited** | 69:13 84:16, | 88:24 | 299:15 |
| 112:11 | 17 142:17 | **collector** | 301:21 |
| 187:22 | 331:16,19,23 | 82:12 | 306:7,8,11, |
| 237:23 | 332:1,4,6 | **collects** | 12 333:15 |
| 249:15 | **Clemmons'** | 93:22 | 337:19 |
| 261:16 269:6 | 68:18 127:20 | **college** | 339:23 340:2 |
| 275:15 276:6 | 145:4 | 79:25 112:9 | **comes** |
| 280:6 297:19 | **click** | **column** | 139:11 |
| 311:24 | 344:6 | 215:11,17 | 140:19,20 |
| **cites** | **cloak** | 216:17,22 | 244:17 |
| 252:19,23 | 281:6 | 217:21 | 246:16 |
| **citing** | **close** | 219:18,21 | 337:21 |
| 214:22 | 92:13 | 220:12,16 | **comfortable** |
| 270:19 | **closing** | 221:19 | 194:25 |
| **claim** | 232:3 | 237:14,17 | **commentary** |
| 320:14 | **closure** | 242:16 | 136:9 237:7 |
| 333:12,16 | 346:4 | 245:8,14,15 | **comments** |
| **claiming** | **co-tenancy** | 268:13 | 268:7,17 |
| 256:25 | 232:23 | 274:7,10,20, | 274:23,25 |
| 257:3,7 | 233:25 234:2 | 24 275:7 | 279:21 |
| 263:12 | **coach** | 282:22 | **commercial** |
| **clarify** | 95:17 | 319:19 | 278:25 |
| 87:10 103:6 | **Cod** | 343:24 | 279:1,2 |
| 104:13 134:6 | 116:17 | 344:3,4,5 | 285:19 |
| 146:11 | | | **commission** |
| | | | 177:22 |

303:8,21

**committee**
225:14

**common**
25:7 82:25
92:17,18
105:5 186:1
201:23
278:23
297:20

**communicate**
18:6 19:8
20:2 21:10,
17 22:5
23:10,13
31:15,17
32:9 51:21
103:1,13
105:19
106:10,11

**communicated**
10:5,10
74:10 102:6
103:23
147:22
155:14 156:4
211:17

**communicating**
18:8,14,17
102:20
211:18
221:16,23

**communication**
102:8 151:2
181:3

**communications**
22:19 37:12,
20 49:18
102:12,19
103:20
104:25
147:17,20
181:20

**community**
51:21

**companies**
63:7 216:10,

12

**company**
17:19,21
22:25 27:3,
23 41:22,25
43:22 48:10
67:1 75:9,
13,15 86:12
87:21 88:7,9
96:12 111:19
113:15
147:2,12
148:18,19
157:13 159:6
160:14
166:15
174:6,8
179:12,14
181:12,14
182:7 183:3
184:1 188:7
212:17
269:21
332:1,4,6

**company's**
174:22
178:19

**compare**
76:25 309:16

**compared**
69:16 333:10

**comparison**
3:17,19
47:11 53:24
54:1 55:24,
25 56:16
278:9 302:5
308:12
309:25
314:18
317:24
319:25

**compensation**
96:10

**competency**
20:14

**competes**
196:21

**competing**
168:2 185:22
186:8,9
331:6

**Complaint**
17:5,6,7
331:2

**complete**
167:4,8,16
323:5,23

**completed**
61:20 171:18
172:4 234:24

**completely**
142:7 322:15

**completion**
275:17

**component**
24:15 101:23
251:23

**components**
24:22 169:7
251:19
269:5,9

**comprehensive**
61:23

**comprises**
18:22

**compulsion**
230:23

**computation**
23:25 243:4
340:7

**computations**
136:3

**computer**
58:11,13,15
97:9 109:14

**conceal**
291:7

**concept**
185:13

**concert**
88:4

**conclude**
53:25

**concluded**
311:14

**concludes**
348:3

**conclusion**
65:24 76:23
150:11
171:1,2
207:8 319:2,
3 324:23

**conclusions**
67:7,9 69:3
76:20 124:22
170:16 278:4

**condition**
211:3

**conditions**
91:14 211:6
305:11

**conducive**
212:1

**conduct**
59:18 85:13
110:11,25
111:10,16,
18,19,24
112:3 162:22
167:20

**Conduct111**
3:5

**conducted**
55:1 154:13
211:21

**conducting**
47:8 163:3
227:8

**confer**
15:9,10,20

**conferences**
51:15 80:22

**conferred**
145:25

**conferring**
14:25 15:7

**confident**
228:14

confidential
119:16
272:9,24,25
273:7,11
284:19 286:7
confidentiali
ty
272:11,17
273:9 323:13
confirmed
308:7
Congratulatio
ns
45:13
conjunction
14:24 69:5
183:8
connection
35:2,4
37:12,20
129:25
conservative
221:23 226:6
consider
42:13 54:7
64:22 74:22
83:3 202:9
205:19,24
223:5
consideration
65:25 70:10
71:21 76:7
196:24 197:4
240:14
254:24
257:12
258:23
261:16
271:20
274:13
306:24
considered
83:4 226:19
248:18,24
273:5 278:11
considers
66:1

consist
255:24
consisted
227:12,13
consistent
71:10 81:14
173:2 213:19
265:7
consistently
238:3
consists
87:6
constant
264:18
constantly
181:16 294:9
constitute
172:9
constitutes
173:24
construction
227:4
251:21,24
253:13
254:1,2
consult
21:7
consultant
47:5 83:15
155:25
consultants
82:13 83:7,
8,12,13
108:16
216:2,6,9
273:8
consultation
43:18
consulted
21:5
consulting
42:1 216:12
consumes
89:25
contact
19:1

contacted
103:16 181:7
contained
67:4 135:20
136:11
194:2,7
203:20 296:8
contains
66:21 136:15
188:3
212:19,23
297:6 310:5
319:13
contemplated
158:12 177:9
252:5
contemplating
251:22
context
7:8 21:11
33:9 64:24
113:6 115:11
156:10
162:16
continually
160:22
continuation
135:4
continue
5:3 31:18
42:24 257:17
304:25
continued
29:5 131:25
135:4
continuing
78:22 130:14
160:22 162:4
225:6 277:18
Contis
20:21 72:22,
23 74:7
265:15 292:8
295:20
contract
255:4,5
257:12,13

265:2
contracts
258:16
contrary
100:4 208:22
261:3
contrast
309:16
contribute
91:3,21
104:17 105:6
269:13
contributed
150:17
contributing
90:17,19
104:16
248:15
249:14
control
7:24
controller
44:11
controlling
334:17
convened
314:1
conversation
103:22 104:5
262:19
288:19
conversations
5:6 34:3
153:14
203:16
211:20
convicted
112:6,17,21
130:4,5
convictions
129:22
cook
2:7,12 6:7,9
8:12,14,18,
21,22 9:7,
10,18,21
10:6,10,12,

14,16,17,24
11:4,13,17,
24 12:20,21
13:1,3,4,13,
22 14:2,7
15:5 16:21
39:22,23
40:2 42:25
43:6 98:22
99:1,11,17,
21 122:6,8
167:19
170:12,19
171:8 201:9,
13 202:18,25
203:14,18
204:1,7,13,
18 205:2
206:9
207:17,19,23
208:5,14
210:4 211:8,
12,15,20
213:4 224:1,
15,20
242:13,22
256:23
272:15,17,
19,21 278:1
300:2 316:20
323:5,7
324:7,16
325:18
345:20

**copied**
235:1 300:10

**copies**
68:21 118:21

**copy**
40:12 51:11
69:10 116:6
124:18,19
125:9 127:8
133:3 183:13
314:10

**copying**
209:22,25
214:22 266:2

295:20

**copyright**
244:21

**core**
20:14 75:9

**corner**
344:7 346:20

**corporate**
20:8 82:24
108:21,22
114:5 121:25
126:12,16

**corporation**
87:15 121:22
152:5

**corporation's**
180:21

**correct**
12:1,11,12,
14,15,16
13:15,20
14:16 15:3,8
16:15 17:2,
3,22,23
18:1,2
19:10,22,25
20:5 21:12,
23,25 22:1,3
25:18 26:7,
18 27:9,24
28:4 37:5
40:18 52:2
59:22 65:16
81:18 92:2
98:23 101:10
109:2 111:24
123:6,7
126:19
134:11
139:4,18,19
140:13,14
145:20
147:3,15,16
151:20,23,25
154:18,22
155:2
157:15,16,
21,22,24,25

158:13 160:4
161:9,15
164:3 165:5
166:17 169:2
170:3,6
173:6 174:6
176:7 177:6,
7 179:15,17
184:21,25
185:4,14
186:20,22
188:16
207:2,9
209:22 210:6
212:21,25
215:7 217:12
219:2 227:15
231:10,11,19
234:25
237:16,19
239:19 242:5
244:19 247:7
250:6,9,10,
12 251:24
253:10,11,19
254:1 256:24
271:13
272:4,7
276:24 277:2
278:14
281:12 283:1
284:3,9,11
287:6 293:6,
7,8 295:3
300:6 303:25
304:4,23,24
312:17
316:18 320:7
321:16
322:5,6,7,14
324:7,21
341:6,7,9
342:5
345:11,13

**Correction**
195:24

**correctly**
332:18

**correspond**
9:5

**correspondence**
21:4

**corresponding**
9:17 197:21
320:19

**cost**
15:11 47:10
53:21,22,23
54:22 55:5,
10 56:5,13,
15 104:15
169:5 173:20
175:20,22,
23,24 177:4,
10 185:12,21
186:3,5,10,
14 264:9,19
277:24,25

**costs**
45:25 46:2
105:3 169:7
186:2 190:16
226:15 241:8

**Couch**
73:22,24
85:20 244:13

**could've**
20:20,21,22
214:21

**Council**
61:25

**counsel**
5:8,23 14:25
15:8,10,14,
20 22:25
89:3,4
123:12
126:25
145:25
146:14 147:2
148:3 149:3
154:6 165:19
203:17

**counsel's**
165:20

**count**
  35:13,15
**county**
  2:7,12 3:17
  6:7,9 8:12,
  14,18,21,22
  9:7,10,18,21
  10:6,10,13,
  14,16,17,24
  11:4,14,18,
  24 12:20,22
  13:1,3,5,13,
  22 14:2,7
  15:5 16:21
  39:22,23
  40:2 42:25
  43:6 98:23
  99:1,11,17,
  22 117:23
  119:14 120:9
  122:6,8
  167:19
  170:12,19
  171:8 201:9,
  14 202:18
  203:1,14,18
  204:1,7,13,
  18 205:2
  206:10
  207:17,19,24
  208:5,14
  210:4 211:8,
  13,15,21
  213:2,4,7
  224:1,15,20
  242:14,22
  245:18,21
  256:23
  272:15,17,
  19,21 278:1
  300:2 316:21
  323:5,7
  324:7,16
  325:19
  341:22
  342:12
  345:18,21
  346:16

**couple**
  7:13 74:3
  107:18
  121:23
  123:10
  135:12
  190:12 191:1
  237:13
  266:13 302:2
**course**
  7:18 41:20
  46:19,23
  47:1 52:7,9,
  10,20,21,25
  53:1,4,7,9,
  15,18,19
  54:14 56:20
  58:5,8,14,
  17,23 60:12
  61:20 80:19,
  24 180:18
  227:25
  255:19 285:5
  297:25
**courses**
  50:14 51:13
  61:13 63:4
**coursework**
  47:8
**court**
  5:12,21,24
  6:11 13:10
  39:7,11,13,
  16 105:24
  130:10
  148:13
  267:13
  324:16,17
  327:6 329:18
**courtesy**
  7:21
**Courtney**
  97:20 212:13
  265:24 279:9
  282:25
  283:14,25
  288:19
  342:14

  344:9,16
**cover**
  250:1
**COVID**
  52:15
**Cozzi**
  2:6,22 6:4,
  18 22:17
  37:15,24
  38:1 40:23
  41:4 78:15,
  23 87:17
  117:20
  129:10
  130:15
  151:12
  161:19,22
  162:5
  223:20,23
  224:25 225:7
  277:19 308:9
  314:12,15
  317:7 325:8,
  24 326:3,9,
  12,22 327:3,
  6,14,17,21,
  25 328:7,11,
  16,20
  329:10,13,22
  330:9 331:9,
  12 332:12,
  17,22 333:18
  334:3,9,15,
  25 335:3,9,
  13,16,20,25
  336:4,10,14,
  19 337:2,6,
  12,15,20,25
  338:7,11,15,
  19,21,24
  339:8,11
  341:3 344:14
  347:18,23
**CPA**
  62:22
**CPS**
  346:3

**create**
  53:1 86:14
  111:1 228:18
  296:15,19
**created**
  77:7 89:12
  111:4
  139:20,23
  191:9,10,25
  192:4,10
  214:3 216:25
  217:1,2
  233:17
  245:16
  262:15,18,21
  274:1,23
  275:10 296:4
**creates**
  97:7
**creating**
  219:25
  289:24
**credit**
  106:5,8
**credits**
  45:18,21,22
  64:9 160:23
**crime**
  112:6,17,18,
  22 130:4,6
**criteria**
  172:14
**criticism**
  9:7,9,21
  11:13,17
  12:17 39:18
  170:18 171:7
  205:7,11,13,
  15,22 330:22
**criticisms**
  8:18 330:11,
  14 331:11
**CROSS-
EXAMINATION**
  2:23 330:6
**cross-
examined**

116:3
**cross-
reference**
 123:20
**CULBERTSON**
 2:12
**culmination**
 26:4
**current**
 17:7 30:7
 50:24 56:13
 72:11 73:3
 96:22 191:21
 219:7 236:22
 250:22 267:6
**curriculum**
 40:7
**Cushman**
 129:1
**cut**
 313:6,21
 329:2
**cutting**
 329:1

---

**D**

---

**d-u**
 25:7
**damage**
 167:22 168:4
 186:11
**damaged**
 185:19
**damages**
 167:18 168:6
 257:8 322:11
 332:9,10,16,
 19 333:4,14
**Dan**
 6:4 40:20
 129:18
 223:18
 325:22
 332:15
**Daniel**
 2:6,22 6:18

38:1 57:15
78:23 130:15
154:13
155:21,23,24
162:5 225:7
277:19
**data**
 62:16 66:19,
 20 108:2
 109:5 123:1
 135:22
 154:25
 163:11,20,
 22,24 164:15
 181:6 195:10
 199:10
 202:12
 203:20 236:7
 239:1
 245:15,20
 251:4 271:24
 290:8 325:1,
 11,15,18
**database**
 134:14
 219:24
 237:4,6,8,9,
 24 276:16
**date**
 25:2 50:23
 112:2 117:2
 149:24
 195:17 199:8
 239:2 240:22
 250:22
 273:16
 306:15
 312:23
 313:17,21
 322:10 343:9
**dated**
 111:12,17
 212:3 308:15
 313:8 320:6
**Dave**
 72:25
**David**
 20:21 72:22,

23 73:2 74:7
265:15 292:8
295:20
**Davis**
 55:20
**day**
 53:20 54:25
 109:12 201:2
 216:10 250:6
 281:20,21
 302:17 326:7
**day-to-day**
 47:19
**days**
 36:12 97:16
 144:8 334:6
**dcozzi@
smbtrials.com**
 2:10
**dealing**
 164:15
**Dean**
 6:23
**debits**
 64:9
**Debt**
 182:3
**decades**
 343:8
**December**
 41:11 98:10,
 13,15
**deception**
 291:14
**deceptive**
 291:2,9,12
**decide**
 137:17
 145:18
 200:19
**decided**
 59:7 70:15
 115:8 159:8
 240:16 264:3
**deciding**
 12:10 13:23
 43:5 155:1

306:20
**decision**
 13:19 14:1,
 22,24 15:4,
 25 43:13,14
 143:8 145:23
 146:8 148:2
 154:6 159:2,
 3 165:21,22,
 24 193:25
 194:10,11,16
 199:13,20
 200:16
 203:24
 204:5,12,16
 206:4 213:3,
 18 223:9
 227:17,22
 229:23
 246:25 247:1
 263:10
 264:1,3,9
 267:11,24,25
 272:3 276:1
 287:15
 288:23
 292:15
 293:18,23
 303:20
 305:21
 312:14,20
 314:2 319:1,
 11,16,21
 320:20
 322:15 328:1
**decision-
makers**
 263:20 270:2
**decision-
making**
 20:19 43:9
 86:5 185:24
 186:13 258:1
**decisions**
 20:8,15
 194:2,6,12
 213:23
 240:23

256:14
319:23
**decline**
301:3 347:9,
10
**declining**
75:4 91:18
199:24 200:7
257:19 346:2
**decreasing**
260:24
**deduct**
76:13
**deducting**
66:6
**deduction**
253:1
**deemed**
62:17 75:2
139:7 156:24
157:2,3
171:16
294:16
**deems**
21:6
**defend**
283:12
**defendant**
2:11 5:9
115:22,24
229:2
**Defendant(s)**
3:3
**defendants**
2:6 39:18,21
206:23 329:5
330:11,23
**Defendants'**
335:5
**define**
34:4 39:21
42:14 54:9
87:12 122:11
162:11
163:15,24
186:25
190:11,12

229:13
**defined**
163:13
177:21
**defines**
82:25
**definition**
156:25
230:18
287:17 291:5
**definitive**
322:21
**degree**
74:19
**Del**
114:22 117:8
**Delaware**
152:23
**deleted**
345:16
**deliberately**
207:18
**delineated**
93:2
**delivered**
35:17 52:13
**Demchak**
146:16
147:1,7,11,
18,20,22
148:6,25
**demo**
262:3
**demolished**
171:16
249:6,11
264:20
**demolishing**
173:21
264:10
**demolition**
171:14
172:2,4,5
173:3,10,14,
18,23 263:22
307:15,22
346:4

**demolitions**
265:9
**denied**
39:8
**depart**
65:5
**department**
10:8,9 15:7,
19 19:9,16
21:8,10,17,
22 22:6
26:15,20
28:21 29:3,
12,14,21
31:5 34:19
44:5,8,9
52:1 65:14
69:17 72:6,
13 73:6,23
78:24 79:12
80:13 81:10,
14,16,23
82:22 88:11,
14 89:6,14,
17,19,21
94:8,10
95:21,24
96:17 97:3,6
101:9 102:9
103:2,14,17
106:13,20
108:15
109:2,10
111:1,22
116:14
118:13
134:13
139:20
142:19
143:20
145:23
146:3,7
166:4 174:12
175:8
180:12,13
183:17
184:10,24
187:23

191:24
194:21
225:12,22
228:17
233:18,21
234:20
235:25
236:13,17
263:17
283:15
288:17,24
289:16,20
298:16
309:4,5,11
323:3,4
**department's**
86:9 166:1
**departmental**
96:16 97:2
**departments**
17:19 18:1,
6,12 290:1,
5,20
**departure**
232:24
233:24
240:20
**depending**
54:5 202:14
213:11 241:9
**depends**
23:4 70:8
78:5 91:8
164:14 202:2
256:12 270:1
279:1 310:18
343:13
**deploy**
228:23
**DEPONENT**
348:4
**deposed**
36:9
**deposition**
6:25 7:3
15:3 32:13
33:15,24
34:2,9 35:6

36:16 37:4, 9,22 99:18 113:14 114:14 115:9 117:15,22 118:14 133:23 139:25 140:3,8 144:6 145:4, 7,11 167:11 255:18 327:1 329:15 334:6 348:3

**depositions**
113:3,7 118:10 121:13 145:2

**depreciation**
142:3 175:25 177:6,19

**Dept**
3:13

**derivation**
56:11 189:16

**derive**
17:19 66:8 67:2 128:18 137:4 222:24

**derived**
67:7 70:9 136:18 170:16,22 278:4

**derives**
253:2

**deriving**
124:6 276:9

**describe**
78:5 86:21 185:13 244:15 332:10 342:25

**described**
86:22 189:7 192:8 207:9 212:6 275:7

**describes**
154:12 322:9

**describing**
259:22

**description**
3:2 4:1 153:6 315:12

**deserve**
271:4

**designation**
42:9 60:12 61:10,15,16, 21 62:6 74:24

**designations**
65:1

**desire**
298:6

**desired**
81:15 86:7

**destroy**
133:25

**destroyed**
126:18 127:2,11,15 134:9 195:1 247:25

**detail**
76:18 164:14 267:10

**detailed**
164:13 170:21 282:7

**details**
164:7

**determination**
12:3,21 14:9 15:5,13 42:22 69:19 75:20 101:12 139:17 156:19 173:5 264:11 305:2 313:15 315:16

**determinations**
13:24

**determine**
12:9 19:15 20:13 23:18, 23 24:4,5,8, 11,13 28:12 64:2 75:19 76:25 90:2 94:5 95:1 101:10 107:8 125:2 150:20 163:3 173:19 191:5 192:1 198:7,21,23 199:4 227:15 230:2,5 240:2,17 250:24 270:13 311:7 321:23 332:24

**determined**
14:19 69:24 70:5 71:1,14 72:3 75:8 139:1,7,13 165:10,12,14 175:19 199:15 221:12 242:22 244:4 247:3 248:11 252:22 269:1,3 271:24 288:4,17 296:24 304:6,12 312:11 313:18 319:6

**determines**
101:13 137:11 138:18

**determining**
15:20 23:16,

25 24:1 43:1 76:1 100:5 122:23 162:24 191:12 205:16 226:17 254:11 268:15 276:25

**develop**
49:3 64:21 129:3

**developed**
53:4 65:18 66:25 70:10 108:7

**developing**
42:22

**development**
18:9 19:9,16 45:24 46:1 114:5 121:25 226:13,22 227:3,19,20 262:5 299:24

**developments**
227:10 232:20

**develops**
64:24

**devices/ copiers**
44:20

**difference**
70:13 141:5, 11 247:20,21 248:14 249:15,17 252:1 255:6 291:10 316:13

**differences**
202:6

**different**
17:14 55:1 77:20 103:9 122:6 124:22

125:21
132:22
134:21,22
142:7 146:1
147:2 164:5
171:5 178:9
191:17
197:21
209:1,6
216:12 229:9
242:12
247:8,9,10
248:22 255:2
269:24
277:9,12
280:24 281:8
284:5 289:18
290:1 343:5

**differently**
122:17

**difficult**
186:12
272:13

**diligence**
94:21

**diminution**
332:25

**dinner**
83:9

**direct**
2:21 6:17
22:15 28:18
35:6 67:5,6,
7 78:22
82:14 124:25
130:14 162:4
180:23
192:24,25
193:3,7,10,
17,21 194:2,
7,15,19,22
195:1,13
196:3,6
197:14
199:17
201:6,16,19,
21,24
202:11,13,

17,21,24
203:5,8,13,
20,25 204:6,
13,19,23
206:14,16,
20,22 207:2
225:6 261:11
277:18
282:10
283:13
287:11
306:23
315:22
335:22

**directed**
158:24
266:14

**direction**
107:2 296:6
300:17
344:16

**directly**
180:18
266:15

**director**
31:10 48:5,6

**directors**
64:20 79:18

**disagree**
230:7 258:19
339:6

**disappears**
343:24

**disciplined**
61:1 113:2

**disclose**
27:8,12
285:11
288:3,13,16

**disclosed**
180:11

**disclosure**
166:14
176:6,9

**disclosures**
3:6 152:14
174:10,15,

17,21,25
175:6,9,19
176:18,22
177:25
178:3,10,11,
12,23 288:14

**discovery**
36:8 68:12,
14,22 69:6
120:15,20
126:6 128:12
133:11,14,
16,17,20,21
140:5 166:21
172:7,24
180:3 182:19
183:6 214:5

**discrepancy**
40:3 316:6,
17

**discretion**
13:18,23

**discuss**
33:20 76:19
103:21

**discussed**
53:24 77:14
78:11 97:1,5
177:13

**discussing**
20:25 172:8

**discussion**
10:2 202:5
346:12

**discussions**
33:13 292:5
298:9

**disparity**
257:20

**displayed**
283:2

**displaying**
282:22,24
283:10,13
291:1

**disposition**
20:10 36:15

**dispute**
119:15
170:23,24
243:2,17,22
244:3 330:10

**disputes**
141:3

**disputing**
169:21,24
170:3,5
243:3 341:4

**distill**
281:4

**distilling**
284:25

**distracted**
260:5

**distribute**
93:8

**distributed**
93:23 105:25
240:7 271:4,
6,10 280:19
284:20
289:6,15,19
294:19,20

**distributing**
295:16 345:8

**distribution**
23:16
150:14,16
281:15
294:15,17

**district**
5:12 7:1
39:7,11,16

**disuniformity**
333:16

**divide**
251:10 270:2
274:19 338:2

**divided**
53:19 336:22
339:19
340:18,24
341:15

**dividing**
  191:15 276:4
**Division**
  5:13
**dmelvin**
  301:11
**document**
  66:21 69:10,
  11 78:2,4,6,
  13 100:17
  105:20
  106:10,11
  108:19,20
  109:22,24
  110:3,6,7
  111:4,9,15
  126:16
  134:4,10
  152:12 169:9
  195:13
  200:18 212:6
  214:4 217:17
  226:8 242:10
  244:11,15
  251:12
  254:15,18,19
  255:10,11,13
  257:23 259:7
  263:11 266:9
  273:16
  274:1,2
  282:13
  284:18,19
  289:12
  292:17 301:4
  302:4
  308:16,18
  314:8 315:20
  316:20 317:3
  321:3 322:8
  326:16
  329:14
  334:24
  335:19 341:8
  344:7
**document-**
**processing**
  44:20

**documentation**
  78:14 86:14
  228:18
  255:15
**documented**
  66:17,19
  106:7 199:16
  200:15,17
  254:5,9
  255:21 282:1
**documenting**
  228:22
**documents**
  24:21 36:8
  68:17 100:8,
  11 105:18
  109:15
  120:21
  122:24
  123:15,20
  124:7
  126:14,17
  127:11
  128:1,7,9,11
  133:21,25
  134:9 140:2,
  6 145:6
  168:18,24
  172:7,24
  183:5,6
  187:2 225:9,
  22 226:21
  227:6,9,24
  242:9 254:7
  273:4 326:15
**doing**
  7:25 14:16
  35:4 64:8
  66:4 160:8,9
  163:1 181:16
  273:2 327:25
  344:17
**dollars**
  158:5 216:23
  217:6,10,21
  218:14
  219:11 243:7

**Don**
  73:2 74:13,
  14,17 88:21
  115:15,20
  131:19
  132:9,11
  301:14
**doubt**
  30:21 237:20
  305:23
**Douglas**
  113:12
**downstream**
  243:25
**downtown**
  112:15
**dozen**
  33:25 34:3
  114:16
**draft**
  214:9 217:18
  218:23
**drafted**
  236:25
  237:2,5
**drag**
  344:4
**drill**
  11:22
**drilling**
  164:6
**drive**
  5:17 119:4,5
**dropped**
  166:9
**du**
  25:5
**due**
  39:11,14
  94:21 149:24
  150:23
  173:23
  297:12 299:7
  300:21
  320:23
  331:1,2
  332:25 346:2

**Duffield**
  120:4,6
**duly**
  6:13
**dumb**
  140:15 178:6
**dump**
  329:14
**durability**
  198:13
**duration**
  88:20
**Dushman**
  2:7 6:5
**duties**
  100:22
**duty**
  90:11 93:6
  100:16,18
  101:4 184:19
  324:1,5,9,19

---

**E**

---

**E-I-S-E-N-M-**
**A-N-N**
  235:3
**e-mail**
  3:7,8,9,10,
  11,12,13,14,
  15,16,23,24
  4:2 17:24,25
  18:7 19:9
  30:13,15,19,
  22 31:18
  32:15 77:14
  85:13 103:3,
  4,23 104:8
  116:9 146:24
  147:9 188:3,
  15 209:20,24
  210:3 211:19
  231:18,22,25
  234:8,11,12
  235:1 250:1,
  2 251:16
  261:24

262:2,3,17
265:24
279:9,15
290:25
295:19 297:6
299:5,20
300:9 307:2,
7,8 326:6
342:16 344:8
345:25

**e-mailed**
31:11
118:18,20
147:1 307:14

**e-mails**
30:18,24
31:16,22
32:1,12,17,
19,20 33:2,7
49:21 50:11
74:14 126:2,
3,4,7,9,10,
17 127:16,20
134:11
211:12,14
266:14
292:18

**earlier**
16:11 35:12
60:8 90:16
141:25 162:9
197:9 231:14
329:9 330:8
331:15 332:8

**early**
29:23 66:25
76:3 88:18
214:9 215:13
217:14,18
218:4 225:12
228:6 275:3

**Earnest**
225:20
265:14
292:9,10
293:11
295:21 300:9

**earnings**
142:3

**easier**
7:22

**easily**
168:4

**Eastern**
5:13

**EBITDA**
142:3

**economic**
19:19 75:6
173:13
199:25 200:1
305:11
306:24

**educate**
49:3 190:3
290:8

**education**
46:21 65:3
160:22

**educational**
47:8 53:13
63:5

**effect**
38:23 108:23
123:5 130:13
224:14 249:7

**effective**
76:11,14
217:3 218:2
274:7,10,12,
16 280:2,4,
6,7 284:11,
24 290:14
302:11

**effectively**
321:25

**efficient**
95:18

**effort**
155:6

**Eisenmann**
235:2

**either**
27:1 46:4

76:3 82:14
96:2 105:22
106:3 114:13
132:20 138:1
153:20 170:3
174:13
178:15
191:12 219:7
246:6,16
267:12
274:20,21
294:12
298:18
300:17
303:11
313:17
318:24
319:20
327:23
343:17 344:4

**Electric**
114:2,4
121:25

**electronic**
66:20 86:6
109:5,13
117:9 118:24
119:2 132:21
133:1,2,7
195:10 345:3

**electronically**
109:13
118:24

**element**
64:10 124:19
168:3 249:14
257:25 283:7

**elements**
53:6,22 56:3
66:1 77:21,
22 124:23
171:1 178:18
198:9,17
199:3 230:25
265:4

**embark**
258:2

**Emerald**
130:21
131:3,4

**employ**
64:17

**employed**
121:2

**employee**
44:25 88:23
110:13,18,
19,22 111:2
301:14

**employees**
29:17 78:25
79:2,11
88:23 89:14
109:1 285:18

**employees'**
94:11

**employment**
227:25

**enclose**
188:18

**enclosing**
250:2

**end**
67:9 75:5
90:21 105:9
140:24
144:10
173:12 186:7
196:2 200:1,
8 201:1
233:16
281:19,21
315:25 317:7
336:16

**endeavor**
122:17

**endeavored**
123:14

**ended**
42:3

**ending**
43:22

**ends**
137:13

315:22

**engage**
146:21 148:2
298:9

**engaged**
272:16
314:23

**engages**
22:19

**engaging**
83:17 146:22

**ensure**
94:19,20
101:7 280:5

**ensuring**
79:16

**entered**
148:22
189:14
237:25
243:23
276:17,18
282:9

**entire**
46:13 133:12
143:24 207:2
220:11

**entities**
35:14 103:9

**entitled**
322:11

**entity**
89:12,15
92:6 96:7,9
135:23
269:25 271:8
315:8

**entries**
89:17

**environment**
91:2

**epropertytax**
134:18,22,25
135:5

**equal**
24:17,20
331:14

**equalized**
136:2

**equals**
136:4

**equity**
129:5 230:23

**era**
119:6

**Erdman**
79:24

**Ernest**
72:19

**Ernst**
176:11,12,
15,17,21,24
177:1 180:24
181:3,11,15,
21

**errors**
215:15
218:24 219:1

**essence**
243:6 284:25

**essentially**
25:22

**established**
105:16
221:13

**estate**
3:18 56:24,
25 87:4 93:4
249:11
296:21
301:5,8
306:8,11
313:8 315:9,
18 316:8,10
319:17,18

**estimate**
31:21,25
84:8 105:8,
12 139:10
143:4 191:6,
7,9,13,15
220:9 226:3,
6 228:9
245:5 261:25

275:13 276:7
304:2

**estimated**
135:25 141:7
144:3 184:5
196:22
215:12,17,19
228:18 245:7
246:6 253:1
264:6
270:14,15
302:16

**estimates**
192:21
221:22,23
222:24 226:7
231:21

**estimating**
59:5 306:2

**et**
347:12

**et al**
5:10,11

**ethical**
55:16 159:18

**ethics**
54:3 55:14
111:10

**ETR**
279:22 280:1
344:22
345:16

**evaluate**
76:5,12
89:16 90:1,6
96:3 128:23
162:21
193:15
282:18

**evaluates**
20:12

**evaluating**
47:6,7 66:5,
6 125:21
141:22,25
142:1 200:21

**evaluation**
137:4 173:19
246:3 264:19
265:16

**event**
125:22

**events**
82:20

**eventual**
29:13

**eventually**
83:10 131:24
132:3 265:15

**evergreen**
108:1 294:5,
7

**everybody**
289:7 347:25

**everyone**
237:6 279:21
281:7

**evidence**
10:24 11:3
12:3 122:5
168:14,19
201:3,19
203:18,23
204:17
205:23 206:1
207:17,22
208:7,22
209:7,10
224:1,5,6,9,
10,14,15,19,
20,24 259:1
278:11
281:22
286:23
287:10

**evidenced**
75:6

**evolved**
28:23 30:1

**exact**
34:20 50:6,8
321:5

exactly
  89:8 214:19
exam
  61:23
EXAMINATION
  2:21 6:17
  78:22 130:14
  162:4 225:6
  277:18
examined
  6:15
examples
  18:5
Excel
  66:23 68:19,
  23 78:9
  274:4 342:20
  343:1,2,9,
  10,12 345:3,
  15
excellent
  7:11
exceptions
  169:17
excess
  40:5 138:9,
  20
excessive
  151:6,16
exchange
  31:22 32:1,
  19 33:7
  34:20 35:2
  36:1 177:22
  211:12,14
exchanged
  32:12 33:3
  34:11 35:25
exclamation
  215:21
excuse
  132:1 165:12
  198:19 246:8
  262:22 320:6
executed
  140:5

executive
  18:10 20:3,
  6,7,11,15
  21:5 72:19,
  22 74:25
  218:12 220:8
  221:24
  225:14
  227:18
  266:24 267:4
executives
  20:18,22
  264:8
exercise
  232:23
exhausted
  106:2 264:4
exhibit
  3:4,5,6,7,8,
  9,10,11,12,
  13,14,15,16,
  17,18,19,20,
  21,22,23,24
  4:2,3,5
  40:12 41:19
  98:4,5
  108:18
  110:12 111:8
  117:1
  152:10,12,15
  188:1,2
  189:19
  191:19
  195:11,17
  199:6 206:21
  209:19
  211:23
  214:15 215:9
  221:2 225:23
  231:16,25
  233:16
  234:7,11
  236:20
  243:19
  244:11
  245:20 248:5
  249:24
  251:5,11

258:14
  261:21,24
  262:10
  263:15
  265:19,21,23
  267:6
  273:14,21
  277:3,12
  295:18,19,24
  297:5 299:19
  300:7 307:1
  308:11
  309:22,24
  311:17 312:2
  313:5 314:9,
  17 315:11,21
  316:9,19
  317:15,19
  320:4 322:9
  325:24
  334:1,13
  335:22,23
  341:23
  342:13,16
  345:18,25
  346:11,15,
  16,21
exhibits
  4:6 145:10
  326:4 328:13
  334:4,5,10
exist
  126:10,15
  163:20
existed
  237:24
  240:18
existence
  29:6 148:8
existing
  263:24 264:7
expand
  46:3 189:21
expect
  83:2,9 86:2
  105:13
expectations
  81:8 94:15

137:20
expected
  76:3 80:3
  81:15 85:6
expecting
  223:13
expenditure
  169:4,5,14
  171:17
expenditures
  169:10,11
  171:12 174:2
expense
  92:19 104:17
  181:14,25
  187:18,23
  274:19,22
expenses
  23:17 66:8
  76:10,13
  89:13
  101:22,24
  105:11 106:5
  187:14,16
  198:22,23
  240:23
  253:2,4,16
  261:4 270:21
  271:2
  309:19,20
experience
  14:11 41:18
  63:5 65:2
  73:9 159:21
  278:19
  297:25 343:8
experienced
  167:19
expert
  47:5 54:7,9
  120:25 121:3
  131:13,18
  162:9,11
  323:1
expertise
  178:14
experts

131:15
166:10

**expired**
126:13
160:21

**explain**
138:5 198:1
219:21
242:17
247:20
248:14
271:14 289:2
316:6 337:11
342:6

**explanation**
248:9 249:21
259:20
260:6,13
268:20,24

**explicitly**
243:12

**exported**
219:24

**express**
298:6

**extend**
7:21

**extension**
101:6 234:5

**extent**
22:13 35:1,3
44:18 93:9,
11 163:24
173:23
205:19
322:23
324:2,22

**extenuating**
93:12,14

**external**
18:20 255:3

**extra**
328:15,19

**extracted**
219:24

---

**F**

---

**F-O-N-D**
25:7

**F-P-AMPERSAND-A**
308:22

**faced**
211:5,6

**faces**
18:19

**facility**
113:13
114:3,5
122:1,2
130:24,25

**fact**
13:12 62:19
75:7 101:12
138:16 180:2
210:25
222:19 223:6
246:22 258:3
260:22 297:9
300:25
312:13
322:14

**fact-finding**
13:13,14

**factor**
248:15

**factors**
198:8

**factual**
135:22

**fair**
9:4,5,15,16,
19 11:25
12:9,14
17:10 24:2,
3,8,19 29:2
32:12,16
38:22 40:4,5
50:25 60:22
67:10,11,16
90:3,4 92:12

101:1,7,8,
10,13 154:11
165:10
183:25
184:16 191:5
192:7,13
197:23
203:19
205:16
207:5,6
212:19,24
213:24
229:7,9
230:3,5,6,
15,18,20
231:12
242:23
243:2,5,13,
14,15,16,22
244:3 251:7
252:17,19,
20,21 253:6,
8,13,16,19,
20,21,22,24
254:16
255:6,21
256:1,16,21
257:23
259:22
260:24
262:13,24
263:2,4
264:11,14
265:10
267:16,18,21
268:13,15,21
269:6,13
272:6
274:14,18
275:22
278:22
280:11,13
281:1,11
282:20 283:9
284:8,23
285:2,4,19,
22 286:17
287:4,20
288:4,20,25

289:4,13,19
290:5,14,19
292:11,19,25
293:3,4,13,
15,19,24
296:1,7,10,
13,16,19
302:10,16
303:25
304:10,21
305:2 306:4,
14 308:24
310:6,10,24
311:4,18,23
312:1,20
313:1,3
315:2,13
316:3,8
318:17,20
319:2 320:13
321:4,14,24
325:16
330:10,16,
17,19 336:23
337:18
339:19
340:19
341:15

**fairly**
10:18 259:11
311:6

**fairness**
282:24

**fall**
92:5 136:22

**familiar**
59:10 61:24
119:5 126:21
129:9 187:4,
8 226:8
343:9

**far**
10:6 47:6
130:17
177:15
245:11
275:13

**fashion**
  109:14
  174:23
**faster**
  200:8
**fault**
  327:3,7
**favor**
  93:20,21
  158:16
  159:14 162:6
  322:15
**February**
  299:20
  318:15
**federal**
  39:13 324:21
**fee**
  66:2,13
  67:11,17
  136:18 137:3
  141:23
  197:23 207:7
  253:17,21,
  23,24 254:5,
  7,17 255:3,
  8,10,15,20,
  25 256:8,18,
  21 257:6,9,
  21,22,24
  258:4,6,8
  259:1,6,8,
  11,22 260:25
  261:4,10
  263:9,12,16
  309:2,3,7,9,
  12,13
  310:10,23
  313:2 330:21
**feed**
  194:16
**feel**
  36:14,16
  75:16 76:23
  90:8 282:17
**feels**
  347:19

**fees**
  92:24 158:23
  160:22
  190:18,19,22
  270:17 321:1
**feet**
  77:15
**felt**
  47:20 70:16
  124:24
  347:19
**fiduciary**
  90:5,11 93:6
  100:15,18,20
  184:19
**Field**
  110:2,6,8
  117:24
**figure**
  50:25 63:24
  105:16,19
  220:1 289:11
  315:5 329:18
**figurines**
  82:12
**figuring**
  21:23
**file**
  14:4 15:15
  43:13 70:14,
  16 71:19
  76:2 82:2,5
  86:11,13
  101:14,15
  132:21
  133:8,12
  138:2,6,17
  146:21 149:3
  155:1 184:24
  200:23,25
  233:5,8
  327:19
  328:22
  329:10
**filed**
  5:11 39:13
  43:2 119:20
  174:9,17

  180:8 240:9
  244:5,6
  273:5 275:12
**files**
  66:20 118:25
  119:2
**filing**
  23:1,6 77:1
  101:21
  103:15
  170:16
  190:22
**final**
  71:19 78:6,
  13 106:3
  125:3 214:11
  215:16
  218:5,23
  222:4 239:24
  246:20 272:2
  279:23
  283:11 289:6
  315:15 316:3
  337:5
**finalized**
  184:7
**financial**
  20:12 63:14
  64:1,8,10,16
  73:1 86:19
  128:19
  142:21
  143:6,9
  144:1
  158:13,15
  175:10,12
  176:8
  180:20,21
  184:2 187:25
  188:11
  189:21
  218:16
  221:24
  222:9,23,25
  225:18,24
  226:22,23
  227:12,13
  232:4,8,13,

  17 240:1
  258:24
  264:24
  270:1,11
**financially**
  5:19
**financials**
  184:4 232:21
  346:3
**financing**
  46:4,6
  159:23
  230:14
**find**
  107:13,25
  123:14
  124:2,9
  231:2 239:11
  278:20
**finder**
  13:12 101:12
  322:14
**finding**
  89:2
**fine**
  7:18 33:19
  327:18
  328:22
  329:16
  339:5,10
**finish**
  7:19 262:4
  326:20 328:4
  338:20
**firm**
  42:1 115:21
  148:11 155:5
  158:3,6,9,16
  176:10
**first**
  6:13 24:10
  27:4 29:6
  43:4,8 53:20
  60:18 79:24
  89:22,24
  94:4 103:6
  111:12
  113:23

119:13
165:19
188:14
189:19
195:19,20
213:16 214:4
231:24
234:11
235:13
237:25 241:4
250:8 261:23
265:23
273:21 282:8
286:4 295:23
302:24
303:1,13,15,
18 305:7
307:19
316:19,23
317:11 321:9
334:22,23
336:16,25
338:22
339:13
342:16,18
345:24

**first-level**
13:12 65:17

**firsthand**
149:12 332:3

**fit**
75:12

**fits**
20:14

**five**
58:25 97:19
278:18
312:21

**five-day**
53:20

**five-minute**
329:24

**five-year**
302:13

**fixed**
169:15,17

**flexible**
55:6

**flip**
40:12 98:4
108:18
109:18
110:12 111:8
112:1 152:10
153:8 191:18
195:11 197:6
209:19
211:23
231:16 234:7
236:20
241:18
243:19
244:11
249:23
251:11
261:21
265:19,21
273:14 277:3
279:8 283:18
295:18 297:5
299:19 300:7
301:4 302:2
307:2 308:11
309:22 313:5
314:16
317:15 320:4

**flipping**
220:4

**Flows**
251:13

**fluff**
40:25

**FMV**
67:10,11
189:10
242:17,18
275:8,10
279:23
344:22
345:16
346:19

**focus**
177:8 336:25

**focusing**
343:19

**folder**
133:18

**follow**
59:22 95:21,
24 96:2
161:7

**follow-up**
297:13 299:7

**follow-ups**
300:4

**followed**
344:11

**following**
111:23 141:8
142:25
143:16 161:3
345:20

**follows**
6:16

**fond**
25:5 140:25

**font**
212:2

**foot**
245:3,4

**footer**
192:1

**forces**
19:19 255:3
257:18

**forecast**
232:22

**forecasted**
274:22

**forecasting**
26:10

**forecasts**
26:14 232:19

**foremost**
89:24

**forever**
343:24

**forget**
194:18

**forgot**
122:4

**form**
11:10 12:23
13:11,16
15:23 21:14,
20 23:8
28:8,14
31:23 37:15
39:20 57:20,
25 67:18
70:6 71:3,15
83:22 99:16
103:5,25
109:14,23
118:2 120:18
122:10
138:24
139:5,15
143:1 151:10
155:3 160:5
166:19
167:21
174:23
180:16
192:11 196:9
202:1 204:3,
9,15,21
205:9,18
207:21
226:12
229:12
248:20 249:2
256:10
258:10
263:18 281:2
290:17,22
292:20
308:20
311:2,12
325:4
332:12,22
333:18 339:3

**Forma**
251:13
308:12

**formal**
22:2 89:6,10

**formally**
16:1

formed
29:22
forms
100:17 104:2
forth
163:16
244:23
252:23
319:16
336:23
339:20
340:19
forums
82:15
forward
254:12
265:18
foundation
20:17 21:13,
20 27:10
28:8,14
43:16 48:18
52:3 53:3
62:13 74:8
81:5 84:20
85:22 111:3
126:8
127:13,18
143:3 149:18
150:1 151:4,
10,21 154:9
158:17
159:1,11
164:19
176:19,25
178:16,21,24
179:6,10
180:6 193:23
195:4 196:9
201:4 205:18
207:21 229:5
264:1 281:24
287:10
288:11
331:9,12
332:12
333:18

foundational
53:13
foundations
261:3
founder
235:22
four
7:7 35:24
36:11 38:15
97:19 113:3
147:24
153:14
278:18
Fox
6:3 152:2,7,
22 180:4
FP&A
226:23
308:22
frame
19:5 21:2
42:12 59:5
72:11,15
107:21,23
115:7 127:7,
9 155:18
177:12
228:7,8
260:22
Frank
43:23 80:10,
16,18,24
126:7 127:16
166:3
Franklin
2:13
frequent
68:6
frequently
31:25
Frey
73:2 74:13,
14 88:21
Friday
144:11
front
303:18

full
6:19 47:23
55:8 61:9
92:17,19
189:16
230:24
287:25
314:25
fully
83:9
function
136:3
343:10,12
funds
93:22
future
26:11 105:13
118:6,7,11
198:11
240:23
306:25
310:17

---

**G**

---

gained
63:6
gave
47:20 48:14
330:14
GE
114:1 130:24
general
19:7 25:16
60:14 61:4
96:21 114:2,
4 121:24
146:14
160:25
generally
17:15 22:10
44:2 46:1
66:23 77:4
79:5 106:16
169:16
174:21,24
213:19

277:20
278:23
generally-
accepted
177:22
generate
133:21
226:16
237:10 301:9
generated
66:5 76:8,9,
10 96:19
193:9,22
218:20 227:7
246:2,24
252:6 254:25
286:23 294:4
301:11,16
308:22 310:2
312:17
320:24
generation
274:2
generations
134:21
generator
130:25
generic
149:8
gentleman
72:18
geographic
132:16
getting
39:14 50:11
159:4 221:5,
9 228:19
243:8 272:6
281:11
291:15
292:2,4
293:12
326:25 345:3
gift
83:3,4,11
gifts
81:25 82:4,

9,18,22

**give**
18:5 22:11,
14 34:8
35:13 43:25
57:17 79:10
84:8 115:9
121:13
124:18 131:5
228:9,13
243:6 286:20
294:25
329:22

**given**
7:3 22:7
69:18 82:18
92:7 93:25
113:6 116:6
117:14,22
118:1,13
122:19
188:25
218:13
229:21
259:10 262:5
265:10
268:25
271:20
274:17 329:5

**giving**
7:20 35:5
79:8 131:10
328:14

**glad**
347:18

**glass**
82:16

**glasses**
153:5

**Glimcher**
148:18,19,22

**global**
219:15

**glossy**
178:17

**Gloudemans**
156:13,15

**goal**
90:3 268:10

**goals**
94:13,17,25
95:4,13 96:5

**goes**
23:24 100:23
186:5,6
198:15
199:13
200:10,25
222:13 223:9
258:1 302:14
309:11
343:24

**going**
9:25 51:23
52:24 75:8
78:17 88:16
98:17
129:13,16
161:24 170:8
190:3
198:24,25
199:1 200:5
223:9 225:1,
4 229:18
234:4 238:3
240:25
249:19 261:2
263:8 265:17
277:5,7,13,
16 281:15
311:1 314:16
325:22,25
330:1,4
333:11
338:13
340:13 344:5
347:10,11
348:1

**good**
6:1,4,8 7:25
25:25 72:24
86:5 94:24
97:20 129:10
148:10 179:4
209:2 277:6

**gotta**
150:19

**governmental**
268:14

**graduate**
41:10 63:3

**grants**
149:2

**graphs**
343:5

**grass**
172:20,21

**great**
8:12 137:10
327:13 329:7

**green**
128:25
216:17

**grew**
25:12

**grocery**
112:10,12

**gross**
76:11,14
92:14,15
190:9 196:12
198:19
253:15
258:21
260:18,19,21
261:15
264:25 265:6

**group**
6:3 11:7
18:11,21
26:22,24
27:16,19,20
28:3,7,11,
16,20,25
29:4,14
35:15 42:20,
24 43:21
49:22 53:3
57:8 72:20
73:1 75:8,11
84:18 86:24
87:3,13,14,

16,20,22,23
88:3,12
89:10,11,20
95:20 96:8
102:1 103:21
105:2,10
106:15
108:23
110:1,5,8
111:9 112:13
121:3 144:1
145:24
147:13
148:15
149:21,25
150:4 151:1,
3,20 152:3,
4,5,8,9,23
167:19
169:12,19
174:5,9,14,
18 180:9
188:11
201:12 212:7
222:20
224:11,16,22
225:18
231:3,4,7
234:17,21
235:6,12
236:1,3
270:12

**Group's**
175:3

**groups**
60:4

**growth**
75:16

**guarantee**
229:19

**guard**
141:2

**guess**
8:5 50:10
57:4 62:11
82:13 104:23
124:10
156:22 173:2

234:10
276:20,22,23
347:23
**guessing**
60:20
**guidelines**
59:14 163:19
164:22
**guilty**
112:22
**guys**
24:4 118:17
289:3 309:14
315:15
323:22

---

**H**

---

**Haering**
2:16 5:15
**half**
33:25 34:3
114:16
**hand**
107:11
**handbook**
106:14
110:14,18,
19,23 111:2
**handle**
73:10 89:17
99:7 216:14
**handled**
88:23 94:1
216:7 235:7
**hang**
25:7 104:13
208:23 268:4
303:6
**Hanson**
43:18,19,20,
24 80:13
300:10
**happen**
136:23
137:20
193:13

294:22
298:11
**happened**
121:5
**happening**
14:6 291:25
292:1
**happy**
80:3
**hard**
68:20 69:10
119:4 133:3
268:11
314:10
**Harry**
279:17
**head**
10:9 26:23
29:21 44:7
50:9 65:13
80:12,14
81:16 82:21
111:22
143:20
165:25 166:4
225:12
299:24 323:3
**headed**
42:20 44:9
**headquarter**
30:9
**headquarters**
18:23 30:10
**hear**
81:9,22
85:1,7,12
97:15 237:1
312:8 347:21
**heard**
14:6,15
81:12,25
82:17 85:17
104:22 111:5
285:22
**hearing**
114:14,22
115:12

205:22,25
288:2
**hearings**
206:6
**Hearsay**
81:11 82:6
85:3,10,15,
19
**heavy**
44:21
**held**
5:14 10:2
41:20 60:12
172:13 182:6
346:12
**help**
17:8 36:14
79:11 116:22
176:9,17,22
204:1
**helping**
174:13 175:9
**hey**
104:3 223:18
**hidden**
279:23
280:14
283:1,2
284:2,7
288:25
342:15,19
344:10,13,
22,25
**hide**
280:17,25
281:10
283:4,15,23
284:4 285:2,
6 286:16
287:8 288:20
289:5,14
290:25
291:1,5,12
292:14
293:15
295:6,7
343:10,12,
14,15,19,22

**hiding**
281:6 282:20
283:5,6,8
284:16 287:3
290:19,23
291:10
292:11
293:18,23
343:20,22
344:17
**high**
174:23
185:21
207:25 208:6
278:14,15
333:1
**high-level**
174:24
178:18
**high-visible**
194:24
**higher**
9:2,4,5,6,13
24:17 69:23
70:4,25
71:13 72:2
90:20,21
139:11
140:20
164:5,13
165:13
167:23
200:12
256:21,25
257:3,7,10
259:23
260:9,15
293:5,8
312:10 319:5
330:17 331:5
337:8
**highlighting**
337:9
**highly**
186:12
**HINSHAW**
2:12

hire
161:14 216:5
235:16 282:5
hired
72:17 80:2
110:9
hiring
108:12,16
historical
70:11 97:10
107:14
136:24 137:1
141:16
300:23
305:20
historically
216:13
historicals
137:19
history
23:4 70:12
136:20
hit
95:13
hold
40:20 126:21
127:1,3,5,12
160:25 182:5
303:11
holdings
231:6
holds
87:15,21,23
89:14
home
58:11
honest
40:24
hour
277:5 326:7
347:16
hours
140:10 144:7
325:23
326:13
327:12 329:6
347:20

hours'
326:7
houses
109:6
Houston
5:17
HR
86:10,13
Human
109:7,9
111:1
hung
112:9
Hynes
15:15 16:4,
6,14,16
158:16,23
159:15 162:7
205:3 298:19
317:1,4,13
320:12
325:14

I

IAAO
49:14,16,20,
21,23 50:4,
12,17 51:4,
7,11,13,15,
18 52:2,5
57:2,6,9,11
95:22 163:6,
7,17,18
ICSC
62:1,8
ID
269:17,19
270:6,7
idea
38:12 154:16
187:10,12
identical
214:20
identification
344:6

identified
123:12,20
124:8 136:8
344:21
identifies
189:1 319:19
identify
89:4 123:17
226:13
identifying
126:25
136:10
216:18
IL
2:4,9,14
Illinois
5:13 7:2
60:23,24
96:11,14
98:21,25
183:17
impact
228:2 230:25
232:2,4,8,20
233:25
251:13
254:11 264:6
346:3
impacted
223:17
234:5,6
impacts
232:22
implication
280:8
implies
322:21
important
51:20 186:15
216:20 230:9
236:12,16
281:22
287:14
importantly
8:5
imposed
337:23

340:5,22
impression
289:22,24
improperly
85:13
improve
169:6
improvement
136:1 169:6,
14 172:16
249:13
improvements
136:11
177:11,15,17
244:25 245:2
264:10 265:3
improving
53:6 200:3,4
in-house
89:4 147:2
216:8,16
in-person
77:13
inaccurate
221:20
305:16
inadvertent
214:21
inappropriate
161:13
215:3,6
inaudible
41:3 50:10
84:12 117:6,
19 124:4
125:24
204:10 329:4
Inc.'s
152:24
174:14
incentives
45:19,21,22,
24
include
21:1 73:12
125:13
174:18,22

189:21
190:18,21
193:17
196:24 197:4
256:8 261:16
269:11 320:1

**included**
33:2 44:11
120:12 136:6
155:5 178:3
262:8 269:5
313:11
319:12

**includes**
99:3 106:18
188:15 201:3
262:24
295:19 296:1

**including**
18:3 44:14
47:9 135:25
261:25
320:22

**income**
3:7 4:2
47:11 54:2
55:12 56:7,
12,16 66:9
76:11,14
89:13 180:17
184:20
187:17,23
196:12,25
197:2,3,7,
11,14 198:5,
13,20 234:4
253:3,5,15
258:21 261:7
264:25 265:6
277:22
278:8,24
279:4 309:20

**Incomplete**
168:22

**incorporated**
5:10 152:4

**incorrect**
27:11

**increase**
24:18
119:21,22
257:17
305:25 306:1

**increased**
272:6

**increasing**
260:19,23

**incremental**
46:4,5
251:13

**incur**
46:2

**incurred**
23:22 76:13
92:21 169:5,
8 309:20

**indeed**
344:22

**independent**
157:1 180:24

**independently**
136:18

**Indiana**
6:11

**indicate**
261:12

**indicated**
60:8 91:23
163:14
172:11
185:19
217:13
262:13
275:12
294:13
300:22 301:2
313:21

**indicates**
126:17 210:3
242:11
262:18
268:8,17

**indicating**
300:19

**indication**
66:11 76:16
78:12 157:1
201:17
219:15 253:6
269:8 285:17

**indicator**
200:13

**indirect**
44:14 82:14
180:22

**indirectly**
184:14

**individual**
16:20 47:21,
25 55:4 56:4
64:6,12
65:17 79:4,
15 84:3 86:8
94:6 96:4
97:23,24
104:6 175:15
179:11
181:14
210:18
221:15 226:2
297:22

**individuals**
18:22,25
20:21 26:25
55:1,2 73:5,
15 79:17
82:11 89:4
94:4 102:19,
22 107:10
142:22
155:10
211:20
226:24
254:22
265:12,16

**industry**
56:22 91:13

**inflated**
11:24

**information**
40:17 41:7
48:16,24

49:12,14
50:13,15
52:22 56:21
59:18 62:12,
15,18 68:15
89:2 97:12
119:17
123:13 124:3
126:5,15
128:10
135:14,18,20
163:25 167:7
172:10
174:13
176:14,23
180:14
181:17 192:3
193:18 194:7
200:10 201:2
202:4,9,22
204:19
205:1,5,20,
24 207:5
212:19,23
214:22 215:9
218:12
219:23
221:19
229:21
236:1,14,18
238:18
239:8,12,17
244:23
263:20
264:8,23
267:3 271:19
272:7,9,12,
18 273:7,10,
12 279:16
280:20 281:5
282:17,21
283:10,15
284:1,7
285:1,10,11,
20,23 286:8
288:8,21
290:10
291:3,11
292:16

295:15
306:10
310:5,16
311:10,11
315:19
320:22
322:18,23,24
323:5,11,16,
18,20,23
324:1,6,10,
15,20

**informed**
17:18

**infrequent**
32:4,7

**inherited**
274:3

**initial**
3:6 15:5
152:14 189:1
213:6 301:23
318:25
319:20
337:3,5,7

**initially**
221:13
294:11

**input**
15:24 77:22
101:18
142:23 146:7
227:2,3,4,5
228:1 237:7
245:17
262:20 275:5
315:15

**inputs**
124:23
199:22
226:24
264:16

**inquire**
101:20

**inquiries**
101:25
102:1,2,4,21
103:14 143:6
281:17

293:12

**inquiring**
104:4

**inquiry**
104:6

**insight**
192:2

**inspect**
297:23
298:13
299:15

**inspected**
297:17 299:2

**inspecting**
298:22

**inspection**
297:13,14,18
298:19
299:12

**inspections**
153:21

**instance**
254:20
267:14

**Institute**
46:10,20
47:13 49:11
53:11 61:6,
11,12 163:18
164:16,21
165:2

**Institute's**
56:23 60:11
163:2

**instituted**
295:14

**institutional**
19:18

**instruct**
15:14 47:3

**instructed**
52:24

**instructing**
47:23

**instruction**
46:15 107:1

**instructions**
344:10

**instructor**
46:9,13,16
47:16 48:12,
15,21 54:16
80:23 235:20

**instructors**
54:6

**insurance**
26:18,21,22,
23 38:17,21,
23

**intelligence**
51:23

**intelligent**
264:8

**intend**
189:20

**intentionally**
194:14

**interact**
17:25

**interacted**
84:5

**interaction**
30:1 56:8

**interest**
66:2 67:12,
17 87:15,22,
23 141:23
142:3 179:12
207:7 258:4
310:11,23
320:22,24,25
330:21
333:13

**interested**
5:19 69:2

**interesting**
7:23

**interfering**
47:18

**interim**
43:20 80:14

**internal**
28:25 29:11

49:18 64:18
70:4,24
74:13 76:7
126:24
137:21
284:18,19
285:12
311:10 345:2

**internally**
15:6 70:11
138:14,19
139:2 179:1
285:21,23
293:5

**International**
61:25

**interpreted**
226:2

**interrogatories**
36:8 38:3
120:22 140:4
166:22
167:3,6,11,
13,16 335:5

**interrupt**
339:9

**interruption**
291:24

**intertwined**
56:2

**inventory**
128:7,9

**invested**
177:18

**investigated**
112:25

**investment**
20:9 87:4
175:21
226:18
227:16

**Investor**
131:23
132:1,4

**invite**
298:3,15

**invoking**
  326:18
  327:17
**involved**
  43:4 44:24
  49:16 79:19
  81:20
  122:23,24
  130:23
  145:23
  153:17
  154:8,10,12
  155:6,8,11
  161:3 174:12
  175:13
  182:7,14
  232:12 233:3
  256:13
  330:15
  331:20
**involvement**
  11:15 49:8
  53:5 73:6
  132:6
  180:14,23
  182:23,24
**involves**
  45:23 330:10
**involving**
  120:17
  131:16 333:3
**IPT**
  48:13,16,23,
  24 52:9,21
  53:10,14
  54:13 56:21
  58:17 59:4,7
  80:19,22
  235:20,21
**Iron**
  128:6
**irrelevant**
  281:21
  282:2,3,16
**issue**
  12:5 35:8
  39:15,17
  50:6,8

  152:24,25
  173:17 214:8
  216:23
  217:6,21
  218:14
  219:11 241:7
  298:14,23
  299:4 320:14
  322:20
**issues**
  7:9 18:20
  19:21 21:7,
  11,18,19
  33:11 49:15
  96:21
**item**
  124:11
**items**
  97:10 320:21
**iteration**
  214:9
**iterations**
  125:19

---

**J**

---

**Jan**
  275:2
**January**
  195:17
**Jersey**
  132:19
**Jester**
  88:17
**job**
  7:11,25
  64:4,20
  79:24 86:21
  94:24 95:16
  96:3 143:19
  145:17 343:1
**jobs**
  41:19
**Jodi**
  86:17,18
  231:18
  300:10

**joined**
  43:10 44:10
  45:10 131:25
  135:1
**joining**
  342:24
**Jones**
  54:17,19
  57:4
**Joseph**
  113:25
  121:22
**Juan**
  31:5,11,21
  32:1 34:13
  36:1 43:17
  49:6 52:5
  64:19,22
  66:14 73:9
  74:11 76:5,
  18 77:5,11
  78:2 79:17
  95:13 99:14
  103:3,24
  118:14,15
  126:4 142:12
  143:4,15
  144:23 145:1
  156:22
  157:6,8
  172:7 192:4
  196:7 198:15
  200:18
  209:21,24
  210:3 231:25
  250:2,6,20
  251:16
  261:25
  262:18
  270:10
  275:4,5
  279:17
  295:21
  298:17,18
  300:10,17
  308:3,4,7
  309:6 310:2

**Juan's**
  172:25
**judge**
  218:17
**judicial**
  120:13
**Julie**
  188:3,9,10,
  15
**July**
  188:4 212:3
  222:1,8
  307:7,12,14
**June**
  43:11 45:1,7
  191:22
  209:20
  210:1,5
  211:21
  234:11
  236:22
  238:10,20
  272:19 279:9
  280:25
**junior**
  263:23
**jurisdiction**
  119:20 172:6
  189:2 190:16
  191:13
  202:15
  274:13 310:9
  311:1,6
**jurisdictions**
  45:23 90:2
  202:2,3,14
  272:14

---

**K**

---

**K-O-R-P-A-C-Z**
  131:19
**Karen**
  73:22,24
  85:20 244:13
**Kate**
  6:8

**Katherine**
2:11
**Kathryn**
266:1,2,4,5,
11,17
**keep**
8:2 81:19
132:20
133:12 149:8
222:12
247:17
276:14 277:6
283:13
314:16
317:17 339:3
**Kelly**
2:16 5:15
84:4 153:9
154:4,7,11,
16,21 155:4,
9,15 156:20
157:20
166:15 318:5
**Kelly's**
154:24
**kept**
108:2 109:9
148:11,23
**key**
163:9
**kickbacks**
81:23
**kidding**
55:20
**kind**
17:11 25:15
41:25 44:15
185:13
**kinda**
251:19
**Kirk**
209:21,25
**knew**
225:24
**know**
8:6,13,14,22
10:6,12,24

14:12 17:16,
24 20:19
21:1,3 26:3
28:18,24
29:20,24
30:5,6 32:9
34:18 35:3,
24 37:16
38:25 40:15
47:9 50:15
52:6 57:8
58:25 61:11
62:6,14
63:11,18,19,
21 64:9 65:8
66:24 67:20
68:13,18
70:14 71:23,
24 73:5,19
74:2 75:1
77:20 80:10
81:6 82:7,8,
17,18,19
83:1,2 84:25
85:5 86:13
88:23 89:15,
16 90:3 91:6
93:25 96:3,
4,13,14,15
97:11 99:5
100:22
102:11
105:20
106:3,10,12
109:12 110:7
111:4,20
112:18 118:8
119:5,10
120:2 122:5,
16 124:18,20
126:9,10,12
127:16,19,
20,23 130:5,
11 133:16,19
134:8 135:8,
9 137:23
138:1,3,16
139:6,8,23
142:5,19

143:12,14
146:25
147:10
148:14
150:12 151:5
153:8,17
154:4
155:10,21,23
156:6,9,12,
16,17 158:5,
8 159:4,12
160:6,8,11
162:10
164:24
166:5,11,13
169:25
170:22
171:11,14,23
172:2,13
173:7,17
177:1 178:2,
13,22,25
179:23,25
181:2,20
182:12,15,20
183:3,4,9,
14,17 188:12
192:20
200:21
202:15 203:4
206:14,20,25
210:18 214:8
222:23 226:7
228:8 229:6
230:9 231:6
232:10
233:12,13,15
238:14
239:24 240:5
241:13 242:6
243:21 248:1
249:5 252:9,
14 254:14
255:14,17
256:3,6,14
258:11
260:21
264:5,7
268:2,9

269:15
270:2,5,7,10
274:6 279:11
280:22
282:18
285:14,18
286:5 291:4
296:5 302:24
306:16
309:10
312:9,12
314:1,21
316:17
319:4,17
320:21,25
323:19
325:21 326:2
331:25 343:5
347:15,16
**knowingly**
134:9 161:13
**knowledge**
11:2,7 17:17
19:18 31:3
40:11 72:10
85:16 92:10
100:7,19
108:7 120:1
127:14
135:17
149:12
152:22 153:6
158:2 163:2,
7 167:5,17
168:13
170:21
180:10 195:5
199:9 203:22
213:5 230:24
242:15 256:4
266:19 278:3
332:3
**knowledgeable**
270:9 308:24
**known**
66:9 134:18
192:25 314:4

**Korpacz**
129:1
131:19,20,
22,23 132:1,
2,6

**Kris**
97:22

**Kristy**
97:23

**kschnake@
hinshawlaw.
com**
2:14

---

**L**

---

**L-A-C**
25:7

**labeled**
206:21

**Lac**
25:5

**lack**
39:14 331:1,
3,7

**laid**
163:22

**Lake**
2:4

**land**
136:1 169:6
199:20
208:25
244:25 245:1

**landlord**
101:4

**landlord/
tenant**
150:21

**lane**
94:1,3

**large**
44:18 52:22
101:23
186:16
278:23

**largely**
228:6 281:20
282:2,16

**largest**
44:21 88:3
181:13

**Larson**
3:11,14,15,
16,24 5:8
6:13,21,25
7:3 10:5
37:3 129:20
152:19,21
225:8 266:18
330:8 334:12
348:6

**late**
326:25

**latest**
133:11 314:4

**Latin**
25:23

**law**
14:12 74:18
100:4 233:6

**lawsuit**
19:24 23:6
30:19 31:12,
19,22 32:2,
16,21 33:4,
7,12 34:12
39:4,7,19
69:5 74:12,
15 93:20
257:4 324:21

**lay**
96:1

**layout**
211:4

**lead**
272:5

**leading**
335:9 336:4
337:25 339:2

**leakage**
23:22 91:7

**lean**
200:11

**leap-frog**
125:24

**learn**
126:20

**learned**
67:25

**lease**
18:11 23:10,
14,15 44:19
91:13,23
92:14,15
93:16 94:6
100:21
101:25
102:7,12,16,
22 103:1,7,
12 105:2,10,
18 150:19,20
186:8 240:1,
16,18 241:10
253:23
255:10,20
257:16

**leased**
253:17,24
254:5,7,17
255:3,7,15,
25 256:8,17,
20 257:6,9,
20,22 258:4,
8 259:1,6,8,
11,22 263:9,
12,16 309:2,
7,9,12,13

**leases**
93:2 142:5
184:21

**leasing**
18:9 20:23
94:5 102:1
103:7,12
142:1,22
227:2

**leave**
59:7 74:7
79:21 80:7

186:8 234:3

**leaves**
93:16

**leaving**
185:23

**lecture**
54:10 55:9,
23

**lectured**
54:14 55:10

**lectures**
59:2,3

**lecturing**
56:15 57:5

**led**
85:2 205:3
259:21

**Leer**
3:7 188:3,9,
10

**left**
61:19 72:21,
24 81:10
86:6,12
132:2 168:1,
15,20,25
240:14,15,19
241:13
245:11
332:1,4,6
346:20

**left-hand**
344:6

**legal**
5:16,22
20:22,24,25
21:4,7,10,17
22:6,9,11,
15,18,25
39:12 74:13,
20 89:12,15
92:6,24 94:5
118:2 123:11
126:25
145:25
150:10
194:12

270:17
271:2,8
320:25
324:23
**lender**
183:4
**length**
220:25 331:1
**lessee**
91:15 257:14
**lessor**
91:15 257:15
**letter**
127:12
268:5,19
271:14,19
**level**
14:4 20:9
39:16 85:6
86:1,4,23
87:2 90:7,10
122:6,11,20
130:12
174:24 177:2
196:20 208:8
209:8 229:23
242:12
267:12,13
268:2 320:16
333:21 336:5
337:23
339:16
340:5,16,22
341:13,19,21
**levels**
21:1 164:6,
13,14 199:2
330:17
336:20
**levied**
342:11
**liabilities**
91:6 105:8
141:21
174:22
180:19
189:22,23
190:4,8,9,14

219:16 246:6
275:17
320:16,18
**liability**
90:22 91:19
144:4 174:25
183:22
184:5,25
274:14 280:9
300:13 301:3
306:2
**license**
44:13 60:14,
25 61:4
161:1
**licensed**
60:22
**licenses**
61:3 112:24
**lien**
312:23
**lies**
255:5
**life**
7:22 75:6
173:13
199:25
200:1,8
**lifting**
44:21
**likelihood**
220:13,20
**Lima**
43:23 80:10,
16,18,24
81:10,22
166:3
**Lima's**
126:7 127:16
**limit**
328:16,20
**Limited**
87:16
**Lincolnwood**
99:11,20,25
**line**
198:5,6

315:23 316:2
317:3,7
342:15
**lines**
292:24
**lingered**
39:10
**Linkedin**
3:4 40:13,18
45:17 46:8
**liquids**
161:20
**Lisa**
65:10 67:21
68:2,15,18
69:12 84:16,
17,21 127:20
142:17 145:4
331:16,18,23
332:1,4,6
**list**
50:2 60:20
116:20,22
266:7
**listed**
214:15
237:21 238:5
239:5 241:20
242:7 247:13
248:3 251:5
256:17
268:22
301:18
311:18
315:13 316:7
317:1
**Listing**
3:20
**lists**
41:19 152:17
217:22
254:16
269:17 306:3
318:17
**literally**
317:11
**litigation**

21:12,19
22:20,23,24
23:2 97:5
113:9 116:16
120:21
122:25
126:18,21
127:1,3,5,12
134:2 147:23
150:8 154:8
156:10 221:6
228:20
322:12
**little**
7:17 11:23
13:7 82:12,
15 110:12
144:12 146:1
171:4 179:13
308:1 337:8
**live**
25:4
**LLC**
3:20 89:7,12
92:6 96:11
104:19,20
**LLP**
2:3,8,12 6:2
**loaded**
24:14
**local**
7:2 45:23
**locate**
107:21
**located**
5:17 132:16
**location**
128:6
**locations**
128:2
**long**
16:5 35:23
42:16 43:24
49:23 50:3,
11 62:9
65:13 74:2
127:5 140:7

144:5 176:13
180:25
266:11
290:19
295:12
342:20

**long-term**
75:16

**longer**
28:23 48:14
97:14 124:12
126:15 150:3
154:8 237:12
238:15
241:15
281:16
294:20
326:20

**look**
24:21 34:20
70:11 98:21
102:16,18
128:4 136:20
142:4 157:11
162:24
163:1,7
188:1
198:16,18,
20,22 199:21
202:8 205:4
212:2 215:11
238:4 239:11
240:8,9
246:11 248:2
261:1 262:9
267:5 283:17
300:22 306:3
307:1 315:2
316:19

**looked**
17:4 86:10
107:16
127:25
177:25
206:15

**looking**
23:18 38:3
76:20,21

124:3 127:24
133:19
141:15,16,19
142:6 166:18
186:14
191:11 199:6
201:22 203:5
212:1 219:18
220:19
242:23
243:12
249:11,19
254:18,19
260:17 262:2
275:25
311:17
312:24
315:17,21
316:10
334:22

**looks**
40:14,21
92:8 157:16
188:6 214:20
217:6

**Lord**
72:25 97:20

**loss**
196:16
198:21
332:25

**losses**
66:8 142:6

**lot**
19:17,18
62:4,15,16
65:3 79:16
86:6 90:1
91:4,17
117:3 133:20
145:14
200:11 202:3
223:7 240:23
241:8 272:14
281:17 292:4
342:14

**Lotus**
342:22

**loud**
8:3

**Louis**
113:13,15

**low**
292:25

**lower**
137:22
138:12,18
139:1,11
165:11 168:2
171:20
185:4,10,12
186:9 200:5
297:11 299:6
311:15

**LP**
87:22,23
152:5,8

**lunch**
161:21

**Lyons**
15:15 16:3,
6,14,16
158:16,23
159:15 162:7
205:3 298:18
317:1,4,12
320:12
325:13

---

**M**

**made**
12:6 13:24
15:6 20:15
38:18 43:13,
14 77:24
78:7,10
124:25
143:12
171:12 194:6
213:4 264:2
265:13,14
292:15
312:20 327:7

**Madison**

115:20

**MAI**
60:11 61:5,
10,14

**mailing**
50:2

**main**
130:24 233:6

**maintain**
101:5 134:14

**maintained**
294:5

**maintenance**
92:18 105:5
169:7 186:2

**majority**
216:15

**make**
12:2,10
15:13 78:3,
11 90:4
103:9 124:25
125:1,10
130:12 137:2
138:23
143:10 148:2
167:3 184:15
193:25
194:1,24
200:16
203:24
204:5,11
214:6,20
215:15
217:13
225:22
229:10 237:7
264:8 270:22
287:15
289:10 291:6
293:23 303:5
321:19 344:2

**makes**
7:22 20:8
272:2

**making**
11:19 73:13
163:10

199:19 276:1
303:19 339:3
344:16

**malfunction**
95:17

**mall**
8:16 9:11,20
10:14 12:1,
15 14:20
18:3,7,16
19:2,7,11
20:16 22:12
23:5,7
27:13,15
28:12 30:20
38:17,23
49:9 59:21
63:8,9,17,
20,23 64:4
65:15,19
66:15 67:16,
17,23 68:9,
25 69:12
73:7 74:22
75:10 77:3
84:13 88:25
90:12,13
91:12 92:6
97:1 100:12
102:12,23
116:17
117:8,24
123:18
130:21 131:4
132:24
133:7,13
145:19 146:9
151:7,17,19
154:22,24
159:10
168:15
169:10
170:13
171:12
175:1,2
178:4
179:20,22,24
180:5,9

181:21
186:19 187:9
192:8 205:17
207:25
208:6,9,19
209:8,13
210:5 228:11
239:13
241:14
242:10,11
254:5 255:11
264:25 265:6
279:3,4
297:7 300:14
317:12

**Mall's**
11:15

**malls**
88:3 185:8
186:23
187:24

**man**
318:12,14

**manage**
34:19 35:14
86:9 87:24
94:22 98:19
195:9

**managed**
64:11 89:18
99:9 169:12

**management**
3:20 18:9,
10,15 19:2
20:3,6,11,15
21:9 22:11
26:22,24
35:16 38:20
72:20 74:25
89:7,11
96:11
169:12,19
210:5 216:16
218:12,17
220:8 221:24
225:14,20
227:18
244:18

266:24 292:6
293:11

**manager**
19:7 31:9
43:20 50:9
65:7 79:9
84:17 87:1
95:6,10
99:14,19
103:18,19,22
137:13,14,16
142:18 143:2
235:6,12
275:1 292:6

**manager/
department**
103:22

**managers**
64:15 86:25
94:18,25
95:5 128:20
221:14 345:2

**manages**
232:16

**managing**
88:1 146:12
181:19
228:25
285:12
314:24

**Manual**
111:6

**manuals**
56:24

**manufacturing**
113:13,15
114:2 122:2
131:1

**March**
6:12 231:18
232:1

**Maria**
5:10

**mark**
55:19 78:8
314:8 315:21
333:25

**marked**
3:2 4:1,6
188:2 322:8
342:1

**market**
3:7 9:4,5,
15,16,20
11:25 12:9,
14 24:2,3,8,
19 40:5,6
66:7,13
67:3,10,11,
16 76:24
136:2,4,25
138:8,10,12,
14,19,20
141:18,24
142:4,5
165:10 191:5
192:7,13
196:18,21,24
197:4,21,23
198:1,6
199:11,12,16
203:19
205:17
207:5,6,9
212:20,24
229:7,9
230:3,5,16,
18,20 231:1,
12 242:19,
21,24 243:2,
5,7,13,14,
15,16,22
244:3 245:20
251:7
252:17,19,
20,21 253:6,
8,13,16,19,
20,21,22,24
254:16
255:1,2,6,21
256:1,16,22
257:13,18,23
259:2,12,16,
23 260:9,15,
23,24
262:13,24

263:2,4
264:11,14
265:10
267:16,18,21
268:13,15,
18,21 269:6,
14 271:24
272:6
274:14,18
275:22
278:11
280:11,13
281:1,11
282:20 283:9
284:8,23
285:2,4,17,
20,23 286:17
287:4,21
288:4,20,25
289:4,13,19
290:5,14,20
292:3,5,11,
19,25 293:4,
13,16,19,24
296:1,7,10,
13,16,19
301:18
302:10,16
303:25
304:11,21
305:2 306:4,
14 308:24
310:6,10
311:18,23
312:1,21
313:1,3,10
314:4 315:2,
6,13 316:3,8
318:17,20
319:3 320:13
321:4,14,24
322:19
325:1,11,15,
16,18
330:10,16,
18,19 336:23
337:18
339:20
340:19

341:16
**marketed**
231:1
**markets**
257:17
**marking**
334:12
**Marshall**
79:24
**MARTIN**
2:8
**Masbaum**
3:13,14
97:20 98:2
212:13
265:24 279:9
344:9,16
**Masbaum's**
342:14
**Massachusetts**
116:16
130:21 131:2
**material**
50:2,14
58:24 62:8,9
70:13 133:19
168:13 184:4
**materials**
50:12 52:20
53:1 57:1,6
58:14,21
68:15 79:10
96:19 127:24
255:18
**mathematical**
23:25 136:3
243:4 340:7
**Matt**
6:9
**matter**
5:9 6:15
33:21 39:12
46:25 52:8
116:15,16
230:4 258:3
299:10

**matters**
14:11,25
21:5 51:20
113:8 160:4
**Matthew**
2:12
**MBA**
41:12
**Mccarty**
299:21,24
307:8
**Mcdade**
88:19
**Mcdonnell**
113:12
**Mcmillan**
57:15 154:14
155:21,23,24
**Mcmillan's**
165:7
**mean**
25:20 34:5
39:21 61:8
65:20 91:8
99:17 109:24
122:11
125:11
139:16
154:10
166:13,14
179:9 182:4
186:25
190:1,13
194:10
195:21
196:1,18
216:4 217:7,
9,24 220:12
223:2 261:13
267:9 270:14
291:5,7
294:6,7
296:8 310:24
327:4,24
329:17 331:7
333:6 339:5
340:21 342:7
343:23

**meaningful**
83:5 202:5
**means**
61:9 196:19
216:5 217:8,
10,11,25
219:21
242:17
261:15,19
267:11
268:13
271:14
283:2,4
321:13,25
326:2,3
342:3
**meant**
190:3,23
197:2
**measure**
94:23 95:5
173:9 198:12
264:18 265:8
**measured**
94:12
**measures**
66:1
**mediation**
117:11
**meet**
77:10 80:18
144:13
153:16
210:9,15,16,
25 211:9
**meeting**
77:13 81:7
97:4,6,7
201:13
203:11
206:11
210:13,14,
21,23 211:1,
2,21 266:22
267:1,2
272:20
297:13,14
299:7 300:4

301:1 345:20

**meetings**
96:17,20
97:2 144:17
206:9 266:25

**Melanie**
48:1 49:5
235:15

**Melvin**
301:14

**member**
47:14 49:22,
23,24,25
50:1,4,19
51:1,4,18
52:5 59:24
60:4,8 61:10
62:2,4,5,19
95:19 155:5

**members**
46:19 51:22
52:1 62:15
155:7

**membership**
50:16,23

**memory**
121:18 168:9

**Menomonie**
112:15

**mentally**
114:23

**mention**
180:5

**mentioned**
113:2 125:6
131:21 132:5
170:2 191:1
206:12 234:8

**merchandise**
112:14

**merged**
148:19

**merger**
148:22

**message**
35:17

**messaged**
34:13

**messages**
34:11,13
35:11,25

**met**
37:3 77:5
80:16,20
153:11,19
171:24 172:1
202:19 300:2

**method**
124:6 193:3
276:8

**methodology**
141:5,11
205:16
276:25
282:15

**methods**
81:13 191:17

**metrics**
94:11 189:22

**Michael**
5:8 6:12,21,
25 152:19
153:9 154:4,
7,11,16,21,
24 155:4,15
156:20
157:20
166:15
266:18
299:24 307:8
348:6

**Michigan**
60:19

**microphones**
5:5

**Microsoft**
342:20

**middle**
25:12

**midway**
336:12

**migrated**
342:22

**Mike**
84:4 155:9
279:20
299:21

**million**
200:23
223:7,12,13
243:2 247:22
249:18
260:18
276:11
297:10
304:5,11
305:3 337:11
340:1 346:23

**millions**
158:5

**Millis**
115:15,20

**Milwaukee**
41:23
115:18,19

**mind**
81:19 222:12
247:17
276:14

**mine**
38:13 178:15
327:3 335:17

**minimize**
334:19

**minimum**
92:16

**minus**
190:9 243:5

**minutes**
87:18 123:3
326:23,25
327:12,15
328:3,8,9,
11,14,15,17,
19,21,24,25
329:6,11

**misheard**
303:12

**mislead**
281:6

**misleading**
324:2,4,7,
11,15,20

**misrepresent**
283:5

**misrepresenta
tion**
286:19

**missed**
342:6

**Missouri**
60:19
113:13,16

**misspoke**
303:12

**misstated**
332:17

**misstatement**
305:19

**misstates**
147:4 154:19
203:2 259:17
281:2 284:15
285:7 286:11
290:7,16,21
291:18
293:20 295:8
305:17
321:17
323:25

**misstating**
312:23

**mistake**
51:5 327:7
341:5

**misunderstood**
146:4

**Mlarson@
simon.com.**
30:14

**mode**
344:1

**model**
66:25 193:7,
11 343:3

**models**
193:6

**modified**
125:8
**modifying**
347:8
**module**
53:18 54:3,
16,25
**modules**
53:16 54:15
55:3,7,9
**Moffitt**
3:8 209:21,
25
**moment**
9:8,22 12:19
27:2 29:1
57:10 60:6
97:25 113:18
129:20 222:1
**Monday**
54:22 144:9,
11,12
**monetary**
179:11
**money**
95:10 150:9
158:8
**monthly**
105:7 180:19
186:22,25
187:4,10,13,
15,18
**months**
44:1 107:18
123:11
**Moore**
5:9
**morning**
6:1,4,8 7:23
34:14 327:2
**mortgage**
129:4
182:13,16,
17,19,21
183:1,4,8,15
**mortgages**
182:5,6

**motion**
327:19
328:22
329:11
**Mountain**
128:6
**move**
112:14
172:16
**moved**
277:12
**moving**
277:8
**multi-tiered**
64:15 87:13
**multifaceted**
13:6
**multiple**
16:21 17:14
64:12 86:25
125:17,25
154:22
214:14 218:2
219:11
269:10
319:21

---

**N**

**name**
5:15 6:19
20:20 27:1
29:20 55:21
66:21 72:18
80:10 89:6,
10 100:11
102:22
105:17,20
112:2,18
116:1,18
119:1 120:4,
6 132:3
135:5,23
148:12,14,24
152:18 153:9
156:12,16
164:11 165:1

175:12
202:23
211:8,16
235:2,13
**named**
63:11 209:21
301:11
**names**
98:1 113:10
**Nassau**
117:23
119:14 120:8
**nature**
18:20,21
44:19 96:25
332:24 333:3
346:2
**nearing**
75:5
**necess**
310:9
**necessarily**
65:1 83:11
98:16 104:1
125:16
199:19
200:17
243:24 262:7
269:23 276:8
291:11
310:21
**necessary**
78:11 89:18
237:8 276:7
281:5 290:8,
13
**need**
7:16,17
23:23 27:6
78:7,10 90:8
162:20
172:21
225:14
284:2,20,23,
24 285:1,10
288:10
291:4,24
292:7 308:9

309:12
326:20
327:15 328:7
329:20 344:2
**needed**
86:7 109:21
110:22
124:24
172:18
344:25
**needing**
291:11
**needs**
64:11 96:22
126:25
285:14,16
288:25
**negative**
217:8,9,11
**negotiate**
91:19
259:15,21
260:8,14
**negotiated**
91:5,13
**negotiation**
257:14
**net**
66:9 91:11
176:2,5
189:23 190:8
197:6,10,14
198:5
215:12,19
253:2,5
261:7
270:14,15,
20,25 321:2
**never**
14:15 52:5,6
85:17 104:22
120:11
255:10
286:9,16
288:8 323:15
**new-age**
119:6

night
328:6 329:9

Niskayuna
114:6,7
122:1,3

NOI
66:9,10
76:15 197:10
198:17,19
276:4

non-attorneys
32:20

non-core
74:23,24
75:2,3

North
5:17

northeast
132:18

Northern
5:12 7:1

notable
114:22

note
5:4 69:14
300:24

notebook
83:2

notes
36:4,7,10,
11,13,17,19,
21,25 37:7,
11,19 38:3,
8,12,14

notice
29:9 69:15
76:5 126:21,
24 229:22,23
242:20
303:21
305:10
318:25

noticed
213:7 245:17

notices
73:12 76:4
106:19

134:15
301:23,25
306:12

notification
75:24

November
250:1,21
265:24 267:6
300:8 301:16
304:3,20
320:6 322:10

number
20:18 35:19
86:25 87:6
107:10
132:13
135:23
138:4,20
191:10,17
199:21
216:11 220:2
228:14
234:12 244:4
246:16,23
247:4,8,9,10
268:25
269:19,20
276:5
287:11,14
296:8,16,20,
22 301:21
302:20 306:7
311:20,24
312:22
313:12
315:15 316:7
319:4 321:5
322:21
337:1,11,19,
21 339:22
340:1 343:5
346:23

numbered
195:19
335:24

numbers
142:13
192:10,11,16

214:6,19
215:10
221:12
223:14
245:19
248:25
265:10
269:25
275:10 296:1
341:18

numerous
77:21 153:15

O

O'KEEFE
15:15 16:3,
6,14,16,24
158:3,9,16,
23 159:15
162:7 205:3
298:18
317:1,4,12
320:11
325:13

O'Keefe's
158:6

Oak
232:9

Oaks
2:3 8:16,23
9:11,20
10:14 11:1,
15 12:1,15
14:20 18:3,
7,15 19:2,11
20:3,16
22:12 23:5,7
24:9,23 26:7
27:7,13,15
28:12 29:9
30:19 38:17,
23 43:9 49:8
59:21 63:8,
17,20 64:4
65:7,15,20,
23 66:15
67:14,15,22

68:3,9,25
69:12,23
72:1 73:7,16
74:22 75:10,
21 77:3
81:18 84:11
88:25 90:12,
13,18,24
91:1,4,18
92:5,9 97:1
98:23 100:12
102:12,23
104:10
123:18
125:14
127:3,11
128:10
132:24
133:7,13
135:15,21
137:25
143:25
145:19 146:9
151:7,17,19
152:3,7,22
153:19
154:22,24
155:8 156:19
158:22
159:4,9
161:14 166:6
168:15,20,25
169:10
170:13,19
171:8,12
173:6 175:1,
2 178:4
179:20,22,24
180:5,9
181:21
182:6,23,24
183:1,7,19
186:19 192:7
195:2 202:20
205:17
207:24
208:6,9,19
209:7,13
210:5,10

211:10
212:20,24
226:9 228:11
230:12,14
231:3,13,22
232:3,13,20
233:1,11
235:9 236:3
239:13
241:14
242:10,11
246:12,20
247:19
248:6,12
249:8 250:3,
9,12,25
251:7 252:18
253:14 254:6
255:11,22
261:13
262:1,25
263:2,5
265:1 269:17
270:5 271:9,
11 273:24
274:17 278:2
279:2,4
280:11,14
281:1 283:9
284:8,14
285:3
286:10,14,18
293:4 295:3
297:7 298:13
299:15
300:14
301:18
302:17
304:1,22
306:5 307:23
308:25 310:6
311:19
313:11
315:3,7
317:12
318:18,20
321:4 323:6
325:1 330:18

**Oaks'**
92:1 143:13
312:20
**object**
11:10 12:23
13:11,16
15:23 20:17
22:13 23:8
27:10 28:8,
14 31:23
35:1 39:6,20
43:16 52:3
57:20,25
62:13 67:18
71:3,15 74:8
81:5 83:22
99:16 103:5,
25 109:23
120:18
122:10
138:24
139:5,15
143:1 149:18
150:1 151:4,
10,21 154:9
155:3 158:17
160:5,15
176:16,19,25
192:11
193:23 194:4
202:1
204:15,21
205:9,18
207:21 208:1
229:12
252:13
259:17
311:12
334:3,9
339:2 344:17
**objecting**
344:14
**objection**
10:20 21:13,
20 32:3
37:1,15
39:24 48:18
70:6 81:11

82:6 84:20
85:3,10,15,
19,22 111:3
122:15 126:8
127:13,18,22
143:3 147:4
150:5,10
151:24
154:19
159:1,11
165:23
166:19
167:21
168:7,22
171:22
178:21,24
179:6,10,16
180:6,16
183:11 194:9
195:4 196:9
203:2 204:3,
9 206:18,24
224:3,8,12,
17,23 229:4
241:6 248:20
249:2 256:2,
10 258:10
259:25
260:11
263:18 281:2
284:15 285:7
286:11
288:11
290:6,16,21
291:18
292:20
293:20 294:1
295:4,8
297:2,24
304:13
305:17 311:2
321:17 322:4
323:25
324:13,22
325:3 331:9
334:15,25
335:3,9,13,
25 336:4,10,
14,19 337:20

338:25
339:6,7
**objections**
39:25 337:2,
6,12,15,25
338:7,11,15,
19 339:4
344:15
**objective**
256:12
**obligated**
342:9
**obligation**
181:11
322:18
324:14
**obligations**
100:23
150:21
**observe**
69:7,14
**observed**
218:24
**obtain**
38:16 168:13
287:12
**obtained**
346:1,8
**obvious**
190:2
**obviously**
20:11 58:23
81:6 101:22
138:18 241:8
243:10
300:24 339:6
**occasion**
117:15
181:16 228:6
271:16
**occasionally**
133:5 162:18
181:5,7
292:21
**occasions**
101:20
121:24

occupancy
  76:22
  185:12,21
  186:3,5,6,
  10,15
occur
  175:24
  189:17
occurred
  71:18 114:19
  160:23
  177:12
  209:10
  225:11
occurring
  28:10
occurs
  106:2 150:22
  184:5
October
  261:24
  262:21,22
off-site
  46:1
offer
  50:14 57:22
offered
  46:19 52:16
  80:19 82:9
offering
  165:6 328:10
offers
  80:22
office
  10:25 11:4,
  9,12 14:9
  18:23 32:5,
  6,8 36:24
  40:4 82:17
  85:13
  115:19,20
  127:8 133:10
  135:24 138:9
  155:12
  171:15,24
  172:1,9,15
  173:3

  206:10,11
  210:5,8,15,
  19,23 211:6,
  9,13,15,17,
  19 250:3
  263:22
  265:1,7
  268:6
  271:16,21,25
  285:19
  296:11,14
  298:12,20,22
  299:1 302:1
  305:22
  306:13
  307:10
  310:21
  311:16
  313:4,18
  314:7 346:4
offices
  327:8
official
  165:12,13
  201:25 210:8
  287:22
  313:15
officially
  27:22
officials
  160:1 206:10
  297:21
  311:1,7
offset
  175:25
oftentimes
  74:25 77:23
  240:20
  278:19
okay
  9:9 10:12,23
  11:13,22
  12:8 15:17
  16:12 17:4,
  10,21 22:5,
  10 23:5
  24:3,17 26:5
  33:10 34:1,

23 35:10,12
  37:24 38:10,
  12,22 46:7
  47:13 50:3
  54:22 59:2
  62:3 64:22
  67:4,20
  70:22 71:6,
  8,9,22 72:6,
  12 73:5
  74:4,7
  77:13,17,19
  80:4,23
  84:24 86:10,
  14 87:17
  88:2 89:9
  90:23 91:7,
  24 92:7
  93:14 94:3,7
  98:7,21
  100:8,15
  101:8 102:3,
  11 104:19,23
  106:7 108:5,
  22 109:20
  110:1 112:17
  113:10
  114:13,17,18
  116:11
  117:25
  119:19
  120:8,19,25
  123:23
  124:13
  127:11
  129:12,18
  131:2,5,12,
  16 133:12,24
  134:10,25
  142:8 147:14
  152:16
  156:12
  159:13
  165:25
  170:10 171:4
  172:25
  173:2,10,18
  174:2 177:3,
  8,19 178:9

180:12
  182:17,25
  186:17 187:8
  188:14
  189:18
  190:11
  191:18,20
  192:23
  193:1,5
  194:18
  195:16,25
  196:6,11
  197:13 198:1
  200:19
  201:20
  202:23
  204:11,23
  206:6
  208:18,22
  209:5,19
  212:6 213:3,
  8,12,24
  214:14,17
  215:22
  216:2,22
  217:5,20
  218:19,25
  219:4,17
  221:2,21
  222:8 223:2,
  10 224:25
  230:8,11,18
  231:8,16
  232:7,12,18
  234:7 235:24
  236:20
  237:9,13
  238:4,12,18,
  22 239:5,18
  240:3,6
  241:2,18
  243:8 244:3,
  8 245:8
  246:8,11,15,
  19 247:1,12,
  16,21 248:2,
  9,16 249:6,
  23 250:19
  252:16

253:7,12,19,
24 254:14
255:9,13,24
256:6,16,20
259:14
260:2,6
261:18,21,22
262:9,12,15,
24 263:2,7,
11,14 264:11
265:19,22
266:6,11,20,
23 267:5
268:3,4,12,
20,24 270:22
271:6,10,23
272:13
273:1,14,22,
23,25 274:5
275:7 276:21
277:3 279:6,
15,20 280:1
281:4,25
283:5,21,22,
25 284:4,18
285:9 286:16
287:3 288:23
289:2 290:4,
12 291:13,20
292:10
293:10
294:10 295:1
296:7,12,18
299:19
302:3,16
304:3,9,19
305:14
306:3,7,19
307:1,20,25
308:2,5
311:3 312:9,
25 313:5,10,
20,24,25
314:6,16,17
315:4,11,20
316:12,19,24
317:9,19,23,
24 318:12
319:4,9,25

320:4,9
321:10 322:8
323:22 324:5
325:24
327:20,24
328:23
329:3,10,12,
19,20 330:20
331:7 332:8,
18 333:15
334:21
335:22
336:20
337:8,22
338:5 339:8,
10 340:4,9
341:2,22
344:19
345:9,14
346:6,18

**on-the-job**
79:3

**once**
76:17 143:23
172:1 202:20
276:18
282:11

**one**
14:18 16:22
19:4 25:16
26:5,16
27:1,4,5
28:22 29:8
30:16 31:4,
16 40:8 55:3
56:3 60:18
64:6 69:8
70:15,24
71:23,24
73:22 78:1
80:3 87:8
97:1,22
113:12
114:15 116:3
117:22
119:11,12,13
120:11 122:4
124:22

132:16
134:23
141:10
144:16
145:17
151:13,16
154:25
158:24
159:16 163:1
168:3,19
169:18 170:7
175:1,2,15
179:13
184:9,18,23
187:6 188:18
201:13,22
204:10
206:19
209:25
212:22
215:22,25
225:8 232:25
234:9 236:15
246:3,12
254:18 257:5
260:12 265:4
266:5,8,9
271:23 272:2
278:5 283:19
289:3 295:5,
9 298:4,5,17
318:6,7
325:8 326:7
345:15,16
347:4,18

**one-week**
46:19,23,25
52:7,9,21,25
53:15 54:14

**ones**
55:11 83:17
90:25 99:17
113:17
117:12
158:22
214:17 295:6

**ONESOURCE**
134:19,23,24

135:3,6,14,
17,21 136:13
215:24,25
244:18 246:3
301:10 302:9
310:3,11,16

**open**
195:11
210:23 231:1
344:5

**opened**
191:7

**operated**
142:19

**operating**
66:9 186:22,
25 187:4,9,
10,13,20
197:7,10,14
198:5 253:2
261:4

**operational**
216:14

**operations**
4:2 18:18,21
20:12 76:20
178:19 211:3
266:25

**opinion**
9:1,12,19
11:20,23
12:6,13 13:9
42:15 49:17
57:17,22
62:17 64:24
65:19,22,23,
24 66:14
67:8,13,15,
16,19 69:12,
17 70:4,25
71:13 72:2
77:6,11 78:3
100:24
124:14
125:13
136:15 137:8
138:10
141:6,13

142:8 151:6 167:22 189:3,6 202:6 205:21 206:5 207:6 214:14 217:14 250:9,12,25 251:1,5,6 278:17 280:23,24 281:8,25 287:25 290:18 309:13 310:11,22 311:13,15 318:22 322:25

**opinions**
42:22 44:16 64:21 65:14 66:22 67:4, 22 68:3,8,24 69:22 77:17 123:17 124:2,6 136:13 137:21 157:5 165:6 280:22 322:22 333:9

**opportunity**
13:25 75:17

**opposing**
119:22 131:14

**OPT**
134:20 135:11

**optimal**
94:9

**options**
167:25

**oral**
94:15 117:4

**order**
54:4,25 55:7 172:15

176:17 264:5 265:8 272:10,11 285:16 309:17 323:14

**ordinance**
14:12 320:16

**organization**
18:10 20:23 21:2 23:15 28:23 29:11, 25 30:2 44:10,22 45:10 46:10 47:20,21 50:15 64:7, 16 72:21,24 73:4,25 79:5 87:14 102:20 103:7,13 104:7 134:23 135:2 175:11 226:25 227:11 254:23 261:6 280:20 294:21 309:13

**organizations**
17:19 62:4 96:2,5

**orient**
79:11

**original**
125:4 274:2, 21 320:13,17 333:10

**originally**
25:9 72:17 134:18 297:12 299:6

**Orland**
84:13 99:3, 5,20,23

**OS**
215:22

**Oshkosh**
25:13

**outcome**
5:20 26:2

**Outlet**
84:14 114:19 118:4

**Outlets**
155:17

**outline**
96:21

**outlined**
107:21 172:15

**outside**
7:24 14:25 15:8,9,14,20 21:11,18 22:19 145:22,24,25 146:3,4 148:2 165:19,20 176:10 179:2 193:18 203:16 289:20

**overassessed**
15:13 42:23

**overestimate**
221:25

**oversaw**
29:7 43:20

**oversee**
64:14 86:25 216:6

**overseeing**
38:21 44:12 159:2

**oversees**
20:11 64:12 232:16

**overstate**
226:7

**overwrite**
125:23

**overwritten**
108:4

**owe**
90:11 100:24 101:2 217:11

**owned**
28:2 38:24 98:10 99:5,8 109:7 122:9 134:22 152:7,9

**owner**
88:3 121:20

**owner's**
297:22

**owners**
98:20 121:21

**ownership**
23:22 152:6, 24 183:15 239:23 270:14,15, 16,20 271:6, 8

**ownerships**
134:22

**owns**
152:5 258:4

---

**P**

**P-I-N**
339:17

**p.m.**
78:18,21 129:14,17 161:25 162:3 225:2,5 277:14,17 320:8 330:2, 5 348:4

**P/l**
222:11

**PAF**
226:9,10,11, 12,20,21 227:24

308:19
**Pagano**
  2:12 6:9
**page**
  3:4 40:14
  41:19 98:5
  109:18,20
  111:12 112:1
  116:24
  145:13,15
  152:15,17
  153:8 166:18
  188:14
  189:19
  191:18 192:8
  195:16,19,
  20,24 196:11
  197:6 209:20
  212:3
  231:17,24
  236:20
  241:18
  242:16,23
  251:20
  252:2,3,21
  254:14,15
  255:22
  256:17,21
  257:6 261:23
  262:9 265:23
  267:5
  273:20,21
  283:18 284:5
  295:23 297:5
  301:4 305:15
  307:2,19
  308:11
  309:23
  311:17
  315:22,23,24
  316:19,22,23
  317:6
  334:22,23
  335:6,7,10,
  22 336:12
  338:5,13,23
  340:10,13,14
  341:8,11,23,

  25 342:16,
  17,18
**pages**
  2:20 3:2 4:1
  38:14,15
  40:15,21
  41:2,5
  145:9,12
  302:2 326:15
  329:13
**paid**
  62:20 91:12
  92:1,3,9
  93:11,23
  104:14 136:9
  151:7,8,17,
  18 158:6,7,
  22 159:16
  173:22
  185:25
  190:15 241:4
  270:17
  271:11
  274:14 321:1
**pandemic**
  52:16
**paper**
  132:21 133:1
**pappas**
  2:7 5:11
**paragraph**
  152:17,21
  189:19
  335:24
  336:2,16
  337:9 338:6,
  9,22 339:14
  340:9 341:6
**parcel**
  136:7,10,12
  208:24 209:1
  315:10
**parcels**
  208:23
  269:10,12,
  15,22 315:7
  316:14
  319:11,13,

  21,22,24
  320:1
**Pardon**
  82:3 155:22
  265:20
  267:20 274:9
  275:20 309:8
**parentheses**
  217:7
**parse**
  139:10
**part**
  12:8 21:22
  24:3 25:12
  27:25 42:21
  53:3 66:19
  77:9 105:15
  106:5 107:16
  110:24
  128:12
  133:16
  143:19,25
  155:4,16
  158:12 161:6
  162:22 164:2
  173:1 176:21
  180:2,21
  182:19
  183:19
  185:1,24
  186:16
  202:21 204:7
  214:5
  222:13,14,
  17,18,19
  223:9 227:7
  231:22
  232:18
  233:4,6
  237:3,12
  247:17,18,19
  265:16 273:8
  301:1,9
  302:21 315:7
  316:15
  325:12
**participant**
  162:19

  230:24
**participate**
  20:19
**participated**
  55:12 104:14
  155:13
**particular**
  11:1 58:22,
  23 70:15
  131:14 138:7
  190:5 218:3,
  15,16 220:10
  226:19
  228:25 237:5
  239:14
  240:12
  254:20
  267:14 269:6
  282:19 333:5
**parties**
  5:4 91:15
  93:18 176:9
  240:22
**partnership**
  87:16 98:18
  152:3,6,23
**party**
  5:18
**pass**
  98:2 102:2,8
**past**
  113:4 329:6
**Patrick**
  109:19
**Paul**
  2:2,23 6:1
  144:18
  327:25
  329:22 330:7
  338:24
  347:19
**paul.tzur@**
**blankrome.com**
  2:5
**pay**
  50:16 89:23
  90:4,15,25

91:6,20
92:16,17,19,
24 104:9
105:13 130:9
138:22
140:22
149:16,25
151:23
157:13
160:22
167:23
179:22
184:15
185:10 186:1
250:16
310:25 311:6
342:10

**payable**
320:23

**paycheck**
96:6

**paying**
92:23 93:10
100:25 105:1
149:15
150:17
181:24 185:3
258:18

**payment**
153:1

**payments**
73:14

**pays**
51:25 92:4,
16 96:9

**Paz**
3:9,11,12,
16,23 4:2
15:3 31:5,
11,22 32:1,
13,15,25
33:3,14,23
34:13 36:1
43:17 49:6
52:5 64:22
65:5,6,14
67:14,21
73:9 74:11

76:5 79:18
95:13 124:14
125:14
142:13
143:4,16
144:23
156:22
157:6,8
192:4 196:7
209:21,24
210:3 231:25
250:2,6,20
251:16
252:10,12
261:25
262:18
270:10
275:2,4
279:17
295:21
298:17,18
300:10,17
308:3,4,7
309:6 310:2

**Paz's**
126:4 145:2

**PDFS**
345:4,6,9

**penalty**
130:9

**pending**
3:8,13
119:23
120:10
126:18 134:1
188:19,22,
23,24 189:7,
8,14 191:8,
21 192:21
212:7 215:13
217:15
219:23 225:9
228:3,10
234:15
236:4,5,7,21
237:3,4
243:11
273:23 274:3

276:16
280:18
282:23
289:12 294:3
295:2,13

**Pennsylvania**
119:12,18,19
120:4

**people**
14:18 17:25
31:4 49:3
51:25 72:12
73:22 94:7
101:9 112:9
142:8 146:6
155:12
234:12
236:9,14,18
271:23
280:3,10
281:12 283:7
284:20
288:24
291:22

**perceived**
157:10,17

**percent**
91:22

**percentage**
24:13,24,25
91:25
220:22,24

**percentages**
223:15

**perceptivenes
s**
202:15

**perfect**
91:2,8,9
163:21

**perform**
17:17 25:17
26:6 27:6
28:11 84:9
99:21
159:22,25
160:13
162:25

165:17 258:8
263:19
306:22

**performance**
20:13 81:7
86:1,3 89:16
94:9,12 95:9
96:3 141:25
218:18
306:24

**performed**
57:15,19,24
99:23 104:10
156:18 166:6
183:7,18
187:18
196:20
214:24
243:25
256:3,7,15
263:17

**performing**
59:20 81:13
85:5 161:12
163:10
164:2,3
234:20

**performs**
17:13 26:14
160:3

**period**
73:25 74:4
295:1 302:13
315:10 345:8

**periodic**
193:10
266:24

**periodically**
110:21

**permission**
146:14,17
149:2

**person**
19:1 29:20
52:13,15
57:4 63:21,
22 64:2,3,11
65:5 77:16

79:14 80:12
85:23 87:18
109:19
142:12
144:21
153:14,16
175:12 179:4
232:7

**personal**
11:2,21 21:3
30:18,22,24
44:19,22
58:11,13,15
71:17 85:7,
14,16 100:7
116:13
127:14
128:16
132:20
133:18 235:7

**personally**
38:25 39:25
54:12 57:3
117:18
122:18
127:25
201:11
211:14,18
298:15

**pertains**
158:21

**Peter**
131:19,20,22
132:2,6

**Petition**
336:24
337:16
339:21
340:20

**phases**
45:24

**phone**
7:17 34:15,
23 35:19
104:3 153:15

**phrase**
71:8

**physical**
18:20 211:4

**physically**
101:5

**pick**
5:5 83:9

**piece**
168:14,19
318:9,11

**pieces**
79:8 154:25
284:1

**PIN**
336:21
339:17
340:17
341:14,17

**place**
5:3 29:10
102:16,18
107:14
108:5,15
148:21
171:15 172:3
222:16 241:4
254:3 292:22
315:1

**Plaintiff**
6:3 152:14

**Plaintiff's**
334:1,13
335:23

**Plaintiff(s)**
4:4

**plaintiffs**
2:2 336:8

**planned**
19:15

**Planning**
226:23

**plant**
130:24 131:1

**platform**
129:6,8
267:10

**Pleasant**
84:14 114:18

115:1,23
118:4
153:17,22
155:16

**please**
5:4 6:19
9:23 13:21
21:15 31:24
37:18 48:20
57:21 65:21
95:3 98:4
120:19
141:10 146:5
152:10
176:20
195:11 204:4
208:3 209:19
211:23
231:16 234:7
243:19 248:4
249:24
251:3,11
259:19 260:2
265:19
273:14 285:8
286:12
293:22
295:18
307:1,3
309:22 313:5
317:15 320:5
336:2,18
337:14
338:18,20
339:13
340:14
341:3,11
344:19
345:24

**pled**
112:22

**plethora**
278:20
291:21 292:2
293:12

**point**
7:16 101:11
102:24

105:10 128:1
154:11
160:18
168:14
175:22 183:1
186:20 187:6
188:25
189:17
204:17,22
209:2 215:21
218:13 224:7
229:22
238:17,24
243:23
269:18
282:17
299:10 318:6
324:25

**pointed**
53:12

**policies**
106:14
108:21,22
109:1,4,6
110:2,6,8,20

**policy**
3:5 82:24
110:13
126:12,16
134:5,10

**poor**
11:8,11

**populated**
276:19

**portfolio**
20:14 75:12
143:24
188:25
220:11 226:5
236:6 237:12
238:15

**portion**
44:21 241:16
252:25
308:15

**position**
20:8 27:5
42:2 43:24

48:4 79:20,
23 80:8
97:25 193:15
279:14
**positions**
45:3
**possible**
17:16 71:16
126:13
130:7,8
143:9 168:1
214:21
225:23
263:22
275:16
**possibly**
270:10
**potential**
93:19 145:9
168:3 185:9
196:12
198:19 216:9
221:16
226:14 265:6
**potentially**
185:11
**Powerpoint**
58:8,16
**practice**
39:2 59:14
194:23
**practices**
44:15 111:6
**practicing**
74:18
**Prairie**
84:14 114:18
115:1,23
118:4
153:18,22
155:17
**precede**
16:9
**precisely**
127:9

**Preconstructi
on**
251:25
**predicate**
263:24
**predicated**
263:8
**predict**
137:5
**preemptive**
202:7
**preemptively**
300:1
**Preliminary**
251:12
**premise**
173:25
258:19
259:13
**Premium**
84:14 114:19
118:4 155:17
**prep**
35:4
**preparation**
37:14,22
**prepare**
37:4 53:23,
25 59:16,17
62:18 68:6
100:8,13
121:15
139:25
142:8,9
144:8 167:11
174:13
175:5,9
176:9,17,22
226:20
300:22
**prepared**
36:15,16
37:8 54:14
68:21 106:25
107:1,2,5
143:7,15
178:7 192:21

196:7
212:12,13
214:13
216:19 222:2
225:10 227:9
228:11
232:8,10
252:8 281:23
294:12
300:16
320:11
**prepared/
submitted**
61:21
**prepares**
141:6 187:23
198:16
**preparing**
7:12 107:11
137:14 140:7
141:12,13
144:6 154:12
166:20
229:14,15
257:22 267:3
300:23 343:4
**present**
16:14 31:7
45:1 56:6,
10,11 108:24
144:17,18,
21,23 173:21
193:9 198:11
206:6,9
288:1
**presentation**
201:15,16
203:5
**presentations**
205:3
**presented**
12:3 182:20
201:3 203:6,
8 296:10
323:1
**president**
16:10 38:21
42:4 45:11,

12,15,16,18
63:14 64:1,
14 72:19,22
73:1 86:18,
24 188:10
232:15
**pretty**
98:8 145:15
325:25
**prevail**
101:14
**prevailing**
222:21
228:19
258:23
**previous**
151:14 325:9
**previously**
28:2 68:2
86:22 119:14
123:22 236:7
261:10
**price**
230:20
**Pricewaterhou
secoopers**
128:25
**primarily**
55:10 56:23
75:12 246:4
**primary**
73:9 155:9
**Prime**
27:16,19
28:3,7,11,
16,20,24
29:5,14,18,
22 75:7,11
147:13
148:6,8,12,
15 149:17,
21,25 150:18
151:1,3,9,20
222:20
231:4,9
234:16,21
236:1,3,10,
14,18 237:11

239:16,22
**principal**
  42:4
**principles**
  177:23
**print**
  133:3,4
  344:1
**printed**
  133:7 244:12
  314:18
  318:2,12,15
  320:9
**printing**
  314:21
  343:18
**prior**
  65:11 69:3
  113:8 119:3
  126:11
  129:21
  154:19
  191:11 195:8
  275:25 290:7
  294:13 308:8
  321:17
**priority**
  89:22
**private**
  5:6 148:13
**privileged**
  22:16
**pro**
  92:20 251:13
  308:12
**probabilities**
  221:13 222:2
  228:25
**probability**
  3:8 212:7
  214:10,12
  215:14
  216:19,21
  217:15
  218:14
  219:6,9,12,
  13,25 220:6,

7 222:4,21
225:9 226:4
228:4,10,15
**probably**
  43:25 50:5
  58:7,10,13
  60:13 65:11
  75:14 87:18
  97:10,19
  114:8,16
  153:19 178:6
  181:13 183:5
  200:13
  219:17 296:9
  321:21
  326:22
  342:22
**procedural**
  96:25 107:9
**procedure**
  76:1 77:2,10
  163:21
  292:22
**procedures**
  106:14,17,
  21,23 107:5,
  7,12,14,20,
  23 108:5,8,
  9,14,16
  110:2,6,9,20
  123:4
**proceed**
  227:18
**proceeded**
  227:21
**proceeding**
  5:7,13
**process**
  39:14 75:23
  76:1 77:25
  79:7 94:16
  96:24 106:1
  108:8 120:13
  135:25
  136:20
  137:15
  163:21
  175:13

183:24,25
185:25
186:13
216:14
225:13
226:13 289:2
301:2 308:20
331:1,2
**processes**
  142:7
**processing**
  73:13
  106:18,19
**Proctor**
  97:22
**procuring**
  26:21
**produced**
  36:25 68:21
  122:25
  123:18,21,22
  125:12
  133:22
  135:18 140:2
  187:3
  206:16,22
**product**
  271:18
**production**
  120:23
  166:25
  254:15
  326:16
  334:11 339:1
**profession**
  61:19 157:18
**Professional**
  59:13
**Professionals**
  46:11 47:13
**profile**
  40:13
**Profit**
  3:21,22
**profitable**
  186:6

**programs**
  63:3
**project**
  173:11
  226:16,19
  252:4,6,24
  253:13
  254:12,25
  307:22
  321:12
**projected**
  144:3 227:16
  253:7,14,15,
  25 255:1
  261:5 263:21
  303:25 305:4
  321:5
**projecting**
  141:1 258:15
  305:13,23,25
**projection**
  137:17
  260:20 261:2
  300:13
  302:14
  304:10,21
  305:15
  310:20
**projections**
  223:16
  252:23
  254:21,22
  258:15
  303:24
  305:19
  306:25
  310:17,18,19
  347:11
**projects**
  226:14
  227:14
  263:21
  265:17
  308:21
**promoted**
  44:11 45:11
**Prop**
  3:13

| | | | |
|---|---|---|---|
| **proper**<br>141:23<br>**properly**<br>27:8 57:18,<br>24 86:8<br>**properties**<br>10:18 16:21,<br>23,25 17:14<br>21:25 22:3<br>26:17 27:7<br>28:1 34:19<br>42:25 44:3,<br>16,18 64:18<br>70:24 83:25<br>84:11 87:24<br>91:17 94:22<br>95:2 98:9,<br>12,15,17,18,<br>19,22,25<br>99:15,22<br>100:6 108:6<br>113:11<br>114:15,23<br>116:23 117:3<br>122:9 130:19<br>132:14,22<br>167:25 168:2<br>185:23<br>188:20<br>193:11<br>194:20,24<br>218:21<br>242:13<br>255:25 256:1<br>269:24<br>278:18,25<br>282:1<br>284:21,22<br>285:19 288:5<br>289:24<br>292:19,21<br>293:25 331:6<br>**properties'**<br>26:11<br>**property**<br>3:20 4:3 6:3<br>7:8 9:1,3,13<br>10:9 11:5,7 | 12:9 14:11,<br>18,19 15:7,<br>19,21 16:5,<br>10,13,18,20<br>17:2,13<br>18:3,8,14,<br>15,18,19,21,<br>24,25 19:1,<br>15,17,20,22<br>20:13 21:8,<br>9,11,16,18,<br>22,23 22:12<br>23:4,18,20,<br>21 24:2,8,<br>12,15,19<br>25:18,25<br>26:6,11,15,<br>18,21 27:12,<br>20 28:6,20,<br>25 29:3,4,7,<br>12,13,16,21<br>30:11 31:9<br>35:6,14,16<br>38:17,22<br>40:1 42:18,<br>20,24 43:21<br>44:3,4,7,9,<br>14,17,19,22,<br>23,25 45:6,<br>18 46:3,9,<br>16,22 47:2,<br>4,5,9 48:2,<br>7,17,23<br>49:4,19<br>50:9,16<br>51:25 52:1<br>55:16 59:21<br>62:20 63:8<br>64:17 65:7,<br>13,16 66:3,<br>6,13,24 67:3<br>68:1,8 69:17<br>70:1,3,12,23<br>71:12 72:1,<br>6,12,20<br>73:6,7,23<br>75:3,5,15<br>76:6,11,21,<br>24 78:24 | 79:7 80:4,<br>13,20,25<br>81:2 82:2,5,<br>21,22 83:16,<br>19 84:7,18<br>85:9,13<br>87:1,3,12,<br>13,14,16,20,<br>22,23,25<br>88:2,12<br>89:6,7,10,<br>11,19,20,21<br>90:1,9,15,<br>18,19,25<br>91:6,10,11,<br>18,19 92:20,<br>22,23,25<br>93:7,10<br>94:8,10,17,<br>25 95:4,6,<br>10,19,21,24<br>96:8,11,17<br>99:6,7,8,9,<br>12,14,19<br>100:16<br>101:5,9,19,<br>23 102:5,9,<br>13 103:2,13,<br>15,16 104:4,<br>14,16,24<br>105:1,6,7,<br>14,21 106:8,<br>13,15<br>108:15,23<br>109:2 110:1,<br>5,8 111:9,22<br>113:8,9<br>115:2<br>116:19,20<br>117:23<br>119:7,25<br>120:16,17<br>121:2,20,21<br>122:7,21<br>126:25<br>128:20<br>130:20<br>132:13<br>133:24,25 | 134:1,13,19<br>135:22<br>136:14,17,<br>21,25 137:12<br>138:11,23<br>139:20<br>140:12<br>141:7,8,9,<br>13,14,15<br>142:1,2,9,<br>10,18,24<br>143:2,16<br>145:19,22,24<br>146:3,5,7,9,<br>12 148:21<br>149:13,15,<br>19,23 150:4,<br>17 151:23<br>152:3,4,5,8,<br>9,23,24<br>153:1,2,20<br>157:14<br>158:24<br>159:3,15<br>161:8<br>165:17,25<br>166:4 167:18<br>168:1,16,21<br>169:1,8,9,<br>12,18,20<br>171:15<br>173:6,15,21<br>174:5,9,12,<br>14,18 175:3,<br>16,21 176:5<br>177:9,18<br>179:18<br>180:9,12,13,<br>25 181:13,<br>18,23,24,25<br>182:8,13<br>184:10,11,<br>12,23 185:4,<br>10,18,19<br>186:1,4,9,<br>15,19 187:15<br>189:1,22,23<br>190:4,5,7,8,<br>13,17 191:2, |

4,15,24
193:22,25
194:1,6,20
195:1 196:21
199:5,8,23,
24,25 200:3,
4,6,13,22
201:12,14,23
202:10
207:1,11,14,
19,25 208:6
210:10
211:4,5,6
212:7 214:13
216:7,12
218:6,18
221:5 222:3
224:2,7,11,
16,22
225:20,21
226:12,15
227:5
228:16,17,20
229:8,10,16
230:3,21,25
231:3,7,9
232:17
233:4,9,21
234:1,3,4,
13,16,19
235:6,7,24,
25 236:2,12,
16 241:4,16
242:21
244:18,24
245:4,9
252:7 255:9
257:18
258:3,4,5
259:12
267:24
268:5,19
269:2,11,17,
19,25 270:2,
6,7 271:11,
15,18,19
275:15
277:21
278:18

279:1,2
282:14
285:25
286:13
289:15,20
297:13,14,
17,22,23
298:4,7,10,
23 299:2,12
300:13
301:10,24
302:9,24
305:11
306:25
308:20
309:21
310:25
311:5,8
312:11
314:24
317:5,13
319:13
321:2,14
322:1,17
323:3 324:16
332:1 333:1,
5 336:6
342:10,11
343:6 346:2,
9 347:9,10
**property's**
10:17 69:22
114:15
142:24
184:14
219:16
**property-by-
property**
90:7
**property-
level**
64:13
**proportion**
150:16
**proportionate**
150:13

**proportionate
ly**
150:24
**proposed**
213:1,3,13,
17 217:25
223:6 227:10
242:16,18
243:1,4,15,
20 267:15
269:13
274:19
**prosecute**
47:10 53:22
**prosecuting**
190:17
281:18
**protective**
272:10
323:14
**proud**
112:16
**provide**
40:9 46:15
62:14 66:14
82:15 97:12
101:18
172:12
176:23 181:5
201:6,9,18,
24 202:13,
16,17 203:13
204:23
218:12
219:14 228:1
232:19 235:9
258:1 263:19
264:5,7
271:19,24
272:21 273:1
280:21
285:16,19
286:6,13,21,
22 287:5,8,
21 290:8,9,
13 292:7,13
315:18
322:18

323:4,7,11
324:1,6,10,
14,19
325:15,18
**provided**
52:23 67:22
68:3 84:12
124:14
128:13 136:4
150:19 180:2
202:24
205:1,5,20,
24 206:2
232:22
254:22
258:21,24
261:5 264:24
273:7 274:25
286:9
323:15,18,
20,22 324:3
325:11,13
**provides**
57:8 67:15
131:21 157:1
252:16
**providing**
44:16 59:18
65:14 166:24
180:14
203:25
204:6,12
220:8 231:21
232:13
272:18
322:23,24
324:25
**public**
128:21
**publicly**
273:5
**publicly-
traded**
87:21 174:5,
8
**publish**
164:21

published
88:6,8
135:24 165:2
279:24
280:15
Publishing
135:8
pulled
128:9 347:4
punched
273:15
puncher
273:15
purchase
231:9
purpose
85:4 89:19,
21 166:7
173:10,14,18
211:1,2
218:8,10,11
252:14
266:10
290:11 291:2
343:16
purposes
17:14 25:18
26:7,9 37:8
46:20 49:4
66:13 137:4
159:23
175:19
184:9,23
219:24
229:8,10,13
230:13,15
258:6 264:19
282:3 288:5
291:2,10
343:18
Pursuant
6:11
pursue
14:23 70:3,
23 71:4,5,12
93:7 101:19
145:18 146:8
149:1 218:6

304:25
pursued
15:22 16:2
71:25 102:6
pursuing
61:9 102:13
256:22 304:9
pushback
141:3
pushing
327:11
put
40:17 49:2
274:5 292:22
putting
137:10
puzzle
318:10
Pwc
131:25
132:1,2,3

Q

qual
95:15
qualified
57:17,22
156:7
qualitative
94:23 95:16
173:8
quality
198:13
quantifiable
168:5
Quantifying
186:10
quantitative
199:3
quantity
34:18 164:15
198:12
quarterly
294:12
question

7:20 8:6,9,
10 11:16
13:6 17:12
21:15,21
22:23 25:15
28:17,18
31:24 32:10
33:18 37:17
48:20 51:3
57:21 65:21
71:22 78:1
95:3 98:24
103:11
108:13 112:2
120:19 124:1
130:19
140:15
146:2,5
147:6 148:10
151:11,15
163:13
164:25
171:4,6
175:7 176:20
178:6 180:7
185:7,18
187:7 194:5
197:2 204:4
205:6 208:2,
3 230:1
247:16
248:22
249:20 251:3
260:2 286:12
288:12 289:8
293:22
296:18,23
304:18
307:20
308:1,6,8
325:7,10
330:25 336:9
338:9 344:19
347:13,15
questioned
38:5 283:7
questioning
33:21

questions
2:22,23 6:18
34:6 38:1
41:4 55:22
78:23 129:21
130:1,15
162:5 192:23
209:2 223:21
225:7 277:19
280:21
281:11,14,18
283:8 284:13
290:4 291:15
292:2,4,18,
23,24 293:1
297:16
326:4,17
327:23 328:5
329:8 330:7,
9,12 331:15,
17,18,20
332:8,11,13,
14 333:2,23
338:1,25
341:24
342:14
345:19,22
346:14,19
347:22
quick
223:20
277:6,10,11
quickly
145:15 200:2
241:19 277:4
326:1
quite
31:15 249:5

R

R&d
130:24
Rachelle
235:2
range
199:21
200:23

**Rapkin**
115:15
**rare**
32:7 101:20
225:11
**rata**
92:20
**rate**
24:4,5,6,7,
10,12,14,18,
24 26:4
91:25 104:12
128:14,16,
17,18,23,24
129:3,4
131:21 132:4
136:9 191:16
198:2,10
199:5,7
200:5,12
217:4 218:2
237:18,21,
23,24 238:5,
12,19,22
239:3,5,9,12
240:8,10
241:21,23,25
242:2 260:21
261:8,9
264:17
274:7,10,12,
16 276:4
280:2,4,6,7
284:11,24
290:15
342:4,7,8
**rates**
136:7,22
137:1
141:18,19
142:5
198:11,18
238:1,16
241:19 242:7
302:11
**ratio**
54:3,8,10,15
57:5,9,11,

14,18,23
58:2 122:13,
14 154:13,17
155:25
156:7,9
162:10,12,
18,25 163:6,
10,19 164:2,
5,12,17,22
165:2,7
208:11,13,
14,19,25
209:1,6,12,
15,16 255:24
256:3,7,12
312:4 331:5
333:20 338:4
341:1
**ratios**
122:20
**re-assessment**
302:22
**re-negotiates**
93:16
**re-review**
268:6,8
271:17 272:1
279:21
323:17,21
325:20
**re-valuation**
268:19
**REAC**
83:15,18,19,
21 84:2,5,9
99:21,23,24
104:10 115:2
146:22
149:7,10,11
153:25
155:5,7
158:2,8,15,
25 159:5,8,
9,14,16,22,
25 160:3,8,
13 162:6
165:9,11
166:9,15

193:19
214:24 215:4
273:1,4
287:18 293:8
311:11
320:15,18
321:4,23
333:10
**reach**
12:14 22:8
89:3 147:7,9
298:21
**reached**
147:11
298:17
**read**
35:8 36:1
51:7 57:11
88:2,6
110:10
111:18 145:1
151:14 153:4
172:10
191:25
192:1,19
268:11
279:24 299:5
325:9 336:2,
18 337:14
338:18
339:13
340:14
341:11
345:24
**readers**
190:3 292:16
**reading**
51:9 111:21
307:18
311:20
312:22
**ready**
199:11
**real**
3:18 44:23
46:9,16,22
48:22 56:24,
25 80:20,25

87:4 93:4
249:11
296:21
301:5,8
306:8,10
313:8 315:9,
17 316:8,10
319:16,18
**reality**
91:3
**realized**
172:5
307:16,23
**Realty**
4:2 129:1
131:22
**reason**
27:6 40:24
100:1
159:13,17
169:25
207:23 208:4
209:16
215:12
221:18
222:6,14
230:4,9
237:20
238:7,25
247:10
281:17
283:11
**reasonable**
101:7,8,10,
13 137:18
198:21 231:1
279:6,7
**reasons**
25:16 26:5,
16 39:12
81:6 346:7
**reassessment**
215:1
**rec**
24:23 237:17
342:1,3
**recall**
17:9 19:4

27:1 30:21
32:14 33:5,
13,22 34:1
41:11 42:10
43:12 51:9
54:21 63:22
67:24 69:8,
25 72:5
74:16 86:16
97:3,6 98:1
99:24 100:14
102:15
110:24
111:20
113:19
114:25
121:14 127:6
130:2 131:10
138:7 146:13
147:8 148:5,
15 165:15
168:23
172:6,24
179:21
187:21
201:15
202:21
203:16
204:16
206:13
211:18
221:14
235:10
256:24 257:2
271:16
272:16,18
286:1,4
293:1,14,17
294:2,23
295:14
297:16
314:25
332:23 333:2
342:13

**recalling**
41:17 113:18

**receivable**
88:24

**receive**
75:24 81:25
82:9 96:6
104:25
105:12
150:23
204:18
241:12,15
266:14
270:25

**received**
10:13 22:15
23:7 42:6,9
76:5 104:6
106:4 107:18
123:10 158:9
165:9 173:4,
7 183:6
212:2 232:4
243:22
245:18
301:23
306:13 307:9
320:19
326:16 346:7

**receiving**
81:22 82:4
103:8 218:15
242:12 345:7

**recent**
114:21
117:14,25
133:13
268:14
313:14

**recently**
32:4 128:13
333:7

**receptive**
203:19

**recess**
78:19 129:15
162:1 225:3
277:15 330:3

**recipient**
222:17,18

**recipients**
290:9 291:3

295:17
344:11,24
345:7

**recitation**
176:1 178:18
333:8

**recognize**
334:23
335:2,11

**recollection**
21:3 36:3
50:22 71:17
79:13 88:17
118:15 127:7
170:8 208:21

**recommended**
149:7,10,11

**reconcile**
105:11

**reconciliatio
n**
106:1

**record**
5:1,4,24
6:20,24 9:24
10:1,2,4
78:18,21
129:14,17
130:13 144:3
161:25 162:2
188:24
225:2,5
244:19
277:14,17
310:13
327:22
330:2,5
334:5 346:13
348:2

**recordation**
187:14

**recorded**
59:2 131:10
169:15 174:3
184:7 192:22
222:7

**recording**
5:3 64:9,10

**recordings**
131:12

**records**
47:7 128:5
169:16
180:22
181:12 207:4
223:1 249:20
254:4 270:12

**recover**
95:11

**recovered**
24:11 91:22,
24 190:10
240:25 321:2

**recoveries**
23:19 76:9
142:2
189:23,24
190:6,23,25
191:1 238:3
239:25
240:13

**recovery**
3:21,22
23:24 24:4,
5,6,7,10,12,
18,24 90:16
91:7,24
104:12 150:7
237:18,21,
23,24 238:1,
5,12,16,19,
22 239:3,5,
9,12 240:8,
10 241:19,
21,23,25
242:2,6
342:3,7,8

**redevelop**
46:2

**redevelopment**
252:24

**reduce**
184:10,12,
17,24 205:12

**reduced**
213:8 300:25

reducing
  222:15
reduction
  101:15
  173:4,7,22,
  24 174:1
  210:11
  220:21
  221:10
  223:8,13
  268:18
  270:20
  299:11
  300:5,20,21
  305:13
  337:17
  345:20
  346:1,8
reductions
  300:3
refer
  45:21 52:24
  53:8,11,14,
  16 56:19,22
  57:1,5 65:23
  213:22
  215:23
  220:2,19
  267:18,21
  269:22
  274:7,10
  308:19
reference
  180:9
  215:14,20
referenced
  4:6 99:18
  109:15
  119:15
  145:10
  297:15
references
  297:9
referencing
  49:19 326:15
referring
  109:6
  187:17,19

195:20
197:23
304:17
319:17
refers
  25:25 91:25
  274:12
reflect
  6:24 24:14
  219:13
  267:23
  303:23
  310:10 315:6
reflected
  213:9,12
  315:8
reflective
  243:24
  309:19
reflects
  315:5
refresh
  168:9 332:14
refreshed
  17:8 107:8
  108:3 110:21
refund
  105:22,25
  106:4 215:19
  218:3 220:13
  222:24
  241:2,12,16
  270:16 271:5
  320:25
  333:12
refunds
  93:8,19
  95:2,7,11
  150:23
  215:12 220:9
  320:19 333:4
refused
  211:9 299:16
regarding
  59:15 96:19
  100:12
  114:15

128:10 165:2
178:3
regional
  63:14 86:18,
  24 188:10
  232:15
regular
  255:15
regularly
  31:15 107:8
  227:6,9,24
  228:1
regulations
  59:15
regurgitate
  243:9
reimbursed
  150:15
reimbursement
  46:3 342:10
reimbursement
s
  45:25
reimbursing
  105:4
reinforces
  259:5
related
  5:18 11:18
relating
  6:15 30:19
  33:11 60:4
  80:4 108:9
  115:1 122:19
  132:21
  135:15
  188:19
relationship
  11:8,11 85:8
  87:9 152:2
  207:11
relative
  254:10
relay
  284:1
relaying
  279:15

relevance
  10:20 39:6,
  20
relevant
  19:21,24
  95:9 287:9
  288:9
  306:17,20
  347:8
reliability
  223:16
reliable
  48:16,24
  49:1,11,14
  53:13 62:12,
  17 86:7
  95:19
relief
  101:16
  172:12
relinquish
  93:18
relinquished
  60:10
rely
  225:16
  229:18 282:4
relying
  225:25
remaining
  92:4 328:12
remains
  264:17
remedies
  106:2 264:4
remember
  50:23 113:10
  115:24
  176:13
  210:20
  288:19
  324:25
  330:12
  331:16,18,21
  332:11,18,20
  333:23
  341:25

345:21 347:2

**remind**
302:20

**remotely**
25:6

**removal**
172:9 295:15

**remove**
173:12
343:16

**render**
49:17 205:20
278:16,17
322:15

**rendered**
138:9,13
189:2 202:8
213:1,18
246:25
263:10
267:12,24
275:13
296:9,13
305:20 310:8
312:14,16
313:3,17
314:2 318:25
319:11
320:20 337:4
338:2 339:24
340:25

**rent**
92:17 186:2
257:17
258:18
259:24 260:9
272:21,24
285:25
286:2,3,9,13

**rental**
198:18
258:21

**rents**
170:25 199:1
255:4,5
257:13,19
258:16,23
259:15,20

260:7,13,16,
22,23 261:2
265:2

**repair**
169:5,7

**repeat**
37:17 57:21
95:3 98:24
103:10
120:19 146:5
147:6
151:11,12
176:20 180:7
185:5 194:5
204:4 208:3
212:22 248:4
251:3 259:18
260:2 289:8
311:25
325:7,8
344:19

**repetition**
145:14,16

**repetitive**
123:25

**rephrase**
31:24 32:22
65:21 151:16
185:7 249:4
304:15
344:20
347:13

**report**
3:4,17,19
4:3 61:22
64:11 67:10
88:21 98:6
104:18
178:17,20
187:21
188:19
189:7,8
190:2 191:4,
21,25 193:17
195:14
196:4,6
197:14
199:8,18

201:22,24
202:25
203:21,25
204:7,13
206:14,16,
21,22 218:9,
10,11,20
219:22 221:2
234:16
236:8,22
237:10
238:20 239:5
244:17
246:1,2,24
249:16
251:14
252:8,16
261:12
273:23 274:3
280:6,18
282:23
285:9,12
286:20
287:13
290:11
295:9,10,11,
17 301:8,19
302:5,8,18
303:8,22
305:7 306:15
308:13,19
309:25 310:5
312:13,15,16
313:11
314:18
317:25 320:1
322:16,25
343:17

**reported**
72:21,24
175:20 176:6
222:9 297:12
299:7

**reporter**
5:21,24
151:14 325:9
327:5,7

**reporting**
73:2 142:22
175:10,12
176:8 189:21

**reports**
59:16,17
67:5 121:15
133:20
153:21
162:19,23
178:7,8
188:22,23
192:24,25
193:21
194:3,8,16,
20 195:2
201:7 202:17
203:14
204:20,24
207:3 225:16
228:10,15
236:4 243:12
244:2 266:20
289:13
294:3,11,15,
18,19,20
295:3,13
301:9

**repository**
108:2 109:5,
11

**represent**
8:12,21
137:3 170:9
198:11
214:11 219:5
246:19
253:17 255:7
256:5 270:4
273:18
296:12,14
313:1,2,7
314:4 324:3
337:1

**representatio
n**
252:7 256:19

| | | | |
|---|---|---|---|
| **representative** | **requirement** | 341:11 | **result** |
| 310:22 | 96:1 119:16 | **responses** | 39:12 120:8 |
| 313:16 | 161:7 163:9 | 4:5 8:4 | 167:19 234:5 |
| **represented** | **requirements** | 120:15,22 | 268:18 |
| 115:14,24 | 50:1 95:25 | 166:24 335:4 | 312:12 |
| 119:7 | 209:18 | **responsibilit** | 313:18 |
| **representing** | **requisite** | **ies** | 316:14 |
| 247:7 317:4 | 49:25 61:13 | 42:21 44:12 | 336:20 |
| **represents** | **research** | 45:14 47:19 | 339:16 |
| 66:11 198:6 | 114:5 121:25 | 64:5 86:9, | 340:16 |
| 220:23 252:4 | 133:18 | 21,23 145:17 | 341:13 |
| 268:5 270:15 | 172:8,25 | 343:7 | **resulted** |
| 310:8 337:3 | **resent** | **responsibilit** | 171:20 300:4 |
| 342:8 | 290:23 | **y** | 319:1 |
| **request** | **residual** | 16:9 73:19 | **resulting** |
| 100:9 | 150:24 | 89:24,25 | 186:11 |
| 107:17,22 | **resolution** | 90:5 92:5 | 332:25 |
| 118:21 | 39:15 | 93:4 100:21 | 340:8,25 |
| 123:10 | **resolve** | 101:4,6 | **results** |
| 181:17 | 219:6 220:5 | 143:19 | 93:20 221:17 |
| 218:21 | **resolved** | 149:20,25 | 226:4 267:13 |
| 233:23 | 219:12 | 150:4 184:15 | 268:9 310:13 |
| 258:11 | **resource** | 185:1 | **resume** |
| 297:23 | 53:12 128:22 | **responsible** | 40:7 |
| 299:17 | **resources** | 23:16 26:20 | **retail** |
| 334:11 339:1 | 56:22 109:7, | 43:1 58:19 | 91:10 112:19 |
| **requested** | 9 111:1 | 79:14,15 | 185:22 |
| 181:5 228:5, | 129:3 163:4 | 89:5 90:17 | **retain** |
| 23 233:22 | **respect** | 102:23 | 16:1 83:13 |
| 265:12 | 8:15,23 9:10 | 105:3,4 | 149:3 160:17 |
| 266:10 | 11:14 13:1 | 111:23 | **retained** |
| 271:17 286:6 | 19:19 20:9, | 137:14 | 16:19 75:9 |
| **requesting** | 10 40:1 55:6 | 149:15 161:2 | 82:1,5 |
| 270:24 | 137:25 | 175:8 221:16 | 121:17,19, |
| **requests** | 150:20 | 241:11 | 20,21,22,24 |
| 73:13 120:22 | 154:17 | **responsive** | 155:25 158:2 |
| 123:16 | 183:21 | 123:15 124:3 | 165:20 |
| 166:25 | **responded** | 126:6 127:25 | **retainer** |
| 265:13,14 | 35:15 307:12 | **rest** | 16:3,5,8,13, |
| **require** | **response** | 150:18 | 22 |
| 164:21 | 123:9 299:17 | **restate** | **retaining** |
| **required** | 328:21 | 11:16 13:6 | 149:9 |
| 59:21 73:20 | 332:23 334:8 | 21:15 48:20 | **retention** |
| 91:5 110:10 | 336:13,17 | 259:19 | 126:12,16 |
| 157:19,20,23 | 338:14,23 | 293:22 | 128:5 134:4, |
| 161:6 172:15 | 339:14 | 321:22 | 10 |
| 288:1 321:1 | 340:12 | **rests** | **retired** |
| | | 15:25 143:8 | |

27:4 88:19
155:19
182:16,22
**retrospective**
141:20
**return**
173:20
180:17
226:18
227:16
**returned**
241:1,3
**returns**
180:4,8,15
**Reuters**
135:7,9
244:20
**Rev**
125:18
**revenue**
24:11 260:18
**revenues**
66:5 76:8,21
187:14,16
226:15
252:5,24
254:21,24
260:19
261:15
**reverse**
119:21
**review**
11:14,18,24
12:8,13,18,
21 13:1,4,9,
20,24 14:1,
10 36:7 39:9
59:17 61:22
68:14 69:24
70:5 71:2,14
72:4 94:16
100:2,3
105:23,24
137:16,19
143:5 145:9
162:21
168:11
198:14,15,16

200:19 201:7
204:24
205:2,7,21,
22,25 206:7
207:12,14
209:12
213:9,18
224:11 229:2
246:17 247:3
248:10,17,24
257:1 267:4
269:3 273:6
285:24
286:3,10,14,
18,25 287:2,
4 293:3
304:6,12
312:10,14,19
315:16
316:3,21
318:23 319:6
324:11 325:2
335:18
**Review's**
13:13 69:18
205:16
246:20 305:1
**reviewed**
69:21 77:22
107:6,8
124:8 128:8
140:2,4,6
167:10,13
196:8 214:4
221:14
227:24 242:9
335:19
**reviewing**
69:6 124:23
172:7,24
255:17
**reviews**
153:21 205:6
**revised**
78:12
**reworking**
53:6

**rid**
65:15
**riddled**
218:25
**right**
20:4 30:5
32:4,6 34:23
89:9 97:16
114:20 119:3
120:12,14
126:18 153:4
157:14
166:16
171:25 212:3
237:15
273:16,17
276:23 284:5
287:1 290:25
291:20
295:10 299:3
308:15
309:14
311:24
318:11
337:22 342:3
347:5
**rights**
135:13
232:24
**ring**
120:7
**risk**
26:22,23
38:20 198:24
199:1,2
200:6,7
234:1
**risks**
199:23
**risky**
200:3
**River**
2:3 8:15,23
9:11,20
10:13,25
11:15,25
12:15 14:20
18:3,7,15

19:2,11
20:3,16
22:12 23:5,7
24:9,23 26:6
27:7,13,15
28:12 29:8
30:19 38:17,
23 43:9 49:8
59:21 63:8,
17,20 64:4
65:7,15,20,
22 66:15
67:14,15,22
68:3,9,25
69:12,23
72:1 73:7,16
74:22 75:10,
20 77:2
81:17 84:11
88:25 90:12,
13,18,24,25
91:4,18,25
92:5,8 97:1
98:23 100:12
102:12,23
104:10
123:18
125:13
127:3,11
128:10
132:24
133:7,12
135:15,21
137:25
143:12,24
145:19 146:9
151:7,17,19
153:19
154:21,24
155:8 156:19
158:21
159:4,9
161:14 166:6
168:15,20,25
169:10
170:12,19
171:8,12
173:5 175:1,
2 178:4

179:20,22,24
180:5,9
181:21
182:6,23,24
183:1,7,18,
19 186:19
192:7 195:2
202:19
205:17
207:24
208:6,9,19
209:7,13
210:5,10
211:10
212:20,24
226:8 228:11
230:12,14
231:3,13,22
232:3,8,13,
20,25 233:11
235:9 236:3
239:13
241:13
242:10,11
246:12,20
247:19
248:6,11
249:8 250:3,
9,12,25
251:7 252:17
253:14 254:6
255:10,21
261:13
262:1,25
263:2,4
265:1 269:17
270:5 271:8,
11 273:24
274:17 278:2
279:2,4
280:11,14
281:1 283:9
284:8,14
285:3
286:10,14,18
293:4 295:3
297:7 298:13
299:15
300:14

301:18
302:17
304:1,22
306:4 307:23
308:25 310:6
311:18
312:20
313:11
315:3,7
317:12
318:17,20
321:4 323:6
325:1 330:18

**Rob**
146:16
147:1,7,11,
18,20,22
148:6,25

**Robert**
156:12,15

**Robin**
2:16 318:5,
12 325:8

**Robyn**
234:8,12

**ROC**
4:2

**Rochester**
41:13

**Rod**
265:13
307:14

**Rogs**
4:5

**rokelly**
318:2

**role**
12:25 13:3,4
16:7 29:25
43:9 65:8,10
80:2 81:15
86:8,20
212:18

**rolls**
272:24
285:25
286:2,3,9,13

**Rome**
2:3 6:2
119:8

**Romteen**
2:7 6:5

**Ron**
43:18,19,20,
24 80:13
300:10

**Roosevelt**
117:24

**rough**
43:25

**roughly**
114:20

**round**
133:14

**row**
262:12
321:25
343:23 344:2

**rows**
343:15,20,22
345:12

**rule**
152:13
326:6,18
327:18

**rules**
7:2,13

**run**
47:6 303:22
305:8

**Ryan**
134:24
135:12
216:11

---

**S**

---

**s-e-e-d-e-d**
172:20

**S-E-I-B-A-L-D**
116:2

**SAITH**
348:4

**sakes**
313:6

**sales**
3:22 44:12
46:5 47:11
53:24 54:1
55:23,24,25
56:16
154:13,17
162:10,11,
18,25
163:10,19
164:2,3,4,
12,17,22
165:2
196:23,25
197:1 255:24
256:3,7,12
277:22
278:9,13,14,
15,16,20
331:5 347:11

**Sam**
2:3 6:1
38:11 144:18

**sample**
181:5,6

**Sara**
115:15,19

**satisfying**
270:21

**save**
118:23 119:1
125:21

**saved**
97:9 118:24
125:5,18

**savings**
105:25
215:19
222:25
264:20 271:1
307:15,22

**saying**
9:18 14:8
15:17 70:22
71:11 74:4
100:24 171:5

232:1 244:8
245:19
247:21
248:16,19,23
255:9,14
258:12,14
259:14
266:17
276:10
283:13 286:9
287:3,20
291:22
292:14
303:12
304:16,20
305:14,15
307:8,21
308:3 312:19
315:14
327:10 329:7

**says**
14:12 24:23
45:17 46:8
67:10 98:9,
12 152:21
164:8,9
166:15
189:10
195:17,25
196:12,15,18
214:2
215:17,19,22
216:2,22
237:14,17
242:16 245:8
246:10,14,23
248:8 253:19
262:3,13
266:20
273:18 284:4
289:5 290:25
291:1 297:11
299:5,8
300:1 306:6
316:2

**scan**
117:12

**scanned**
145:12,13
**Scenario**
265:5
**scheduled**
118:5,8,10
210:9
**Schenectady**
114:3 122:2
**Schnake**
2:11 6:8
314:10,13
327:22
328:25
329:4,19
**school**
46:10,17
48:23 80:20
235:21
**score**
182:10
183:21,23
184:8
**screen**
334:13,14,18
343:25
**screened**
163:12
**screening**
164:3,17
**scroll**
335:6
**search**
123:8,13
124:11
**searchable**
127:17,21
**searched**
126:2,4,5,7,
10 128:5
135:14
147:17,19
**searching**
123:4
**Sears**
232:3,24,25
233:3,4,11,

13 346:3
**SEC**
174:9,14,21
175:5,9,19
176:6,9,18,
22 177:25
178:3,9,11
288:14,17
**second**
9:24 27:5
53:4 89:25
152:13,20
181:13,24
182:12
189:18
195:16,22,24
208:23
250:11 268:4
303:6,11
321:7 329:22
342:15
**section**
41:18 98:22
99:1 196:11
207:8 213:13
**secured**
183:15
**Securities**
3:5 177:21
**see**
30:25 40:14,
20 51:23
56:10 68:15,
24 83:11
90:23 98:21
102:3 110:2
111:8 114:8
123:14 144:9
152:17,20
153:3 172:21
180:1 184:9
188:2
189:20,24
192:2 195:18
196:12
197:7,18
198:5 211:3
212:4 216:22

217:5,20
234:10 235:3
238:2,17
242:10 243:9
244:20
251:14
255:19
260:17 261:1
262:12
264:13,17
265:4 267:15
283:22
284:22,23,24
285:1 287:15
297:7 298:4,
7 300:1
307:7,11
316:2,25
317:3,8
334:12
335:7,23
336:12
338:5,14
344:25 345:5
346:21
**seed**
172:20
**seeded**
172:11,18,
20,23
**seeing**
17:9 69:8
305:8 307:17
**seek**
15:24 45:24
46:3 268:6
298:19 300:3
323:4
**seeking**
14:4 22:25
119:21
146:13
333:4,14
**sees**
19:16
**Seibel**
115:25 116:3

selection
  170:25
sell
  230:21
  231:3,5
seller
  230:22
send
  50:13 103:3
  146:24
  235:25
  266:17
sending
  233:20
  252:10,11,12
  266:8
senior
  42:9 45:11,
  14,16 60:8
  63:25 64:12,
  14 72:25
  218:17,21
  292:6 293:10
sense
  82:25 138:23
  214:6,20
  215:15
  217:13
  229:11 303:5
  321:19
sensitive
  5:5
sensitivity
  198:7
  199:13,22
sentence
  152:20
  190:24
  336:18
  337:10,11,14
  338:17,18,22
  339:13
  340:15
  341:12
  345:24 346:6
separate
  18:12 27:23
  89:12

106:13,14
separately
  136:7
September
  251:17
  252:12
  313:9,23,24
  314:18
sequence
  55:7
series
  152:6
Sermersheim
  6:6
serve
  89:20 266:11
served
  120:25 121:3
server
  195:9
service
  182:3
services
  84:12 96:8
  104:19,20
  235:9
session
  53:20
set
  11:24 12:2
  50:1 55:16
  94:25 95:4,
  13 163:16
  210:13,14
  252:23 289:3
  319:16
  336:23
  339:20
  340:19
sets
  230:15
  244:23
settled
  234:15
  267:9,16,18,
  21,23
  268:12,21

269:7,13
settlement
  93:21 310:15
settlements
  240:21
setup
  211:25
seven
  40:21 41:2
  325:23
  326:7,13
  327:12 329:6
  334:5
seven-hour
  326:18
  327:18
several
  11:19 16:11
  113:23
  114:21
  197:20 219:1
share
  90:4 92:20
  101:1 104:24
  184:16 190:4
  272:3,4,7,8,
  12 281:16
  334:5
shared
  150:24 288:9
shareholder
  178:7 179:8,
  9,11,14,18
shareholders
  27:9,13
  284:14,17
  288:3,9,10
Sharepoint
  119:3 124:9
  127:24
  195:6,7
sheet
  180:2
sheets
  128:9 174:3
shift
  207:18

shopping
  61:25 88:3
short
  73:25 74:4
  88:20
shortfall
  140:23
shortly
  188:6
should've
  138:22
show
  41:2 124:20
  314:8 315:20
  319:15
  333:25 334:1
showed
  166:14
  172:25
shown
  36:19 249:16
  261:10
shows
  302:9 320:16
sideways
  212:1
sign
  78:6 109:21,
  24 110:22
  112:3
  120:15,20
  167:6 273:10
  335:19
signature
  109:18 112:2
  335:11,12,15
signed
  6:12 110:5,
  7,25 125:15
  167:14
significant
  53:5 171:11,
  17 173:4,8
  316:13
significantly
  15:12 75:4
  259:16 298:5

**signify**
  198:2
**silicone**
  131:1
**similar**
  72:23 247:16
  259:11
**similarly**
  242:13
**Simon**
  6:3 10:17
  11:5,7 14:18
  15:19 16:5,
  13,18,19,25
  17:13 21:18
  25:17 26:5,
  16,20 27:6,
  12,20 28:2,
  5,21 29:4,
  13,17 30:11,
  15 35:5
  38:24 39:2
  42:24 43:7,
  10 44:17,25
  45:6 48:2
  49:19 50:16
  51:25 62:20
  63:7 64:17
  65:15 68:1,8
  69:16,22
  70:1,2,23
  71:11,25
  74:1,7,23
  81:2 82:5,21
  83:15,19,25
  84:7,9,17,19
  85:8,12,20
  87:3,12,13,
  14,16,20,22,
  23 88:2,12
  89:20 90:11
  93:6,21 96:8
  98:6,10
  99:5,8,12
  100:15
  104:19,20
  105:22
  106:15

108:23
109:4,5,10
110:1,5,8
111:6,9,23
114:15
119:7,25
120:16
121:2,6
122:7,9
126:20
128:14
132:13
133:24
134:25 135:3
138:19,20
139:2,3,16,
21 140:15
141:6,7
145:22,24
146:2,6
147:14
148:21
149:16
150:4,25
151:23
152:3,4,5,8,
9,23 158:24
159:15
165:16,19
167:18
169:9,20
170:5 173:3,
15 174:5,8,
14,18 175:2,
5,8,16
176:8,14,22
178:3,6,20
179:1,18,20
180:8,25
181:4,25
183:13
184:19 185:2
186:22
187:23
189:11,13
191:4 193:8,
22,25 194:1,
6 195:1,9
201:12,23

202:16
203:13,24
204:5,11,23
207:1,11,14,
19 212:7
213:7,25
214:24
216:13 218:6
220:20
221:3,8,12
222:9,14,17,
25 223:4
224:2,7,11,
16,21 226:20
227:7,25
228:3 231:3,
7 233:5
234:13
235:24,25
236:13,17
241:5,15
242:24
243:13
245:23
247:13
251:22
254:8,15
255:9 256:22
257:3,7
258:3,16
259:15,21
260:7,14
265:11
270:9,23,25
271:7 276:22
277:1 282:1
286:13,16
288:3,13,16
290:1 293:6
296:15,19
297:1 298:21
299:13,14
301:15
304:9,25
305:3 308:23
317:5,11
322:11,17
324:5,9,14,
19,25 325:18

331:25
342:24
**Simon's**
  21:24 26:10
  39:18 40:9
  70:24 98:14
  100:5 111:1
  132:21
  134:4,10
  136:13
  137:21 139:1
  144:13
  165:21
  166:20
  174:21
  175:1,18
  180:4
  183:15,22
  184:11,13
  185:8 189:6
  204:8 222:21
  234:19
  239:23
  246:22
  250:11,24
  251:6 253:7
  254:4 276:12
  288:5 289:24
  293:24
  304:21
  305:15
  316:25
**Simon/fox**
  337:16
**simple**
  66:2,13
  67:11,17
  136:18 137:3
  141:23
  191:10,14
  197:23 198:4
  207:7
  253:18,22
  256:9
  257:21,24
  258:6 260:25
  261:4,10
  275:25

276:10
309:2,3
310:10,23
313:2 328:19
330:21
**simplified**
67:2
**simply**
89:15 98:19
177:17
222:23 261:5
276:4 285:12
290:24
323:12
**single**
168:14
202:24
243:23
**sir**
334:24
335:22
**sit**
58:1 76:17
92:10 102:25
118:16 130:4
137:15,23
138:16
164:24 165:4
168:8,17,23
169:3
182:16,21
183:16
186:21
192:5,15,19
199:9 200:9
202:20
203:4,22
204:25
211:11 222:4
223:5 228:8,
13 238:21
239:3,10
241:17
242:8,15
247:6 248:1,
13 252:14
258:13
269:4,16

270:8 272:22
274:6 296:23
297:3 302:25
304:8 316:11
323:19
325:21
**site**
128:8
172:11,18
**sits**
32:4 77:15
**sitting**
71:16 72:5
171:6 193:15
202:23
208:16
316:16
**situated**
242:13
**situation**
27:14 93:25
282:19
**situations**
134:8
**size**
212:1
**skill**
55:16
**skills**
46:21 86:5,6
**Slate**
97:23
**slightly**
248:22
297:11
**sliver**
208:25 209:4
**small**
25:13 208:25
209:3
**smaller**
87:6 223:14
**so-called**
78:14
**Society**
42:10 60:9

**software**
35:16 135:13
244:18 310:3
**sold**
134:23,24
135:6
**solid**
339:17
**someone's**
260:20
287:25
**sort**
11:8 13:9
22:10 23:13
46:15 105:12
112:19
132:20
134:13
135:20 150:7
194:12 195:9
241:14
255:11
267:24
**sought**
74:20 146:17
333:12
337:17
**source**
48:16,24
49:1,11,14
62:12 164:8,
9,11 169:18
255:14
**sourced**
191:16 192:4
**sources**
56:14,19
124:21
128:18,24
142:4 162:24
**South**
60:19
**spaces**
261:17
**spd/fox**
2:3

**speak**
55:3 68:6,16
94:2 142:20
254:19
**speaking**
17:15 22:11
33:6 44:2
72:10 77:4
174:21
277:20
**speaks**
100:20
**specific**
17:16 51:9
62:6 63:9,
21,22 81:6
92:10 93:3
100:10
101:25
110:17
164:6,11
168:23 171:7
187:21
199:20 224:9
232:16
239:1,3
244:23
269:22 276:8
278:3
**specifically**
75:1 86:3
96:1 98:5
100:20
103:16 107:4
113:19
114:25
143:22
144:17
147:19 149:7
155:11
207:24 208:5
211:16 228:8
279:20
282:21 284:4
309:5 316:16
**specifics**
82:7 186:17,
20

speculating
  294:25
speculation
  70:7 71:3,15
  158:18
  160:15
  165:23 169:1
  171:22
  183:11 194:4
  206:18 229:4
  241:6 248:21
  249:3 252:13
  256:2,11
  260:11
  297:2,24
  304:13
spell
  116:1 279:17
spelling
  25:8
spend
  140:7 144:6
spent
  42:17
SPG
  219:19
  220:12,16
  221:19
  222:15 225:9
  228:3,9
  251:1,4
spin-off
  27:25
  149:19,22
  231:13
  234:23
split
  222:12
spoke
  232:1
spoken
  33:14,23
  156:2
sporting
  82:19
spot
  181:6,8

spreads
  125:17
spreadsheet
  66:23 78:9
  86:6 124:15
  125:7,10
  192:5 217:1,
  2 259:4
  274:4 320:5,
  10,11,12
  344:23
spreadsheets
  68:19,23
  125:12 289:3
  343:4 344:12
spring
  300:2
spun
  27:22
  148:10,21
  231:6
square
  84:13 99:3,
  5,20,23
  130:21
  131:3,4
  245:3,4
St
  113:13,15
stabilized
  253:4,5
  261:7
staff
  15:10 18:23
  42:3 107:3,4
  232:11
  298:18
stand
  6:22 288:23
standard
  57:11 163:6
  177:21 276:8
standardized
  276:24
standards
  51:8,9,11
  57:9 59:13

95:22 96:5
  163:16
  164:17,20
standing
  338:24 339:6
  344:15
standpoint
  173:16
stands
  266:22
start
  7:20 43:21
  61:13 135:11
  262:4 292:11
  293:15,18,23
  327:1 347:3
started
  42:3 43:6
  48:9 67:25
  84:7 97:19
  121:5 144:9
  145:13 188:7
  212:16,17
  317:12
starting
  75:18 101:11
  152:20
  175:22
  293:21
  340:12
  347:20
starts
  137:13
  231:17 279:8
  300:8 302:14
  337:10
state
  5:23 6:19
  25:12 100:22
  114:24
  119:18
  160:20 336:5
stated
  295:14 331:2
  337:10,16
statement
  187:9,11,13,
  18,20

statements
  186:23
  187:1,4,24
states
  5:11 42:19
  60:15,16
  66:4 150:20
  202:4 268:7
  331:13
statistician
  155:24
status
  32:21 33:8
  192:17 236:2
  274:23
  319:19
statutory
  209:16,17
stay
  186:18
steno
  346:12
step-ups
  257:15,16
Steve
  175:15,16
  179:4
Stewart
  54:19
stick
  326:6
STIFS
  46:5
stipulation
  310:14
stock
  179:14
stop
  47:16 228:3
stopped
  228:16,22
storage
  128:5,8
store
  112:10,12
  233:4,13

stored
  109:4,13
  195:6,7
Stout
  41:8
straightforwa
rd
  98:8
strained
  207:11
strategic
  203:24
  204:5,12,16
stream
  198:13 234:4
Street
  2:4,13 30:8
  128:25
strike
  8:13 10:23
  13:2,8 15:18
  17:11 21:8,9
  30:9 31:4
  42:5 43:14
  44:3 48:15
  49:5 65:6
  67:14,20
  70:1 71:24
  87:8 100:2
  105:17
  107:13
  109:17
  122:23
  126:20 138:5
  157:6 158:1,
  8 159:9,13,
  22 165:16
  170:11
  175:2,5
  177:24
  180:12
  181:23 183:3
  184:19 189:5
  192:9 193:8
  194:1 199:15
  202:16
  203:10 215:5
  223:25

  225:21 231:8
  233:3 235:24
  238:25
  244:12
  245:14
  248:16
  249:23
  252:10,11,20
  253:7,8
  255:17 263:3
  268:20
  286:16
  289:23
  296:15
  299:13
  305:14
  306:20
  312:15,16
  324:5,9
string
  56:12
strongly
  218:22
structures
  152:7
students
  47:3 52:13,
  23 53:12
  54:10,14
  56:15
studies
  54:8,11,15
  57:5,9,12
  156:1
  162:10,18
  163:6,20
  164:5,12,23
  165:3
study
  54:3 57:14,
  18,23 58:2
  122:18
  128:15,16
  154:13,17
  156:7,9
  162:12,25
  163:10
  164:2,18

  165:7 255:24
  256:7,13
  260:18 331:5
studying
  98:16
stupid
  112:14,15
subject
  18:25 33:20
  40:1 46:25
  52:8 134:1
  244:24 336:6
subjective
  282:15
subjectivity
  276:12
submit
  184:2
submitted
  184:6
subscribe
  62:7
subscribed
  62:9
subsequent
  238:18
substantive
  34:1,4,5
subtract
  218:1
subtracting
  243:16
success
  229:1
successful
  96:24 105:21
  229:20
  270:18
successor
  65:10
sufficient
  278:16
sufficiently
  163:11
  305:12
suggest
  11:3 122:5

  168:20
  204:17
suggests
  259:14
Suite
  2:4,9,13
summarize
  102:3
summary
  3:22 40:14
superfluous
  290:10
  292:16
supersedes
  12:21 13:14
supervisor
  72:16,18
supplemental
  4:5 107:17,
  22 124:4
  335:4,5
  336:13,17
  338:14,23
  339:14
  341:10
supplementary
  123:9 124:7
  128:12
  133:17
support
  5:16,22 79:9
supporting
  343:6
suppose
  236:21
Supreme
  6:11
sure
  7:11 11:17
  13:8 21:16,
  21 32:23
  35:9 37:19
  48:21 57:22
  65:22 90:4
  95:4 109:24
  127:8 130:12
  134:7 146:6

147:7 151:12
153:4 154:10
161:19
163:11 167:3
176:21
184:15 185:6
194:6,25
204:5 206:20
208:4 212:23
220:16
223:22
236:16 248:5
249:10,25
251:4 270:22
274:20 275:3
289:9,10
291:6 299:9
304:16 311:4
312:1 314:3
329:24
339:10

**surprise**
257:9

**survey**
131:21,23,24
132:2,4

**surveys**
128:17,21

**suspect**
262:20

**SWANSON**
2:8

**swear**
5:24

**swim**
94:1

**switch**
55:5 129:11

**switching**
153:5

**sworn**
6:13

**syllabus**
58:5,16

**symposiums**
80:22

**system**
35:16 109:14
119:1 124:12
134:19,20
189:15 191:8
195:7 216:1
237:25
243:24
244:19 245:6
276:17,18
282:9 301:10
302:9 310:12

**systems**
134:21

---

**T**

---

**T-H-O-M-P-S-O-N**
30:3

**Tab**
152:11,12
333:7

**table**
197:17,20
198:3,4
211:25
212:19,23
213:10
245:12
250:8,11
251:1,5,21
252:1,2,4,25
262:12,16
290:12
295:23
296:1,4,8

**tables**
24:22 177:21
233:16,17,21
250:5,20,21
251:20

**take**
5:3 8:3
29:16,17
36:10,13,17
38:12 61:22
69:15 70:9

71:20 75:18,
23 76:12
78:1,15
114:9 129:11
161:18,22
173:17 188:1
217:25
219:10
223:23
224:25
239:19
240:13 241:7
251:4,9
254:23
258:22
274:13,18
277:6,9,11
300:24
303:16
322:20
329:24

**taken**
5:8 6:25
36:4,7,11
37:11 78:19
129:15 162:1
225:3 277:15
330:3

**takes**
65:25 183:25
257:12

**taking**
26:4 29:10
37:5 38:8
56:11 61:13
76:7 79:6
191:15 217:3
243:4,15
254:3 255:3,
4 276:4
306:23

**talk**
40:24 77:11
93:3 124:17
293:10 326:9
329:23

**talked**
7:16 90:15

94:7 125:6
141:24 326:5

**talking**
24:22 32:20
130:3 177:3,
4,5 182:17
201:20,21
208:11 209:3
223:12
287:1,2
314:13
333:16

**talks**
197:6

**tally**
303:17 333:8

**target**
189:8,10
191:5 192:7,
13 207:14
213:25
214:3,7,15
216:17,22
217:3,12,21
219:10,14,19
220:7,12,13,
16,21,25
221:5,10,19
222:5,10,15
223:4 228:20
243:13,14
275:8,10,14,
22 276:2,5,
9,12,14,15,
18,21,25
279:22
280:11,13,23
281:1,8,20,
25 282:4,7,
8,13,14,22
284:8,23
285:2,4
286:17,22
287:3,20
288:25
289:4,13,19
290:14,19
291:23

292:3,5,11, 19,25 293:3, 15,19,24
306:14
325:16
344:22
345:15

**targeted**
207:24 208:5 218:1 293:13

**targeting**
10:25 11:4
189:11
207:16
242:24
245:23

**targets**
281:19

**tasks**
123:12

**taught**
52:9 55:15
58:6,9

**tax**
3:10,13,18, 20 4:3 10:9 11:1,5 12:1, 15 14:11,23 15:7,19
16:10 19:22 21:8,9,11, 16,22 23:2, 18 26:1,3,4, 15 28:20,25 29:3,12,13, 16,21 31:9
35:14,16
42:20 43:15, 21 44:4,7,9, 12,13,14,22 45:18 46:4, 5,16 47:5
48:7 49:4
50:8,9 52:1
65:7,13
68:10,24
69:17,18
70:3,23

71:12 72:6, 12 73:6,10, 13,23,24
78:24 79:9
80:4,13,20
81:16 82:2, 5,22 84:17
89:6,7,10, 11,19,21
90:21 91:6, 19 92:18
93:7,24
94:8,10,17, 20,25 95:5, 6,10,20,21, 24 96:11,17
99:7,14,19
101:9,19,23
102:5,9
103:2,14,15, 16,18,19,21
104:14,19,20
105:8,21
106:9,13,18
107:3,4
108:15 109:2
111:22
113:8,9
128:20
134:13,14,20
136:6,9,21
137:1,13,14, 16 139:20
140:20
141:14,18,19
142:18 143:2
145:22
146:3,5,7
149:14 150:8
152:25
166:1,4
169:21,24
170:3,5,19
171:9 172:5
174:12
175:25 176:1
180:4,8,12, 13,15,17,19
181:13,18

183:22
184:5,10,23, 24 186:1,2, 11,15
189:22,23
190:4,8,13, 15,25 191:4, 24 192:13
194:20 195:2
196:3,5
197:13
206:15
207:18
208:10
210:11
212:18
213:16,24
215:7,24
216:3,12,23
217:3,5,10, 20,21 218:2, 6,13 219:11, 16 220:9
221:3,8,14
222:11,19,22
223:3 225:21
227:5 228:2, 16,17,20
230:12
233:4,9,21
234:16,19
235:6,12,25
236:2,12,16
237:14,21
238:4,12,22
239:6 241:4, 16,20,23,25
242:2,5,24
243:6,16
244:18
245:7,12
246:6,8,11, 21 247:2
248:3,6,11
249:9,12
250:14,17,18
251:1,8,13
252:18
253:9,12

259:10
260:8,15
262:25
263:3,4
264:6,12,14
268:13 269:1
270:24 271:1
274:7,10,12, 14,16,17,19, 21,22,25
275:10
279:13
280:2,4,6,7, 9 283:15
284:11,24
289:16,20
290:14
296:2,16,21, 25 298:13,23
299:3,9
300:13
301:3,5,8,10
302:9,11,17
303:5,9
304:7,10,11, 18,22 305:1, 16 306:3,8, 11,14,21
307:9,15,16, 21,23 308:25
310:6,17
311:19
312:2,21
313:8 314:13
315:3,9,12, 18 316:10
318:18
319:7,17,18
320:16,17
321:6,12
322:12 323:3
324:16 336:7
338:9 339:15
340:9,10
341:20 342:8
343:7 345:2

**taxable**
245:1

**taxation**
7:9 8:15,23
9:11 46:11
47:14 48:17,
25 55:17
60:5 160:4
166:7
**taxes**
11:15 14:20
15:21 21:23
23:20,21
24:15 26:11
29:7 43:15
44:14 72:1
73:7 75:20
89:23 90:5,
15,18,25
91:11 92:1,
8,20,23,25
93:4,10,11,
23 100:17
101:1,7
102:13
104:5,16,24
105:1,6,7,14
120:17 136:8
138:21 139:1
140:12
141:8,12
142:4,24
143:16
145:19
146:9,13
149:15,20,23
150:3,18
151:7,8,17,
23 153:1
157:14
167:23
168:2,16,21
169:1
173:16,22
181:24
184:11,12,
16,17,20
185:4,10,19,
25 186:4,19
191:2 207:25
208:6 217:11

221:5 229:16
245:5 262:1
271:12
302:11
310:25 311:5
314:24
317:13 333:1
342:10
**taxpayer**
10:12 96:14
160:9
**taxpayer's**
320:14
**taxpayers**
160:3 207:20
**teach**
52:10,18
53:21
**teaching**
47:22 53:9,
15 54:13
55:4
**team**
18:10 21:6
75:1 96:22
140:4 155:4,
7 226:22,23
227:3,4
232:16,18
**tearing**
307:9
**technical**
64:25
**technically**
195:21
**Technology**
113:25
121:23
**Ted**
54:16,19
57:4
**tell**
6:13 34:17
35:11 36:6,
17 45:9 63:2
69:7 71:18
73:17 75:25

87:17 89:9
113:6,22
114:17
123:19,24
130:9 178:15
192:5,15,20
199:11 222:3
238:14
242:23
247:6,9,12
248:13
254:20
258:25 261:8
269:4 272:23
274:1 288:24
297:3 315:5
323:22 341:4
347:2
**telling**
203:4 257:19
292:13 328:2
**temporary**
301:14
**tenant**
90:16 92:15
93:10,11,16
102:7 103:14
104:4,15
129:6,7
168:15,20,25
185:23
186:18
240:15
241:4,10,15
**tenants**
23:17,21
24:16 90:6,
11,13,24
91:2,4,19,21
92:1,3,9,23
93:9,23
100:16,23,25
101:2,18,20,
22 102:4,11
104:9,14,23
105:4,6,12,
19,25 106:12
140:22,24,25

141:4 149:16
150:14,17,22
151:9,19
167:23,24
168:1 173:15
184:11,13,
14,17,25
185:3,9,20,
25 186:13
191:3
232:23,25
233:8 234:2
240:7,14,15,
17 241:1,3,
13 258:17
260:8 271:4,
7,11 333:1
342:9 347:12
**tenants'**
184:20
**tend**
24:18 200:11
**Tennessee**
132:19
**tenure**
29:23 43:22
58:20 60:13
67:1 69:20
74:3 225:12
235:23
**Teresa**
63:11
**term**
64:25 179:8,
9 194:10
226:1 241:7
**terminate**
85:25
**terminated**
79:20 80:7
81:1,4
84:19,21,22,
24 85:2,20
294:14
331:21 332:7
**termination**
240:21
241:10

terminology
  106:12
terms
  34:7 91:14
  93:3 94:5
  100:21 149:9
  177:16
  184:20 198:4
  240:6,18,19
  256:7
terrible
  347:14
testified
  6:16 58:2
  113:23,24
  114:1,4,13,
  18,20 115:4
  118:14
  119:25 120:2
  154:2 275:24
  286:20
  330:24
  333:7,20
  347:1
testify
  113:20
  115:11
  118:8,19
  153:22,25
  154:4 157:11
testimony
  7:12 33:24
  34:2 113:9
  114:7 116:6,
  11,13 117:4
  118:1,5
  121:10
  122:19
  130:16
  131:5,7,11
  154:20 203:3
  259:17 281:3
  284:15 285:7
  286:11
  290:7,16,21
  291:19
  294:14 295:8
  305:18

  321:18
  323:25 326:8
  329:9
Texas
  5:18 117:3
text
  34:11,13
  35:11,17,25
  192:17
textbook
  53:8,10,14
thank
  87:19 116:25
  129:18
  137:11
  144:20 307:6
  316:1 334:21
  347:25
Thanks
  339:11
theater
  247:18,23,25
  248:14,18,
  19,25 249:6,
  10,14,18
  263:22
theaters
  346:5
theft
  112:19
theory
  217:12
there'd
  64:6 289:5
thing
  112:16
  277:21
  306:19
things
  7:24 20:25
  23:13,19
  33:10 71:20
  82:17,20
  95:18 110:20
  144:24
  188:18
  190:22 219:1

  237:13 344:9
think
  9:8,22 12:19
  22:17 33:9
  40:23 43:11
  49:25 54:20
  55:21 57:10
  58:14 62:5
  70:20 71:10
  78:9 81:20
  82:24,25
  88:18 98:8
  101:5 109:19
  112:20 113:2
  115:5 116:18
  117:5,13
  120:10
  121:19 123:3
  129:10,20
  130:18 131:7
  136:22 144:9
  145:12,14
  146:1 148:13
  157:5 168:8
  177:5 197:9
  203:12
  204:25 206:3
  209:14
  213:21 214:5
  215:20
  218:13,25
  219:8 222:24
  223:2 229:25
  231:5 233:6
  238:7 249:17
  254:7 273:17
  276:1,10
  278:8,9
  294:11
  298:17
  303:11
  305:24
  307:19
  308:23
  310:20,24
  311:4,20,23
  312:6 317:9,
  22 325:25
  326:20

  330:24
thinking
  129:25
third
  17:4,6 97:24
  122:3,4
  176:9 277:23
  321:8 342:17
third-party
  165:18
  216:2,5,9
  244:1
third-party-
owned
  87:25
third-tier
  75:14
Thompson
  29:24 279:17
Thomson
  135:6,7,8,9,
  10 244:20
thorough
  168:11
thoroughly
  76:19
thought
  38:2,4 75:25
  77:9 185:16,
  17
three
  7:7 35:24
  36:11 55:22
  56:2,8 113:3
  114:12
  147:24
  153:14
  214:19 215:2
  321:11,24
three-hole
  273:15
threshold
  169:13
tickets
  82:19
tickle
  117:2

**tiered**
  86:22
**Tim**
  72:18 225:20
  265:14
  292:9,10
  293:11
  295:21 300:9
**time**
  18:1 19:5
  21:2,16
  28:6,22
  35:11,12
  42:12 43:4,8
  45:4 46:13
  47:17,22
  50:13 51:7
  56:12 59:5
  69:20 71:16
  72:11,15
  73:25 74:4
  90:1 94:6
  96:16 105:10
  106:1
  107:21,23
  108:14 115:6
  117:14,25
  127:7,9
  129:10,17
  140:9 141:10
  147:1 148:1
  149:11
  155:14,18
  160:25
  161:25 162:3
  165:19
  177:12 182:7
  183:25
  188:25
  189:17 190:8
  191:7 192:21
  202:24
  203:8,10
  204:10
  206:19 207:2
  209:16 210:9
  211:8 212:22
  218:13
  223:18
  225:2,5,20
  226:3 228:7
  229:22
  231:2,13
  232:14 233:1
  234:21
  236:15 237:6
  238:1,17,24
  240:8,10,11
  243:23
  244:4,6,9
  255:19
  260:12,22
  261:14
  268:17
  271:25 275:1
  276:16
  277:14,17
  279:14
  280:19
  281:16 286:1
  294:7 295:1
  299:25
  310:14
  314:22 318:6
  320:23
  328:12
  330:2,5
  331:1 342:24
  345:8 348:2
**timely**
  89:23 94:19
**times**
  7:6 22:8
  26:4 32:7
  33:23 55:12
  77:21 83:6
  84:8,10
  95:17 97:16
  104:8
  114:13,16
  118:21
  125:16
  144:15,16
  147:21
  153:13,14,
  15,20 154:22
  158:2 191:1
  217:3 219:13
  225:11
  269:23 298:3
**timing**
  213:11 262:5
**title**
  19:6 45:6,9
  49:6 54:19,
  21 62:5
  69:10 72:23
  88:20 188:12
  334:23 335:7
**titled**
  152:13
**today**
  7:12 37:5
  102:25
  118:16 130:5
  140:1 144:6
  145:6 167:12
  171:4,6
  186:21
  202:23
  255:18
  316:16 330:8
  331:15 332:9
  348:3
**today's**
  109:12
  216:10
**told**
  36:13 38:2
  52:8 85:4
  123:3 184:18
  281:10
  282:14
**tolls**
  272:21
**Tom**
  63:11
**tomorrow**
  240:3
**tool**
  49:2 51:23
  53:13 67:2
  228:23 343:2
**toolbox**
  49:3
**tools**
  246:4
**top**
  98:9 110:3
  195:16
  209:20
  251:21
  252:2,4,25
  253:9 295:19
  299:19
  340:13 342:1
  344:14
  345:25
**topic**
  277:9
**topics**
  25:16 38:4
**total**
  3:22 35:13
  136:1
  185:12,21
  186:3,4,5,
  10,14 245:2,
  3,4,9,14,15,
  19 246:9,12,
  22 247:12
  248:2,6,25
  249:7 297:9
  306:4 312:1
  315:2 316:8
  320:24
**totally**
  249:10
  295:16
**tour**
  210:9
**town**
  25:13 99:11,
  25 115:23
**track**
  89:13 310:12
  320:13
**tracked**
  89:18 169:11
**tracking**

73:12 183:23
189:4
269:20,24
275:16

**Trading**
3:5

**train**
78:24 79:2,6
235:18

**trained**
65:2 156:23
235:19

**training**
51:20 58:21
62:24 79:3,
14,16,17

**transaction**
148:20

**transactions**
278:12

**transcript**
116:9 145:1

**transcripts**
116:8,12,15,
17 117:6,7,
10,13
118:17,18,22
121:10
130:20
131:8,9,13

**transfer**
28:1,6 44:13
222:15

**transferred**
27:16 28:2
75:7,11
88:21

**transition**
29:10 81:20
88:19 315:1

**translation**
25:23

**transmit**
143:5 176:14
177:1
236:13,17

**transmittal**
3:18 249:12
296:22
301:5,8
313:8 315:9,
18 316:11
319:17,18

**transmittals**
306:9,11

**transmitted**
128:11
143:23,25
180:20 236:9
345:4,6

**transmitting**
225:19 291:3

**transparent**
213:15

**Transportation**
183:18

**treasurer**
6:7 8:12,14,
19 10:6,10
39:22 40:2
73:3 88:18
224:21
345:18
346:16

**Treasurer's**
341:23
342:12

**Treasury**
88:11,14

**treat**
62:4

**treated**
10:17 122:16
272:25

**treating**
100:2

**treatment**
10:13 11:1,5

**trends**
76:21,22
141:17
142:1,2

198:23
300:23
305:20,24

**trial**
114:14
115:12,13,14
116:4 118:1,
5,14 153:22
201:4

**trials**
118:7

**triennial**
215:1
302:21,25
303:2,13,15,
19 321:8,9,
11,13,15
347:3,9

**triggering**
233:25

**trinkets**
82:16

**triple**
91:11

**Tripp**
2:8 6:6

**trouble**
112:10

**true**
17:15 40:5
88:4 141:25
193:2

**trust**
27:19 65:3
87:4

**trusts**
87:6

**truth**
6:14

**try**
7:19,21,24
8:2 95:5,21,
24 151:16
163:23
190:11
225:22 298:8

**trying**
50:25 54:20
116:18
157:13 192:1
220:1 230:2,
4 264:18
280:25
281:4,10
283:12 327:8
332:24
343:13

**Tuesday**
53:23 55:6
144:11,12

**turbine**
130:25

**turn**
47:18 87:1
119:16 152:8
201:18
341:23

**turned**
68:11 116:19
124:8
133:11,13,18

**turnover**
73:19

**TV**
245:8

**twice**
309:14,15

**two**
26:25 29:6,8
32:20 33:6,
20 35:24
40:22 55:2
97:24 113:19
114:25
119:11 138:2
142:7 170:7
215:18
219:4,5
223:20
230:15
231:21
241:20 250:5
251:19
263:15

269:24
283:22
284:1,4
294:18
295:2,10,11,
12,15 321:9,
15 322:2
340:8 345:14
346:23

**type**
56:7 75:13
117:7 148:23
203:20 261:9
263:14 279:1
291:24
308:18
309:17

**types**
34:6 121:8
253:20
263:16
278:21

**typical**
39:2 75:23
119:4 124:6
136:9 183:10

**typically**
32:15 33:6
55:2 77:17,
19 79:3 91:3
102:6 103:3,
18,23 105:7
109:8
118:18,20
132:16,18
150:22
331:13

**Tzur**
2:2,23 6:1
7:11 9:23
10:20 11:10
12:23 13:11,
16 15:23
20:17 21:13,
20 22:13,22
23:8 27:10
28:8,14
31:23 32:3

35:1 37:1,7,
11,19 38:11
39:6,20,24
40:20 41:2
43:16 48:18
52:3 57:20,
25 62:13
67:18 70:6
71:3,15 74:8
78:16 81:5,
11 82:6
83:22 84:20
85:3,10,15,
19,22 99:16
103:5,25
109:23 111:3
117:19,21
120:18
122:10,15
126:8
127:13,18,22
129:12,18,24
130:7 138:24
139:5,15
143:1,3
144:18 147:4
149:18
150:1,5,10
151:4,10,21,
24 154:9,19
155:3 158:17
159:1,11
160:5,15
164:19
165:23
166:19
167:21
168:7,22
171:22
176:16,19,25
178:21,24
179:6,10,16
180:6,16
183:11
192:11
193:23
194:4,9,13
195:4 196:9
202:1 203:2

204:3,9,15,
21 205:9,18
206:18,24
207:21 208:1
223:18,22
224:3,8,12,
17,23 229:4,
12 241:6
248:20 249:2
252:13
256:2,10
258:10
259:17,25
260:11
263:18
277:4,11
281:2 284:15
285:7 286:11
288:11
290:6,16,21
291:18
292:20
293:20 294:1
295:4,8
297:2,24
298:2 304:13
305:17 308:6
311:2,12
317:6,20
321:17 322:4
323:25
324:13,22
325:3,22
326:2,5,11,
19,24 327:4,
10,16,20,24
328:2,9,14,
18,23 329:3,
5,12,17,20,
24 330:7
332:13 334:8
338:20
339:5,10
341:5
347:14,21,25

_____

**U**
_____

**U.S.**
5:16,22
**Uh-huh**
212:9 219:20
250:7 262:11
343:21
**ultimate**
26:2 69:19
176:2 218:18
221:15
243:25
**ultimately**
14:22 15:24
19:24 88:21
90:13,15,24
101:11 104:9
123:21
134:24 143:8
151:6,18
176:6 192:3
194:21 201:1
227:15 245:6
270:12 271:3
272:5 311:14
312:11
**unbiased**
157:2,19,20,
23 159:19
161:11
287:13,17
**unclear**
8:7
**uncollected**
149:19,23
**uncommon**
201:18 298:8
**underbudgeted**
140:21
**undercollecte
d**
140:22
**undergrad**
41:8

**undergraduate**
  63:3
**underlying**
  258:19
**underneath**
  196:15
  197:17,20
  209:24
**understand**
  19:14  21:21
  67:13  84:4
  108:13
  138:25  152:1
  175:7  178:12
  181:17  190:7
  192:18
  243:10  246:5
  270:23
  284:21
  285:15
  289:10  293:2
  336:8  337:1
**understanding**
  12:25  13:3,
  17  14:3  15:2
  17:12  18:18
  39:4  68:2,4
  75:10  81:1
  82:8  98:14
  126:1,3
  150:2,6
  151:22  154:7
  155:19,20
  169:23
  170:7,11
  174:20
  181:23
  182:25
  208:8,18
  209:11
  213:16,20,21
  246:15
  250:19
  268:12
  277:25
  303:13
**understood**
  8:10  124:1

125:11  126:1
  229:25  290:1
  330:17
  333:21
**undertaken**
  226:14
**underway**
  43:12
**undo**
  230:22
**unfair**
  9:19  11:1,5
**unforeseen**
  141:3
**unhide**
  344:7,12
  345:10
**uniform**
  59:13  331:13
**uniformity**
  39:16  331:3,
  8,14
**unique**
  11:8  55:16
**uniquely**
  62:5  91:14
**Unit**
  266:22  267:2
**United**
  5:11  42:18
  202:3
**University**
  41:8,12
**unnecessary**
  290:10
  294:16
**unquantifiabl**
**e**
  167:22
  185:14
  332:20,23,24
  333:3
**upcoming**
  136:23  184:3
**update**
  192:18  244:1
  274:24

**updated**
  239:8,12
  242:6  294:9
**updating**
  107:11
**upheld**
  206:3
**upper**
  346:20
**urban**
  278:23
**useless**
  287:21
**user**
  344:2
**USPAP**
  59:10,22
  95:25  157:18
  158:12
  161:3,7
**utilize**
  24:6,7,12
  263:24  264:1
  343:17
**utilized**
  309:18
**utilizing**
  81:13  306:22

---

**V**

---

**vacancy**
  66:7  76:22
  142:6
  196:15,20,24
  197:4  198:20
  211:5  259:2,
  3,4  261:2,
  13,14,18
  264:22
**vacant**
  261:17
**vague**
  32:10  77:19
**valid**
  163:10  278:8

**validate**
  181:12
**Valley**
  2:3  6:3
  337:16
**Valley's**
  180:4
**Valley/river**
  152:2,7,22
**valorem**
  25:18,20,23,
  25  26:2,3
  160:4,9
  166:7  229:8
  230:13
  288:5,16
**valuated**
  191:13
**valuation**
  25:16,17
  26:3,6  27:7
  28:5,10,12
  42:1  47:2,9
  49:2,12
  56:23,24,25
  66:25  78:9
  79:6,8  80:5,
  24,25  108:6
  121:9  125:2
  131:16
  193:4,6
  231:12
  243:25
  246:20
  319:20  343:3
**valuations**
  17:13,17
  26:8  59:19
  65:18  124:5
**value**
  3:10,17,19
  9:2,3,4,5,6,
  12,15,16,19,
  20  11:20,25
  12:2,9,14
  14:5  15:6
  17:20  23:25
  24:1,2,3,8,

19,23 25:21 26:4,17 27:8,12 28:13 40:4, 5,6 42:15,22 44:16 53:25 56:6,10,11, 13 64:21,25 65:3,15,19, 22,23,24 66:2,3,11, 12,13,14,22, 24 67:3,4,8, 10,11,13,15, 16,22 68:3, 9,24 69:3, 12,17,22 70:4,9,10, 16,25 71:13 72:2 75:4 76:6,16,24 77:5,6,11,18 78:3,6,13 100:5 123:17 124:2,6,14 125:3,13 136:1,2,4,5, 13,15,17 137:3,5,8, 11,21 138:4, 8,10,12,14, 19,20 139:7 140:18 141:6,13,24 142:9 156:19 157:1,5,11 165:10 170:15,22, 23,24 172:16 173:5,22 175:18 176:2,3,5, 15,23 177:10 178:2 189:1, 3,6,9,11,13 191:5,12 192:7 193:11 195:17 197:24

198:6,11 199:11,12,17 201:17 203:19 205:12,17 206:3 207:5, 7,9 210:11 212:20,24 213:1,3,6,8, 13,17,25 214:3,7 216:17,23,25 217:1,3,21 218:1 219:10,14 220:7,25 223:6,14 229:7,9,23 230:3,5,19, 20 231:12 234:1,6 242:19,20, 21,24 243:1, 2,5,7,13,15, 17,22 244:3, 25 245:1,2, 3,4,5,9,14, 15,19,20,24 246:9,12,22 247:4,13 248:2,6,11, 24,25 249:8, 13 250:25 251:7,23 252:17,19,20 253:6,13,16, 17,18,19,20, 21,22,24 254:17 255:7,8,10, 16,20,21,25 256:1,4,22 257:21,23 258:7 259:2, 11,12,23 260:25 262:13,24 263:2,4,9,12 264:11,14

265:10 267:15,16, 18,21,23 268:13,15, 18,21 269:1, 6,7,14 271:22,24 272:6 274:15,18 275:14,22 276:2,5,9, 14,15,18,21, 25 278:2,4, 24 280:11, 13,23 281:1, 9,11,20,25 282:5,7,8, 13,15,20,23 283:9,11 284:9,23 285:2,5,17, 20,23 286:17,22 287:4,21 288:13,20,25 289:4,14,19 290:5,14,20 291:23 292:5,12,25 293:4,13,16, 19,24 296:1, 7,10,13,16, 19 297:10 300:3 301:18 302:4,16 303:23,25 304:11,21 305:2 306:4, 14 308:25 309:2,12,13, 25 310:6,8, 10,22 311:7, 15,18,23 312:1,3,21 313:2,3,10, 16 314:5,17 315:3,6,13 316:3,8 317:24

318:17,20 319:2,3,25 320:1,20 321:4,14,24 322:1,19,22 325:1,11,15, 16,18 330:10,16, 18,19 331:5 332:25 333:9 336:22,23 337:3,7,17, 18 338:3 339:18,20,24 340:18,19,25 341:15,16,17 346:1,8

**valued**
44:3 258:5

**values**
10:19 49:4 70:12 90:1 135:23 137:1 141:18 192:13 197:21 198:2 214:15 217:12 222:5 230:16 245:17 246:5 248:18 249:15 252:21 254:5,7,16, 17 256:17, 18,21 257:6 264:7 276:13 288:4,16 292:3,19 302:10,22 305:21 320:13

**valuing**
42:18 46:21 47:4 66:2 79:7

**varied**
72:17 209:17

varies
101:17 107:6
172:6
variety
39:11 128:17
various
21:1 24:22
45:25 47:3
53:6 56:3
60:14 82:9,
11,19 135:23
153:20
226:24 236:6
253:20
263:20
320:21
vary
54:4,24
73:17
vast
216:15
vendors
81:23
Ventresca
2:3 6:2
38:11
144:19,20
verbal
8:2
verdict
93:20 240:6,
10 241:2
verification
163:14,15
335:7
verify
174:13
296:22
verifying
167:7
Verizon
35:22,23
version
17:7 40:21
91:8 108:3
110:17,18
111:21

215:13,16
217:15,18
218:5 289:6,
11,18 345:3,
4
versions
108:1
125:21,25
295:2,10,11,
13 345:14
versus
5:10 13:1
99:9
vice
16:10 38:20
42:4 45:10,
12,14,16,18
63:14 64:1,
14 72:19,22,
25 86:18,24
188:10
232:15
video
5:2 52:14
129:11
video-
recorded
5:7
videoconferen
cing
5:14
videographer
5:1,16 9:25
10:3 78:17,
20 129:13,16
161:24 162:2
225:1,4
277:13,16
327:5,6
330:1,4
348:1
VIDEOGRAPHERS
2:16
view
136:24 200:2
291:7 337:22
340:4,21

violate
338:25 339:1
violation
334:11
virtually
52:17,18
vis-a-vis
13:4 198:2
visibility
143:11
343:16
visible
343:25 344:3
vitae
40:7
vital
343:2
volition
143:10
volume
3:22 278:14,
15
voluntarily
74:7
Vosper
265:13
307:14

---

## W

W-I-N-N-E-C-
O-N-N-E
25:14
Wabash
2:9
wait
7:19 201:13
328:24
waiving
339:7
Wakefield
129:1
walk
32:5 112:13
124:19
wanna

78:15
want
35:8 50:13
78:1 103:9
125:22
130:12
133:15 137:2
139:10
160:21
200:25
204:18
221:25
225:15
270:22 277:5
280:3,5,17
281:14
289:10,11
290:4 291:6,
21 311:24
315:2
317:16,17
327:12,14
328:2,9,11,
15,18,24
329:7 339:3,
8
wanted
34:18 38:16
75:13 213:22
227:18
239:11,24
250:24 251:4
280:10,13
283:14,25
284:7,13
warrant
170:16
305:12
warranted
12:4 271:22
298:10
warrants
77:1
Washington
27:16,19
28:3,7,11,
16,20,24
29:5,14,18,

22 30:8
75:7,11
117:6 147:13
148:6,8,12,
14 149:17,
20,25 150:18
151:1,2,9,19
222:20
231:4,9
234:16,21
236:1,3,10,
14,18 237:11
239:16,22
**watching**
101:22
**Waterford**
114:2,3
122:1,3
131:1
**way**
8:7 44:2
61:1 71:8,
23,24 74:10
82:18 92:14
99:7 100:4
137:10
140:9,11
148:9 156:4
157:17
170:18,25
171:7 183:23
185:5 189:4
207:12,15
216:18 220:8
226:16 230:1
243:10 254:4
275:16,19,21
291:7 308:23
312:8 323:2
330:25 333:4
347:19
**ways**
31:16 191:10
276:5 342:25
**Webster**
114:1
**Wednesday**
54:1 144:12

**week**
47:23 53:2
144:10
326:17
329:14
**weigh**
15:10 199:22
**weighing**
198:8
**went**
33:19 41:7
42:19 123:11
145:15
148:12,13
192:16
199:10
222:13
227:17 237:9
273:12 289:2
**West**
2:4 30:8
**what-if**
309:17
**whatsoever**
62:24 180:23
209:7
**whispering**
5:6
**wholly**
99:6
**Wilson**
113:25
121:23
**windfall**
241:5,7
**Winneconne**
25:13
**Wisconsin**
25:5,9,11
41:8 60:18
84:15 115:2,
16
**with/they**
148:20
**withdraw**
48:19 308:9

**withdrawn**
260:1 331:25
344:21
347:15,16
**witness**
5:25 37:6,
10,17,23
121:1,3
129:23
130:2,8
161:18,20
277:8 326:14
329:21
**witnesses**
166:16
326:13
**woman**
318:13
**wonderful**
120:13
**Woodfield**
84:13
**word**
77:19 78:5
172:19
173:17
221:21 231:5
283:16,17
303:16
322:20
332:9,21
342:15
**words**
117:9 139:10
170:14
242:20
283:14
**work**
25:6 29:13
48:12 56:20
58:12 61:20
64:9 65:4
68:18 74:1
81:12 83:21,
23 84:2,3
121:5 132:19
147:12
157:12,13

159:18
160:8,11
161:12
175:16 176:8
181:4 262:3,
4 331:23
**workbook**
343:14
345:15
**worked**
31:7 41:22
42:16 48:2
54:19 73:22,
24 74:2
79:24 180:25
**working**
45:23 47:16
48:21 63:6
68:1 176:21
263:10
**works**
31:5 91:13
**worksheets**
78:8 343:14,
20
**world**
88:4 91:9,10
163:21
**worth**
200:14
289:25 326:7
**worthwhile**
254:12
**would've**
53:24 54:1
65:9,11
68:11 73:9
126:9,11
142:17
145:25 149:2
191:24 196:7
207:4 222:17
303:1 319:2
325:11
**WPG**
3:23 146:13
148:15,22,24
222:13,16

314:23
**WPG's**
  146:14
**write**
  124:15
**writes**
  178:20,23
**writing**
  16:1
**written**
  79:10 94:15
  96:19
  106:21,23
  117:10
  120:15,20
  166:21
**wrong**
  8:15,22 12:7
  15:4 112:9
  214:5,15,16,
  17,19 215:9
  222:6,7
  284:16
  311:20
  312:22 347:2
**wrote**
  282:25

---

**X**

---

**Xerox**
  42:20,25
  44:2,4,17
  114:11
  121:22
  130:25
  160:23,24
**Xerox's**
  44:18

---

**Y**

---

**YE**
  195:25
**yeah**
  22:8 29:16
  34:16,22,25

35:9 42:15
53:17 56:19
75:23 77:9
78:16 83:3,
17 87:11
97:16 98:25
100:11
107:19
109:11
116:24
120:20 121:4
129:18 133:5
138:25
139:11
141:11
144:19
152:12
157:17
161:22
164:10,16
170:7 180:8
181:9 182:25
192:12
195:21,22,23
210:17
213:15
223:11,20
231:14
233:10
239:20
244:22 248:5
252:1 257:6
259:18 260:4
271:8 275:23
277:11 279:7
280:16
281:13
283:3,24
287:19
292:21 294:8
307:21
312:22
314:12
318:8,11
324:18 325:6
326:5,11
331:13
344:20
347:14,21

**year**
  3:17,19
  10:22 16:7
  22:7 23:2
  38:24 41:10
  42:11 43:15
  45:11 48:14
  52:16 53:4
  54:4,5,24
  68:16,24
  69:8,18,19
  70:15,17,18
  73:17 92:7
  105:1,9
  107:7 115:4
  136:23
  137:22 138:7
  141:8,14
  142:18,25
  149:14 150:8
  169:21,24
  170:3,5,20
  171:9 193:14
  196:2,3,5
  197:13
  203:10
  206:15
  208:10
  210:11
  213:16
  215:7,22,24
  217:5,20
  218:3,15,16
  219:7,12
  220:5,10,14,
  22,23 221:8
  222:11,12,
  20,22 223:3
  230:13
  237:14,15
  238:4,13,22
  239:6 240:12
  241:20,23,25
  242:2 243:16
  246:8,11,21
  247:2 248:3,
  6,11 250:14,
  17,18 251:1,
  8 253:12

258:22
259:10
260:9,10,15,
16,19 263:3,
4 264:12,15
268:13 269:1
270:25
274:17
275:25
296:16,25
299:3,9,10
302:4,17,25
303:1,5,9,
13,15,18
304:7,10,11,
16,17,18,22
305:1,16
306:3,15,21
307:16,24
309:24
311:19
312:2,21
314:13,17
315:3,13,16
317:11,24
319:25
321:6,8
336:7 338:9
339:15
340:9,10
341:20 347:4
**year's**
  140:12
  143:16 184:3
  229:16
**year-by-year**
  75:22
**year-end**
  240:12
**year-over-
year**
  302:12,22
**years**
  11:19 12:1,
  5,15 14:23
  16:11 26:12
  29:6,8 35:24
  39:8,11

42:17 47:17
50:6,8
58:22,23,25
62:11 68:10
69:3 73:20
74:1,3 81:16
88:18 93:24
98:18 107:10
132:14
135:12 138:2
142:12
152:25
158:6,10
159:2 170:8
192:13 195:3
213:24
214:1,8,25
215:2,25
216:3 221:3
237:21
239:14
242:5,8,24
245:11,12
249:9 250:14
252:18
253:8,10
258:24 261:8
262:25
266:13
275:3,5,11
296:2
298:13,23
308:25
310:6,17
312:21
318:18
320:14
321:9,11,12,
15,24 322:2,
12 323:12
346:24 347:8

**years'**
191:11

**York**
60:19
113:20,23
114:1,3,6
117:23

130:23

**Young**
176:11,12,
13,15,17,21,
24 177:1
180:24
181:4,11,15,
21

**YTD**
3:22

---

**Z**

---

**Zoom**
5:14 334:2