
444 West Lake Street | Suite 1650 | Chicago, IL 60606

*Phone:* **(312) 776-2558**

*Fax:* **(312) 264-5386**

*Email:* **paul.tzur@blankrome.com**

September 22, 2025

<u>**VIA EMAIL**</u>
Professor Maura R. Grossman, JD, PhD
229 Corrie Crescent
Waterloo, Ontario N2L 5W3
Canada
maura.grossman@uwaterloo.ca

> **RE:** ***A.F. Moore & Assocs., Inc. et al. v. Pappas et al.,***
> <u>**No. 18 CV 4888**</u>

Dear Professor Grossman:

We write on behalf of Plaintiffs Fox Valley/River Oaks Partnership and Simon Property Group (Delaware), Inc. (collectively, "Plaintiffs" or "Simon") in response to Defendants' letters to the Special Master dated September 11, 2025, and September 16, 2025.

The Defendants concede that the discovery disputes raised in their original motions to compel, Dkts. 488, 489, have since been mooted and are no longer live issues before the Special Master. That is why the Defendants no longer complain about *those issues* and have instead submitted *new letter briefs* about the affidavit submitted by Simon on September 8, 2025 (the "Affidavit"). In their letters, the Defendants claim that the Affidavit is "inadequate" and "fails to demonstrate that the plaintiffs have conducted a timely, comprehensive and reasonable search for documents responsive to defendants' discovery requests served in 2021." The Defendants have no legal basis to make this assertion and otherwise are factually wrong.

> **A.** **The Plaintiffs Worked to Respond to the Defendants' "Market Value" Discovery Requests in Good Faith.**

An explanation of the progression of discovery—which Defendants ignore in an effort to cast aspersions on the Plaintiffs—is important. The Plaintiffs served objections and responses to the Defendants' written discovery requests in late 2021 and early 2022, largely objecting to the sweeping nature of those requests— particularly the numerous requests related to "market value." Following briefing,

Judge Finnegan permitted this discovery, but explained, "[R]easonable minds could differ—and they do here—on whether the market value of the plaintiffs' subject properties is relevant or not. Dkt. 265 at 4-6; Dkt. 304.

The Plaintiffs appealed. In September 2023, while the appeal was pending, Simon retained undersigned counsel, with the goal of working with the Defendants to cut through the market value discovery disputes in a reasonable manner and move the case forward. To that end, the parties had numerous meet-and-confers in late 2023 into 2024, all designed to address the market value requests and provide updates about the documents that Simon would agree to search for and produce. *See* Dkt. 493 at 4 (explaining the parties' meet-and-confer history). The Plaintiffs believed that the parties were working through the disputes, which is what led the Plaintiffs to produce thousands of additional documents between late 2023 and late 2024.

The Defendants deliberately stalled to manufacture the urgency they are complaining about today. Critically, and as previously explained, the Defendants never once asked the Plaintiffs about the identities and numbers of custodians whose documents were being pulled, the search terms being run to identify potentially relevant documents, the shared sites where Simonm's employess might keep data, or the types of software used by various employees who touched River Oaks Mall in one way or the other. Moreover, the Defendants deliberately chose to wait until after the close of written discovery before deposing a single Simon Property witness. That is, the Defendants could have deposed Simon Property witnesses in 2023 and 2024— years before written discovery closed—and learned information about Simon Property's systems then. That Defendants made the strategic choice to wait cannot be held against the Plaintiffs today.

On March 19, 2025—years after undersigned counsel produced thousands of pages of fair market value discovery to the Defendants—Judge Tharp denied the Plaintiffs' motion for protective order. Dkt. 448. In light of the timing of the rulings by Judge Finnegan and Judge Tharp, the Defendants' suggestion that the Plaintiffs were withholding documents since 2021 is deliberately misleading; simply because information was searched for in 2021 does not mean the Plaintiffs were obligated to produce it at that time.

Moreover, the Defendants complaints go well beyond what they ever sought in written discovery when the written discovery period was open. As the County Defendants admit, the only one of their more than 170 requests for documents that even remotely seeks the information they are demanding now is Request 90. That request sought:

> Any and all documents and electronic information referencing or identifying any and all *quarterly valuations* or *asset management*

*appraisal valuations* relating in any way to the subject property at any point in time between January 1, 2002 and December 31, 2017.

Request 90 is limited in scope. As drafted by the Defendants, it only seeks information for "*quarterly valuations*" and "*asset management appraisal valuations*." The County Defendants now claim that they are entitled to all valuations performed by anyone at Simon Property, for any purpose, using any valuation method. They also now demand all source data for any such valuation. Such a demand is far from—has no relationship to—Request 90. The Defendants cannot broaden the scope of Request 90 or add to the written requests, as that window closed in June 2025, before the Defendants chose to take a single deposition. The Defendants cannot now use Request 90 as a backdoor to dozens of new document requests.

### B.     The Affidavit Is Not Deficient.

As explained below, the Affidavit, which contains 14 pages of information and addresses in detail each item requested by the Special Master, leaves no question that the Plaintiffs have conducted reasonable searches in response to Defendants' requests.

First, the Defendants claim the Affidavit is deficient because it does not contain certain information, such as "no explanation of email migration archives, backups or Iron Mountain retrieval" for certain custodians, and "no preservation account for Lotus Notes archives, departed custodians or the migration process." The Special Master, however, did not ask for the Affidavit to contain any such information. In any event, the Plaintiffs have already determined—and confirmed in the Affidavit—that these custodians do not have responsive documents in their Lotus Notes accounts. Many of the custodians left Simon years ago, so there is nothing surprising about this given the company retention policy (which was produced to the Defendants years ago).

Second, the Defendants point to systems and software that they say are not listed in the Affidavit but should have been searched (CTI, Yardi, JD Edwards, DYNA, SSLE, Guru, e-Property Tax, ENGIE, Intranet, Anaplan, and Access). For one, Simon *did* search and produce documents from CTI—that is one of the noncustodial sources listed in Exhibit 2 to the Affidavit. With respect to e-Property Tax, that was simply the prior name of the software that is now called OneSource, which was also searched.

As for the other systems, the Defendants contend that these contain information about property tax expenses, budgets, rents, leases, and capital expenditures, but they fail to identify what information these systems contain that the Defendants have not already received in discovery through the other sources

produced. They also never once try to explain how these new requests fit under Reuqest 90 or any other written document request properly served before the written discovery deadline. They do not, because they cannot. These are new, untimely requests.

Rule 26 requires that discovery be proportional to the needs of the case, and that limitations can be implemented for discovery that is "unreasonably cumulative or duplicative." Fed. R. Civ. P. 26(b)(1), (2)(C)(i). The Plaintiffs have produced thousands of documents with information about River Oaks property tax expenses, budgets, rents, leases, and capital expenditures, and "[t]he Federal Rules of Civil Procedure do not require perfection or guarantee that every possible responsive document will be found and/or produced." *Edwards v. Scripps Media, Inc.*, 331 F.R.D. 116, 124 (E.D. Mich. 2019).

To illustrate the absurdity of Defendants' position, ENGIE is a third-party vendor that Simon uses to pay utility bills. The Defendants now claim that Simon should have produced all of the utility bills from ENGIE, even though the Defendants never requested those in discovery, and the documents have no relevance. Similarly, the Defendants point to the Intranet as having "companywide policies and procedures," but they do not explain the relevance of any those policies, let alone that they never requested any company policies other than Simon's current and former document retention policies, which were produced in December 2021.

Third, the Defendants list several departments within Simon that they say were not searched but should have been. As a threshold point, the Affidavit states that the M:Drive is a company-wide drive that would have covered all departments. The focus of the M:Drive search was for valuation documents, and the Plaintiffs did not limit that search to particular departments. Nevertheless, the Defendants list, for example, the Development, Real Estate Tax,[1] Legal, and Procurement departments as not having been searched, even though the Affidavit identifies all of those departments as having custodial and/or noncustodial sources that were searched. Indeed, Simon employee Jodi Calisto testified to these exact ppints in her deposition on September 9, 2025; the Defendants are deliberately ignoring that testimony. Additionally, Cash Receipts and Accounts Receivable fall under Financial Operations, which was searched, and Energy Services falls under Property Management, which was searched. And Short-Term Leasing and Long-Term Leasing are not their own departments, but Leasing was searched.

Telling, the Defendants do not explain why any additional departments need to be searched or would have relevant information—let alone information that is not

---

[1] The Defendants' September 11 letter refers to "Real Estate Tax" instead of the correct name "Property Tax."

duplicative of what the Defendants have already received in discovery. *E.g.*, *Maenza v. Uchicago Argonne LLC*, 2019 WL 13276114, at *2 (N.D. Ill. May 15, 2019) ("Plaintiff's unfettered and unfocused request to search email accounts of 3,200 employees for possible reference to the Plaintiff is simply inconsistent with the proportionality balancing that Rule 26 requires. This is especially true as Defendant has already produced non-privileged emails of three patently relevant custodians as well as Plaintiff's own emails."); *see also Arconic Inc. v. Novelis Inc.*, 2020 WL 9459169, at *6 (W.D. Pa. Feb. 14, 2020) ("There is no requirement that any party search the files of every single employee with relevant knowledge." (citing *Enslin v. Coca-Cola Co.*, 2016 WL 7013508, at *1 n.2 (E.D. Pa. May 13, 2016) (the party advancing the inclusion of additional custodians must "articulate [a] basis to believe that . . . they would be in possession of additional non-cumulative responsive information."))).

Indeed, the Defendants have taken the (erroneous) position in meet-and-confers and at depositions that Plaintiffs have "no damages" because Simon's internal documents defeat any entitlement to a refund. If the Defendants truly believe that, then they have all the discovery they need.

## C.     The Defendants Misrepresent Ken Brown's Testimony.

In their September 16 letter, the Defendants make a series of claims relating to the U:Drive and the testimony of Simon mall manager Ken Brown. The Defendants' assertion that "data relevant to this lawsuit was not adequately preserved and has been destroyed" is unfounded because they do not (and cannot) point to any category of information sought in discovery that the Plaintiffs have not produced.

First, the Defendants erroneously state that the U:Drive is a "non-custodial data source" that was never searched. The U:Drive, however, was a custodial source accessible only by a given user, not a noncustodial source. The Affidavit identifies the U:Drive as a custodial source that was searched for Frank Lima and Lisa Clements, both of whom left Simon in early 2009. Simon stopped using the U:Drive after migrating to Microsoft OneDrive in 2022; the company-wide migration process began in January 2022 and the transition was completed in July 2022. As stated in the Affidavit, the OneDrive files of Michael Larson and Juan Paz, who hold similar roles to those previously held by Mr. Lima and Ms. Clements, respectively, were also searched. The Defendants provide no basis for claiming that the U:Drive has not been searched, or that additional searches are warranted.

Second, the Defendants misrepresent Ken Brown's testimony regarding the migration of data from the U:Drive to OneDrive. Mr. Brown was the manager of River Oaks Mall from June 2007 to June 2010. He testified that during the migration

process from U:Drive to OneDrive—which occurred more than 10 years after his time at River Oaks—he and other field employees in the Property Management department "chose what was supposed to be migrated from the U drive over to OneDrive." Brown Tr. at 28:6-20. Mr. Brown explained that his U:Drive was "not property specific" but was instead a larger set of documents that he had gathered over the years in his various roles. *Id.* at 271:6-14.

With respect to River Oaks, he said his U:Drive files "likely" contained PowerPoints that he would have presented to his bosses with maps of the mall showing "what part of the property we were going to pave, what part of the property we were doing improvements on, traffic plans. Those type of things." *Id.* at 31:14-32:3. He said the PowerPoints and other files related to River Oaks "possibly" included information about capital expenditures, and "may" have contained information about leases and income and expense information, but he did not believe the files contained anything about property taxes on River Oaks or valuations of River Oaks. *Id.* at 32:4-17, 34:11-22, 270:11-14.

As Mr. Brown explained, "Most of what I would have migrated over were things that—things that happened at other properties that I might run into in the future, whether it's—just out of the ordinary situations that I would have run into from an operations standpoint and what we did to address it, or, like I said, personal pictures and those type of things, awards." *Id.* at 270:20-271:5. Mr. Brown did not know about this lawsuit until approximately two months ago, when he found out he was going to be deposed. *Id.* at 79:5-8. He knew nothing about any valuations of River Oaks or the tax appeal process related to River Oaks. *Id.* at 70:5-72:9. In fact, Mr. Brown was not even responsible for budgeting for property tax expenses at River Oaks. *Id.* at 100.

That certain data may not have been retained in the migration from the U:Drive to OneDrive does not mean that the Defendants are now missing critical categories of information about River Oaks. Again, the Plaintiffs produced the documents actually requested by the Defendants in their timely written requests for production: thousands of documents related to capital expenditures, leases, income and expense information, property taxes, and valuations. *See, e.g.*, *Craigville Tel. Co. v. T-Mobile USA, Inc.*, 2023 WL 12016210, at \*2 (N.D. Ill. June 27, 2023) (where requesting parties "already ha[d] a good deal of information about" a particular issue, they did not need responding party "to identify everyone who knew anything about [that issue], who they communicated with, and what they said" because there was "no indication . . . that expanding the search for information in this way will provide any material insight into [that issue] beyond what [the requesting parties] already know" (citing *Vakharia v. Swedish Covenant Hosp.*, 1994 WL 75055, at \*2 (N.D. Ill. 1994) ("The discovery rules are not a ticket to an unlimited, never-ending exploration

of every conceivable matter that captures an attorney's interest. Parties are entitled to a reasonable opportunity to investigate the facts—and no more.")")).

Lastly, while the Defendants cite Request for Production No. 129 ("Any and all documents, electronic information or other materials sent to or received from a property manager for the subject property at any point in time between January 1, 2002 and December 31, 2017 relating to a lease, vacancy or the value of the subject property") in support of their arguments, they conveniently leave out that the Plaintiffs objected to this request at all times. During the parties' meet-and-confers about this request in late 2023, the Defendants acknowledged that the request was extremely broad and agreed to limit the scope of the request to "asset management reports," which Simon does not possess. The Defendants cannot now walk back the parties' meet-and-confer agreements and claim that their original request stands and that the Plaintiffs' response is deficient.[2]

### D.   The Defendants Manufactured Claims of Prejudice.

As previously briefed, the Defendants chose not to take depositions until July 2025, during which they asked questions about Simon repositories and demanded that the Plaintiffs conduct supplemental searches. The Plaintiffs conducted those supplemental searches in good faith and have produced thousands of additional documents. The Defendants also demanded that 12 additional custodians be searched, and the Plaintiffs agreed to that as well, and agreed to search risk management files related to property insurance, even though no such request was ever made in written discovery.

Yet, the Defendants claim that the Plaintiffs' discovery efforts remain deficient and that more searches and productions need to occur, while at the same time complaining that the supplemental documents the Plaintiffs have produced make it "impossible" for the Defendants to comply with the schedule.

The Defendants seem intent on placing the Plaintiffs in a Catch-22—if the Plaintiffs do not search for and produce certain documents, they are accused of violating their discovery obligations, but if they do produce the documents, they are accused of document dumps. The Plaintiffs conducted additional searches and produced additional documents in a good-faith effort to resolve any discovery disputes as quickly as possible and avoid what would otherwise have been a months' long fight

---

[2] The Defendants also misleadingly state that the predecessor and successor managers to Mr. Brown (Dennis Gilliam and John Campbell) were not searched as custodians, while ignoring that the Plaintiffs identified their list of custodians on August 18, 2025, gave the Defendants the opportunity to request additional custodians, and agreed to search 12 additional custodians requested by the Defendants (which did not include Mr. Gilliam or Mr. Campbell).

over motions to compel. All told, the Plaintiffs have worked very efficiently to collect, review, and produce thousands of additional documents requested by the Defendants. The Defendants do not meaningfully explain why their collective team of over 10 people cannot review these documents over the next two-and-a-half months as they prepare their expert reports due on December 1, 2025. The Defendants' goal appears to be to continue to demand documents,[3] and then use any such document "deficiencies" or supplemental productions as a basis to argue that the schedule cannot be met. That is a patently unfair approach to litigating a case.

As for the Defendants' requests for updated written responses and an updated privilege log, the Plaintiffs intend to serve the updated written responses by September 26, 2025. As for the privilege log, the Plaintiffs do not agree that the privilege disputes pending before the Special Master cannot be addressed until the Plaintiffs serve an updated log. To the contrary, the Plaintiffs will be guided by the Special Master's rulings in determining whether they can continue to maintain privilege over certain documents. For efficiency's sake, the Plaintiffs propose that they wait to update their privilege log pending those rulings, and then serve an updated log within a certain time thereafter.

**E.     The Defendants Are Not Entitled to the 2021 Search Methodologies.**

Finally, there is no basis for the Defendants' request for additional details of the searches performed in 2021 beyond what the Special Master ordered to be produced in the Affidavit. That is classic "discovery on discovery," which the Plaintiffs have already provided through the Affidavit, and for which any further discovery would be violative of the policy in this District. *E.g., LKQ Corp. v. Kia Motors Am., Inc.*, 345 F.R.D. 152, 156 (N.D. Ill. 2023) (Parties "generally they do not need a deep dive into the collection, review, and processing methodology of their opponent. If second-guessing was the norm, the whole discovery system would break down into an endless barrage of motions based on mistrust about the opponent's production.").

There is also no "major red flag" concerning the custodians for whom no responsive documents were located. Frank Lima and Lisa Clements both left Simon in early 2009, twelve years before the Defendants' discovery requests were even served. Similarly, Karen Couch left Simon in 2011. As for Rod Vosper and Donna

---

[3] By way of further example, the Defendants have sent a letter after every deposition with a new list of document demands, including three letters sent on September 18 and 19 alone. These requests all are untimely, as the written discovery period closed in June 2025.

Vosper, neither of them was a member of the Property Tax department or responsible for tax appeals, and they both left Simon in 2017 and 2020, respectively.

\* \* \*

We look forward to addressing these matters further at the upcoming conference on September 23, 2025.

Respectfully submitted,

*s/ Paul H. Tzur*

Paul H. Tzur

cc:     All counsel of record